**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **ROWENA SIMMONS,** *et al.*, | * | |
| **Plaintiffs,** | * | |
| v. | * | Civil Action No. RDB-21-0969 |
| **BALTIMORE CITY POLICE** | * | |
| **DEPARTMENT,** *et al.*, | * | |
| **Defendants.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

On March 21, 2020, Baltimore City Police Officers engaged in a vehicular chase through the streets of Baltimore City, in which the suspect ultimately struck another vehicle, killing the driver, Darius Gore, and seriously injuring his passenger, Gary Tyson. On April 19, 2021 Plaintiffs Rowena Simmons, individually and on behalf of the Estate of Darius Gore, and Gary Tyson (collectively, "Plaintiffs") filed a twelve-count Complaint against Defendants Baltimore City Police Department ("BPD") and the officers involved in the pursuit, Felix Torres ("Torres"), Johnta Gray ("Gray"), and Zachary Franks ("Franks") (collectively, the "Officer Defendants"). (ECF No. 1.) The BPD now seeks dismissal of all but one of the claims against it. (ECF No. 23.) Officer Defendants seek dismissal of all claims against them. (ECF No. 29.) For the reasons that follow, the BPD's Motion to Dismiss (ECF No. 23) will be GRANTED, and all claims against it will be dismissed with the exception of an indemnification claim set forth in Count XII. The Officer Defendants' Motion to Dismiss (ECF No. 29) will be GRANTED IN PART and DENIED IN PART. Specifically, it is

GRANTED with respect to the simple negligence claim in Count V and the battery claim in Count VII, and those counts are DISMISSED WITH PREJUDICE.  It is DENIED with respect to the other claims against the individual Officer Defendants.

## BACKGROUND

In ruling on a motion to dismiss, this Court "accept[s] as true all well-pleaded facts in a complaint and construe[s] them in the light most favorable to the plaintiff." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (citing *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015)).

### A.  The Parties

Plaintiff Rowenna Simmons ("Simmons") is a resident of Baltimore, Maryland and the mother of Darius Gore, who was killed at age twenty-nine after being struck by a vehicle fleeing a police pursuit.  (ECF No. 1 ¶¶ 5,6.)  Gary Tyson ("Tyson") was in the car with Gore when Gore's car was struck and suffered significant injuries from the collision.  (*Id.* ¶ 7.) Simmons, on behalf of herself and the Estate of Gore, and Tyson filed this lawsuit on April 19, 2021.[1]

The Baltimore City Police Department ("BPD") is a government agency of the State of Maryland.  (ECF No. ¶ 10.)  At all times relevant to the Plaintiffs' Complaint, Defendants Felix Torres ("Torres"), Johnta Gray ("Gray"), and Zachary Franks ("Franks") were each employed as police officers for the BPD.  (*Id.* ¶¶ 11-13.)  The Plaintiffs are suing each of the Officer Defendants in their individual and official capacities.  (*Id.*)

---

[1] The Plaintiffs note that Raymond B. Hinton, the biological father of Decedent Gore, may be entitled by law to claim damages as a result of his son's death.  (*Id.* ¶ 9.)  They allege that they made a good faith and reasonable effort to identify, locate, and name any "Use Plaintiffs" such as Mr. Hinton.  (*Id.*)  Plaintiffs' undersigned counsel does not, however, represent Mr. Hinton.  (*Id.*)

### B.  Baltimore City Police Department Pursuit Policies

From 1990 to sometime in 2012, General Order 11-90[2] dictated the BPD's procedures regarding police vehicle pursuits.  (ECF No. 1 ¶ 17.)   General Order 11-90 specifically prohibited officers from engaging in high-speed pursuits unless there were "exigent circumstances."  (*Id.*)  "Exigent circumstances" were limited to circumstances where (1) the officer determined that immediate action was necessary; (2) insufficient time existed to resort to other alternatives; and (3) failure to pursue resulted in grave injury or death."  (*Id.*)  General Order 11-90 also prohibited officers from exceeding the speed limit if doing so would endanger the life or property of others.  (*Id.*)  When an officer did exceed the speed limit, such officer could not exceed it by more than ten miles per hour.  (*Id.*)  Additionally, General Order 11-90 stated that Baltimore City is a "highly congested urban area which necessitates driving motor vehicles in a safe manner."  (*Id.* ¶ 18.)  It required officers to use their emergency lights and sirens and to stop at intersections before proceeding.  (*Id.*)  The Plaintiffs put forth allegations that training with respect to General Order 11-90 was minimal.[3]

Plaintiffs allege that sometime after 2012, General Order 11-90 was replaced by Policy 1503, entitled "Emergency Vehicle Operation and Pursuit Policy."  (*Id.* ¶ 21.)  As the BPD explains, Policy 1503 was adopted on November 24, 2019 pursuant to the policies of a

---

[2] On a motion to dismiss, a court may take judicial notice of matters of public record.  *See Brennan v. Deluxe Corp.*, 361 F. Supp. 3d 494, 501 (4th Cir. 2019) (citing *Phillips v. Pitt Cty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)).  Both General Order 11-90 and Policy 1503, discussed *infra*, are public records of which this Court will take judicial notice.

[3] Specifically, the Plaintiffs put forth testimony of Officer Timothy E. Beall, who stated that he was provided with little training on General 11-90 and police vehicular pursuits. (ECF No. 1 ¶ 19.)  Beall could recall practicing high speed driving on wet roads at a training facility, but he could not recall how fast he was instructed to drive, how long such training lasted, or otherwise describe the training he received with respect to General 11-90's policies.  (*Id.*)  He suggested that despite any language in General Order 11-90 instructing pursuits to be limited to cases involving "exigent circumstances," supervisors routinely instructed officers to pursue vehicles and continue pursuits even if such circumstances violated the General Order.  (*Id.* ¶ 20.)

Consent Decree[4] entered by this Court on April 7, 2017. *See United States v. Baltimore Police Dep't*, No. JKB-17-0099, 249 F. Supp. 3d 816 (D. Md. 2017). The Consent Decree was the result of a complaint filed by the United States against the BPD and the Mayor and City Council of Baltimore City on January 12, 2017, in which the United States alleged that the defendants had engaged in a pattern and practice of conduct by law enforcement officers that deprived persons of rights, privileges, and immunities secured and protected by the Constitution and laws of the United States. *Id.* at 817. The same day the United States filed its complaint, the parties jointly filed a motion seeking entry of a consent decree to resolve the litigation and reform the BPD such that police services would be "delivered to the people of Baltimore in a manner that complies with the Constitution and laws of the United States, promotes public and officer safety, and improves public confidence in the law." *Id.*

The 227-page Consent Decree (JKB-17-0099, ECF No. 2-2), now monitored by this Court, provided that the BPD would develop its policies and procedures in areas such as "Use of Force" in a collaborative process involving the United States Department of Justice ("DOJ") and an "Independent Monitor," a team of individuals with expertise in policing, civil rights, monitoring, data analysis, project management, and related areas, as well as local expertise and expertise with the diverse communities of Baltimore. The Consent Decree now in place states that the "BPD agrees to re-review each new or revised policy or procedure that relates to the Material Requirements of this Agreement after it has been in effect for a year and before 18 months to ensure it provides clear guidance to officers and is consistent with

---

[4] "A 'consent decree' is a court order that embodies the terms agreed upon by the parties as a compromise to litigation. Thus, consent decrees are akin to contracts but also function as enforceable judicial orders." *See Chisolm ex rel. CC v. Greenstein*, 876 F. Supp. 2d 709, 712-13 (E.D. La. June 27, 2012) (citing *United States v. Chromalloy Am. Corp.*, 158 F.3d 345, 349-50 (5th Cir. 1998)).

this Agreement and current law," and orders that revisions are subject to public comment and collaborative process.  (JKB-17-0099, ECF No. 2-2 ¶¶ 287, 283, 285.)  Specifically, after a set "Collaboration Period," the BPD is required to post any new or revised policy on its website and provide the public and its officers with an opportunity to comment within a 30-day period. (*Id.* ¶ 285.)  Defendant BPD asserts that Policy 1503 was subject to the Consent Decree's review and revision process and was enacted in collaboration with the DOJ and the Independent Monitor in 2019.  (ECF No. 23-1 at 6, 18.)  The BPD asserts that the Plaintiffs will have the opportunity to propose any changes to Policy 1503 during the next comment period.  (*Id.*)

A copy of Policy 1503, a public record, was provided to this Court as an attachment to the BPD's Motion to Dismiss.  (ECF No. 23-2.)  At the top of the first page, the Policy clearly states that it was published on November 24, 2019, well before the accident of March 21, 2020 giving rise to this case.  (*Id.*)  The twelve-page document includes "Core Principles" and specific "Directives" and "Required Actions."  (*Id.*)  One of the Core Principles included in the Policy is title "Sanctity of Human Life."  (*Id.* at 1 ¶ 2.)  The Policy states: "Members shall make every effort to preserve human life in all situations."  (*Id.*)  Another Core Principle is "Sound Judgment and Discretion."  The principle states:

> The BPD recognizes it is better to allow a suspect to temporarily escape apprehension than to jeopardize anyone's safety in a Vehicle Pursuit.  No member shall be criticized or disciplined for a decision not to engage in a Vehicle Pursuit or to terminate an ongoing Vehicle Pursuit based on the risk involved, even in circumstances where this policy would permit the commencement or continuation of a pursuit.

(*Id.* at 2 ¶ 13.)

Having stated these and other Core Principles, Policy 1503 goes on to provide certain

"Directives" to officers.  The first set of Directives addresses driving in "Emergency Response Mode."  (*Id.* at 3-4.)  For example, officers may only begin driving in Emergency Response Mode if they are in a vehicle equipped with emergency lights and sirens.  (*Id.* at 3 ¶ 1.)  The Policy explicitly instructs officers to consider certain factors before engaging in a pursuit, including: (1) the nature and seriousness of the offense or the call for service; (2) current road or environmental conditions; (3) familiarity with the route and destination; and (4) pedestrian and vehicular density.  (*Id.* at 3 ¶ 3.)  The Policy permits officers to exceed the speed limit, "so long as members do not endanger life or property."  (*Id.* at 3 ¶ 6.)  It also allows them to "[p]roceed through a red light or stop signal, a stop sign, or a yield sign, but only after slowing down as necessary for safety."  (*Id.*)  Further, officers are permitted to disregard regulations governing turning or movement in a specified direction.  (*Id.*)

The second set of Directives is entitled "Vehicle Pursuit Authorization."  (*Id.* at 4.)  In that section, Policy 1503 specifically instructs that officers may pursue an "eluding vehicle" (defined as a vehicle in which the driver increases speed, takes evasive action, and/or refuses to stop despite a member's signaling to stop) when (1) "[t]he vehicle contains a felony suspect and failure to immediately apprehend poses an immediate threat of death or serious bodily injury to the member or others;" and (2) "[b]efore the pursuit is initiated, there exists probable cause to believe the fleeing suspect committed a felony which resulted, or could have resulted, in death or serious bodily injury."  (*Id.* at 4 ¶ 1.)  This section also provides a list of factors "that shall be considered, both individually and collectively, when deciding to initiate or continue a pursuit," and include, *inter alia*:

> (1) The safety of the public, including: the type of area, such as a school zone; time of day and lighting; weather, road conditions, and density of vehicular

and pedestrian traffic; and the speed of the pursuit relative to these factors;

(2) The pursuing members' familiarity with the area of the pursuit, the quality of radio communications between the pursuing vehicles and dispatchers/supervisors, and the driving capabilities of the pursuing member(s) under the conditions of the pursuit;

(3) Whether or not the identity of the suspect has been verified;

(4) The availability of other resources, such as air support assistance; and

(5) The likelihood of apprehension at a different time.

(*Id.* at 4 ¶ 2.)  The Policy specifically instructs that "[u]pon notification that a pursuit has been initiated, supervisors shall at their discretion approve or disapprove the continuation of the pursuit, and may direct additional units to join the pursuit."  (*Id.* at 4 ¶ 3.)

The third set of Directives covers "Vehicle Pursuit Prohibitions."  (*Id.* at 4-5.)  The section prohibits officers from initiating a pursuit under certain conditions.  For example, it instructs that officers should not initiate a pursuit when (1) transporting passengers other than on-duty police officers; (2) the initial violation is a crime against property (including auto theft), misdemeanor, a traffic offense without imminent danger, or is a non-violent warrant; and (3) the risk of the pursuit outweighs the need to stop the eluding driver.  (*Id.* at 4-5 ¶¶1-4.)  The types of risks an officer is directed to consider include the underlying reason for the pursuit, traffic conditions, weather conditions, speed and capabilities of the eluding vehicle, and geographic conditions such as the direction of travel, location density, and terrain.  (*Id.*)

The fourth set of Directives is entitled "Vehicle Pursuit Considerations" and addresses the types of considerations officers must take into account when making decisions about how to conduct their pursuit once initiated.  (*Id.* at 5.)  Many of the same factors which influence an officer's decision to initiate a pursuit should also dictate how that officer carries out the pursuit: officers should consider whether specific driving tactics are appropriate in light of the road conditions, their familiarity with the area, the population density of the area, traffic, etc.

(*Id.* at 5 ¶ 1.)  They are instructed to space themselves from other "involved vehicles" such that they can see and avoid hazards and react safely to unusual maneuvers by any vehicle involved in the pursuit.  (*Id.* at 5 ¶ 2.)  They are further instructed to slow down near intersections and are prohibited from pursing a vehicle driving the wrong direction on a roadway or passing other pursuing vehicles unless requested to do so.  (*Id.* at 5 ¶¶ 3-5.)

The ninth set of Directives covers "Terminating a Pursuit."  (*Id.* at 7-8.)  It instructs officers that they must terminate a pursuit if ordered to do so by a supervisor.  (*Id.* at 7 ¶ 1.) The Policy explicitly states that "[m]embers may terminate a pursuit when the pursing member believes that the danger to the member(s) or the public outweighs the necessity for immediate apprehension of the Eluding Driver, even if not directed to terminate the pursuit."  (*Id.* at 7 ¶ 2.)  The factors that "shall be considered" when making a decision as to whether an officer should terminate a pursuit include: (1) if someone is injured during the pursuit and there are no personnel able to render immediate assistance; (2) the distance between the pursuing vehicle and eluding vehicle is so great that further pursuit would be futile or would require the pursuit to continue for an unreasonable time or distance; (3) the eluding vehicle's location is no longer definitively known; (4) the pursuing vehicle sustains damage or a mechanical failure that renders it unsafe to drive; (5) the pursuing vehicle's emergency lights or sirens become inoperable; (6) the identity of the eluding driver becomes known and it does not reasonably appear that the safety needs for immediate capture outweigh the risks associated with continuing the pursuit; and (7) when pursuit requires that the members drive in a manner which exceeds the performance capabilities of the pursuing vehicle or the drivers.  (*Id.* at 7-8 ¶ 3.)

The other sets of Directives discuss the responsibilities of the Primary Unit engaged in a pursuit and the Secondary Unit which follows behind to serve as backup, tactics for ending a pursuit, instructions related to the use of firearms and air support assistance, reporting requirements, and inter-jurisdictional concerns.  (*Id.* at 5-10.)  The final section of the Policy includes "Required Actions," and specifically orders the "first-line supervisors of the Primary Unit" engaged in the pursuit to activate body-worn cameras, exercise management control over the pursuit, direct that the suit be terminated at any time, determine whether the pursuit violates Policy 1503, and determine whether injury to officers or others outweighs the danger that the eluding driver will injure or kill someone if not immediately apprehended.  (*Id.* at 10 ¶ 4.)

Overall, the Plaintiffs allege that Policy 1503 provides more discretion to police officers than General Order 11-90 and does not contain the express prohibitions contained in General Order 11-90.  (ECF No. 1 ¶ 30.)  They assert that the Policy provides such discretion in a manner that is contrary to the national "and necessary" trend of implementing stricter policies for pursuits.  (*Id.*)  They note that the factors outlined in the Policy regarding whether a pursuit should be terminated are "merely considerations that provide no definitive rules regarding whether a pursuit is permitted."  (*Id.*)

## C.  BPD's Alleged Notice of Violations

The Plaintiffs allege that the BPD has been sued multiple times for injuries and deaths arising from police pursuits that ended up killing innocent bystanders, putting it on actual notice of a pattern and practice of officers' use of excessive force in the context of vehicular pursuits, substantive due process rights violations, and/or other Constitutional violations

and/or violating the BPD's pursuit policies. (*Id.* ¶ 31.) They provide a list of cases that have been filed against the BPD within the last ten years alleging substantive due process rights violations, and/or other constitutional violations, and/or violation of BPD's pursuit general order or policies resulting in serious injuries. (*Id.*)

The Plaintiffs also note that since 2015, all local law enforcement agencies have been required to provide annual comprehensive reports to the Governor of Maryland that identify and analyze deaths that have occurred as a result of actions or omissions of a police officer, including from pursuits. (*Id.* ¶ 32 (citing Maryland Statistical Analysis Center, Governor's Office of Crime Control & Prevention, *Reports to the State of Maryland under HB 954* (2015-2019), http://goccp.maryland.gov/reports-publications/law-enforcement-reports/deaths-involving-law-enforcement/ (last visited Aug. 3, 2021).)[5] The reports show that at least thirty Maryland citizens were killed by police pursuits, including seven innocent bystanders between 2015 and 2019. (*Id.*) Five of those individuals were killed as a direct result of pursuits by the BPD. (*Id.*) The reports do not include data related to injuries, rather than deaths. (*Id.* ¶ 33.)

### D. March 21, 2020 Incident

On the evening of Saturday March 21, 2020, the three BPD Officer Defendants Torres, Gray, and Franks were notified by the BPD that a GPS device located on a stolen 2014 Ford Fusion indicated that the vehicle was in the 2600 block of W. Patapsco Avenue, which is located in the Southwestern section of Baltimore City. (*Id.* ¶ 38.) The Officer Defendants were provided with the vehicle's description, and license plate number, and they were told that

---

[5] Again, this Court notes that it may take judicial notice of matters of public record. *See Brennan*, 361 F. Supp. 3d at 501 (4th Cir. 2019) (internal citation omitted).

the car was *not* the subject of a carjacking.  (*Id.*)  According to the Plaintiffs, the car was taken after the owner had left the keys inside.  (*Id.*)  The Officer Defenders were told that the car was stopped and had not moved for some time.  (*Id.* ¶ 39.)  A police helicopter was also summoned to locate the vehicle.  (*Id.* ¶ 40.)

Defendant Torres arrived at 2650 W. Patapsco Avenue, observed the summoned helicopter flying overhead, and noticed a person in the driver's seat of the missing 2014 Ford Fusion.  (*Id.* ¶ 41.)  That individual is now known to be Delissa Ann Dello-Stritto ("Dello-Stritto").  (*Id.*)  Torres parked his vehicle behind the Ford Fusion, and Gray and Franks then parked on the other two sides of the vehicle, attempting to prevent Dello-Stritto from moving. (*Id.*)  Nevertheless, Dello-Stritto proceeded to back up, strike Gray's vehicle, and flee westbound on Patapsco Avenue.  (*Id.*)  All three Officer Defendants pursued Dello-Stritto for eleven miles through Baltimore City.  (*Id.* ¶ 42.)  This pursuit lasted more than six minutes, and at times, the vehicles involved exceeded speeds of ninety miles per hour.  (*Id.* ¶ 44.)  The Plaintiffs allege that the pursuit traveled through areas where civilians were located, passing three schools and one hospital.  (*Id.*)  They allege that Dello-Stritto made U-turns, blew through at least three stop signs on busy streets, and took the officers through more than fifty intersections and down narrow residential streets.  (*Id.*)  The Plaintiffs also assert that visibility was lower at the time of the pursuit given it was Saturday evening around dusk.  (*Id.* ¶ 45.)

Throughout the pursuit, a helicopter was flying overhead and was allegedly communicating the location of the Ford Fusion to the Officer Defendants.  (*Id.* ¶ 46.) Throughout the pursuit, the GPS device in the Ford Fusion was also providing the location of the eluding vehicle.  (*Id.* ¶ 48.)  The Plaintiffs allege that at no time the helicopter crew

advised the Officer Defendants as to traffic congestion, road hazards, or any other pertinent information which could have led them to consider terminating the pursuit.  (*Id.* ¶ 46.)  The helicopter crew never advised them of the excessive speed of the pursuit or that Dello-Stritto was ignoring stop signs.  (*Id.*)  The helicopter crew never recommended that the Officer Defendants terminate the pursuit.  (*Id.*)  At no time did a supervisor make such recommendation either.  (*Id.* ¶ 47.)

After more than six minutes of evasive driving, Dello-Stritto reached the intersection of Liberty Heights and Callaway Avenue.  (*Id.* ¶ 50.)  As she reached the intersection, she ignored the red light and t-boned Gore's car on the passenger side, causing it to spin several times and then hit another car that was in the intersection.  (*Id.*)  An eyewitness to the crash allegedly stated that at least five police vehicles were pursuing the Ford Fusion at the time of the collision.  (*Id.* ¶ 51.)

Tyson's injuries from the crash included a broken tibia, two broken ribs, bruising on his lung, and pooling blood between his chest wall and lungs on his right side.  (*Id.* ¶ 52.)  He was taken to the hospital for his injuries and required extensive treatment and subsequent physical therapy.  (*Id.*)  When first responders arrived on the scene, Gore was unresponsive and was bleeding from his right ear.  (*Id.* ¶ 53.)  It was determined that he had suffered a severe brain injury and had a Glasgow Coma Scale of 3.  (*Id.*)  He was covered with bruises and cuts. (*Id.*)  At the hospital Gore was diagnosed with a fracture of one of the vertebrae in his neck and an acute brain bleed.  (*Id.* ¶ 54.)  Gore underwent surgery when blood flow to his brain became obstructed, but the lack of blood continued and swelling increased.  (*Id.*)  He remained in a coma until his condition declined and he went into cardiac arrest.  (*Id.*)  He was

pronounced dead on April 17, 2020.  (*Id.*)  Due to the ongoing COVID-19 pandemic, Gore's family was unable to visit him in the hospital.  (*Id.* ¶ 55.)

### E.  Procedural Background

The Plaintiffs allege that as a direct and proximate result of the Defendants' actions or omissions, Decedent Gore was killed and Plaintiff Tyson sustained significant injuries.  (*Id.* ¶ 56.)  They allege that Gore and Tyson had conscious pain and suffering, and that Gore's mother has suffered and will continue to suffer from mental anguish, emotional pain and suffering, loss of society, loss of comfort, loss of protection, loss of filial care, loss of attention, and loss of services.  (*Id.* ¶ 57.)  Gore's mother also allegedly incurred medical and legal expenses and other damages.  (*Id.*)

Simmons and Tysons filed the operative twelve-count Complaint against the BPD and the Officer Defendants on April 19, 2021.  (ECF No. 1.)  Count I of the Complaint alleges due process violations against the Officer Defendants under of 42 U.S.C. § 1983.  (*Id.* ¶¶ 58-70.)  They allege that their use of force was intentional, excessive, unconstitutional, unlawful, objectively unreasonable and absent of any lawful justification or excuse.  (*Id.* ¶ 64.)  In Count II, the Plaintiffs allege the BPD is liable under Section 1983 due to its adoption of Policy 1503, which they assert unconstitutionally allows officers to use force that far exceeds what is reasonable, necessary, and proportional to respond to a threat.  (*Id.* ¶¶ 71-89.)  Count III alleges that the BPD is further liable under Section 1983 due to its unconstitutional custom, pattern, and/or practice of failing to train and supervise its officers regarding police pursuits.[6]  (*Id.* ¶¶

---

[6] As discussed *infra*, Counts II and III of the Complaint allege claims pursuant to *Monell v. Department of Social Services*, in which the U.S. Supreme Court determined that local governmental bodies may be liable under Section 1983 based on the unconstitutional conduct of individual defendants if those defendants were executing an official policy or custom of the local government when they violated a plaintiff's rights.  436 U.S. 658, 690 (1978).

90-106.)  In Count IV, the Plaintiffs allege that the Officer Defendants violated the Maryland Declaration of Rights Article 24, which prohibits the deprivation of life, liberty, and property. (*Id.* ¶¶ 107-20.)  Counts V, VI, and VII allege negligence, gross negligence, and battery under Maryland law against the Officer Defendants.  (*Id.* ¶¶ 121-48.)  Count VIII alleges negligent hiring, training, and supervision under Maryland law against the BPD.  (*Id.* ¶¶ 149-62.)  In Count IX Plaintiff Simmons alleges wrongful death under Maryland law against both the BPD and the Officer Defendants.  (*Id.* ¶¶ 163-69.)  Count X is survival action brought solely by the Estate of Darius Gore against all Defendants.  (*Id.* ¶¶ 170-75.)  In Count XI the Plaintiffs seek injunctive relief against the BPD, asking this Court to enter an order modifying Policy 1503 to significantly restrict the circumstances in which a police officer may pursue a fleeing vehicle, limiting those circumstances to those that involve a violent felony and an imminent threat to citizens; imposing a maximum pursuit speed in the City; ordering the BPD to increase training of police officers in pursuits; increasing supervisory requirements during a pursuit; and modifying Policy 1503 to remove an officer's personal discretion to engage in a pursuit.  (*Id.* ¶¶ 176-80.)  Finally, Count XII asserts a claim for indemnification against the BPD for the actions of the Officer Defendants.  (*Id.* ¶¶ 181-84.)

On June 9, 2021, the BPD filed a Motion to Dismiss (ECF No. 23) seeking dismissal "of all counts against it" pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  The Motion does not, however, address the Plaintiffs' claim for indemnification in Count XII.  The BPD contends that Counts II and III fail to state a claim against the BPD, and that even if Plaintiffs had stated a claim, such claims brought under Section 1983 are barred by the Eleventh Amendment.  (ECF No. 23-1.)  The BPD then asserts that the state

law claims filed against it (negligent hiring/training/supervision in Count VIII, wrongful death in Count IX, and the survival action in Count X) must be dismissed because the BPD has sovereign immunity under Maryland law. (*Id.*) Finally, the BPD asserts that the Plaintiffs' claim for "injunctive relief" in Count XI is improper, as such a claim for injunctive relief is not a standalone cause of action. (*Id.*)

On June 24, 2021, the Officer Defendants filed their own Motion to Dismiss (ECF No. 29) seeking dismissal of all claims against them. They contend that Count I and Count IV of the Complaint fail to allege plausible claims for relief under the burdensome standard for excessive force claims brought under Section 1983 in the context of police pursuits. (ECF No. 29-1.) They assert that they are immune from suit with respect to the Plaintiffs' claim for negligence in Count V. (*Id.*) Finally, they contend that Count VI (gross negligence), Count VII (battery), Count IX (wrongful death), and Count X (survival action) fail to state plausible claims for relief on various grounds. (*Id.*)

## STANDARD OF REVIEW

### A.        Rule 12(b)(6)

Rule 8(a)(2) of the Federal Rules of Civil Procedure provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted. The purpose of Rule 12(b)(6) is "to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).

The United States Supreme Court's opinions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), "require that complaints in civil actions be alleged with greater specificity than previously was required." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted).  In *Twombly*, the Supreme Court articulated "[t]wo working principles" that courts must employ when ruling on Rule 12(b)(6) motions to dismiss. *Iqbal*, 556 U.S. at 678.  First, while a court must accept as true all factual allegations contained in the complaint, legal conclusions drawn from those facts are not afforded such deference. *Id.* (stating that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *see also Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) ("Although we are constrained to take the facts in the light most favorable to the plaintiff, we need not accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." (internal quotation marks omitted)). Second, a complaint must be dismissed if it does not allege "a plausible claim for relief." *Iqbal*, 556 U.S. at 679.

While ruling on a motion to dismiss, a court's evaluation is generally limited to allegations contained in the complaint. *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166-67 (4th Cir. 2016).  However, courts may also consider documents explicitly incorporated into the complaint by reference. *Id.* at 166 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).  In addition, a court may "consider a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Id.* (citing *Sec'y of State for Defence v. Trimble Nav. Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007)).  A

document is "integral" when "its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F.Supp.2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis omitted). Considering such documents does not convert a motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015).

### B.  Rule 12(b)(1)

The Baltimore City Police Department asserts a facial challenge to this Court's subject matter jurisdiction, arguing that the allegations of the complaint establish its immunity to suit under the Eleventh Amendment to the United States Constitution and Maryland law.  *See Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018) (holding that sovereign immunity deprives the court of subject matter jurisdiction).  A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction challenges a court's authority to hear the matter brought by a complaint.  *See Davis v. Thompson*, 367 F. Supp. 2d 792, 799 (D. Md. 2005).  A challenge to jurisdiction under Rule 12(b)(1) may proceed either as a facial challenge, asserting that the allegations in the complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting "that the jurisdictional allegations of the complaint [are] not true."  *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted).  The Defendants in this case clearly present a facial challenge and accordingly "must show that [the] complaint fails to allege facts upon which subject matter can be predicated."  *Amador v. Mnuchin*, 476 F. Supp. 3d 125, 139 (D. Md. Aug. 5, 2020) (quoting *Hutton v. Nat'l Bd. of Examn's Inc.*, 892 F.3d 613, 620-21 (4th Cir. 2018)).

### C.  Section 1983

In Counts I though III of the Complaint, the Plaintiffs allege violations of the Fourteenth Amendments to the United States Constitution, pursuant to 42 U.S.C. § 1983. Under Section 1983, a plaintiff may file suit against any person, who acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  *See* 42 U.S.C. § 1983.  To state a claim under Section 1983, a plaintiff must allege that: (1) a right conferred by the Constitution or the laws of the United States was violated and (2) the alleged violation was committed by a person acting under the color of state law.  *See West v. Atkins*, 487 U.S. 42, 48 (1988).

## ANALYSIS

## I.      Claims Against Defendant Baltimore City Police Department

### A.  Counts II and III

In *Monell v. Department of Social Services*, the U.S. Supreme Court determined that local governmental bodies may be liable under Section 1983 based on the unconstitutional conduct of individual defendants if those defendants were executing an official policy or custom of the local government when they violated a plaintiff's rights.  436 U.S. 658, 690 (1978).  To plead a claim for *Monell* liability, a plaintiff must allege that (1) "the municipality had an unconstitutional policy or custom;" and (2) "the unconstitutional policy or custom caused a violation of the plaintiff's constitutional rights."  *Johnson v. Baltimore Police Dep't*, No. ELH-19-00698, 2020 WL 1169739, at *30 (D. Md. Mar. 10, 2020) (citing *Bd. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997)); *Kirby v. City of Elizabeth City*, 388 F.3d 440, 451 (4th Cir. 2004),

*cert. denied*, 547 U.S. 1187 (2006); *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003)).  A policy or

custom for which a municipality may be held liable can arise in four ways:

> (1) through an express policy, such as a written ordinance or regulations; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Lytle*, 326 F.3d at 471 (quoting *Cater v. Morris,* 164 F.3d 215, 217 (4th Cir. 1999)).  In Count II,

the Plaintiffs allege that the BPD is liable under the first theory of liability.  In Count III, the

Plaintiffs appear to allege that the BPD is liable under a combination of theories three and

four.

### i.      Count II – Liability based on express policy.

The Plaintiffs have failed to state a claim in Count II.  They allege that the BPD, by

express policy, created a policy that was the moving force behind violation of their

constitutional rights to life, liberty, and property under the Fourteenth Amendment to the U.S.

Constitution.  (ECF No. 1 ¶¶ 73-76.)  They allege that Policy 1503 authorizes officers to use

force that far exceeds what is reasonable, necessary, and proportional to respond to threats,

and that through Policy 1503's implementation and promulgation, consistently and over time,

BPD officers have violated citizens' due process rights to life, liberty, and property.  (*Id.* ¶ 76.)

Specifically, they allege that Policy 1503 does not designate maximum speed limits; does not

provide guidance on the weight to be given to the various factors listed; and does not limit

pursuits to exigent circumstances or those involving violent felonies that will cause imminent

harm to the public.  (*Id.* ¶ 77.)  In their view, the Policy provides officers with far too broad

discretion over when to pursue: although it states that there are factors to be "considered," there are no defined rules. (*Id.* ¶ 78.)

In *Jewell v. Ridley Township*, the district court, later affirmed by the United States Court of Appeals for the Third Circuit, held summary judgment in favor of the defendant local government where the plaintiffs alleged that a pursuit policy was constitutionally deficient. No. 09-4947, 2011 WL 5524260, at *7-*8 (E.D. Pa. Nov. 10, 2011), *aff'd*, 497 F. App'x 182 (3d Cir. 2012). The district court noted that the policy provided decision-making criteria with respect to the termination of pursuits, required officers to use sirens, instructed supervisors to terminate a pursuit at their discretion, and addressed pursuit tactics. *Id.* at *7. Notably, Pennsylvania did in fact at that time have a statute which required police pursuit policies to comply with certain requirements, but as the district court noted, Section 1983 deals with violations of *federal*, not state or local law. *Id.* at *6 (citing *McMullen v. Maple Shade Twp.*, 643 F.3d 96, 99 (3d Cir. 2011)). In this case, Policy 1503 provides detailed factors officers are required to consider when determining when to initiate a pursuit as well as when to terminate a pursuit. It addresses pursuit tactics and communication between the Primary and Secondary Units. It also explicitly states that officers should terminate a pursuit if ordered by their supervisors. The fact that officers are provided discretion with respect to how to weigh the provided factors, does not render the Policy unconstitutional. *See Jewel*, 2011 WL 5524260, at *6 (noting that commanding officer had discretion with respect to termination of any pursuit).

Moreover, as noted above, Policy 1503 was created through a required collaborative process involving this Court, the DOJ, an Independent Monitor, and the BPD. The public also had the opportunity to provide comment on the Policy. To suggest that Policy 1503,

developed as required through the Consent Decree, is unconstitutional places the BPD in an impossible situation. The BPD was mandated to revise its policies in conjunction with the DOJ and the Monitoring Team to ensure that there is "effective and constitutional policing" in the City of Baltimore. *United States v. Baltimore Police Dep't*, JKB-17-0099, 249 F. Supp. 3d 816, 819 (D. Md. 2017). The undisputed record in this case indicates that a pattern of practice was in fact implemented to comply with the Consent Decree as ordered by this Court. There is simply no basis for an allegation in this case that there was a pattern and practice of constitutional violations in the aftermath of the implementation of Policy 1503. With respect to Count II, the BPD's Motion to Dismiss (ECF No. 23) is GRANTED, and Count II is DISMISSED WITH PREJUDICE.[7]

### ii.    Count III – Liability based on failure to train and condonation.

The Plaintiffs have also failed to state a claim in Count III. They allege that the training, supervision, and oversight required by the BPD regarding incidents of misuse of police powers and constitutional rights violations committed by the BPD's officers was inadequate, insufficient, and/or nonexistent, and that the BPD directly and through its employees, agents, and officers, failed to exercise the required degree of care in the supervision of such employees, agents, and officers under its discretion and control. (ECF No. 1 ¶ 94.) As Judge Hollander of this Court explained in *Grim v. Baltimore Police Department*, "'the inadequacy of police training

---

[7] As a general rule, leave to amend a complaint to address deficiencies in an original complaint is freely given pursuant to Rule 15(a). *See* Schwarzer, Tashima & Wagstaffe, *Federal Civil Procedure* § 9:286. However, leave to amend may be denied if such amendment is deemed futile. Schwarzer, Tashima & Wagstaffe, *Federal Civil Procedure* § 9:294.1; *see also Abagninin v. AMVAC Chem. Corp.*, 545 F.3d 733, 742 (9th Cir. 2008). "[T]his Court has discretion to dismiss an action with prejudice where 'it is clear that amendment would be futile in light of the [complaint's] fundamental deficiencies.'" *See Letren v. Arch Bay Holdings, LLC*, No. GJH-15-622, 2016 WL 8716598, at *5 n.8 (D. Md. Mar. 25, 2016) (quoting *Cozzarelli v. Inspire Pharm., Inc.*, 549 F.3d 618, 630 (4th Cir. 2008)). This Court is satisfied that the Plaintiffs' claim that the BPD is liable under Section 1983 based on Policy 1503 as an express policy is so fundamentally deficient that amendment is futile.

may serve as the basis for § 1983 liability,' but 'only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.'" No. ELH- 18-3864, 2019 WL 5865561, at *17 (D. Md. Nov. 8, 2019) (quoting *Canton v. Harris*, 489 U.S. 378, 388 (1989)). "[E]ven if 'a particular officer may be unsatisfactorily trained,' that 'will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from other factors other than a faulty training program.'" *Id* (citing *Canton*, 489 U.S. at 390-91). "'Neither will it suffice to prove that an injury or accident could have been avoided if an officer had better or more training, sufficient to equip him to avoid the particular injury-causing conduct.'" *Id.* (quoting *Canton*, 489 U.S. at 391). To state a claim under Section 1983 based on a failure to train, a plaintiff must allege (1) "the nature of the training," (2) "that the training was a 'deliberate and conscious' choice by the municipality," and (3) "that the officer's conduct resulted from said training." *Id.* (quoting *Lewis v. Simms*, AW-11-CV-2171, 2012 WL 254024, at *3 (D. Md. Jan. 26, 2012) (internal citation omitted)).

Similarly, a plaintiff may allege violation of Section 1983 under a "condonation theory" of liability where "municipal policymakers fail 'to put a stop to or correct a widespread pattern or practice of unconstitutional conduct.'" *Id.* at *19 (citing *Owens v. Baltimore City State's Attorney's Office*, 767 F.3d 379, 402 (4th Cir. 2015) (internal quotation and citation omitted)). To assert a plausible claim for relief under such theory, a plaintiff must allege "a 'persistent and widespread practice[ ] of municipal officials,' the 'duration and frequency' of which indicate that policy makers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'" *Owens*, 767 F.3d at 402 (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1386-91 (4th Cir. 1987)).

The Plaintiffs have simply failed to allege a failure to train or condonation claim in this case.  In support of their failure to train allegations, the Plaintiffs point to the testimony of Officer Beall, who stated that he was provided little to no training in vehicular, emergency pursuits and that supervisors routinely instructed officers to pursue regardless of what the BPD policies required.  (*Id.* ¶ 95.)  Yet, at the Plaintiffs concede, Beall was not trained with respect to Policy 1503—he served as an officer for the BPD while General Order 11-90 was still in place.  (ECF No. 1 ¶¶ 18-19.)  His testimony is irrelevant with respect to a failure to train officers under Policy 1503.

In support of their failure to train and condonation claims, the Plaintiffs further allege that thirty Marylanders were killed in police pursuits between 2015 and 2019, including five individuals killed as a direct result of pursuits by the BPD.  (*Id.* ¶ 32.)  Policy 1503 was published on November 24, 2019.  (ECF No. 23-3.)  It is unclear which, if any, of the five deaths occurred while Policy 1503 was in place and, by extension, whether any of them are at all relevant to this case.  Nevertheless, even if these accidents are relevant to this matter, as noted above, allegations of some injury or accident are insufficient on their own to state a claim for failure to train.  *See Canton*, 489 U.S. at 391.  A plaintiff must connect the inadequate training to the accident.  *Id.*  The Plaintiffs have not alleged any facts with respect to the training of the officers in this case, nor those involved in the accidents between 2015 and 2019.  Further, the Complaint is devoid of any factual allegations that the five individuals killed as a result of BPD pursuits were killed due to some "widespread" lack of proper supervision.

Finally, the Plaintiffs allege that the BPD, through its ranking officers and supervisors, was aware of the persistent and pervasive pattern and practice of officers disregarding pursuit

policies.  (*Id.* ¶¶ 96-97.)  The Complaint includes allegations regarding other cases in which the

BPD was sued for various Constitutional violations and/or violation of BPD's pursuit policies.

(*Id.* ¶ 31.)  However, as Defendant BPD aptly notes, these other cases predate Policy 1503.

(ECF No. 23-1 at 9-10.)   Further, there are no allegations that such cases deal with

constitutional violations of the same nature as those alleged in this case.  "[A] plaintiff cannot

rely upon scattershot accusations of unrelated constitutional violations to prove either that a

municipality was indifferent to the risk of her specific injury or that it was the moving force

behind her deprivation."  *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999).  The law is clear

that "a 'plaintiff must demonstrate that a municipal decision reflects deliberate indifference to

the risk that a violation of a *particular* constitutional or statutory right will follow the decision.'"

*Id.* (emphasis in original) (quoting *Brown*, 520 U.S. at 411).  The Plaintiffs have failed to allege

a plausible claim for relief in Count III.  Accordingly, with respect to Count III, the BPD's

Motion to Dismiss (ECF No. 23) is GRANTED, and Count III is DISMISSED WITHOUT

PREJUDICE.[8]

### B.  Counts VII, IX, and X

In Count VII of the Complaint, the Plaintiffs seek damages for negligent hiring,

training, and supervision under Maryland law against the BPD.  (ECF No. 1 ¶¶ 149-62.)  In

Count IX, Plaintiff Simmons seeks damages for wrongful death against all the Defendants.

(*Id.* ¶¶ 163-69.)  Count X is a survival action brought by the Estate of Gore against all the

---

[8] As discussed *supra*, the Plaintiffs' *Monell* claim in Count II asserted on the basis of an alleged deficiency of Policy 1503 as an express policy is without merit.  In light of this Court's entry and continued monitoring of the Consent Decree, there is simply no basis for an allegation in this case that there was a pattern and practice of constitutional violations in the aftermath of the implementation of Policy 1503.  With respect to the *Monell* claim in Count III asserted on the basis of an alleged failure to train or supervise with respect to Policy 1503, at this stage in the proceedings, the Plaintiffs have failed to allege facts stating a plausible claim for relief.

Defendants.  (*Id.* ¶¶ 170-75.)  The BPD asserts that State immunity forecloses the Plaintiffs'
claims in these state law counts.  (ECF No. 23-1 at 17.)  On numerous occasions, this Court
has held that "the Baltimore Police Department enjoys sovereign immunity from actions for
damages based on state common law torts or state constitutional torts."  *Chin v. City of Baltimore*,
241 F. Supp. 2d 546, 547-48 (D. Md. 2003) (citing *Baltimore Police Dep't v. Cherkes*, 780 A.2d
410, 422-23 (Md. 2001)); *see also Grim*, 2019 WL 5865561, at *15.

As Judge Hollander explained in *Grim*, "[t]he doctrine of sovereign immunity is 'firmly
embedded in the law of Maryland.'"  2019 WL 5865561, at *12 (quoting *Katz v. Wash. Suburban
Sanitary Comm'n*, 397 A.2d 1027, 1032-33 (Md. 1979)).  The doctrine is applicable to a state's
agencies and instrumentalities.  *Id.* (citing *Proctor v. Wash. Metro. Area Transit Auth.*, 990 A.2d
1048, 1058 (Md. 2010) (internal citation omitted)).  Unless the Maryland General Assembly
has waived State sovereign immunity, the doctrine bars an individual plaintiff from
maintaining a suit for money damages against the State of Maryland or one of its agencies for
violations of State law.  *Id.* (citing, *inter alia*, *State v. Sharefeldin*, 854 A.2d 1208, 1214 (Md. 2004)).
Maryland law defines the BPD as a State agency.  *Id.* at *15 (citing *Mayor & City Council of
Baltimore v. Clark*, 944 A.2d 1122, 1128 (Md. 2008)).  Accordingly, the BPD is immune as to
the Plaintiffs' State-law claims as alleged in Counts VII, IX, and X.  With respect to those
Counts, the BPD's Motion to Dismiss (ECF No. 23) is GRANTED.  Counts VII, IX and X
are DISMISSED WITH PREJUDICE as to Defendant BPD.

### C.  Count XI.

In Count XI of the Complaint, the Plaintiffs allege a claim for "Injunctive Relief,"
seeking modification of Policy 1503.  (ECF No. 1 ¶¶ 176-180.)  Specifically, the Plaintiffs seek

an order restricting the circumstances a police officer may pursue a fleeing vehicle to those that involve a violent felony or an imminent threat to citizens; imposing a maximum pursuit speed limit in Baltimore City; increasing the training of police officers with respect to pursuits and de-escalation techniques; increasing supervisory requirements; and removing an officer's personal discretion with respect to whether to engage in a pursuit.  (*Id.* ¶ 180.)  However, as Judge Bredar of this Court has explained, "a claim for injunctive relief is not a standalone cause of action."  *Doe v. Salisbury Univ.*, 107 F. Supp. 3d 481, 493 (D. Md. 2015) (citing *MCS Servs. Inc. v. Jones*, No. WMN-10-1042, 2010 WL 3895380, at *1 n.4 (D. Md. Oct. 1, 2010)).  In *Salisbury University*, Judge Bredar construed and recast a plaintiff's claim for injunctive relief as "a prayer for injunctive relief as a remedy" for a surviving claim in the operative complaint.  *Id.*  In this case, the only remaining claim against the BPD is that for indemnification in Count XII.[9]  (ECF No. 1 ¶¶ 181-84.)  However, even if this Court were to recast the Plaintiffs' Count XI as a prayer for injunctive relief as a remedy for their remaining indemnification claim, the Plaintiffs cannot satisfy the requirements for a permanent injunction in this case.

"According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief."  *eBay v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  To prevail, a plaintiff must demonstrate: (1)

---

[9] Although Defendant BPD states that it seeks dismissal of all claims against it, it does not make any arguments in favor of dismissal of Count XII.  As Judge Gallagher of this Court has explained, the Local Government Tort Claims Act ("LGTCA") provides that "any 'local government,' which includes the BPD, 'shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment.'"  *Johnson v. Baltimore Police Dep't*, 452 F. Supp. 3d 283, 319 (D. Md. 2020) (citing Md. Code Ann., Cts. & Jud. Proc. § 5-303(b)(1), (d)(1)(21)).  In *Johnson*, Judge Gallagher held that dismissal of the plaintiffs' claim for indemnification was premature given that the plaintiffs had alleged claims against individual BPD detectives and the LTGCA's waiver of State sovereign immunity in the context of indemnification.  *Id.* at 319-20.  Dismissal of the Count XII claim for indemnification against the BPD would at this time also be premature, as the Plaintiffs, discussed *infra*, have stated a plausible claim for relief against the Officer Defendants.

"that is has suffered an irreparable injury;" (2) "that remedies available at law, such as monetary damages, are inadequate to compensate for that injury;" (3) "that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted;" and (4) "that the public interest would not be disserved by a permanent injunction." *Id.* (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-313 (1982) and *Amoco Production Co. v. Gambell*, 480 U.S. 531, 542 (1987)).  The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court and is reviewed on appeal for abuse of discretion.  *Id.* (citing *Romero-Barcelo*, 456 U.S. at 320).

In this case, the Plaintiffs have failed to allege how monetary damages are inadequate to compensate them in the event they are successful on their claim against the BPD for indemnification.  Further, even if they had alleged any facts with respect to inadequacy of a monetary award, they have not and cannot allege the remaining three elements of a permanent injunction claim.  As detailed above, Policy 1503 was the result of a collaborative and required process under a Consent Decree.  On April 7, 2017, this Court entered the Consent Decree finding that such order was "in the public interest" given "the certainty that there must be effective and constitutional policing in order for the City of Baltimore to thrive." *United States v. Baltimore Police Dep't*, JKB-17-0099, 249 F. Supp. 3d at 818.  Given this Court has already determined that the Consent Decree and its collaborative process are in the public interest, the Plaintiffs cannot show that this Court's unilateral modification of a policy created through that collaborative process is in the public interest.  Additionally, the Consent Decree specifically states that after a "Collaboration Period," the BPD is required to post any new or revised policies subject to the Consent Decree to its website and provide the public and

officers an opportunity to comment within a 30-day period.  *See* (JKB-17-0099, ECF No. 2-2.)  It also states that the parties will review the "Use of Force Policies and Procedures that were published in November 2019," which includes Policy 1503.  (*Id.*)  The Plaintiffs cannot show that they will be irreparably harmed by this Court's denial of injunctive relief, or that the balance of equities weighs in their favor, given that they have had and will have the opportunity to engage with the BPD in developing its pursuit policies under Consent Decree procedures. With respect to Count XI, the BPD's Motion to Dismiss (ECF No. 23) is GRANTED, and Count XI is DISMISSED WITH PREJUDICE.[10]

Accordingly, the claims against the Baltimore City Police Department as alleged in Counts II, VIII, IX, X, and XI are DISMISSED WITH PREJUDICE.  The claim in Count III is DISMISSED WITHOUT PREJUDICE.  The claim for indemnification against the BPD as alleged in Count XII remains.

## II.      Claims Against the Officer Defendants

### A.  Count I

In Count I of the Complaint, the Plaintiffs allege that the Officer Defendants are liable under Section 1983 for violation of their substantive due process rights under the Fourteenth Amendment to the U.S. Constitution for their excessive use of force which resulted in Gore's death and Tyson's injuries.  (ECF No. 1 ¶¶ 58-70.)  Specifically, the Plaintiffs allege that the Officer Defendants deprived Plaintiff Tyson, as well as Decedent Gore, of their constitutional

---

[10] This Court is satisfied that amendment of the Complaint with respect to Count XI would be futile.

rights to life, liberty, and property.  (*Id.* ¶ 61.)  They also allege that the Officer Defendants deprived Plaintiff Simmons of the love and affection of her son.  (*Id.*)  They allege that "[t]he conduct of Defendants was without legal justification and was improperly motived by ill will and actual malice.  Defendants, with ample time to deliberate, recklessly and intentionally engaged in a high-speed, high-risk pursuit with the intent to harm, thus causing a vehicle to hit Decedent Gore's vehicle, killing him and severely injuring Plaintiff Tyson."  (*Id.* ¶ 63.)  In *Johnson v. Baltimore Police Department*, Judge Gallagher of this Court denied a motion to dismiss a claim against individual police officers under Section 1983 for violation of the plaintiffs' substantive due process rights in the context of a police pursuit.  452 F. Supp. 3d 283, 300-04 (D. Md. 2020).  Her analysis is instructive in this case.

As Judge Gallagher explained in *Johnson*, substantive due process violations are actionable under Section 1983.  *Id.* at 300 (citing *Zinermon v. Burch*, 494 U.S. 113, 115 (1990)). However, as Judge Gallagher also noted in *Johnson*, the Supreme Court has never extended the constitutionally protected liberty interests incorporated by the Fourteenth Amendment due process clause to encompass deprivations resulting from governmental actions which affect a family "only incidentally."  *Id.* at 303 (citing *Shaw v. Shroud*, 13 F.3d 791, 805 (4th Cir. 1994)). To the extent the Plaintiffs' claim in Count I is based on Plaintiff Simmons' loss of the love and affection of her son, Decedent Gore, that claim is dismissed with prejudice.

When a plaintiff alleges unconstitutional action by the executive branch of government, only official conduct that "shocks the conscience" will give rise to a substantive due process violation.  *Id.* (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998)).  In *Johnson*, Judge Gallagher carefully examined the Supreme Court's decision in *Lewis*, noting that the Court

made clear "that 'high-speed chases with no intent to harm suspects physically or to worsen their legal plight,' ordinarily, do not 'shock the conscience.'" *Id.* at 301 (citing *Lewis*, 523 U.S. at 854). She also noted, however, that "the Court observed that there may be a different result if 'a citizen suffers or is seriously threatened with physical injury due to a police officer's *intentional misuse* of his vehicle.'" *Id.* (emphasis in original) (citing *Lewis*, 523 U.S. 854 n.13).

In *Johnson*, Judge Gallagher ultimately held that the plaintiffs had sufficiently alleged conscious-shocking behavior where officers allegedly engaged in a high-speed pursuit through residential streets in Baltimore City in an unmarked police vehicle and without sirens or emergency lights. *Id.* at 301-02. While in the case at hand there are no allegations that the Officer Defendants pursued Dello-Stritto without activating their emergency sirens or lights, the Plaintiffs allege that the Officer Defendants followed the Ford Fusion for eleven miles through Baltimore City, passing schools, a hospital, and numerous civilians and traveling through more than fifty intersections and down narrow residential streets at high speeds in excess of ninety miles per hour. (ECF No. 1 ¶ 44.) They allege that throughout this chase, the GPS device, which had initially allowed the Officer Defendants to find the missing car, was active and available to provide the location of the eluding vehicle. (*Id.* ¶ 48.) They further allege that a helicopter flying overhead was also available to track the eluding vehicle's location. (*Id.*) The Officer Defendants initiated this chase despite the fact that there was no evidence that the car had been carjacked—the owner had left the keys inside the vehicle. (*Id.* ¶ 38.) Unlike the allegations at issue in the Supreme Court's decision in *Lewis*, there are no allegations in this case that the eluding vehicle was already speeding through town when the Officer Defendants initiated the chase—Dello-Stritto was stopped and had been stopped for some

time.  (*Id.* ¶ 39.)  The Officer Defendants also continued the chase without engaging in any de-escalation techniques and despite the perilous conditions of the route and the resources available to them to track the driver's location without the use of their police vehicles.  (*Id.* ¶¶ 42-48.)

This Court is satisfied that the Plaintiffs have adequately alleged the type of conscience-shocking behavior that *Lewis* requires.  Considering the facts as alleged by the Plaintiffs and drawing all reasonable inferences in their favor, it is plausible that, as the Plaintiffs allege, the Officer Defendants were intentionally misusing their vehicles by engaging in a pursuit that was not necessary in its purpose nor in the manner that it was executed.  Accordingly, with respect to the Plaintiffs' claims in Count I based on Tyson and Gore's alleged deprivation of life, liberty, and property in violation of the Fourteenth Amendment, the Officer Defendants' Motion to Dismiss (ECF No. 29) is DENIED.

### B.  Count IV

In Count IV the Plaintiffs allege violation of the Maryland Declaration of Rights Article 24, which is considered the "Maryland counterpart to the Due Process Clauses found in the Fifth and Fourteenth Amendments to the United States Constitution."  *Allmond v. Dep't of Health & Mental Hygiene*, 141 A.3d 57, 67 (Md. 2016).  "Unless there is good reason to do otherwise, 'state constitutional provisions [such as Article 24] are in *pari materia* with their federal counterparts or are the equivalent of federal constitutional provisions or generally should be interpreted in the same manner as federal provisions.'"  *Id.* (citing *Dua v. Comcast Cable of Maryland, Inc.*, 805 A.2d 1061 (Md. 2002)).  This Court will therefore analyze the Plaintiffs' claims in Count IV under the principles governing Section 1983 claims in Count I.

31

Accordingly, to the extent the Plaintiffs' claims are based on Tyson and Gore's deprivation of life, liberty, and property, their claims are sufficient to survive the Officer Defendants' Motion to Dismiss.  With respect to Count IV, the Officer Defendants' Motion to Dismiss (ECF No. 29) is DENIED.

### C.  Count V

In Count V of the Complaint, the Plaintiffs allege negligence against the Officer Defendants.  (ECF No. 1 ¶¶ 121-30.)  This claim is without merit, as the Officer Defendants are entitled to emergency vehicle immunity.  In *Boyer v. State*, the Court of Appeals of Maryland made clear that Section 19-103(b) of the Transportation Article "flatly renders the operator of an emergency vehicle," such as a police car, "immune from suit . . . for any damages resulting from a *negligent* act or omission while operating the emergency vehicle."  593 A.2d 121, 131 (Md. 1911) (emphasis added) (quoting Md. Code Ann., Transp. § 19-103(b)).  With respect to Count V, the Officer Defendants' Motion to Dismiss (ECF No. 29) is GRANTED, and Count V is DISMISSED WITH PREJUDICE.  While a claim of simple negligence is precluded by Maryland statutory law, this does not apply to an allegation of gross negligence.

### D.  Count VI

In Count VI of the Complaint, the Plaintiffs allege gross negligence against the Officer Defendants.  (ECF No. 1 ¶¶ 131-39.)  Unlike with claims for negligence, the Officer Defendants are not protected by emergency vehicle immunity with respect to claims for gross negligence.  As the Court of Appeals of Maryland explained in *Boyer*, Section 19-103(b) "does not apply where the operative is guilty, *inter alia*, of 'gross negligence.'"  594 A.2d at 126.  The question is therefore whether the Plaintiffs have stated a plausible claim for gross negligence

in this case.

Gross negligence describes "a level of neglect more egregious than simple negligence." *Holloway-Johnson v. Beall*, 103 A.3d 720, 735 (Md. Ct. Spec. App. 2014). Maryland law defines gross negligence as "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another," and is said to imply "a thoughtless disregard of the consequences without the exertion of any effort to avoid them." *Barbe v. Pope*, 935 A.2d 699, 717 (Md. 2007) (internal citation omitted). "Stated conversely, a wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist." *Id.*

This Court is satisfied that at this stage, the Plaintiffs have stated a plausible claim for gross negligence against the Officer Defendants. First, this Court notes that "'[w]hether or not gross negligence exists necessarily depends on the facts and circumstances in each case. It is usually a question for the jury and is a question of law only when reasonable men could not differ as to the rational conclusion to be reached.'" *Rodriguez v. State*, 98 A.3d 376, 391 (Md. Ct. Spec. App. 2014) (quoting *Romanesk v. Rose*, 237 A.2d 12, 14 (Md. 1968)). Further, while in *Boyer* the Maryland Court of Special Appeals held that "the mere engagement in [a] high speed chase of a criminal suspect" does not constitute "a prima facie breach of [ ] duty whenever the fleeing suspect strikes a third party," 594 A.2d at 136, in this case the Plaintiffs have alleged more than the Officers Defendants' mere engagement in a highspeed chase. As detailed above, the Plaintiffs allege numerous violations of Policy 1503 and reasons that the pursuit was unsafe and unnecessary. With respect to Count VI, the Officer Defendants'

Motion to Dismiss (ECF No. 29) is DENIED.[11]

### E. Count VII

In Count VII of the Complaint, the Plaintiffs allege that the Officer Defendants committed battery against Plaintiff Tyson and Decedent Gore.  (ECF No. 1 ¶¶ 140-48.)  "A battery occurs when one intentionally makes a harmful or offense contact with another without that person's consent." *Holloway-Johnson*, 103 A.3d at 736 (citing *Nelson v. Carroll*, 735 A.2d 1096 (Md. 1999)) (emphasis added).  A battery may be committed through an instrumentality, such as an automobile. *Id.* (citing *Hendrix v. Burns*, 43 A.3d 415, 415 (Md. Ct. Spec. App. 2012)).  The contact required for battery may also be indirect. *Hendrix*, 43 A.3d at 426 (citing *Nelson*, 735 A.2d 1096).  However, the law is clear that it must be *intentional*.  A claim for battery involves an "intent to unlawfully invade another's physical well-being through a harmful or offensive contact or an apprehension of such a contact." *Id.* at 427 (citing *Nelson*, 735 A.2d 1096).  Lesser states of mind such as recklessness or wantonness simply "do not equate to the intent to cause a harmful or offensive contact." *Id.*  The Plaintiffs' Complaint is devoid of any allegations that the Officer Defendants meant to physically contact Decedent Gore and Plaintiff Tyson.  With respect to Count VII, the Officer Defendants' Motion to Dismiss (ECF No. 29) is GRANTED, and Count VII is DISMISSED WITH PREJUDICE.[12]

### F. Counts IX and X

[11] This Court notes that under the Local Government Tort Claims Act ("LGTCA"), whether the Officer Defendants are personally liable for any judgment against them depends on whether a jury finds that they acted with or without malice. *Holloway-Johnson*, 103 A.3d at 728-29.  The LGTCA "transfers financial liability for torts within the scope of employment from the employee to the local government." *Id.* at 728.  The LGTCA does not, however, prevent the Plaintiffs from filing this claim for gross negligence against the Officer Defendants as the Officer Defendants seem to contend. *Id.* (noting that under the LGTCA "[a] plaintiff must sue the allegedly negligent employee directly . . . .").
[12] This Court is satisfied that amendment of a claim for battery would be futile in this case.  It was Dello-Stritto who struck Decedent Gore's vehicle, and the Plaintiffs cannot allege that the Officer Defendants intended such contact.

As noted above, in Count IX of the Complaint, Plaintiff Simmons asserts a claim for wrongful death against all the Defendants.  (ECF No. 1 ¶¶ 163-69.)  In Count X, the Estate of Darius Gore asserts a survival action against all the Defendants.  (*Id.* ¶¶ 170-75.)  The Officer Defendants argue that each of these counts should be dismissed because the Officer Defendants are simply not responsible for the death of Darius Gore.  (ECF No. 29-1 at 14.)  They assert that solely Dello-Stritto is responsible for the crash that led to his death.  (*Id.* at 15.)  Such argument ignores the Plaintiffs' numerous allegations regarding the propriety of initiating and failing to terminate an allegedly high-risk and high-speed pursuit of Dello-Stritto and the manner in which the pursuit was conducted.  At this stage in the proceedings, the Plaintiffs have sufficiently alleged that the Officer Defendants caused Gore's death.  With respect to Counts IX and X, the Officer Defendants' Motion to Dismiss (ECF No. 29) is DENIED.

## CONCLUSION

For the reasons set forth above, the Baltimore City Police Department's Motion to Dismiss (ECF No. 23) is GRANTED.  All claims against the BPD are dismissed with the exception of the indemnification claim set forth in Count XII.  Counts II, VIII, IX, X and XI are DISMISSED WITH PREJUDICE as to Defendant BPD.  Count III is DISMISSED WITHOUT PREJUDICE.

The Officer Defendants' Motion to Dismiss (ECF No. 29) is GRANTED IN PART and DENIED IN PART.  Specifically, it is GRANTED with respect to the simple negligence claim in Count V and the battery claim in Count VII, and those counts are DISMISSED WITH PREJUDICE.  It is DENIED with respect to the other claims against the individual

Officer Defendants.

      A Separate Order follows.

Dated: August 5, 2021

                                                        /s/

                                          Richard D. Bennett
                                          United States District Judge