## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

**ROWENA SIMMONS**
**Individually, and on behalf of the**
**Estate of Darius Gore**
3412 Carlisle Avenue
Baltimore, Maryland 21216

and

**GARY TYSON**
3406 Carlisle Avenue
Baltimore, Maryland 21216

     *Plaintiffs*

**RAYMOND B. HINTON**
(Use Plaintiff)
2410 Pennsylvania Avenue
Baltimore, Maryland 21217

**v.**

**BALTIMORE CITY POLICE DEPARTMENT**
601 E. Fayette St.
Baltimore, Maryland 21202

Serve on:    Michael Harrison
             Police Commissioner
             Baltimore City Police Department
             601 E. Fayette St.
             Baltimore, Maryland 21202

             Lisa Walden, Esq.
             Chief of the Office of Legal Affairs
             Baltimore City Police Department
             100 N. Holliday St., Suite 101
             Baltimore, Maryland 21202

and

**MAJOR JASON CALLAHAN**
**Individually and in his official capacity**
**as a Baltimore City Police Officer**

**Civil Action No.:**
**1:21-cv-00969-LKG**

Baltimore City Police Department
601 E. Fayette Street
Baltimore, Maryland 21202

and

**LIEUTENANT LAKESHIA L. TUCKER**
**Individually and in her official capacity**
**as a Baltimore City Police Officer**
Baltimore City Police Department
601 E. Fayette Street
Baltimore, Maryland 21202

and

**SERGEANT JAMES L. CONLEY**
**Individually and in his official capacity**
**as a Baltimore City Police Officer**
Baltimore City Police Department
601 E. Fayette Street
Baltimore, Maryland 21202

and

**OFFICER JOHN W. SCHREVEN**
**Individually and in his official capacity**
**as a Baltimore City Police Officer**
Baltimore City Police Department
601 E. Fayette Street
Baltimore, Maryland 21202

and

**SERGEANT MARC J. CAMAROTE**
**Individually and in his official capacity**
**as a Baltimore City Police Officer**
Baltimore City Police Department
601 E. Fayette Street
Baltimore, Maryland 21202

and

**OFFICER JOHN BILHEIMER**
**Individually and in his official capacity**
**as a Baltimore City Police Officer**
Baltimore City Police Department
601 E. Fayette Street
Baltimore, Maryland 21202

and

**OFFICER FELIX TORRES**
**Individually and in his official capacity**
**as a Baltimore City Police Officer**
Baltimore City Police Department
601 E. Fayette Street
Baltimore, Maryland 21202

and

**OFFICER JOHNTA GRAY**
**Individually and in his official capacity**
**as a Baltimore City Police Officer**
Baltimore City Police Department
601 E. Fayette Street
Baltimore, Maryland 21202

and

**OFFICER ZACHARY A. FRANKS**
**Individually and in his official capacity**
**as a Baltimore City Police Officer**
Baltimore City Police Department
601 E. Fayette Street
Baltimore, Maryland 21202

and

**OFFICER MARK T. GURBELSKI**
**Individually and in his official capacity**
**as a Baltimore City Police Officer**
Baltimore City Police Department
601 E. Fayette Street
Baltimore, Maryland 21202

and

**OFFICER MICHAEL H. WOOD**
**Individually and in his official capacity**
**as a Baltimore City Police Officer**
Baltimore City Police Department
601 E. Fayette Street
Baltimore, Maryland 21202

and

**OFFICER JOSHUA P. CORCORAN**
**Individually and in his official capacity**
**as a Baltimore City Police Officer**
Baltimore City Police Department
601 E. Fayette Street
Baltimore, Maryland 21202

and

**OFFICER SHARIF K. KELLOGG**
**Individually and in his official capacity**
**as a Baltimore City Police Officer**
Baltimore City Police Department
601 E. Fayette Street
Baltimore, Maryland 21202

and

**OFFICER YENUEL F. FAMILIA**
**Individually and in his official capacity**
**as a Baltimore City Police Officer**
Baltimore City Police Department
601 E. Fayette Street
Baltimore, Maryland 21202

and

**OFFICER DYLAN R. LAPORTA**
**Individually and in his official capacity**
**as a Baltimore City Police Officer**
Baltimore City Police Department
601 E. Fayette Street
Baltimore, Maryland 21202

*Defendants*

## FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Rowena Simmons, individually and on behalf of the Estate of Darius Gore, and Gary Tyson (collectively, "Plaintiffs"), by and through undersigned counsel, hereby sue Defendants Baltimore City Police Department, Major Jason J. Callahan, Lieutenant Lakeshia L. Tucker, Sergeant James L. Conley, Officer John W. Schreven, Sergeant Marc J. Camarote, Officer

John Bilheimer, Officer Felix Torres, Officer Johnta Gray, Officer Zachary A. Franks, Officer Mark T. Gurbelski, Officer Michael H. Wood, Officer Joshua P. Corcoran, Officer Sharif K. Kellogg, Officer Yenuel F. Familia, and Officer Dylan R. Laporta (collectively, "Defendants"), and state as follows:

## INTRODUCTION

For years, Defendant Baltimore City Police Department ("BCPD") has allowed dangerous, high-risk, high-speed pursuits in Baltimore City. The BCPD has failed to train its officers in pursuits, limiting its training in emergency vehicular pursuits to several hours during its initial training program. It does not provide or require any refresher courses in emergency vehicular pursuits after this initial training, even when an officer receives a promotion with the BCPD. Nor does the BCPD supervise these pursuits while they are occurring to ensure that its officers who are engaging in pursuits comply with the BCPD's pursuit policy. Nor does the BCPD conduct investigations into the pursuits after they have occurred, even where, as here, someone died, and another suffered significant injuries as a result of the high-risk, high-speed pursuit.

The BCPD's training in emergency vehicle pursuits is deficient, and its supervision and follow-up investigations of the same are severely lacking, if non-existent.

As a result, on March 21, 2020, Officers with the BCPD pursued a car for over 11 miles through the City. The pursuit lasted for over 14 minutes and went by five schools, several playgrounds and parks, and a hospital. The pursuit went through narrow City streets, residential areas, and approximately 100 City intersections. The pursuit, which took place on a Saturday evening at dusk, took BCPD Officers from the southwestern side of the City all the way to the northwestern side, passing through four BCPD Districts ("Districts"), reaching speeds that, at times, exceeded the posted speed limit by 25 to 35 miles per hour.

The high-speed, high-risk pursuit ended when the car that the Officers were chasing hit Darius Gore's car, killing him, and seriously injuring his passenger, Gary Tyson. Mr. Gore's death and Mr. Tyson's injuries were a direct result of Defendant's policy of permitting officers to engage in high-risk, high-speed pursuits, a pattern and practice of failing to train and supervise Officers during these pursuits, and failing to terminate them when the risks to innocent bystanders far outweighed the objective.

## JURISDICTION AND VENUE

1.      This Complaint contains claims arising under the Fourteenth Amendment to the United States Constitution and asserts claims for relief pursuant 42 U.S.C. §1983, the Maryland Constitution, and claims under Maryland State law. It also seeks award of attorneys' fees under 42 U.S.C. § 1988(b).

2.      Jurisdiction of this Court arises under 28 U.S.C. § 1343 and 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

3.      Venue is proper in the District of Maryland pursuant to 28 U.S.C. § 1391(b) because the events, acts, and omissions complained of herein all occurred within this District.

4.      Plaintiffs provided notice to Baltimore City of the claims herein on June 30, 2020, thereby complying with the Local Government Tort Claims Act.

## PARTIES

5.      Darius Gore, the decedent ("Gore" or "Decedent Gore") was a 29-year-old man who was killed after being struck by a vehicle. Plaintiff the Estate of Darius Gore ("Estate") is represented in this action by Rowenna Simmons, the Personal Representative for the Estate.

6.      Rowenna Simmons ("Simmons" or "Plaintiff Simmons") also brings this action individually on her own behalf, as the mother of Darius Gore. She is an adult who resides in Maryland.

7.      Gary Tyson ("Tyson" or "Plaintiff Tyson") is a 54-year-old man who suffered significant injuries after being struck by a vehicle; he was a passenger in the vehicle that Decedent Gore was driving at the time of the incident. He resides in Maryland.

8.      Plaintiffs, the Estate, Ms. Simmons, and Mr. Tyson are collectively referred to herein as Plaintiffs.

9.      Raymond B. Hinton ("Hinton" or "Use Plaintiff") is the biological father of decedent Darius Gore, and he may be entitled by law to claim damages as a result of Decedent Gore's death as a Use Plaintiff. Undersigned counsel does not represent Hinton. Plaintiffs conducted a good faith and reasonably diligent effort to identify, locate, and name Use Plaintiffs and all individuals who may qualify as Use Plaintiffs. Plaintiff Hinton has been provided a copy of the Complaint (ECF 1) and Notice under Md. Rule 15-1001. *See* ECF 48. He has not responded to the Notice or filed a Motion to Intervene as a Use Plaintiff. *See id.*

10.     Defendant Baltimore City Police Department ("BCPD") is a government agency of the State of Maryland, but BCPD officers perform functions typical of a local and municipal, not state, government police department. The BCPD, through its agents, servants, and employees, hired, supervised, and trained each identified officer named in this Complaint. By virtue of its status as a governmental entity that exercised the power delegated by the State of Maryland, the BCPD acted under the color of state law when it hired, supervised, and retained each officer named in this Complaint. The BCPD is a "person" under 42 U.S.C. §1983 and is not immune under the Eleventh Amendment.

11.     Defendant Jason Callahan ("Defendant Callahan" or "Callahan"), at all times relevant to this Complaint, is/was a Baltimore City police officer. As a police officer, he acted as an agent, servant, and/or employee of the BCPD and acted within the scope of his employment and under color of state law. Defendant Callahan was the Captain on duty at the time of the incident, and as such was a supervisor of the pursuit. Defendant Callahan is sued in his individual and official capacities.

12.     Defendant Lakeshia L. Tucker ("Defendant Tucker" or "Tucker"), at all times relevant to this Complaint, is/was a Baltimore City police officer. As a police officer, she acted as an agent, servant, and/or employee of the BCPD and acted within the scope of her employment and under color of state law. Defendant Tucker was the Lieutenant on duty at the time of the incident, and as such was a supervisor of the pursuit. Defendant Tucker is sued in her individual and official capacities.

13.     Defendant James L. Conley ("Defendant Conley" or "Conley"), at all times relevant to this Complaint, is/was a Baltimore City police officer. As a police officer, he acted as an agent, servant, and/or employee of the BCPD and acted within the scope of his employment and under color of state law. Defendant Conley was also the operator of a police cruiser that pursued the operator of a vehicle that ran a red light and ultimately struck Decedent Gore's vehicle. He was also the Sergeant on duty at the time of the incident, and as such was a supervisor of the pursuit. Defendant Conley is sued in his individual and official capacities.

14.     Defendant John W. Schreven ("Defendant Schreven" or "Schreven") at all times relevant to this Complaint, is/was a Baltimore City police officer. As a police officer, he acted as an agent, servant, and/or employee of the BCPD and acted within the scope of his employment and under color of state law. Defendant Schreven was also the operator of a police cruiser that

pursued the operator of a vehicle that ran a red light and ultimately struck Decedent Gore's vehicle. Defendant Schreven is sued in his individual and official capacities.

15.     Defendant Marc J. Camarote ("Defendant Camarote" or "Camarote"), at all times relevant to this Complaint, is/was a Baltimore City police officer. As a police officer, he acted as an agent, servant, and/or employee of the BCPD and acted within the scope of his employment and under color of state law. Defendant Camarote was also the operator of a police cruiser that pursued the operator of a vehicle that ran a red light and ultimately struck Decedent Gore's vehicle. Defendant Camarote is sued in his individual and official capacities.

16.     Defendant John Bilheimer ("Defendant Bilheimer" or "Bilheimer"), at all times relevant to this Complaint, is/was a Baltimore City police officer. As a police officer, he acted as an agent, servant, and/or employee of the BCPD and acted within the scope of his employment and under color of state law. Defendant Bilheimer was also the operator of a camera that recorded the pursuit from a police helicopter. Defendant Bilheimer is sued in his individual and official capacities.

17.     Defendant Felix Torres ("Defendant Torres" or "Torres"), at all times relevant to this Complaint, is/was a Baltimore City police officer. As a police officer, he acted as an agent, servant, and/or employee of the BCPD and acted within the scope of his employment and under color of state law. Defendant Torres was also the operator of a police cruiser that pursued the operator of a vehicle that ran a red light and ultimately struck Decedent Gore's vehicle. Defendant Torres is sued in his individual and official capacities.

18.     Defendant Johnta Gray ("Defendant Gray" or "Gray"), at all times relevant to this Complaint, is/was a Baltimore City police officer. As a police officer, he acted as an agent, servant, and/or employee of the BCPD and acted within the scope of his employment and under color of

state law. Defendant Gray was also the operator of a police cruiser that pursued the operator of a vehicle that ran a red light and ultimately struck Decedent Gore's vehicle. Defendant Gray is sued in his individual and official capacities.

19.     Defendant Zachary A. Franks ("Defendant Franks" or "Franks"), at all times relevant to this Complaint, is/was a Baltimore City police officer. As a police officer, he acted as an agent, servant, and/or employee of the BCPD and acted within the scope of his employment and under color of state law. Defendant Franks was also the operator of a police cruiser that chased the operator of a vehicle that ran a red light and ultimately struck Decedent Gore's vehicle. Defendant Franks is sued in his individual and official capacities.

20.     Defendant Mark T. Gurbelski ("Defendant Gurbelski" or "Gurbelski"), at all times relevant to this Complaint, is/was a Baltimore City police officer. As a police officer, he acted as an agent, servant, and/or employee of the BCPD and acted within the scope of his employment and under color of state law. Defendant Gurbelski was also the operator of a police cruiser that pursued the operator of a vehicle that ran a red light and ultimately struck Decedent Gore's vehicle. Defendant Gurbelski is sued in his individual and official capacities.

21.     Defendant Michael H. Wood ("Defendant Wood" or "Wood"), at all times relevant to this Complaint, is/was a Baltimore City police officer. As a police officer, he acted as an agent, servant, and/or employee of the BCPD and acted within the scope of his employment and under color of state law. Defendant Wood was a passenger in a police cruiser that pursued the operator of a vehicle that ran a red light and ultimately struck Decedent Gore's vehicle. Defendant Wood is sued in his individual and official capacities.

22.     Defendant Joshua P. Corcoran ("Defendant Corcoran" or "Corcoran"), at all times relevant to this Complaint, is/was a Baltimore City police officer. As a police officer, he acted as

an agent, servant, and/or employee of the BCPD and acted within the scope of his employment and under color of state law. Defendant Corcoran was also the operator of a police cruiser that pursued the operator of a vehicle that ran a red light and ultimately struck Decedent Gore's vehicle. Defendant Corcoran is sued in his individual and official capacities.

23.     Defendant Sharif K. Kellogg ("Defendant Kellogg" or "Kellogg"), at all times relevant to this Complaint, is/was a Baltimore City police officer. As a police officer, he acted as an agent, servant, and/or employee of the BCPD and acted within the scope of his employment and under color of state law. Defendant Kellogg was also the operator of a police cruiser that pursued the operator of a vehicle that ran a red light and ultimately struck Decedent Gore's vehicle. Defendant Kellogg is sued in his individual and official capacities.

24.     Defendant Yenuel F. Familia ("Defendant Familia" or "Familia"), at all times relevant to this Complaint, is/was a Baltimore City police officer. As a police officer, he acted as an agent, servant, and/or employee of the BCPD and acted within the scope of his employment and under color of state law. Defendant Familia was also the operator of a police cruiser that pursued the operator of a vehicle that ran a red light and ultimately struck Decedent Gore's vehicle. Defendant Familia is sued in his individual and official capacities.

25.     Defendant Dylan R. Laporta ("Defendant Laporta" or "Laporta"), at all times relevant to this Complaint, is/was a Baltimore City police officer. As a police officer, he acted as an agent, servant, and/or employee of the BCPD and acted within the scope of his employment and under color of state law. Defendant Laporta was also the operator of a police cruiser that pursued the operator of a vehicle that ran a red light and ultimately struck Decedent Gore's vehicle. Defendant Kellogg is sued in his individual and official capacities.

26.     Defendants Callahan, Tucker, Conley, Schreven, Camarote, Bilheimer, Torres, Gray, Franks, Gurbelski, Wood, Corcoran, Kellogg, Familia, Laporta are collectively referred to herein as Defendant Officers.

## STATEMENT OF FACTS

### A.

### The BCPD's History of Innocent Civilian Deaths as a Result of Pursuits

27.     In the 80s and 90s, one could turn on the television and watch episodes of "Cops" or "World's Wildest Police Videos," and see video footage of high-speed pursuits by police officers, usually ending in horrendous crashes.[1] As of 2005, some of the policies governing pursuits across the nation had not been updated since the 1970's, which did not serve the 21st century's increased traffic congestion, resulting in an alarming increase in innocent bystanders' deaths.[2] Accordingly, many police departments were coming to terms with the reality that the killings and severe injuries that resulted from these pursuits were not worth it. This reckoning has led to many police departments modifying their pursuit policies, making them more restrictive than before in an attempt to curb the deaths and injuries that occurred as a result of police pursuits.[3]

28.     In 2017, the U.S. Department of Justice conducted a study ("DOJ Study") that confirmed what most families of the victims already knew: that police pursuits resulted in the death of innocent operators of unrelated vehicles or bystanders at a rate that was too high. The DOJ

---

[1] Cpl. Justin Thompson, *Police Pursuits: Are No-Pursuit Polices the Answer?*, 7 Criminal Justice Institute, Session XXVI (Oct. 21, 2005), https://www.cji.edu/site/assets/files/1921/police_pursuits.pdf; *see also* Mac Demere, *Why High-Speed Police Chases Are Going Away*, Popular Mechanics (May 30, 2013), https://www.popularmechanics.com/cars/a9096/why-high-speed-police-chases-are-going-away-15532838/.
[2] Cpl. Justin Thompson, *supra* note 1, at 7.
[3] *Id.*

Study concluded that from 1996 to 2015 an average of 355 people were killed annually in pursuit-related crashes (about 1 per day).[4] During this time, about two thirds of pursuit-related fatalities involved occupants of a vehicle being pursued and about one third of those killed were occupants of a vehicle not involved in the pursuit or were bystanders.[5]

29.     The DOJ Study also found that police departments that leave the decision to pursue to the discretion of the officer have the highest pursuit rate (17 pursuits out of 100 officers employed), whereas agencies that discourage or prohibit pursuits have the lowest pursuit rate (2 pursuits per 100 officers).[6]

30.     Like much of the rest of the nation, the BCPD has a policy that governs vehicular pursuits, Policy 1503, the "Emergency Vehicle Operation and Pursuit Policy" (hereinafter "Policy 1503" or "Policy"). Policy 1503 was implemented around 2015 and there are three additional iterations to date, one in 2016, one in 2017, with the latest one published in 2019. The differences between the various iterations of Policy 1503 are not substantially different.

31.     The principle of Policy 1503 has been consistent, which is to ensure the safety of the public, including innocent bystanders.  The safety of the public must be weighed against the importance for apprehending suspects. Thus, although Policy 1503 permits officers to pursue under specific circumstances as described below, there are express prohibitions, restrictions, and guidelines to ensure that officers do not create a situation where the pursuit poses a danger to the community.

---

[4] *See* Brian A. Reaves, Ph.D., *Police Vehicle Pursuits 2012-2013*, 6 (U.S. Dept. of Justice Special Report (May 2017), https://www.bjs.gov/content/pub/pdf/pvp1213.pdf.
[5] *Id.*
[6] *Id.*

32.     Policy 1503 dictates that officers "shall use sound judgement and discretion" when pursuing vehicles, thereby allowing officers to use their own discretion when deciding to pursue.

33.     Officers are permitted to use their discretion to pursue when:

> The vehicle contains a felony suspect *and* failure to immediately apprehend poses an immediate threat of death or serious bodily injury to the [officer] or others; *and*
>
> Before the pursuit is initiated, there exists probable cause to believe [that] the fleeing suspect committed a felony which resulted, or could have resulted, in death or serious bodily injury.

(Policy 1503) (emphasis added)

34.     The officer then must consider factors that weigh in favor of or against the pursuit. The risk factors that the officer should consider when engaging in a pursuit and continuing to pursue include the following:

- The type of area in which the pursuit is traversing, such as a school zone or residential area;

- The weather and road conditions;

- The density of vehicular and pedestrian traffic;

- The speed of the pursuit;

- Officers' familiarity with the area of the pursuit;

- The availability of other resources, such as air support assistance; and

- The likelihood of apprehension at a later time.

35.     Policy 1503 also requires that officers use "de-escalation" techniques to reduce the level of threat and to gain compliance. Policy 1107, the policy governing de-escalation techniques, requires officers to reduce threats, gain voluntary compliance, and secure the safety of others.

These techniques include, *inter alia*, communicating in a calm tone and using calming gestures and expressions when in contact with a suspect, avoiding unnecessary display of weapons force, and avoiding physical confrontation. Other de-escalation techniques are to create distance and slow down the pace of the incident.

36.     According to Policy 1503, there are certain limited factors that prohibit an officer from initiating a pursuit, including where the person fleeing is only suspected of a crime against property. Another is when the risk of the pursuit outweighs the need to stop the eluding driver.

37.     Policy 1503 does not limit the speeds that the pursuit may reach, and there is no requirement that officers stop at intersections. However, the Policy does require that officers do not endanger life or property with the speeds traveled, and it also requires that officers slow down as necessary for safety when proceeding through a red light or stop sign.

38.     Policy 1503 requires that pursuits be supervised by a supervisor, and a supervisor has the authority to terminate a pursuit upon command. The Primary Unit (first car pursuing) is responsible for providing updates about the location, the speed, and the direction of travel of the eluding vehicle; the reason for the pursuit; the weather, traffic, and road conditions, and other information so that a supervisor can determine whether the pursuit needs to be terminated.

39.     The Primary Unit is also responsible for completing an Incident Report after the pursuit has ended, detailing the facts that provided probable cause for the pursuit. The Primary Unit must also document the facts that caused the officer to believe that the safety risks of the pursuit were outweighed by the risks posed by the fleeing suspect.

40.     Furthermore, when a pursuit begins, a helicopter must be summoned to establish visual contact with the fleeing vehicle. The helicopter crew, according to Policy 1503, must report on the progress of the pursuit, road hazards and conditions, and other pertinent information to

assist in evaluating whether the pursuit should continue. The helicopter crew also has the authority to recommend terminating a pursuit.

41.     To ensure the safety of the public, officers are expressly prohibited from pursuing a vehicle that is driving on the wrong direction on a street. Officers are not permitted to attempt to pass other pursuing vehicles unless expressly requested to do so by the Primary Unit and there is a clear understanding between all pursuing vehicles that a pursuing officer will overtake another.

42.     Officers who are not involved or assigned to the pursuit must remain in their assigned areas, and they are not permitted to become involved in the pursuit unless directed by a supervisor.

43.     Supervisors are required to manage control over officers involved in the pursuit, ensure that no more than three officers are pursuing the fleeing vehicle, ensure that the risks of the pursuit is not outweighed by the danger posed, direct the pursuit to be terminated at any time based on their analysis of the factors, determine whether the pursuit violates the policy, and prepare a post-pursuit review and ensure that all incident reports and other required documents are uploaded into a reporting system. According to Policy 1503, supervisors are to be held "strictly accountable for maintaining command and control of a pursuit and for emergency response of their subordinates."

44.     As stated above, Defendant BCPD does not adequately train its officers under the pursuit policies. The training on pursuits falls under the general umbrella of what is identified as Emergency Vehicle Operator Course ("EVOC") training, which also comprises of general information about police vehicles and their operation. However, the training BCPD officers receive consists of spending approximately one day reviewing the emergency vehicle pursuit

policy and then practicing on a closed course. This training occurs during the training at the BCPD Academy, after officers are hired but before they are sworn in as officers.

45.     Once the officers have successfully completed the training program and are sworn in, they receive no further formal training or refresher courses on vehicular pursuits.

46.     When an updated version of vehicular pursuits issued, officers are required to review the policy and sign a form that they have reviewed it. There may be a short test after the review, but there is no direct contact with a supervisor to ensure comprehension of the requirements and changes.

47.     Further, there are no requirements for higher ranking officers, who are the officers who supervise pursuits and ensure that lower ranking officers comport with the Policy, to complete any additional training upon receiving their promotion. Thus, officers rise through the ranks and supervise other officers during vehicular pursuits, having never received any additional training on supervisory requirements or even refresher courses on the fundamentals of the Policy. Some officers have been employed by Defendant BCPD for decades and have never received any additional training on the Policy, even though they are supervisors with the BCPD.

48.     Furthermore, Defendant BCPD does not investigate pursuit incidents to ensure that its officers complied with the requirements of the Policy, either on a routine, random basis, and not even in the event of a serious injury or death.

49.     Defendant BCPD is on actual notice that officers are poorly trained and supervised during vehicular pursuits, having been sued multiple times for injuries and deaths arising from police pursuits that ended up killing innocent bystanders, putting it on actual notice of a pattern and practice of officers' use of excessive force in the context of vehicular pursuits, substantive due

process rights violations, and/or other Constitutional violations and/or violating the BCPD's pursuit policies.

50. The following cases are some of the cases that have been filed against the Department within the last 10 years alleging substantive due process rights violations, and/or other Constitutional violations, and/or violation of BCPD's pursuit general order or policies resulting in death. This list is not an exhaustive list, as it does not include matters where only serious injuries occurred.

a. *Holloway-Johnson v. Beall, et al.*
Case No.: 24-C-11002394, Cir. Ct. for Balt. City
Holloway, a motorcyclist, was killed when he was struck by a police vehicle during a pursuit; the pursuit began in the City and ended in Baltimore County. Judgment in favor of Plaintiff 2012.

b. *Yolanda Williams, et al. v. Mayor and City Council for Baltimore City*
Case No.: 24-C-15-0000935, Cir. Ct. for Balt. City
Jordasha Rollins was a passenger in a vehicle that was struck by a car that was being pursued by police. Settlement in 2015.

c. *Ntambo Ciwengo, et al. v. Estate of Terrell Young, et al.*
Case No.: 24-C-15005795, Cir. Ct. for Balt. City
City officers pursued Young for miles, leading him to crash into an SUV at about 100 mph, killing him, a passenger, and another woman in the SUV. Settlement in 2017.

d. *Shirley Johnson, et al. v. Umar Burley, et al.*
Case No.: 24-C-13002083, Cir. Ct. Balt. City &
*Shirley Johnson, et al. v. Baltimore Police Department, et al.*
Case No.: SAG-18-2375, D. Md.
Three police officers, some of whom were members of the now defunct Gun Trace Task Force, in unmarked cars chased a vehicle that crashed into Elbert Davis' car. He died hours later from his injuries. Settlement in 2019 (federal court) and 2020 (state court).

51.     In addition to the above lawsuits, as of 2015, all local law enforcement agencies are required to provide annual comprehensive reports to the Governor that identify and analyze deaths that occurred as a result of actions or omissions of a police officer, including from pursuits.[7] Between 2015 and 2019, at least 30 Marylanders have been killed by police pursuits, including seven innocent bystanders. Of the 30 deaths, five of them were a direct a result of pursuits by the Baltimore City Police Department. These deaths occurred under the pursuit requirements of Policy 1503, which as identified *supra*, has remained substantively similar since then.

52.     In 2015 BCPD investigated a high-speed chase by a Baltimore County Police Officer that resulted in a crash within City limits, killing an 18-month-old baby who was in a stroller waiting at a bus stop with his mother and sister.[8] Notably, these annual reports do not include data as to how many innocent bystanders or drivers are seriously injured, as opposed to killed, as a result of police pursuits.

53.     Despite these deaths that are a direct result of police pursuits, Defendant BCPD has not taken any steps to provide any additional or remedial training to its Officers or supervisors to ensure that the requirements of the Policy are followed during vehicular pursuits.

54.     In *Smallwood, et al. v. Off. Joseph Kamberger, et al.*, Cir. Ct. for Balt. City, Case No.: 24-C-17-00532, the action where an 18-month-old baby was killed, Officer Joseph Kamberger, testified under oath that when an officer pursues an eluder, it induces the eluder to drive faster and continue to attempt to flee. The use of force expert hired by the plaintiffs in this

---

[7] *See* Maryland Statistical Analysis Center, Governor's Office of Crime Control & Prevention, *Reports to the State of Maryland under HB 954* (2015-2019) *available at* http://goccp.maryland.gov/reports-publications/law-enforcement-reports/deaths-involving-law-enforcement/
[8] *See Smallwood, et al. v. Off. Joseph Kamberger, et al.*, Cir. Ct. for Balt. City, Case No.: 24-C-17-005327.

case testified similarly: that where an officer breaks off pursuit of an eluder, it encourages the eluder, who now believes that he is no longer being chased, to slow down and stop at intersections for cross traffic.

55.     Evidenced by a pattern and practice of flagrant violations of the directives of Policy 1503, Defendant BCPD has failed to train and supervise its officers during these pursuits, thereby manifesting a conscience-shocking deliberate indifference and reckless disregard for the rights of citizens. The repeated failure of BCPD officers to comply with Defendant BCPD's Policy 1503 has become so pervasive and widespread that it constitutes a custom or usage with the force of law. As a result, the incident described below was a natural and foreseeable event, and one that was a direct result of the Defendants' actions or omissions.

**B.**

<u>The Incident</u>

56.     On the evening of March 21, 2020, a Saturday, around 7:45 p.m., BCPD officers were notified by the Baltimore County Police Department that a GPS device located on a stolen 2014 Ford Fusion indicated that the vehicle was in 2600 block of W. Patapsco, which is located in the Southern District, just to the west of the Cherry Hill neighborhood. The officers were informed of the vehicle's description, license plate number, and that it was not the subject of a carjacking, the owner having left keys inside.

57.     The information provided to officers indicated that the Ford Fusion was stopped and had not moved for some time.

58.     The police helicopter was summoned to assist in locating the Ford Fusion.

59.     Multiple officers responded to that location. The police helicopter, which had been heading towards that direction, arrived at the location where the stolen vehicle was located before

BCPD officers arrived. The police helicopter identified the vehicle and told the officers that it was "pulled head in" and advised that they may want to "pull in behind it."

60. Defendant Torres, Defendant Franks, and Defendant Gray attempted to box in the stolen vehicle to prevent it from moving, but despite their efforts, the driver of the vehicle, Delissa Ann Dello-Stritto ("Dello-Stritto") backed up, struck Gray's vehicle, and fled westbound on Patapsco Avenue with the helicopter overhead. The helicopter's aerial observer, Defendant Bilheimer, observed and announced these events as they were occurring over the radio to other officers.

61. As Dello-Stritto was leaving the parking lot, fleeing westbound on Patapsco Avenue, Defendant Tucker requested that Gray confirm that Dello-Stritto hit his vehicle, which he confirmed. At that time, there was no evidence that Gray suffered from any injuries, nor did he report that he was injured at that time.

62. Multiple other officers from the Southern District who had heard what had transpired over the radio began pursuing Dello-Stritto. Defendant Conley, who was the Sergeant on duty, was the first vehicle behind Dello-Stritto. Pursuant to the Policy, he was the Primary Unit in pursuit as he initiated the pursuit and was the vehicle closest to Dello-Stritto; therefore, his highest responsibility was the "preservation of life and public safety." He was required to announce several items as he was pursuing, including the location, direction of travel, estimated speed of the eluding vehicle, traffic conditions, and the reason for the pursuit.

63. Other officers participated in the pursuit, but there is no evidence that any of the officers attempted to or used any de-escalation techniques. To the contrary, they escalated it by keeping close distance to Dello-Stritto and keeping pace with her instead of slowing the pace down.

64.     Multiple officers pursued Dello-Stritto in a circuitous 11-mile route through Baltimore City.

65.     The pursuit lasted for a little over 14 minutes and traversed four Districts (the Southern, Southwestern, ending in the Northwestern District, while it briefly entered and exited the Western District as well).

66.     At times, the pursuit exceeded 65 miles an hour and went through areas where civilians were located, placing them at high risk. The speed limits on the streets where the pursuit occurred ranged from 10 miles per hour to no more than 35 miles per hour. Several of the streets had a speed limit of 25 miles per hour, and some of them were zoned for schools.

67.     The pursuit also went through approximately 100 intersections and down narrow residential streets, some of which were one-way. In one intersection, there was a group of three to eight pedestrians in the path of travel. There were several pedestrians who could be seen in at least one other section of the pursuit. Other streets were busy streets, with vehicular congestion. The pursuit also passed at least five schools, several playgrounds and parks, and one hospital along the way.

68.     Dello-Stritto committed multiple traffic violations. She drove through a parking lot of a gas station without stopping. Along the route that she traveled, there were a little over 30 traffic lights, and approximately 15 stop signs. According to Defendant Conley, she did not stop or yield at any of the traffic lights or stop signs. She also passed vehicles from the left, going into the opposite lane of travel, and at least one road had a double yellow line. At one intersection, she weaved through cars that were waiting at a traffic light at an intersection. She also went down a street against the flow of traffic for about 50-100 yards.

69. It was also a Saturday evening at dusk, meaning visibility was lower, increasing the risk to other motorists and pedestrians.

70. During the entire pursuit, the helicopter was overhead following the Ford Fusion and Bilheimer was communicating with officers regarding its location. However, at no time did Bilheimer advise as to the increased traffic congestion, road hazards, visible pedestrians, traffic violations, or any other pertinent information that would assist in evaluating termination of the pursuit. At no time did Bilheimer ever advise as to the excessive speed of the pursuit. At no time did Bilheimer ever advise that Dello-Stritto had blown through multiple stop signs and traffic lights. At no time did Bilheimer ever advise that Dello-Stritto had driven down the wrong side of the roadway and had passed at least one vehicle on the left over a double yellow line. Despite all these violations and factors that increased the risk of the pursuit, at no time did Bilheimer ever recommend that the pursuit be terminated.

71. Defendant Conley did not provide any of these updates either, even though he could hear that Bilheimer was not providing them and even though he was, according to him, right behind Dello-Stritto.

72. Other officers were pursuing as well, yet they never informed their supervisors that they were joining as was required under the Policy. Conley knew that there were multiple other officers pursuing, but he could not state who was pursuing. At one point after Dello-Stritto made a U-turn, four police vehicles were waiting for her as she double-backed down the road. The four police vehicles joined in the pursuit, in addition to all the other police vehicles who were already pursuing.

73.     None of the pursuing officers provided information as to estimated speed, traffic violations committed, or any of the other factors that would identify the high-risk nature of the pursuit.

74.     Although Defendant Tucker was listening to the pursuit in real time, and despite that she was the shift commander under the Policy, she did not request for this information to be provided.

75.     There are other ways in which the officers violated the Policy. At one point in the pursuit, Schreven accelerated, overtook, and dangerously cut off Conley at an intersection. As the unit immediately behind Dello-Stritto, he was now the Primary Unit without specific authorization, which is expressly prohibited under the Policy. Worse, Schreven did not think that by taking over, he was the Primary Unit in pursuit. As the Primary Unit, he now had the responsibility of providing updates according to the Policy.

76.     Gray, whose vehicle was struck at Patapsco, left the scene of where the collision occurred. According to BCPD policy, whenever a police vehicle is involved in a collision, that vehicle must remain at the scene of where the collision occurred until the Accident Investigation Unit arrives to investigate. Gray disregarded this directive, left the scene without telling anyone and then participated in the pursuit. Leaving an assigned area and becoming involved in the pursuit without authorization from a supervisor is prohibited under the Policy.

77.     Officers who admitted that they were engaged in the Pursuit turned their sirens on and off intermittently throughout the pursuit. According to the Policy, officers must keep their lights and sirens on when pursuing. Policy 1503 also requires officers to slow down at intersections to clear cross traffic, which not all officers did.

78.     Gurbelski and Wood, who were not from the Southern District, heard the updates on the radio and decided to join in the pursuit. They did not inform their supervisor, did not alert that they were joining on the radio, and did not provide any of the required updates under the Policy. At some point, Wood pulled out his smart phone and recorded the pursuit while he and Gurbelski were laughing hysterically as they were pursuing.

79.     Camarote, Corcoran, Familia, Laporta, and Kellogg were all pursuing as well. Kellogg stated that he could see "three to four" officers ahead of him and "three to four behind" him, but he continued to pursue. Kellogg's radio was not operating during the pursuit, so it is unclear as to how he could reasonably follow a direct command to terminate a pursuit if it had been given.

80.     At no time during the 11-mile and 14-minutes long pursuit did an officer or supervisor ever recommend that the pursuit be terminated.

81.     During this entire pursuit, the GPS device was providing the location of the vehicle. Therefore, even if the officers on the ground had not pursued, the location of the vehicle would have been known to them. Also, as stated above, the helicopter was overhead the entire time, which means that the eluder's location was known to officers of the BCPD at all times, thus obviating the need for the pursuit.

82.     During various times of the pursuit, one of the officers' speedometer showed speeds of 60 miles per hour to speeds as high as 75 miles per hour. The posted speed limits throughout the pursuit never exceeded 35, which means that officers were exceeding the speed limit by at least 25 to 35 miles per hour over the speed limit.

83.     At no point during the entirety of the pursuit did any officer, including the supervising officers, inquire as to the following: how many officers were participating in the

pursuit and from which District(s); the speed of the pursuit; whether Dello-Stritto was running traffic lights and stop signs; whether she was slowing down at intersections, whether Dello-Stritto was driving in a manner that put other motorists at risk; the speed of the pursuit and posted speed limits; the type of area in which the pursuit was traversing, including residential areas; whether pedestrians were put at risk; the increase in density of vehicular traffic; and ultimately whether the risks posed by the pursuit to innocent bystanders outweighed the need to catch Dello-Stritto.

84.　　When Dello-Stritto turned onto Liberty Heights she went into the opposite lane of traffic and the officers followed her, which is prohibited. Bilheimer, who observed this and who knew that this was prohibited, did not announce the violation. Same for Conley, who was behind Dello-Stritto, followed her into the opposite lane of traffic.

85.　　The speed limit on Liberty Heights is 30 miles per hour. One of the pursuing Officers' speedometer registered about 70 miles per hour as he was pursuing. An Officer with the Accident Investigation Unit estimated that Dello-Stritto was traveling at 68 miles per hour down Liberty Heights, which would place her speeds at 38 miles over the posted speed limit.

86.　　Dello-Stritto, as she had done multiple times before, did not stop at a busy traffic signal that intersected with Liberty Heights and went around vehicles that were stopped at the traffic signal.

87.　　At the intersection of Liberty Heights and Callaway Avenue, the Ford Fusion ran a red light and t-boned Decedent Gore's car on the passenger side, causing it to spin several times and then hit another car that was in the intersection.

88.　　The BCPD and its officers created the threat to the citizens when they engaged in the pursuit and continued to purse, with conscience shocking deliberate indifference and reckless disregard for the rights of innocent citizens.

89.     Plaintiff Tyson, who was in the passenger side, broke his left tibia and two left ribs; he sustained bruises to his right lung and pooling of blood in the area between the chest wall and the lungs on his right side. He was taken to the hospital for his injuries, which required extensive treatment and subsequent physical therapy.

90.     When first responders arrived on the scene, Gore was unresponsive, bleeding from the right ear. He had unequal pupils, with a Glasgow Coma Scale of 3, a score that indicates a devastating brain injury. He also had bruises on the right side of his head; there was a cut on the right jaw and right hand; and there were scratches on the right arm, right ankle, and left knee. [9] While first-responders were attempting to get him out of the vehicle, he could be seen moving about and gasping for air. Officers noted that he was wearing a mask that was full of blood, which they removed so he could breathe.  Officers at the scene also noted that his condition was critical.

91.     At the hospital, Gore was diagnosed with a fracture of one of the vertebrae in his neck and an acute brain bleed. Later, the blood flow to the brain was obstructed, and he underwent emergency surgery where parts of his skull were removed. Despite the surgery, the lack of blood flow continued and swelling increased, putting pressure on his brain. He remained in a coma, gaining consciousness sporadically. After some minimal improvement however, his condition declined, eventually leading to cardiac arrest. He was pronounced dead on April 17, 2020.

92.     Because of the hospital restrictions due to COVID-19, his mother and family were unable to visit him in the hospital, so Decedent Gore died alone, and his mother was unable to say goodbye.

---

[9] Decedent Gore's dog was in the car as well, and its right leg was broken.

## C.

### Post-Pursuit

93.     After the pursuit ended, at least one eyewitness stated that there were at least five other police officers pursuing the Ford Fusion at the time of the collision, which was a conservative estimate. Conley stated that there were about "12" officers following Dello-Stritto during the pursuit, although he could not state who was pursuing.

94.     The pursuit presumably ensued because Dello-Stritto struck Gray's police vehicle. When Tucker looked at Gray's car to assess the damage, she stated that the damage done was "just a scrape." Officer Corcoran also noted that some of the damage done to Gray's vehicle was pre-existing and told him so. But Gray did not inform the Accident Investigation Unit as to the pre-existing damage.

95.     As first responders were attempting to get Gore and Tyson out of the crushed vehicle, Conley can be heard telling Tucker that the pursuit was "so much fun," and that he "couldn't wait to see the video."

96.     Policy 1503 requires that the Primary Unit, here Conley and Schreven, respectively, fill out an Incident Report "detailing the facts providing probable cause for the pursuit." This was not done. The Primary Unit must also document facts that caused the pursing officer to believe that the benefit of catching the eluder outweighed the risks to the public.  This was not done. Policy 1503 also requires that the supervisor of the pursuit prepare a post-pursuit review and ensure all incident reports and other required documentation are completed and entered into a reporting system with BCPD. This was not done.

97.     Neither Conley nor Tucker, the officers who are to "held strictly accountable for maintaining command and control of a pursuit," bothered to follow up with the officers who participated in the pursuit for a formal, or even informal, debriefing.

98.     Both Gurbelski and Wood were present at the scene of the collision and left without ever checking in with anyone at the scene. Not a single Officer asked them who they were, whether they participated in the pursuit, or took any effort to determine whether their actions comported with Policy 1503.

99.     No one from the BCPD bothered to download the footage from the BWC to determine whether officers comported with the Policy during the pursuit. This is not because the BCPD was unaware of what had occurred. To the contrary, it had actual knowledge of what had transpired and the severity of the incident. Given the serious nature of the pursuit and ensuing injuries, Tucker called a major with the BCPD, Major Brown from the Central District, to inform her of what had occurred. Major Brown drove to the scene of the incident, but there is no evidence that Major Brown ever inquired as to the propriety of the pursuit or compliance therewith, including appropriate supervision.

100.    Same for Callahan. He was a Captain at the time, was a supervising officer, and was present at the scene of the incident on Liberty Heights and Callaway Avenue, but never inquired as to the whether any of the officers complied with the pursuit or whether Tucker or Conley had supervised BCPD officers appropriately.

101.    In the weeks following the incident, multiple officers from the Southern District, including Defendants Tucker and Conley, viewed the footage taken from the helicopter on a computer at a desk in the Southern District. However, at no time did any of the officers, including

Tucker and Conley ever make any formal inquiries as to whether the Policy had been violated, if so, in what manner, by whom, and what actions, if any, needed to be taken.

102.     Conley could not offer an explanation as to why he did not question Gray as to his actions. Conley could not offer an explanation as to why he did not formally follow up with Schreven and recommend either remedial training or reprimand for overtaking him and cutting him off without permission to do so. Conley could not offer an explanation as to why he did not inquire as to why more than three officers participated in the pursuit and what their role was. Conley could not offer an explanation as to why he never followed up as to what the appropriate action would be to reprimand someone who followed the eluder down the wrong way, nor could Tucker provide an explanation why she did not do the same.

103.     Some of the Defendant Officers were not formally interviewed regarding the pursuit until late September of 2021, which was weeks after a ruling was issued on the pending Motions to Dismiss on August 5, 2021, and months after the Complaint was filed on April 19, 2021. This evidenced the BCPD's utter failure to supervise as consistent with its pattern and practice of failing to train and supervise it officers in and during vehicular pursuits.

104.     As a direct and proximate result of Defendants' actions or omissions, Decedent Gore was killed, and Plaintiff Tyson sustain significant injuries.

105.     As a direct and proximate result of Defendants' actions or omissions, Plaintiffs Gore and Tyson had conscious pain and suffering. Decedent Gore's surviving mother has suffered, and will continue to suffer, from mental anguish, emotional pain and suffering, loss of society, loss of comfort, loss of protection, loss of filial care, loss of attention, and loss of services. His surviving mother will also incur medical and legal expenses and other damages.

## CLAIMS

## COUNT I

### 42 U.S.C. §1983—Due Process Violations

### (Plaintiffs against Defendant Officers)

106.     Plaintiffs incorporate and adopt each allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

107.     This Count is brought by Plaintiffs against all Defendants identified herein, jointly and severally.

108.     At all relevant times herein, Defendant Officers were state actors and "persons" within the meaning of 42 U.S.C. § 1983 and their conduct was and is subject to 42 U.S.C. § 1983. At all relevant times, they were acting within the scope of the employment.

109.     Defendants' conduct deprived Plaintiffs of their constitutional right to life, liberty, and property, and deprived Decedent Gore's mother of the love and affection of her son.

110.     Absent Defendants' misconduct, Decedent Gore and Plaintiff Tyson would not have suffered the severe physical and emotional pain and suffering, and Decedent Gore would not have died. Plaintiff Simmons would not have suffered the loss of her son.

111.     The conduct of Defendants was without legal justification and was improperly motived by ill will and actual malice. Defendants, with ample time to deliberate, recklessly and intentionally engaged in a high-speed, high-risk pursuit with the intent to harm, thus causing a vehicle to hit Decedent Gore's vehicle, killing him and severely injuring Plaintiff Tyson.

112.     The force used by Defendants was intentional, excessive, unconstitutional, unlawful, objectively unreasonable and absent any lawful justification or excuse.

113.    The Defendants' conduct lacked any legal rationale. They knew they were placing the lives of innocent drivers and/or bystanders in danger when they engaged a driver in a high-speed, high-risk pursuit with an emergency vehicle, causing the operator of the Ford Fusion to drive dangerously and recklessly, ultimately leading to Decedent Gore's death and Plaintiff Tyson's injuries.

114.    Defendant BCPD is vicariously liable to Plaintiffs for Defendants' violations of Plaintiffs' substantive due process rights under the Fourteenth Amendment to the U.S. Constitution.

115.    Defendants' wrongful conduct was conscience shocking and was deliberately indifferent to Decedent Gore and Plaintiff Tyson's due process rights, depriving them of their life, liberty, and property.

116.    As a result of these intentional acts, Decedent Gore and Plaintiff Tyson sustained severe physical injuries, including death. Plaintiffs sustained emotional, mental, and financial injuries, including, but not limited to, pain and suffering, mental anguish, costs and expenses of medical and legal proceedings, lost wages, and other expenses.

117.    Defendants' actions and/or omissions as described herein, were intentional, wanton, willful, malicious, manifested blatant and reckless disregard for Plaintiffs' constitutionally protected rights, and, as such, Plaintiffs are entitled to compensatory and punitive damages from Defendants.

118.    As a direct and proximate result of Defendants' actions and/or omissions identified herein, Plaintiffs sustained physical, emotional, mental, and financial injuries, including, but not limited to, pain and suffering, mental anguish, costs and expenses of medical and legal proceedings, lost wages, and other expenses, and in Decedent Gore's case, death. Plaintiffs' life,

liberty, and property were deprived without due process of law and in violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

**WHEREFORE**, Plaintiffs request that this Court enter judgment in their favor, and against the Defendants, in an amount in excess of $75,000.00 in compensatory damages, plus costs and interest, and any other such relief that this Court deems proper.

**COUNT II**

**42 U.S.C. §1983**
**Unconstitutional Custom, Pattern and/or Practice of**
**Failure to Train and Supervise**
(***Monell*** **Claim**)

**(Plaintiffs against Defendant BCPD)**

119.    Plaintiffs incorporate and adopt each allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

120.    At all relevant times herein, Defendant BCPD was a state actor and a "person" within the meaning of 42 U.S.C. § 1983 and its conduct was and is subject to 42 U.S.C. § 1983.

121.    Under the Fourteenth Amendment to the United States Constitution, Defendant BCPD is prohibited from allowing, enabling, and facilitating Defendant BCPD's officers to engage in a pattern, practice, policy, or custom of violating citizens' constitutional rights and is obligated to train in the misuse of police powers and supervise officers for violating constitutional rights, as well as recognizing patterns of systemic perpetuation of same.

122.    At all relevant times, Defendant BCPD, directly and through its officers and agents had an obligation to ensure that its officers, employees, and agents, exercised the same degree of care that a reasonable and prudent person would exercise in the same or similar situation with respect to the training, supervision, and oversight of all employees, agents, and officers under its direction and control.

123.     As identified *supra*, the training, supervision, and oversight required by Defendant regarding incidents of misuse of police powers and constitutional rights violations committed by Defendant BCPD's Officers was inadequate, insufficient, and/or nonexistent, and Defendant BCPD, directly and through its employees, agents, and officers, failed to exercise the above requisite degree of care in the supervision of all employees, agents, and officers under its direction and control.

124.     As identified *supra*, testimony from at least one former BCPD Officer indicated that BCPD officers were provided inadequate training in vehicular, emergency pursuits.

125.     Defendant BCPD, directly through its agents, supervised the individual Defendants prior to and during the events at issue. The ranking officers and supervisors had actual or constructive knowledge of the pervasive and persistent pattern and practice that its officers were engaged in conduct that violated clearly established rights, and that this conduct posed an unreasonable risk of constitutional injury to Plaintiffs.

126.     Defendant BCPD had actual or constructive knowledge that the individual Defendants and other members of the BCPD were engaged in widespread misconduct over a period of years that posed an unreasonable risk of constitutional injury to Plaintiffs and other citizens of Baltimore. The individual Defendants' conduct, in addition to conduct of other BCPD officers, was so persistent and pervasive that it represented a custom or usage with the force of law.

127.     In spite of this knowledge, Defendant BCPD took no action to prevent or remedy the misconduct by Defendant Officers. Defendant BCPD was deliberately indifferent to the persistent constitutional violations by its officers, including Defendant Officers.

128.     Moreover, before and during this pursuit, as it has failed to do many times before, Defendant BCDP failed to properly train and supervise the Defendant Officers, and other BCPD officers, and it failed to prohibit its officers from engaging in the violation of its own departmental policies.

129.     As alleged herein, Defendant engaged in a pattern, practice, policy, and/or custom of indifference to incidents of Defendant BCPD's officers' violation of citizens' constitutional rights in connection with subduing and/or apprehending individuals and in so doing, failed to properly supervise Defendant officers and employees in the proper handling of police pursuits.

130.     Defendant BCPD failed to properly train its officers, including those in a supervisory role; it failed to implement procedures for investigating the propriety of pursuits and their compliance with the Policy; it failed to investigate the conduct of officers who were engaged in pursuits; it failed to discipline officers who did not comply with the pursuit policy;  and it failed to provide safeguards against abuses and violations of the policy that were committed by its officers who engaged in pursuits.

131.     Supervisors and ranking officers, including an officer with the rank of Major within the BCPD, had actual or constructive knowledge that subordinate officers engaged in conduct that posed an unreasonable risk, and their response was so inadequate as to show deliberate indifference or tacit authorization of the violations of the policies. But-for Defendant BCPD's deliberate indifference, Plaintiffs have suffered injuries, including death.

132.     It was readily foreseeable and highly predictable that failing to properly supervise Defendant BCPD's officers in the proper handling of police pursuits would, and in fact did, result in the violation of Plaintiffs' constitutional rights as alleged herein and Defendant BCPD was indifferent to same.

133.     As alleged herein, the actions by all named Defendants shocked the conscience and were deliberately indifferent, conduct which was a direct result of Defendant BCPD's failure to adequately train, re-train, supervise, oversee, and discipline its employees to deal with pursuits, including termination of pursuits that violated BCPD Policies. Defendant BCPD's failure to properly train, re-train, oversee, supervise, and discipline its employees was tantamount to conscience shocking deliberate indifference to the rights of citizens.

134.     As alleged herein, Defendant BCPD has engaged in a pattern, practice, policy, or custom of allowing Defendant BCPD's officers to violate citizens' substantive due process rights when apprehending and subduing suspects during police pursuits.

135.     As a direct and proximate result of Defendant's actions or omissions identified herein, Plaintiffs sustained physical, emotional, mental, and financial injuries, including, but not limited to, pain and suffering, mental anguish, costs and expenses of medical and legal proceedings, lost wages, and other expenses, and in Decedent's Gore's case, death. Plaintiffs' life, liberty, and property were deprived without the judgment of their peers or by the law of the land.

136.     Defendant BCPD and all other officers identified herein subjected Plaintiffs to the deprivation of these rights, by maliciously and with conscience shocking deliberate indifference as to whether Plaintiffs' rights would be violated by their actions, and such actions were the moving force in having such rights violated and incurring injuries, including death.

137.     Defendants' actions or omissions as described herein, were intentional, wanton, willful, malicious, manifested conscience shocking deliberate indifference and reckless disregard for Plaintiffs' constitutionally protected rights, and as such Plaintiffs are entitled to compensatory and punitive damages from Defendants jointly and severally.

**WHEREFORE**, Plaintiffs request that this Court enter judgment in their favor, and against Defendants, jointly and severally, in an amount in excess of $75,000.00 in compensatory damages, plus costs and interest, punitive damages, and any other such relief that this Court deems proper.

## COUNT III

**Maryland Declaration of Rights Article 24: Deprivation of Life, Liberty, and Property**

**(Plaintiffs against Defendant Officers)**

138.    Plaintiffs incorporate and adopt each allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

139.    This Count is brought by Plaintiffs against all Defendants identified herein, jointly and severally.

140.    The individual Defendants identified herein are sued in their individual capacities.

141.    At all times relevant to this Complaint, Defendant Officers were acting under the color of state law as officers employed by Defendant BCPD.

142.    Defendant Officers violated Decedent Gore and Plaintiff Tyson's civil rights and due process as set forth in the Maryland State Constitution and the Declaration of Rights, including Article 24.

143.    Defendant Officers acted as Defendant BCPD's agents, servants, and/or employees when they engaged in intentional acts of misconduct which violated Decedent Gore's civil rights and due process such that Decedent Gore died as result of the physical injuries.

144.    Defendant Officers acted as Defendant BCPD's agents, servants, and/or employees when they engaged in intentional acts of misconduct which violated Plaintiff Tyson's civil rights and due process such that Plaintiff Tyson suffered significant physical injuries.

145.     As a direct result of Defendants' actions or omissions, Decedent Gore and Plaintiff Tyson were deprived of their life, liberty, and property without the judgment of their peers or by the law of the land.

146.     The conduct of Defendant Officers was without legal justification and was improperly motived by ill will and actual malice.  Defendant Officers intended harm when they, with ample time to deliberate, recklessly and intentionally engaged in a high-speed, high-risk pursuit, thus causing a vehicle to hit Decedent Gore's vehicle, thereby killing him and severely injuring Plaintiff Tyson.

147.     The force used by Defendants when pursuing and apprehending the Ford Fusion was unconstitutional, intentional, excessive, objectively unreasonable, conscience shocking, and absent any lawful justification or excuse.

148.     The Defendants' conduct lacked any legal rationale. They knew they were placing the lives of innocent drivers and/or bystanders in danger when they engaged a driver in a high-risk, high-speed chase, caused the operator of the Ford Fusion to drive dangerously, they recklessly operated an emergency vehicle, and caused a vehicle to hit Decedent Gore, thereby killing him and severely injuring Plaintiff Tyson.

149.     Defendants' actions or omissions as described herein, were intentional, wanton, willful, malicious, manifested blatant and reckless disregard for Plaintiffs' constitutionally protected rights, and as such Plaintiffs are entitled to compensatory and punitive damages from Defendants, jointly and severally.

150.     As a direct and proximate result of Defendants' actions or omissions identified herein, Plaintiffs sustained physical, emotional, mental, and financial injuries, including, but not limited to, pain and suffering, mental anguish, costs and expenses of medical and legal

proceedings, lost wages, and other expenses, and in Decedent Gore's case, death. Plaintiffs' life, liberty, and property were deprived without the judgment of their peers or by the law of the land.

**WHEREFORE**, Plaintiffs request that this Court enter judgment in their favor, and against the Defendants, in an amount in excess of $75,000.00 in compensatory damages, plus costs and interest, and any other such relief that this Court deems proper.

## COUNT IV

### Gross Negligence

### (Plaintiffs against Defendant Officers)

151. Plaintiffs incorporate and adopt each allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

152. This Count is brought by Plaintiffs against Defendant Officers, jointly and severally.

153. At all times relevant to this Complaint, Defendants were acting under the color of state law as officers employed by Defendant BCPD.

154. Defendant Officers had a duty to not misuse their vehicles and to operate their vehicles in a safe and lawful manner, so as not to cause harm to other drivers and/or bystanders. However, Defendant Officers breached their duty by engaging in intentional, willful, and wanton misconduct with a reckless disregard for human life that did, in fact, lead to the death of Decedent Gore.

155. Defendant Officers engaged in intentional, willful, and wanton misconduct and with a reckless disregard for human life or the rights of Plaintiffs. Defendant Officers acted with utter and deliberate indifference to Plaintiffs' rights and wellbeing.

156. Defendant Officers, with an utter and deliberate indifference for human life, engaged a driver in a high-speed, high-risk pursuit and caused a vehicle to hit Decedent Gore, thereby killing him, and causing severe injury to Plaintiff Tyson.

157. Defendant Officers' gross negligence proximately caused the injuries that Plaintiffs sustained. All of Plaintiffs' injuries were caused solely by the negligence of Defendants without any contributory negligence by Plaintiffs.

158. Defendant Officers' conduct was without legal justification and was improperly motivated by ill will and actual malice. Defendants intended to harm Plaintiffs when they engaged in a pursuit that dangerously exceeded the speed limits, went through multiple intersections, and traversed through a densely populated city for 11 miles for over 14 minutes, blowing through almost 100 intersections, 30 traffic lights, and 15 stop signs at speeds in excess of 25 to 35 miles over the posted speed limit.

159. As a result of these acts, Plaintiffs sustained emotional, mental, and financial injuries, including, but not limited to, pain and suffering, mental anguish, costs and expenses of medical and legal proceedings, lost wages, and other expenses, and in Decedent Gore's case, death.

**WHEREFORE**, Plaintiffs requests that this Court enter judgment in their favor, and against Defendants, jointly and severally, in an amount in excess of $75,000.00 in compensatory damages, plus costs and interest, punitive damages, and any other such relief that this Court deems proper.

## COUNT V

### Wrongful Death

### (Plaintiff Simmons against Defendant Officers)

160.    Plaintiff Simmons incorporates and adopts each allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

161.    This Count is brought by Plaintiff Simmons against Defendant Officers identified herein, jointly and severally.

162.    At all times relevant to this Complaint, the Defendant Officers were acting under the color of state law as officers employed by Defendant BCPD.

163.    Defendant Officers, individually and/or through their agents, servants and/or employees were directly and proximately responsible for the fatal injuries suffered by Decedent Gore. Plaintiff Gore's injuries were caused solely by the actions of the Defendants without any wrongdoing on his part.

164.    Plaintiff Simmons has suffered and will continue to suffer from mental anguish, emotional pain and suffering, loss of society, loss of companionship, loss of comfort, loss of protection, loss of filial care, loss of attention, and loss of services and support that Decedent Gore could have and would have provided had he continued to live.

165.    As a result, the wrongful death of Decedent Gore, Plaintiff Simmons has sustained emotional, mental, and financial injuries, including, but not limited to, pain and suffering, mental anguish, costs and expenses of medical and legal proceedings, lost wages, and other expenses.

166.    This Complaint is timely filed within three (3) years after the death of Decedent Gore pursuant to §3-904(g) of the Courts and Judicial Proceedings Article of Maryland's Annotated Code.

**WHEREFORE**, Plaintiff Simmons requests that this Court enter judgment in her favor, and against the Defendants, in an amount in excess of $75,000.00 in compensatory damages, plus costs and interest, and any other such relief that this Court deems proper.

**COUNT VI**

**Survival Action**

**(The Estate of Darius Gore Defendant Officers)**

167.     Plaintiff the Estate incorporates by reference, and adopts, all of the allegations in the preceding and subsequent paragraphs of this Complaint as if they were set forth fully herein.

168.     This Count is brought by Plaintiff Simmons, as the Personal Representative of the Estate, against Defendant Officers identified herein, jointly and severally.

169.     Defendant Officers, individually and/or through their agents, servants and/or employees were directly and proximately responsible for the fatal injuries suffered by Decedent Gore.  Decedent Gore's injuries were caused solely by the actions of the Defendants without any wrongdoing on his part.

170.     As a result of these acts, Decedent Gore sustained severe physical injuries, including death. Between the time he was hit by the vehicle and the time of his death, Decedent Gore was conscious and living for some time before succumbing to his injuries, and therefore, experienced conscious pain and suffering before he died.

171.     This Complaint is timely filed within three (3) years after the death of Decedent Gore pursuant to §3-904(g) of the Courts and Judicial Proceedings Article of Maryland's Annotated Code.

172.     Defendants' actions and/or omissions directly and proximately caused the conscious pain and suffering sustained by Decedent Gore. Decedent Gore's injuries were caused

solely by the actions of Defendants without any wrongdoing on his part. Had Defendants not committed the acts alleged herein, Decedent Gore would not have suffered before his death.

**WHEREFORE**, the Estate requests that this Court enter judgment in its favor, and against the Defendants, in an amount in excess of $75,000.00 in compensatory damages, plus costs and interest, and any other such relief that this Court deems proper.

## COUNT VII

### Indemnification

### (Against Defendant BCPD)

173. Plaintiffs incorporate and adopt each allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

174. Under Maryland law, public entities are directed to pay any tort judgment for which their employees are liable within the scope of their employment.

175. Defendant Officers are or were employees of Defendant BCPD who acted within the scope of their employment and in accordance with accepted custom and usage when they committed the misconduct described herein.

176. Accordingly, Defendant BCPD is required to indemnify any and all of the individual Defendants against whom judgments are entered in this case.

**WHEREFORE**, Plaintiffs requests that this Court enter judgment in their favor, and against Defendants, jointly and severally, in an amount in excess of $75,000.00 in compensatory damages, plus costs and interest, punitive damages, and any other such relief that this Court deems proper.

# RELIEF

**WHEREFORE**, as to each and every count pled, Plaintiffs respectfully requests that this court award them:

A. Judgment in favor of Plaintiffs and against Defendants, jointly and severally, finding Defendants liable to Plaintiffs;

B. Award Plaintiffs compensatory damages in an amount which exceeds $75,000.00, plus interest and costs in an amount to be determined at trial;

C. Reimburse Plaintiffs all costs paid by Plaintiffs or on behalf of Plaintiffs in connection with the incident in an amount to be determined at trial;

D. Award the costs and expenses of this case, including attorneys' fees;

E. Award pre-judgement and post-judgement interest;

F. Award punitive damages; and

Award any other such relief that this Court deems just and proper and further relief as the nature of the case may require.

Dated: February 7, 2022

Respectfully submitted,

MURPHY, FALCON & MURPHY

By: /s/ William H. Murphy, Jr.
William H. Murphy, Jr. (Bar # 07985)

/s/ Andrew K. O'Connell
Andrew O'Connell (Bar # 28168)

/s/ Nikoletta S. Mendrinos
Nikoletta S. Mendrinos (Bar # 18961)

One South Street, 30th Floor
Baltimore, MD 21202
Telephone: (410) 951-8744
Facsimile: (410) 539-6599
Email: andrew.oconnell@murphyfalcon.com
        nikoletta.mendrinos@murphyfalcon.com

*Attorneys for Plaintiffs*

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on the issues set forth in this Complaint.

/s/ Nikoletta S. Mendrinos
Nikoletta S. Mendrinos