IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ROWENA SIMMONS, *et al.* | * | |
| Plaintiffs, | * | |
| v. | * | |
| | * | Case No. 1:21-cv-00969-LKG |
| BALTIMORE CITY POLICE DEPARTMENT, *et al.*, | * | |
| | * | |
| Defendants. | * | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**MEMORANDUM OF LAW IN SUPPORT OF INDIVIDUAL OFFICER DEFENDANTS'
JOINT MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY
JUDGMENT**

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ........................................................................................................... 1

II.   FACTS ......................................................................................................................... 2

  A.   Facts as Alleged in Plaintiffs' First Amended Complaint. ........................................ 2

    i.    General Background. ............................................................................................ 2

    ii.   BPD Policy 1503 ................................................................................................ 3

    iii.  Allegations Against Each Individual Officer Defendant in Plaintiffs' First
        Amended Complaint. ........................................................................................... 6

  B.   Undisputed Material Facts After Six Months of Discovery. ................................... 12

III.  LEGAL STANDARDS ............................................................................................. 16

  A.   Fed. R. Civ. P. 12(b)(6)........................................................................................... 16

  B.   Fed. R. Civ. P. 56 .................................................................................................... 17

IV.   ARGUMENT ............................................................................................................ 17

  A.   Substantive Due Process—Section 1983 and Article 24 ........................................ 18

    i.    Plaintiffs' First Amended Complaint Fails to State a Claim Upon which Relief
        Can Be Granted..................................................................................................... 19

    ii.   Even if This Court Finds That Plaintiffs' First Amended Complaint States a
        Claim, Summary Judgment Is Warranted Because Individual Officer
        Defendants Did Not Violate Plaintiffs' Constitutional Rights. .................................. 21

    iii.  Individual Officer Defendants Are Entitled to Qualified Immunity........................... 26

  B.   Gross Negligence .................................................................................................... 30

  C.   Wrongful Death and Survival Action ...................................................................... 34

V.    CONCLUSION.......................................................................................................... 35

**TABLE OF AUTHORITIES**

**Cases**

*Adams v. Ferguson*, 884 F.3d 219 (4th Cir. 2018) ................................................................ 27, 28

*Allmond v. Dep't of Health & Mental Hygiene*, 448 Md. 592, 141 A.3d 57 (Md. 2016) ............. 18

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................................. 17

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................................ 16

*Beyer v. Morgan State Univ.*, 779 A.2d 388, 394 (Md. Ct. Spec. App. 2001) ............................ 35

*Bland v. Roberts*, 730 F.3d 368 (4th Cir. 2013) ...................................................................... 26-27

*Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514 (4th Cir. 2003) ....................... 33

*Brennan v. Deluxe Corp.*, 361 F. Supp. 3d 494 (4th Cir. 2019) ..................................................... 3

*Brown v. Gilmore*, 278 F.3d 362 (4th Cir. 2002) ........................................................................ 26

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998) ............................................................ 22, 28

*D.C. v. Wesby*, 138 S. Ct. 577 (2018) ..................................................................................... 27-28

*Dean ex rel. Harkness v. McKinney*, 976 F.3d 407 (4th Cir. 2020) ............................................ 22

*Dent v. Montgomery Cty. Police Dept't*, 745 F. Supp. 2d 648 (D. Md. 2010) ............................. 18

*Dua v. Comcast Cable of Maryland, Inc.*, 370 Md. 604, 621, 805 A.2d 1061, 1071 (Md. 2002) ...................................................................................................................................... 18

*Edwards v. City of Goldsboro*, 178 F.3d 231 (4th Cir. 1999) ..................................................... 27

*Gomez v. Atkins*, 296 F.3d 253 (4th Cir. 2002) ........................................................................... 27

*Hafer v. Melo*,  502 U.S. 21 (1991) ............................................................................................ 19

*Ibarra v.  United States*, 120 F.3d 472 (4th Cir. 1997) ............................................................... 16

*In re Birmingham,* 846 F.3d 88 (4th Cir. 2017) .......................................................................... 16

*Johnson v. Baltimore Police Dep't*, 452 F. Supp. 3d 283 (D. Md. 2020) .................................... 22

*Kentucky v. Graham*, 473 U.S. 159 (1985) ................................................................................. 20

*Kloth v. Microsoft Corp.*, 444 F.3d 312 (4th Cir. 2006) ............................................................. 16

*Maciariello v. Sumner*, 973 F.2d 295 (4th Cir. 1992) ................................................................. 27

*Malley v. Briggs*, 475 U.S. 335 (1986) ...................................................................................... 27

*Martinez v. Hubbard*, 172 F. Supp. 3d 378 (D. Mass. 2016) ............................................... 25, 26

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986) .................................. 17

*McDonald v. Dunning*, 760 F. Supp. 1156 (E.D. Va. 1991) ....................................................... 20

*McGowans v. Howard*, 197 A.2d 915 (Md. 1964) ...................................................................... 32

*Meals v. City of Memphis*, 2005 WL 5988642 (W.D. Tenn. Feb. 10, 2005) ............................... 21

*Meals v. City of Memphis*, 493 F.3d 720 (6th Cir. 2007) ..................................... 23, 24, 25, 26, 29

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) ................................................................ 26, 27

*Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978) ................... 20

*Mullenix v. Luna*, 136 S. Ct. 305 (2015) .................................................................... 28

*Pasternak & Fidis, P.C. v. Recall Total Information Management, Inc.*, 95 F. Supp. 3d
     886 (D. Md. 2015) ................................................................................................. 31

*Pearson v. Callahan*, 555 U.S. 223 (2009) .................................................................. 27

*Phillips v. Pitt Cty. Mem. Hosp.*, 572 F.3d 176 (4th Cir. 2009) ................................... 3

*Pittway Corp. v. Collins,* 973 A.2d 771 (Md. 2009) .............................................. 32, 33

*Revene v. Charles Cty. Comm'rs*, 882 F.2d 870 (4th Cir. 1989) ................................ 16

*Scott v. Harris*, 550 U.S. 372 (2007) .................................................................... 17, 18

*Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994) ............................................................. 20

*Slakan v. Porter,* 737 F.2d 368 (4th Cir. 1984) .......................................................... 20

*Slusarchuk v. Hoff,* 346 F.3d 1178 (8th Cir. 2003) ..................................................... 26

*Stracke v. Est. of Butler*, 214 A.3d 561 (Md. 2019) ....................................... 30, 31, 34

*Swedish Civil Aviation Admin. v. Project Mgmt. Enters., Inc.*, 190 F.Supp.2d 785 (D. Md.
     2002) ..................................................................................................................... 31

*Temkin v, Frederick County Comm'rs*, 945 F.2d 716 (4th Cir. 1991) ....... 22, 23, 26, 29

*Tolan v. Cotton*, 572 U.S. 650 (2014) ......................................................................... 17

*Ward v. City of Boston*, 367 F.Supp.2d 7 (D. Mass. 2005) ........................................ 25

*Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989) ....................................... 19

*Wilson v. Layne*, 526 U.S. 603 (1999) ........................................................................ 28

**Statutes**

Md. Code, Crim. Law § 3-203 ...................................................................................... 25

Md. Code, Cts. & Jud. Proc. § 3-901(e) ...................................................................... 34

Md. Code, Est. & Trusts § 7-401 .................................................................................. 34

**Rules**

Fed. R. Civ. P. 12(b)(6) ................................................................................................ 16

Fed. R. Civ. P. 56 ................................................................................................... 17, 33

**Treatises**

Restatement (Second) of Torts ............................................................................... 31, 32

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ROWENA SIMMONS, *et al.* | * | |
| Plaintiffs, | * | |
| v. | * | |
| | | Case No. 1:21-cv-00969-LKG |
| BALTIMORE CITY POLICE | * | |
| DEPARTMENT, *et al.*, | | |
| | * | |
| Defendants. | | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## I.   INTRODUCTION

In its original version, Plaintiffs' Complaint survived a motion to dismiss because Judge Bennett found it contained enough allegations that, if true, could "shock the conscience" and potentially constitute a violation of Plaintiffs' constitutional rights and gross negligence. *See* ECF No. 40.   After the Court granted in part a motion to dismiss filed on behalf of Officers Franks, Gray, and Torres, the named parties in Plaintiffs' original Complaint conducted extensive discovery, including nine (9) depositions and exchanged numerous sets of written discovery and hundreds of documents.   Most importantly, the parties gained access to both aerial footage and body-worn camera recordings, which capture the entire March 21, 2020 incident at issue in this lawsuit.

The parties now have a substantial and undisputed record of what happened and, therefore, all that remain are questions of law.  Following this discovery, on February 7, 2022, Plaintiffs filed a First Amended Complaint [ECF No. 57], adding numerous defendants, but the nature of the allegations and tone have changed.  No longer is this a case of "shocks the conscience" factual allegations.  Instead, the First Amended Complaint now alleges technical "policy violations" that

lack any causal connection to Plaintiffs' alleged harm.  These alleged technical "policy violations" are insufficient, as a matter of law, to establish a violation of Plaintiffs' constitutional rights or gross negligence.   The undisputed material evidence demonstrates that Individual Officer Defendants' conduct does not "shock the conscience" and was not "reckless."  The First Amended Complaint attempts to creatively reframe the allegations but, in doing so, moves further away from a constitutional violation and gross negligence.  No further discovery is needed. The Court should dismiss the First Amended Complaint or, alternatively, grant summary judgment in favor of Individual Officer Defendants.

## II.  FACTS

### A.  Facts as Alleged in Plaintiffs' First Amended Complaint.[3]

#### i.  General Background.

On the evening of March 21, 2020, Baltimore Police Department ("BPD") officers were notified by the Baltimore County Police Department that a GPS device located on a stolen Ford Fusion indicated that the vehicle was stopped in the 2600 block of West Patapsco Avenue in Baltimore City and had not moved for some time.  ECF No. 57, ¶56-57.  The BPD police helicopter, Foxtrot, was summoned to help locate the stolen vehicle.  *Id.* at ¶58.  BPD Officers Zachary Franks, Felix Torres, and Johnta Gray (collectively "Initial Responding Officers") responded and arrived at the stolen vehicle's location.  *Id.* at ¶59.

When the Initial Responding Officers arrived at the location, they "attempted to box in the stolen vehicle to prevent it from moving, but despite their efforts, the driver of the vehicle, Delissa Ann Dello-Stritto ('Dello-Stritto') [who was not known to the officers at the time] backed up, struck Gray's vehicle, and fled westbound on Patapsco Avenue with the helicopter overhead."  *Id.*

---

[3] For purposes of their motion to dismiss, Individual Officer Defendants rely solely on these factual allegations in Plaintiffs' First Amended Complaint.

at ¶60.  "The helicopter's aerial observer, Defendant Bilheimer, observed and announced these events as they were occurring over the radio to other officers."  *Id.*  As Dello-Stritto was fleeing the parking lot, Officer Gray also confirmed over the radio that the stolen vehicle Dello-Stritto was driving had hit his marked police vehicle.  *Id.* at ¶61. "Multiple other officers from the Southern District who had heard what had transpired over the radio began pursuing Dello-Stritto" (collectively "Pursuing Officers").  *Id.* at ¶62. James Conley, who was the BPD Sergeant on duty, "was the first vehicle behind Dello-Stritto." *Id.*  "During the entire pursuit, the [police] helicopter was overhead following the Ford Fusion and Bilheimer was communicating with officers regarding its location." *Id.* at ¶70.

This pursuit went eleven (11) miles through the City of Baltimore, lasted about fourteen (14) minutes and came to an end when the fleeing suspect, Dello-Stritto, ran a red light at the intersection of Liberty Heights and Callaway Avenue and struck a vehicle being driven by Darius Gore ("Decedent Gore") in which Gary Tyson ("Tyson") was a passenger. *Id*. at ¶¶64-65. Decedent Gore died as a result of his vehicle being struck by Dello-Stritto and Tyson was injured.  *Id.* at ¶¶5, 7. "At no time during the 11-mile and 14-minutes long pursuit did an officer or supervisor ever recommend that the pursuit be terminated."  *Id.* at ¶80.

### ii.    BPD Policy 1503.

BPD Policy 1503—Emergency Vehicle Operation and Pursuit Policy ("Policy 1503") governs vehicular pursuits.  ECF No. 57, ¶30.[4]  Policy 1503 is attached hereto as Exhibit 1.[5]  "The

---

[4] "Policy 1503 was created through a required collaborative process involving this Court, the DOJ, an Independent Monitor, and the BPD."  ECF No. 40, p. 20.

[5] "On a motion to dismiss, a court may take judicial notice of matters of public record." ECF No. 40, p. 3 n. 2 (citing *Brennan v. Deluxe Corp*., 361 F. Supp. 3d 494, 501 (4th Cir. 2019) and *Phillips v. Pitt Cty. Mem. Hosp*., 572 F.3d 176, 180 (4th Cir. 2009)). Policy 1503 is a public record that qualifies for judicial notice. *See* ECF No. 40, p. 3 n.2 (taking judicial notice of Policy 1503 on a motion to dismiss).

purpose of this policy is to provide guidance on conducting safe emergency vehicle operations and pursuits." Policy 1503, Exhibit 1, p.1.

"Policy 1503 dictates that officers 'shall use sound judgement and discretion' when pursuing vehicles, thereby allowing officers to use their own discretion when deciding to pursue." ECF No. 57, ¶32.  Under Policy 1503, officers are permitted to use their discretion to pursue a fleeing vehicle when:

> (1) The vehicle contains a felony suspect and failure to immediately apprehend poses an immediate threat of death or serious bodily injury to the [officer] or others; and

> (2) Before the pursuit is initiated, there exists probable cause to believe that the fleeing suspect committed a felony which resulted, or could have resulted, in death or serious bodily injury.

*See id.* at ¶33; Policy 1503, Exhibit 1, p. 4.

Factors to be considered when deciding to initiate or continue a pursuit include, but are not limited to: type of area in which the pursuit is traversing, such as a school zone or residential area; weather and road conditions; density of vehicular and pedestrian traffic; speed of the pursuit; officers' familiarity with the area of the pursuit; availability of other resources, such as air support assistance; and likelihood of apprehension at a later time.  ECF No. 57, ¶34; *see also* Policy 1503, Exhibit 1, p. 4.

Policy 1503 directs officers to use de-escalation techniques to reduce the threat and gain compliance to lawful commands.  *See* ECF No. 57, ¶35.  Under Policy 1503, "there are certain limited factors that prohibit an officer from initiating a pursuit, including where the person fleeing is only suspected of a crime against property" and "when the risk of the pursuit outweighs the need to stop the eluding driver."  *Id.* at ¶36.

But "Policy 1503 does not limit the speeds that the pursuit may reach, and there is no requirement that officers stop at intersections."  *Id.* at ¶37.  Policy 1503 simply requires that

"officers . . . not endanger life or property with the speeds traveled, and it also requires that officers slow down as necessary for safety when proceeding through a red light or stop sign." *Id.*

Under Policy 1503, the "Primary Unit," which is defined as first police vehicle immediately behind the eluding vehicle, is responsible for providing updates about the location, speed, and direction of travel of the eluding vehicle, the reason for the pursuit, the weather, traffic, and road conditions, and other information. *See id.* at ¶38. Further, under Policy 1503, when a pursuit begins, air support assistance (*i.e.,* Foxtrot) should be requested. *See id.* at ¶40. Once the air support crew establishes visual contact with the eluding vehicle, it should video record the pursuit and assume control of radio communication during the pursuit. Policy 1503, Exhibit 1, p. 8; *see also* ECF No. 57, ¶40. Under Policy 1503, the air support crew should "report on the progress of the pursuit, road hazards and conditions, and other pertinent information to assist in evaluating whether the pursuit should continue." ECF No. 57, ¶40. Air support can also recommend terminating the pursuit. *Id.*

Policy 1503 also contains "Vehicle Pursuit Considerations" which provides that officers should not pursue a vehicle driving the wrong direction on a roadway and should not attempt to pass other pursuing vehicles unless requested to do so by the Primary Unit (and there is a clear understanding between all pursuing vehicles that an officer will be passing the other vehicles). *See* Policy 1503, Exhibit 1, p. 5; ECF No. 57, ¶41.

Regarding supervisors, "Policy 1503 requires that pursuits be supervised by a supervisor, and [provides] that a supervisor has the authority to terminate a pursuit upon command." *Id.* at ¶38. Plaintiffs allege that, under Policy 1503:

> Supervisors are required to manage control over officers involved in the pursuit, ensure that no more than three officers are pursuing the fleeing vehicle [not to include Street Paralleling drivers or intersection control drivers], ensure that the risks of the pursuit is not outweighed by the danger posed, direct the pursuit to be

5

terminated at any time based on their analysis of the factors, determine whether the pursuit violates the policy, and prepare a post-pursuit review and ensure that all incident reports and other required documents are uploaded into a reporting system.

*Id.* at ¶43.

There are also reporting requirements in Policy 1503 for the Primary Unit. *See id.* at ¶39. The Primary Unit who initiated the pursuit is responsible for, as Plaintiffs allege, "completing an Incident Report after the pursuit has ended, detailing the facts that provided probable cause for the pursuit," and "document[ing] the facts that caused the officer to believe that the safety risks of the pursuit were outweighed by the risks posed by the fleeing suspect." *Id.*

### iii.   Allegations Against Each Individual Officer Defendant in Plaintiffs' First Amended Complaint.

Plaintiffs have sued each Individual Officer Defendant in their individual and official capacities. *See* ECF No. 57. Plaintiffs' First Amended Complaint alleges the following specific factual allegations against each Individual Officer Defendant.

### 1.  Officer Zachary A. Franks

Zachary A. Franks is a BPD officer whom Plaintiffs allege was "the operator of a police cruiser that chased the operator of a vehicle that ran a red light and ultimately struck Decedent Gore's vehicle." ECF No. 57, ¶19. Plaintiffs acknowledge, however, that "other officers," not the Initial Responding Officers (including Franks), "began pursuing Dello-Stritto." *Id.* at ¶62. Aside from alleging that Franks attempted to box-in the stolen vehicle before Dello-Stritto fled, Plaintiffs fail to allege any other conduct by Franks (let alone misconduct).   Notably, the First Amended Complaint was filed after Franks produced documents, responded to written discovery, and was deposed.

### 2.   Officer Johnta Gray

Johnta Gray was a BPD officer whom Plaintiffs allege was "the operator of a police cruiser that pursued the operator of a vehicle that ran a red light and ultimately stuck Decedent Gore's vehicle." ECF No. 57, ¶18. Plaintiffs acknowledge, however, that "other officers," not the Initial Responding Officers (including Gray), "began pursuing Dello-Stritto." *Id*. at ¶62.  The only other allegations against Gray in the First Amended Complaint are that: (1) Gray's police vehicle was struck and that Gray left the scene of the "collision" and "participated" in the pursuit without authorization from a supervisor, which allegedly violates BPD policy; (2) "[a]t that time, there was no evidence that Gray suffered from any injuries, nor did he report that he was injured at that time;" and (3) *after* the accident, "Gray did not inform the Accident Investigation Unit as to the pre-existing damage" allegedly done to Gray's vehicle.  *Id.* at ¶¶61, 76, 94.  Notably, the First Amended Complaint was filed after Gray produced documents, responded to written discovery, and was deposed.

### 3.   Sergeant Marc J. Camarote

Marc J. Camarote is a BPD officer whom Plaintiffs allege was "the operator of a police cruiser that pursued the operator of a vehicle that ran a red light and ultimately struck Decedent Gore's vehicle."  ECF No. 57, ¶15.  Plaintiffs First Amended Complaint does not levy specific factual allegations against Camarote nor identify any specific misconduct by Camarote; rather, it simply alleges that he was "pursuing."  *See id.* at ¶¶15, 79.

### 4.   Lieutenant Lakishia L. Tucker

Lakishia L. Tucker ("Tucker") is a BPD officer whom Plaintiffs allege "was the Lieutenant on duty at the time of the incident, and as such was a supervisor of the pursuit." ECF No. 57, ¶12. As to allegations of wrongdoing by Tucker, Plaintiffs claim that, "[a]lthough Defendant Tucker

7

was listening to the pursuit in real time, and despite that she was the shift commander under the Policy [1503], she did not request for . . . information [such as speed, traffic violations, etc.] to be provided." *Id.* at ¶¶73-74, 83. Plaintiffs also allege that, *after* the accident, Tucker: (1) did not "follow up with the officers who participated in the pursuit for a formal, or even informal, debriefing;" and (2) that in the weeks following the accident, Tucker viewed the helicopter footage but did not "make any formal inquiries as to whether the Policy [1503] had been violated, if so, in what manner, by whom, and what actions, if any, needed to be taken." *Id.* at ¶¶97, 101, 102. Plaintiffs, however, acknowledge that: (1) immediately after Dello-Stritto hit Gray's police vehicle, Tucker asked Gray to confirm that his police vehicle was hit; and (2) after the accident Tucker called Major Brown "to inform her of what had occurred." *Id.* at ¶¶61, 99. Notably, the First Amended Complaint was filed after Tucker was deposed.

### 5.   Sergeant James L. Conley

James L. Conley ("Conley") is a BPD officer whom Plaintiffs allege was "the operator of a police cruiser that pursued the operator of a vehicle that ran a red light and ultimately stuck Decedent Gore's vehicle" and was "the Sergeant on duty at the time of the incident, and as such was a supervisor of the pursuit." ECF No. 57, ¶13.

Plaintiffs allege that Conley "was the first vehicle behind Dello-Stritto" when she fled the parking lot and that "[p]ursuant to the Policy [1503], he was the Primary Unit in pursuit as he initiated the pursuit and was the vehicle closest to Dello-Stritto[.]" *Id.* at ¶62. As the Primary Unit, Plaintiffs claim that Conley's "highest responsibility" was the "preservation of life and public safety" and that he was "required to announce several items as he was pursuing, including the location, direction of travel, estimated speed of the eluding vehicle, traffic conditions, and the

reason for the pursuit" which he allegedly failed to do in violation of BPD policy. *Id.* at ¶¶62, 71, 75.

Plaintiffs allege that, *after* the accident, Conley stated that "there were about '12' officers following Dello-Stritto during the pursuit, although he could not state who was pursuing" and told Tucker "that the pursuit was 'so much fun,' and that he 'couldn't wait to see the video.'" *Id.* at ¶¶93, 95. Notably, Plaintiffs omit any of the statements made by Conley in the video during the pursuit as part of their First Amended Complaint that would have demonstrated his actual state of mind and thought process. Plaintiffs also allege that Policy 1503 required Conley to fill out an Incident Report *after* the accident, but Conley did not do so. *Id.* at ¶96. Plaintiffs also allege that, *after* the accident, Conley: (1) did not "follow up with the officers who participated in the pursuit for a formal, or even informal, debriefing;" and (2) that in the weeks following the accident, Conley viewed the helicopter footage but did not "make any formal inquiries as to whether the Policy [1503] had been violated, if so, in what manner, by whom, and what actions, if any, needed to be taken." *Id.* at ¶¶97, 101, 102.

### 6. Officer John W. Schreven

Officer Schreven is a BPD officer who allegedly "was also the operator of a police cruiser that pursued the operator of a vehicle that ran a red light and ultimately struck Decedent Gore's vehicle." ECF No. 57, ¶14. At some point during the pursuit, Officer Schreven overtook Sergeant Conley and effectively became the Primary Unit. *See id.* at ¶75. Plaintiffs allege that such an action without authorization is prohibited under Policy 1503. *Id.* "As the Primary Unit, [Officer Schreven] now had the responsibility of providing updates according to the Policy." *Id.* Under Policy 1503, as the Primary Unit, Officer Schreven was supposed to prepare an Incident Report, and "document facts that caused the pursuing officer to believe that the benefit of catching the

eluder outweighed risks to the public." *Id*. at ¶94. Officer Schreven did not prepare those documents. *Id*. Plaintiffs have deposed Officer Schreven before filing their First Amended Complaint.

### 7. Officer John Bilheimer

Officer Bilheimer is a BPD officer who allegedly "was also the operator of a camera that record[ed] the pursuit from a police helicopter." ECF No. 57, ¶16. Officer Bilheimer was the aerial observer in the police helicopter active during the pursuit of Dello-Stritto. *See id.* at ¶60. Officer Bilheimer "observed and announced" the unfolding events as Officers Torres, Franks, and Gray attempted to box in Dello-Stritto's vehicle. *Id.* Foxtrot was overhead during the pursuit of Dello-Stritto, and Officer Bilheimer was in communication with the officers regarding the pursuit. *See id.* at ¶70. Officer Bilheimer allegedly did not "advise as to the increased traffic congestion, road hazards, visible pedestrians, [or] traffic violations." *Id.* Plaintiffs further allege in conclusory fashion that Officer Bilheimer did not advise as to "any other pertinent information that would assist in evaluating termination of the pursuit." *Id.* Plaintiffs also allege that Officer Bilheimer did not "advise as to the excessive speed of the pursuit," or that Dello-Stritto "had blown through multiple stop signs and traffic lights … driven down the wrong side of the roadway and had passed at least one vehicle on the left over a double yellow line." *Id.* Further, Officer Bilheimer did not "recommend that the pursuit be terminated." *Id*. Plaintiffs deposed Officer Bilheimer before filing their First Amended Complaint.

### 8. Officer Felix Torres

Officer Torres is a BPD officer who allegedly "was also the operator of a police cruiser that pursued the operator of a vehicle that ran a red light and ultimately struck Decedent Gore's vehicle." ECF No. 57, ¶17. Officer Torres was one of three officers who, using his vehicle,

"attempted to box in the stolen vehicle to prevent it from moving." *Id.* at ¶60.  But "despite their efforts, the driver of the vehicle, Delissa Ann-Dello-Stritto ('Dello-Stritto') backed up, struck Gray's vehicle, and fled westbound on Patapsco Avenue with the helicopter overhead." *Id.*  Officer Torres answered interrogatories, produced documents, and was deposed before Plaintiffs filed their First Amended Complaint.

### 9.   Officers Mark T. Gurbelski and Michael H. Wood

Officer Gurbelski is a BPD officer who allegedly "was also the operator of a police cruiser that pursued the operator of a vehicle that ran a red light and ultimately struck Decedent Gore's vehicle." ECF No. 57, ¶20.  Officer Wood is a BPD officer who allegedly "was a passenger in a police cruiser that pursued the operator of a vehicle that ran a red light and ultimately struck Decedent Gore's vehicle." *Id.* at ¶21.

Officers Gurbelski and Wood, who were not assigned to the Southern District at the time of the pursuit, heard over the radio updates on the pursuit and decided to join it.  Plaintiffs claim Officers Gurbelski and Wood "did not inform their supervisor, did not alert that they were joining on the radio, and did not provide any of the required updates under the Policy." *Id.* at ¶78.  Additionally, at some point, Officer Wood began recording the pursuit on his smart phone and, at some point, Officers Gurbelski and Wood were laughing during the pursuit. *Id.*  Officers Gurbelski and Wood arrived at the scene of the crash, but "left without ever checking in with anyone at the scene." *Id.* at ¶98.

### 10.   Officer Joshua P. Corcoran

Officer Corcoran is a BPD officer who allegedly "was also the operator of a police cruiser that pursued the operator of a vehicle that ran a red light and ultimately struck Decedent Gore's vehicle."  ECF No. 57, ¶22.

### 11. Officer Sharif K. Kellogg

Officer Kellogg is a BPD officer who allegedly "was also the operator of a police cruiser that pursued the operator of a vehicle that ran a red light and ultimately struck Decedent Gore's vehicle." ECF No. 57, ¶23.  Officer Kellogg continued to pursue even when he could see three to four officers ahead of him and three to four officers behind him.  *Id.* at ¶79.  Officer Kellogg's radio was not working during the pursuit.  *Id.*

### 12. Officer Yenuel F. Familia

Officer Familia is a BPD officer who allegedly "was also the operator of a police cruiser that pursued the operator of a vehicle that ran a red light and ultimately struck Decedent Gore's vehicle." ECF No. 57, ¶24.

### 13. Officer Dylan R. LaPorta

Officer Laporta is a BPD officer who allegedly "was also the operator of a police cruiser that pursued the operator of a vehicle that ran a red light and ultimately struck Decedent Gore's vehicle." ECF No. 57, ¶25.

### B.  Undisputed Material Facts After Six Months of Discovery.[6]

The material facts relevant to this case are undisputed.  The entire incident was captured on aerial footage by Foxtrot, and on numerous officers' body-worn cameras.  To date, the parties have exchanged hundreds of pages of documents, twenty-nine (29) videos, numerous sets of written discovery responses, and conducted nine (9) depositions.  For summary judgment purposes, the following facts are undisputed.

---

[6]  For purposes of their motion for summary judgment, Individual Officer Defendants rely on both fact sections, Sections II.A and II.B.

The stolen vehicle occupied by Dello-Stritto was located at a gas station. Foxtrot Video, Exhibit 2.[7]  When the Initial Responding Officers arrived at the gas station, the stolen vehicle was occupied and not moving and the officers tried to box it in, *i.e.*, they pulled their marked police vehicles behind and to the sides of the stolen vehicle to prevent it from escaping. Foxtrot Video, Exhibit 2; Torres Dep., Exhibit 4, 54:20-55:21; *see also* Franks Dep., Exhibit 5, 25:3-14, 55:19-56:6.  Officers Franks and Torres exited their police vehicles and commanded Dello-Stritto to turn off her vehicle.  Franks Dep., Exhibit 5, 54:18-56:6; *see also* Torres Dep. Exhibit 4, 59:16-20. Neither officer knew Dello-Stritto at that time. *See* Franks Dep., Exhibit 5, 59:11-17, 107:11-16. Dello-Stritto, however, ignored their commands, backed up, pulled forward and struck Officer Gray's occupied police vehicle, and fled the parking lot.  Foxtrot Video, Exhibit 2; Franks Dep., Exhibit 5, 54:8-55:16, 59:11-22, 62:15-63:13.

At the time Officer Gray's police vehicle was hit by Dello-Stritto, Officer Gray was sitting inside his police vehicle and Officers Franks and Torres were standing outside their police vehicles and near the fleeing stolen vehicle while it attempted to escape.  Foxtrot Video, Exhibit 2; Franks Dep., Exhibit 5, 59:18-22; Gray Dep., Exhibit 6, 30:18-31:11.  Officer Franks was standing by the right passenger side of the stolen vehicle and Officer Torres was standing towards the back of the stolen vehicle on the driver's side.  Foxtrot Video, Exhibit 2; Franks Dep., Exhibit 5, 54:18-22.  In fact, when Dello-Stritto was escaping the stop, she nearly struck Officer Torres and his police vehicle as well. Foxtrot Video, Exhibit 2; Torres Dep. Exhibit 4, 59:16-20.

After Dello-Stritto struck Officer Gray's police vehicle (with him inside), Officer Gray radioed "she just hit me," and subsequently confirmed that it was his police vehicle that had been struck.  Foxtrot Video, Exhibit 2; *see also* Gray Dep., Exhibit 6, 30:18-31:11.  Other officers heard

[7] A certificate of records attesting to the trustworthiness of the video footage and explaining that the video is kept in the course of regularly conduced business activity is attached hereto as Exhibit 3.

what was transpiring over the radio. *See* ECF No. 57, ¶62.  One such officer was Sergeant James L. Conley, the Sergeant on duty *See* Conley Dep., Exhibit 7, 55:22-57:17. Sergeant Conley arrived at the gas station right as Dello-Stritto was fleeing.  *See* Conley Dep., Exhibit 7, 87:19-88:9. Knowing that Dello-Stritto had just struck a police vehicle (with the officer inside) and was now fleeing the scene, Sergeant Conley believed that a felony assault on a police officer had just been committed and made the decision to pursue the fleeing suspect Dello-Stritto. *See* Conley Dep., Exhibit 7, 55:8-21, 123:22-124:20; *see also* Tucker Dep., Exhibit 8, 70:6-71:20.

The officers used multiple de-escalation techniques before the pursuit was initiated including but not limited to: (1) announcing their police presence (they were in uniforms and marked police vehicles with emergency lights activated); (2) attempting to box-in the parked stolen vehicle to prevent it from fleeing; and (3) attempting to make contact with the suspect and asking several times for the suspect to "shut the vehicle down," "put the vehicle in park," and "step out of the vehicle."  *See* Foxtrot Video, Exhibit 2; Franks Dep., Exhibit 5, 54:8-55:16; Gray, Exhibit 6, 68:16-21, 72:9-73:10; Conley Dep., Exhibit 7, 59:10-60:8; Tucker Dep., Exhibit 8,155:16-156:10; *see also* ECF No. 57, ¶60.  The officers also activated their emergency lights and sirens when Dello-Stritto fled.  *See* Conley Dep., Exhibit 7, 59:10-60:8.

The Foxtrot video footage shows three (3) police vehicles immediately following Dello-Stritto (*i.e.*, actively engaged in the pursuit).  *See* Foxtrot Video, Exhibit 2; *see also* Tucker Dep., Exhibit 8, 56:6-17.    Under BPD Policy 1503, Sergeant Conley was the Primary Unit and responsible for the conduct of the pursuit.  *See* Policy 1503, Exhibit 1, p. 5; *see also* ECF No. 57, ¶62. The two other officers immediately behind Sergeant Conley were Officer John W. Schreven and Sergeant Marc J. Camarote.  *See* Conley Dep., Exhibit 7, 76:2-7.  During the entire pursuit, Foxtrot was flying overhead and providing information to the officers on the ground. Foxtrot

14

Video, Exhibit 2; *see also* ECF No. 57, ¶70.  No one recommended that the pursuit be terminated. ECF No. 57, ¶80.

During the entire pursuit, the officers were also communicating over the radio.  *See* Foxtrot Video, Exhibit 2.  These communications are captured on the Foxtrot video.  *Id*.  Specifically, as can be heard in the Foxtrot video, various officers discussed what was happening in "real-time" as the pursuit began: (1) Officer Bilheimer radioed that the stolen vehicle was trying to escape the car stop and said, "it's moving like it's trying to get out;" (2)  Officer Gray radioed "she just hit 21, she just hit me;" (3) Lieutenant Tucker subsequently asked, "she hit your vehicle" to which Gray responded "10-4;" (4) Officer Bilheimer provided descriptions of the stolen vehicle, constant updates on its location, and asked dispatch to notify the other districts of its location; (5) Lieutenant Tucker radioed that the fleeing suspect hit Officer Gray's police vehicle; (6) Sergeant Conley radioed that he was behind the suspect after she fled the parking lot and that Foxtrot had the "eyeball;" and (7)  Lieutenant Tucker asked Foxtrot "to keep us updated."  *See* Foxtrot Video, Exhibit 2; *see also* Franks Dep., Exhibit 5, 110:9-14; Gray Dep., Exhibit 6, 30:18-31:11; Conley Dep., Exhibit 7, 50:12-51:2; Tucker Dep., Exhibit 8, 74:12-75:7; Bilheimer Dep., Exhibit 9, 161:8-163:8; Schreven Dep., Exhibit 10, 47:12-49:8.

The Foxtrot video also captures radio communications by supervisors Conley and Tucker <u>during</u> the pursuit which reflects their focus and state of mind: (1) Sergeant Conley radioed "everyone watch your cross streets, Fox has got it, everyone just watch your cross streets, alright, . . . we're good;" (2) Lieutenant Tucker radioed "just follow safely, do not cut off the intersections please;" and (3) Lieutenant Tucker radioed "remember watch your side streets everybody, let Fox keep spotting until she stops." *See* Foxtrot Video, Exhibit 2; *see also* Franks Dep., Exhibit 5,109:2-4; Tucker Dep., Exhibit 8, 74:12-75:7; Schreven Dep., Exhibit 10, 47:12-49:8.  Even after the

15

pursuit, Tucker and Conley can be heard discussing the pursuit and how Conley felt it was under control and that "they [were] not going at a high speed" and "everything was calm." *See* Tucker Dep., Exhibit 8, 94:1-95:6. This discussion, however, was omitted from Plaintiffs' First Amended Complaint. *See generally* ECF No. 57.  Detective Thomas Getsinger was the investigator assigned from BPD's Accident Investigation Unit and responsible for investigating and reconstructing the car accident. *See* Getsinger Dep., Exhibit 11; Getsinger Report, Exhibit 12.

### III.  LEGAL STANDARDS

#### A.  Fed. R. Civ. P. 12(b)(6)

When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court presumes the truth of all the plaintiff's *well-pleaded* factual allegations. *Ibarra v.  United States*, 120 F.3d 472, 474 (4th Cir. 1997) (emphasis added).  A Rule 12(b)(6) motion to dismiss challenges the legal sufficiency of the complaint.  *In re Birmingham,* 846 F.3d 88, 92 (4th Cir. 2017).  To survive a motion to dismiss, a plaintiff's complaint must allege facts that plausibly suggest that the plaintiff has a right to relief, raising that possibility above the speculative level. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Unsupported legal conclusions and conclusory factual allegations, that do not reference specific events, however, do not suffice.  *Revene v.  Charles Cty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989).  A court need not accept as true unwarranted inferences, unreasonable conclusions, or arguments.  *Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006).  Thus, a motion to dismiss will be successful where this Court cannot find that the well-plead facts and reasonable inferences therefrom, construed in the non-movants favor, state a plausible claim for which relief can be granted.  *See In re Birmingham*, 846 F.3d at 92–93.

16

### B.  Fed. R. Civ. P. 56

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine [dispute] as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014).  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue is "genuine" if a reasonable trier of fact, viewing all the record evidence, could rationally find in favor of the nonmoving party in light of his burden of proof.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

Where, as here, there is uncontested video footage that contradicts the plaintiff's version of events such that no reasonable jury could believe it, the facts are viewed in the light depicted by the videotape for purposes of summary judgment.  *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

### IV.  <u>ARGUMENT</u>

Plaintiffs seek monetary compensation under several legal theories after being struck by a felon who was eluding police around the City of Baltimore.  This case does not involve a wrongful arrest, a wrongful conviction, the unlawful use of force, or even the allegation of the violation of the civil rights of a suspect.  There is no question that there was probable cause to arrest Dello-Stritto.  Similarly, there is no question that while Dello-Stritto was operating a stolen vehicle she struck an occupied police car.  There is no question that Plaintiffs in this case were neither the

17

subjects of law enforcement activity nor struck by any police vehicle.  The legal question in this case is, therefore, whether the police conducted the pursuit of the properly identified suspect in a manner that was so egregious, so wanton, and so knowingly illegal that it violated the civil rights of Plaintiffs or constituted gross negligence.  In the First Amended Complaint, Plaintiffs claim that, through a series of alleged police department policy violations, Individual Officer Defendants violated Plaintiffs' substantive due process rights and that their actions were grossly negligent.  Rather than apprehend the fleeing suspect, Plaintiffs essentially argue that the police should not have pursued her at all.  In considering police pursuit cases, however, the Supreme Court has cautioned:

> we are loath to lay down a rule requiring the police to allow fleeing suspects to get away whenever they drive *so recklessly* that they put other people's lives in danger. It is obvious the perverse incentives such a rule would create: Every fleeing motorist would know that escape is within his grasp, if only he accelerates to 90 miles per hour, crosses the double-yellow line a few times, and runs a few red lights. The Constitution assuredly does not impose this invitation to impunity-earned-by-recklessness.

*Scott*, 550 U.S. at 385–86 (2007).

As explained below, Plaintiffs' claims fail as a matter of law to state claims upon which relief can be granted and, for that reason, should be dismissed.  Alternatively, there is no genuine dispute of any material fact, and Individual Officer Defendants are entitled to summary judgment as a matter of law.

## A.  Substantive Due Process—Section 1983 and Article 24[8]

---

[8] Article 24 protects one's right to substantive due process and is to be construed *in pari materia* with its federal counterpart.  *Dent v. Montgomery Cty. Police Dep't*, 745 F. Supp. 2d 648, 661 (D. Md. 2010); *Allmond v. Dep't of Health & Mental Hygiene*, 141 A.3d 57, 67 (Md. 2016).  State constitutional provisions such as Article 24 "generally should be interpreted in the same manner as federal provisions." *Allmond*, 141 A.3d at 67 (citing *Dua v. Comcast Cable of Maryland, Inc.*, 805 A.2d 1061, 1071 (Md. 2002)).  As such, the § 1983 analysis will govern the Article 24 analysis.

Plaintiffs' substantive due process claims, Counts I and III, fail as a matter of law because Plaintiffs do not allege, and cannot establish, a causal connection between any officer's alleged misconduct and Plaintiffs' harm, or even that the conduct of any Individual Officer Defendant violated Plaintiffs' constitutional rights.  In fact, the undisputed video footage clearly demonstrates that Individual Officer Defendants did not violate Plaintiffs' constitutional rights.  Additionally, Individual Officer Defendants are entitled to qualified immunity.  Plaintiffs can point to no authority for the proposition that, even if their allegations are true, any of Individual Officer Defendants could have known that a series of alleged internal policy violations regarding the conduct of an authorized pursuit could amount to violations of clearly established law.  For these reasons, which are discussed in more detail below, Plaintiffs' First Amended Complaint should be dismissed, or alternatively, summary judgment should be entered based upon the undisputed material evidence.[9]

> i.   **Plaintiffs' First Amended Complaint Fails to State a Claim Upon which Relief Can Be Granted.**

The allegations in the First Amended Complaint fail to state a claim for several reasons: First, this case is against individual officers, and the unique allegations against each officer fail to demonstrate that their conduct was illegal, nor do they constitute allegations of violations of clearly established law. As discussed in greater detail below in Section IV.A.iii discussing qualified immunity, Plaintiffs fail to allege actions by each Individual Officer Defendant that are violations of clearly established law. Second, the allegations in the First Amended Complaint, even if illegal

---

[9] To the extent that Plaintiffs allege a § 1983 claim against Officer Defendants in their official capacity, Plaintiffs' § 1983 claim must be dismissed because this is a suit against the State and its agency.  As such, the Eleventh Amendment would apply and bar the claim.  *See Hafer v. Melo*, 502 U.S. 21, 27 (1991) ("State officers sued for damages in their official capacity are not 'persons' for purposes of the suit because they assume the identity of the government that employs them."); *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (holding "neither a State nor its officials acting in their official capacities are 'persons' under § 1983").

and violative of clearly established law, have no factual support to establish a causal connection between the various alleged officer conduct and the accident itself.

Section 1983 imposes personal liability on anyone who *causes* a constitutional deprivation while acting under color of state law. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("On the merits, to establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right.") (emphasis in original). To establish causation, the plaintiff must show an "affirmative causal link" between the defendant's constitutional violation and the harm suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citing *Slakan v. Porter,* 737 F.2d 368, 376 (4th Cir. 1984)). "This concept encompasses cause in fact and proximate cause." *Shaw*, 13 F.3d at 799. "[T]he causal link in § 1983 cases is analogous to proximate cause" meaning that a defendant is liable for the "natural [and foreseeable] consequences of his actions." *Shaw*, 13 F.3d at 799 (citing *Slakan,* 737 F.2d at 376).

Further, "suits against officials in their individual capacity cannot succeed absent proof of some degree of *personal involvement* in the alleged deprivation of rights." *McDonald v. Dunning*, 760 F. Supp. 1156, 1160 (E.D. Va. 1991) (emphasis added). For claims against supervisors, "[i]t is not enough in this respect to show that subordinates of a sued official were the actors; the doctrine of respondeat superior has no application in § 1983 cases." *Id.* (citing *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 691–92 (1978)).

Here, Plaintiffs lack any factual support for their allegations that Individual Officer Defendants *caused* Plaintiffs' harm. Plaintiffs baldly allege that the BPD and its officers "created the threat to the citizens when they engaged in the pursuit and continued to pursue, with conscience shocking deliberate indifference and reckless disregard for the rights of innocent citizens" and

20

Individual Officer Defendants are liable by virtue of engaging in a pursuit that ultimately led to the Decedent Gore's death and Plaintiff Tyson's injuries. *See* ECF No. 57, ¶¶88, 111, 113. This argument, however, ignores the fact that it was Dello-Stritto who made the decision to flee from the police and it was she who struck Decedent Gore's vehicle and caused his death and Tyson's injuries.

This Court should reject Plaintiffs attempt to establish causation by paraphrasing testimony from a lay witness in another, unrelated case. *See* ECF No. 57, ¶54 (citing Officer Joseph Kamberger's testimony in *Smallwood v. Kamberger, et al.* for the proposition that "when an officer pursues an eluder, it induces the eluder to drive faster and continue to attempt to flee"). This paraphrased "testimony" does not address the specific facts of this case and is improper. *See, e.g., Meals v. City of Memphis*, 2005 WL 5988642, at *2 (W.D. Tenn. Feb. 10, 2005) (excluding police practices expert in high-speed police pursuit case from testifying about the driver's perceptions or the effect of the pursuit on the driver's state of mind).

> ii. **Even if This Court Finds That Plaintiffs' First Amended Complaint States a Claim, Summary Judgment Is Warranted Because Individual Officer Defendants Did Not Violate Plaintiffs' Constitutional Rights.**

Plaintiffs' First Amended Complaint attempts to paint one picture; the facts and evidence paint another. This is the rare case where all relevant actions, from the beginning through the accident itself, are caught entirely on video. The First Amended Complaint's allegations of recklessness, disregard for human life, and general lawlessness by Individual Officer Defendants are directly contradicted by the Foxtrot video and its accompanying radio traffic. The Foxtrot video shows dedicated, careful, and diligent officers whose conduct never comes near the "shocks the conscience" standard under existing law that would allow this case to proceed to a jury. The same reasons the First Amended Complaint fails to state a claim are only bolstered by the evidence,

not undermined, and this case is ripe for dismissal.  As discussed in detail below, the record evidence demonstrates that the police had a lawful reason for the pursuit and that they conducted the pursuit in a lawful manner.

"When a plaintiff alleges unconstitutional action by the executive branch of government, only official conduct that 'shocks the conscience' will give rise to a substantive due process violation."  ECF No. 40, p. 29 (citing *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846–47 (1998) and *Johnson v. Baltimore Police Dep't*, 452 F. Supp. 3d 283, 300–04 (D. Md. 2020)).  The Supreme Court has "made clear that high-speed chases with no intent to harm suspects physically or to worsen their legal plight, ordinarily, do not shock the conscience."  ECF No. 40, pp. 29–30 (citing *Lewis*, 523 U.S. at 854 and *Johnson*, 452 F. Supp. 3d at 301) (internal quotations omitted). A plausible Section 1983 claim is stated when "a citizen suffers or is seriously threatened with physical injury due to a police officer's intentional misuse of his vehicle."  *See* ECF No. 40, pp. 30–31 (citing *Lewis*, 523 U.S. at 854 n.13 and *Johnson*, 452 F. Supp. 3d at 301).  For Plaintiffs to ultimately prevail on their § 1983 claim, moreover, Plaintiffs must establish an intent to harm.  *See Dean ex rel. Harkness v. McKinney*, 976 F.3d 407, 414–15 (4th Cir. 2020) ("[U]nder *Lewis*, the intent-to-harm culpability standard applies to officers responding to an emergency call.").

In *Temkin v. Frederick County Commissioners*, 945 F.2d 716 (4th Cir. 1991), the Fourth Circuit affirmed the district court's grant of summary judgment in favor of a police officer following a pursuit that ended when the fleeing vehicle and the officer's vehicle struck the vehicle which Temkin was driving, causing her severe injuries. Although *Temkin* was decided before *Lewis*, the Court applied the same shocks the conscience standard.  *Id.* at 719.  In *Temkin,* unlike this case, the bystander vehicle was struck by both the fleeing suspect vehicle and the pursuing police vehicle.  *Id*. at 717.

22

The facts of *Temkin* are as follows: around 10:00 p.m., Selby, a sheriff,  saw a car "spinning its wheels" as it left a gas station.  *Id.* at 718.  Selby activated his lights and sirens and pursued the vehicle at high speed. *Id.*  During this high-speed pursuit, Selby heard over his radio that the fleeing vehicle's occupant may have stolen from the gas station approximately $17.00 of gas.  *Id.*  During the pursuit, both vehicles traveled at speeds between 65 and 105 miles an hour. *Id.*  The high-speed pursuit took place on a "two-lane highway traversing an area of varying population" and "[a]t the time of the chase, a carnival was taking place in the area and cars were parked along both sides of the road."  *Id.*  The pursued vehicle "lost control, crossed over the double yellow line, and struck the car in which Sharon Temkin was driving[.]" *Id.*  Selby applied his brakes but was unable to avoid striking Temkin's vehicle.  *Id.*

As support for their claim that Selby's conduct shocked the conscience, the plaintiffs relied on the following facts: (1) the chase continued for a significant period of time over a ten mile area; (2) the chase continued at a very high rate of speed (65-105 mph); (3) the chase was initiated because of a minor violation; (4) the police already had, at a minimum, a partial identification of the license plate of the suspect vehicle; and (5) the chase violated General Order # 204 because the Sheriff failed to maintain radio contact with his supervisor throughout. *Id.* at 723. There was also expert deposition testimony stating that the Sheriff's conduct was "reckless," "totally irresponsible," and "wanton."  *Id.*  The Fourth Circuit held, however, that plaintiffs' § 1983 claim failed as a matter of law.  *Id.*

Similarly, in *Meals v. City of Memphis*, 493 F.3d 720 (6th Cir. 2007), the Sixth Circuit reversed the district court's denial of qualified immunity to a police officer on a § 1983 claim for violation of the Fourteenth Amendment stemming from a high-speed police pursuit resulting in bystanders' deaths and injuries because the evidence presented did not meet the high "shock the

conscience" standard.  The officer in *Meals* observed a speeding vehicle operated by Harris, made a U-turn and began following the vehicle, intending to make a traffic stop.  *Id.* at 723.  The officer did not activate her lights and sirens while following Harris's vehicle.  *Id.*  A high-speed pursuit ensued.  *Id.*  Harris's vehicle, followed closely by the officer's, turned into the opposing southbound lanes of "a busy commercial street," before crossing the median into the correct lanes. *Id.* at 724.  Harris's vehicle "left the northbound lane, grazing another vehicle, and crossed into the southbound lanes striking nearly head-on" the Meals's vehicle, killing three of its four occupants and severely injuring the fourth.  *Id.*

The relevant police pursuit policy: prohibited pursuits where a suspect was wanted only for a traffic violation, misdemeanor, or non-violent felony; prohibited pursuits where the pursuing officer fails to obtain supervisory approval within one minute of beginning the pursuit, and where the officer fails to activate lights and sirens; dictated that officers "must continually question whether the seriousness of the violation reasonably warrants continuation of the pursuit, and that a pursuit must be discontinued when there is a clear danger to the pursuing officers or the public"; and provided that pursuits should be discontinued "[w]hen the speeds dangerously exceed normal traffic flow or when pedestrians or vehicular traffic necessitates unsafe maneuvering of the vehicle."  *Id.*

The district court denied the officer's motion for summary judgment on qualified immunity on the complaint's Fourteenth Amendment claim, finding that the evidence that the officer violated the policy "by initiating and continuing the chase in a way that shocked the conscience … would evidence a violation of Plaintiffs' rights under the Four[eent]h Amendment."  *Id.* at 726.  On appeal, the Sixth Circuit reversed, holding that the plaintiffs failed to demonstrate conduct that shocked the conscience.  *Id.* at 730–31.  In reaching its holding, the Court found that the plaintiffs

could not establish that the officer intended to harm the occupant of the vehicle or the bystanders, rejecting the argument that violation of police departmental policy is sufficient to state a § 1983 claim.  *See id.*  Because there was no evidence from which a jury could infer a purpose to cause harm unrelated to the legitimate object of pursuit, the officer did not violate the constitutional rights of the injured bystanders.  *Id.* at 731.

Like *Meals*, the district court in *Martinez v. Hubbard*, 172 F. Supp. 3d 378 (D. Mass. 2016), granted summary judgment for officers in a police pursuit case because a violation of a police rule does not support the proposition that any officer acted with "a purpose to cause harm unrelated to the legitimate object of arrest."  The court explained "[i]n the context of harm caused to an innocent bystander, the fact that officers had violated department regulations and ignored orders to stop the pursuit has been found to be insufficient to show that their conduct shocked the conscience." *Id.* at 389–90 (citing *Ward v. City of Boston*, 367 F. Supp. 2d 7, 13 (D. Mass. 2005)).  Likewise, the fact that some officer may have violated department policy "is insufficient to show that his conduct was so depraved as to shock the conscience."  *Id.* at 390.

Here, the record demonstrates that the officers' actions in attempting to stop Dello-Stritto and in pursuing her were legally justified and not committed with a purpose to cause harm unrelated to the legitimate object of arrest.  Plaintiffs' First Amended Complaint acknowledges, and the Foxtrot video establishes, that the officers observed (and heard over the radio) the suspect, Dello-Stritto, disregard lawful police commands, avoid a vehicle box-in by backing up, striking Officer Gray's police vehicle, and fleeing. The officers had just observed (and heard), what they believed to be, a felony assault on a police officer.  *See, e.g.,* Schreven Dep., Exhibit 10, 47:12-49:8; Conley Dep., Exhibit 7, 123:22-124:20; *see also* Md. Code, Crim. Law § 3-203. Plaintiffs, therefore, cannot establish that the decision to initiate the pursuit was improperly made with any

intent to harm. *See Slusarchuk v. Hoff,* 346 F.3d 1178, 1183 (8th Cir. 2003) (explaining when suspect refused to stop after officers activated their emergency lights, they had probable cause to arrest him for committing a felony in their presence, regardless of their initial reasons for the attempted stop; therefore "the pursuit was 'aimed at apprehending a suspected offender' and did not objectively evidence 'a purpose to cause harm unrelated to the legitimate object of arrest'"). Nothing in this case supports (or even suggests) that Individual Officer Defendants acted with any improper or malicious motive.

Similarly, the manner in which the pursuit was conducted does not "shock the conscience" as a matter of law. When the pursuit is authorized, aimed at apprehending a fleeing suspect and is related to the legitimate object of arrest, as explained above, courts routinely find, even when considering more egregious conduct than in the instant case, that the conduct of the pursuit itself does not violate substantive due process even where departmental policy is violated. *See Temkin,* 945 F.2d at 723; *Meals,* 493 F.3d at 731; *Martinez,* 172 F. Supp. 3d at 389–90.

### iii.     Individual Officer Defendants Are Entitled to Qualified Immunity.

Plaintiffs' First Amended Complaint does not establish, and the record does not demonstrate, that Individual Officer Defendants' conduct violated any clearly established law. Plaintiffs' substantive due process claim, Count I, should therefore be dismissed on the basis of qualified immunity. In the alternative, Individual Officer Defendants are entitled to summary judgment.

Qualified immunity amounts to "an entitlement not to stand trial or face the other burdens of litigation." *Brown v. Gilmore*, 278 F.3d. 362, 366–37 (4th Cir. 2002) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Qualified immunity will protect an officer "'from civil damages in a § 1983 action insofar as [the officer's] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Bland v.*

*Roberts*, 730 F.3d 368, 391 (4th Cir. 2013) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 250 (4th Cir. 1999)). "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

"The Supreme Court has recognized that [qualified] immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Gomez v. Atkins*, 296 F.3d 253, 261 (4th Cir. 2002) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Further, "qualified immunity protects law officers from 'bad guesses in gray areas,' and it ensures that they may be held personally liable only for 'transgressing bright lines.'" *Id.* (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)).

When a defendant asserts qualified immunity, it is the plaintiff's burden to "demonstrate that (1) the defendant violated the plaintiff's constitutional rights, and (2) the right in question was clearly established at the time of the violation." *Adams v. Ferguson*, 884 F.3d 219, 226 (4th Cir. 2018) (reversing in pertinent part denial of motion to dismiss on ground of qualified immunity). Courts have discretion as to which of these two prongs should be addressed first in a particular case. *Pearson*, 555 U.S. at 236. "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

The Supreme Court has made clear that "'[c]learly established' means that, at the time of the officer's conduct, the law was 'sufficiently clear' that every reasonable official would understand that what he is doing is unlawful. In other words, existing law must have placed the constitutionality of the officer's conduct 'beyond debate.'" *D.C. v. Wesby*, 138 S. Ct. 577, 589

(2018) (reversing because officers were entitled to summary judgment based on qualified immunity) (citations and some internal quotations omitted).  A law is "clearly established" if "it is dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority.'"  *Id.* at 589-90 (citations and some internal quotations omitted).  "A rule is too general if the unlawfulness of the officer's conduct does not follow immediately from the conclusion that [the rule] was firmly established."  *Id.* at 590 (citations and internal quotations omitted).  The court should "consider whether a right is clearly established 'in light of the specific context of the case, not as a broad general proposition.'"  *Adams*, 884 F.3d at 227 (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam)).

As explained above in Section IV.A, Plaintiffs cannot sustain a viable claim that any defendant violated their constitutional rights.  The Individual Officer Defendants are therefore entitled to qualified immunity.  Even assuming*, arguendo*, Individual Officer Defendants' conduct did violate Plaintiffs' constitutional rights—which Plaintiffs did not sufficiently allege and cannot show—these defendants would still be entitled to dismissal of the First Amended Complaint or summary judgment based on qualified immunity because such rights were not "clearly established at the time of the [alleged] violation." *See Adams*, 884 F.3d at 226.  There do not appear to be "cases of controlling authority in [the] jurisdiction" or "a consensus of cases of persuasive authority," *see Wilson v. Layne*, 526 U.S. 603, 617–18 (1999), clearly establishing that Plaintiffs' rights were violated on the facts alleged or set forth in the Foxtrot video footage.  To the contrary, reported precedent establishes that no federal rights were violated.

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998), is instructive.  In *Lewis,* the Supreme Court reversed the district court's denial of a deputy sheriff's motion for summary judgment on qualified immunity on a substantive due process claim.  *Id.*  The case arose from a crash following

the pursuit of a motorcycle by a sheriff's deputy.  *See id.* at 836–37.  More specifically, while responding to a call, the sheriff's deputy observed "a motorcycle approaching at high speed."  *Id.* at 836.  The sheriff activated his rotating lights, yelled at the motorcycle to stop, and attempted to box-in the motorcycle.  *Id.*  The motorcycle escaped and fled at high speed.  *See id.* at 836–37.  Deputy Smith activated his lights and sirens and began a high-speed pursuit of the motorcycle.  *Id.* at 837.  "For 75 seconds over a course of 1.3 miles in a residential neighborhood, the motorcycle wove in and out of oncoming traffic, forcing two cars and a bicycle to swerve off the road. The motorcycle and patrol car reached speeds up to 100 miles an hour, with Smith following at a distance as short as 100 feet."  *Id.*  The motorcycle tipped while negotiating a turn.  *Id.*  Deputy Smith applied his brakes but was unable to avoid striking and killing the motorcycle's passenger. *Id.*  The district court noted that the pursuit was in violation of applicable general orders.  *Id.* at 838–39.  As discussed above, on those facts, the Supreme Court held that the deputy's conduct did not shock the conscience.  *Id.* at 854.

   *Temkin* and *Meals*, discussed above in Section IV.A.ii, are also instructive.  In both cases, the subject officer had a lawful basis to stop a fleeing vehicle.  Thus, notwithstanding that the pursuits violated applicable policies, the Fourth Circuit and the Sixth Circuit both held that the officers' conduct did not evidence an intent to harm and, therefore did not shock the conscience. *See Temkin*, 945 F.2d at 723; *Meals*, 493 F.3d at 730–31.

   Here, Plaintiffs' allegations and the record demonstrate both a lawful basis to stop Dello-Stritto and a lawful basis to pursue her after she fled.  In such circumstances, there can be no intent to harm.  Plaintiffs have therefore failed to demonstrate a violation of a clearly established right. For that reason, the Individual Officer Defendants are entitled to dismissal of the First Amended Complaint or, alternatively, summary judgment.

### B.  Gross Negligence

Count IV of Plaintiffs' First Amended Complaint alleges gross negligence under Maryland law.  In addition to Plaintiffs' constitutional claims being both deficient and unsupported by the evidence, Plaintiffs' gross negligence claim also should not be allowed to proceed.

As described below, but not argued in the prior Motion to Dismiss, Plaintiffs have failed to allege sufficient facts to support a finding of legal and factual causation—both required elements of gross negligence—as they fail to connect any of the specific allegations against specific officers to the ultimate crash.  Further, with the evidence now known, there is no material dispute of fact that requires resolution by a jury as to whether the conduct in the pursuit was grossly negligent. The new allegations, when viewed in light of the obvious video evidence, demonstrate that, at best, Plaintiffs have alleged no more than technical policy violations, not gross negligence by any of the Individual Officer Defendants, and this claim should not be allowed to proceed.  While this Court did consider the gross negligence claim in some of the individual defendants' prior motion and denied the motion "at this stage" based on the arguments raised at that time, the new arguments by Defendants, the allegations in the First Amended Complaint, and the evidence gained in discovery place the case at a very different stage that is now ripe for dismissal.  *See Stracke v. Est. of Butler*, 214 A.3d 561, 568 (Md. 2019) ("Gross negligence is a question of law 'when reasonable [people] could not differ as to the rational conclusion to be reached.'"). !!!

As this Court previously noted regarding the scope of the breach of duty:

> Gross negligence describes a level of neglect more egregious than simple negligence. Maryland law defines gross negligence as an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and is said to imply a thoughtless disregard of the consequences without the exertion of any effort to avoid them. Stated conversely, a wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist.

ECF No. 40 at p. 33 (internal citations and quotations omitted).  But, "[g]ross negligence is not just big negligence.  For these purposes, gross negligence must be sufficient to establish that the defendant had a wanton or reckless disregard for human life.  Only conduct that is of extraordinary or outrageous character will be sufficient to imply this state of mind."  *Stracke,* 214 A.3d at 569 (internal citations, quotations, and alterations omitted).

What was not addressed in the prior motion or ruling is that, to prevail on a gross negligence claim, Plaintiffs also must establish proximate and actual causation.  *Pasternak & Fidis, P.C. v. Recall Total Information Management, Inc.*, 95 F. Supp. 3d 886, 895 (D. Md. 2015) (citing *Swedish Civil Aviation Admin. v. Project Mgmt. Enters., Inc.*, 190 F. Supp. 2d 785, 803 (D. Md. 2002)).  To establish causation, Plaintiffs must prove Individual Officer Defendants' gross "negligence was both a cause in fact of the injury and a legally cognizable cause."  *Id.* (internal citations and quotations omitted).  "The cause in fact inquiry concerns whether defendant's negligent conduct actually produced an injury."  *Id.* at 896. (internal citations and quotations omitted).  To determine whether causation-in-fact exists, Maryland courts apply the substantial factor test in situations, like here, "where more than one independent negligent act may be responsible for a plaintiff's injury."  *Id.* (internal citations and quotations omitted).  "Under the substantial factor test, an action is viewed as the cause of an injury only if the action was a substantial factor in bringing about plaintiff's injury."  *Id.* (internal citations and quotations omitted).  On the other hand, the "legal causation" inquiry "is a policy-oriented doctrine designed to be a method for limiting liability after cause-in-fact has been established" and "[c]ommonly, this inquiry involves a determination of whether the injuries were a foreseeable result of the negligent conduct."  *Id.* (internal citations and quotations omitted).

Maryland's Court of Appeals "has adopted the substantial factor test set forth in the Restatement (Second) of Torts." *Pittway Corp. v. Collins*, 973 A.2d 771, 787 (Md. 2009).  Section 431 of the Restatement provides that "[t]he actor's negligent conduct is a legal cause of harm to another if (a) his conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which the negligence has resulted in the harm."  Under Restatement § 433, "[t]he following considerations are in themselves or in combination with one another important in determining whether action's conduct is a substantial factor in bringing about harm to another: (a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it; (b) whether the actor's conduct has created a force or a series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces of which the actor is not responsible; (c) lapse of time."

Where causation-in-fact is established, the court then considers "whether the defendant's negligent actions constitute a legally cognizable cause of the complainant's injuries."  *Pittway*, 973 A.2d at 787.  "The question of legal causation most often involves a determination of whether the injuries were a foreseeable result of the negligent conduct."  *Id.* at 788.  Where there are multiple allegedly negligent actors, courts also consider "whether a negligent defendant is relieved from liability by intervening negligent acts or omissions."  *Id.*  As the *Pittway* Court explained, "[l]iability is avoided only if the intervening negligent act or omission at issue is considered a superseding cause of the harm to the plaintiffs."  *Id.* at 789.  Maryland courts apply Restatement §§ 442 and 447 to determine whether an intervening negligent act is a superseding cause.  *Id.*  "[A] superseding cause arises primarily when 'unusual' and 'extraordinary' independent intervening

negligent acts occur that could not have been anticipated by the original tortfeasor." *Id.* (quoting *McGowans v. Howard*, 197 A.2d 915, 918 (Md. 1964)).

As described above at Section II.A.iii, Plaintiffs' claims against the Individual Officer Defendants are discrete, different and specific.  Most, if not all of, the claims relate to conduct detached in time, or even visual line of sight by the pursuing officers to the ultimate accident.  *See* Foxtrot Video, Exhibit 2, at 15:30-16:03 (showing the distance between any BPD vehicle and Dello-Stritto immediately before and after the crash). Given that, Plaintiffs cannot survive the simple hurdle of "substantial factor" causation in this instance because, here, neither the initiation of the pursuit nor any of the other allegations against Individual Officer Defendants were a cause of the accident.  Rather, Dello-Stritto's decision to flee and her decision to continue to flee caused the accident.  There is no allegation, anywhere, that the Individual Officer Defendants lacked probable cause to arrest Dello-Stritto.  No reasonable jury could take any of the allegations stated in the First Amended Complaint against each Individual Officer Defendant, and find those specific allegations satisfy substantial factor causation analysis because, had Dello-Stritto simply stopped and complied with Individual Officer Defendants' lawful instructions at the gas station, or when being pursued by police, no accident would have happened.

With regard to gross negligence, the same or similar analysis as is made in the § 1983 section demonstrates that now, "at this stage," after viewing the material evidence that is not in dispute, the allegations are simply not supported by the clear evidence.  As the court noted, gross negligence is a high standard that requires more than simple negligence.  When considered at summary judgement, the court will apply the known, undisputed facts to determine if the allegations, in light of the evidence could support a jury finding of liability.  *See* Fed. R. Civ. P. 56.  A case cannot be allowed to go to a jury simply because of the allegations.  There must be

some evidence suggesting that the allegations could be demonstrated by a preponderance of the evidence. "A party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (internal citations, quotations and alterations omitted).

Here, as demonstrated above at Section IV.A.ii, the pursuit was not prohibited under Policy 1503. Further, there is no evidence that any Individual Officer Defendant intentionally or recklessly disregarded any aspect of Policy 1503. Instead, the allegations, when taken in the context of the undisputable video evidence, show, at most, that a hyper-vigilant hindsight analysis with 20/20 vision of a stressful and evolving situation, amounting to a series of technical policy violations by a variety of officers who are otherwise demonstrating a general attention and concern for the safety of themselves and innocent bystanders. There is, however, no evidence that the Individual Officer Defendants "inflict[ed] injury intentionally or [were] so utterly indifferent to the rights of others that [they] act[ed] as if such rights did not exist." *Stracke*, 214 A.3d at 569 (internal citations and quotations omitted). For these reasons, the Individual Officer Defendants are entitled to the dismissal of or, alternatively, summary judgment on Count IV.

### C. Wrongful Death and Survival Action

For a beneficiary to maintain a wrongful death action under Maryland law, there must have been a "[w]rongful act," which is defined as "an act, neglect, or default including a felonious act which would have entitled the party injured to maintain an action and recover damages if death had not ensued." Md. Code, Cts. & Jud. Proc. § 3-901(e). The Maryland Survival Action Statute allows a personal representative to bring a personal action which the decedent might have commenced or prosecuted. Md. Code, Est. & Trusts § 7-401. "A survival action is a claim personal

to the decedent that the decedent could have brought in his own right if he had lived." *Beyer v. Morgan State Univ.*, 779 A.2d 388, 394 (Md. Ct. Spec. App. 2001), *aff'd*, 800 A.2d 707 (Md. 2002).

As previously explained, Individual Officer Defendants are not responsible for the death of Decedent Gore.  Individual Officer Defendants did not engage in any "wrongful acts" and Decedent Gore would have no claim against Individual Officer Defendants, had he lived.  Dello-Stritto, is solely responsible for crashing into Decedent Gore's vehicle, thereby causing his injuries and ultimately his death.  Individual Officer Defendants, conversely, based on Plaintiffs' allegations and the record evidence, pursued a suspect to a violent crime and did so for no other reason than to apprehend the suspect they believed posed an immediate threat to the safety of the officers and the public.  Unfortunately, despite the Individual Officer Defendants' best efforts, this threat came to fruition.  The fact that the fleeing suspect, Dello-Stritto, struck Decedent Gore's vehicle during the pursuit does not establish that Individual Officer Defendants committed tortious and constitutional violations against Plaintiffs.  For the same reasons the Section 1983, Article 24, and gross negligence claims should be dismissed, the wrongful death and survival action claims should be dismissed, as well.

## V.  <u>CONCLUSION</u>

For the foregoing reasons, Individual Officer Defendants respectfully request that this Court dismiss with prejudice and without leave to amend, or alternatively, enter summary judgment as to Counts I, III, IV, V, and VI of the First Amended Complaint.

*[Signatures on following page]*

Respectfully submitted,


**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC**

By: /s/ *Thomas H. Barnard*
Thomas H. Barnard, Fed. Bar No. 27488
tbarnard@bakerdonelson.com
Stuart R. Goldberg, Fed. Bar No. 21236
sgoldberg@bakerdonelson.com
100 Light Street
Baltimore, MD 21202
Phone:  410-862-1185
Fax:  410-547-0699

Ashleigh Singleton (*Admitted Pro Hac Vice*)
Florida Bar No. 1025754
asingleton@bakerdonelson.com
3301 Thomasville Rd, Suite 201
Tallahassee, Florida 32308
Telephone: (850) 425-7550

*Attorneys for Defendants Officer Zachary A.
Franks, Officer Johnta Gray, Sergeant James
L. Conley, Lieutenant Lakishia L. Tucker and
Sergeant Marc J. Camarote*


**KRAMON & GRAHAM, P. A.**

/s/ *John A. Bourgeois*
John A. Bourgeois, Fed. Bar No. 11934
jbourgeois@kg-law.com
Christopher C. Jeffries, Fed. Bar No. 28587
cjeffries@kg-law.com
(signed by Thomas H. Barnard with
permission of Christopher C. Jeffries)
One South Street, Suite 2600
Baltimore, MD 21202
Phone:  410-752-6030
Fax: 410-539-1269

*Attorneys for Defendant Officers John W.
Schreven, John Bilheimer, Felix Torres, Mark
T. Gurbelski, Michael H. Wood, Joshua P.
Corcoran, Sharif K. Kellogg, Yenuel F.
Familia, and Dylan R. LaPorta*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 15th day of April, 2022, a copy of the foregoing *Memorandum of Law in Support of Individual Officer Defendants' Joint Motion to Dismiss or, in the Alternative, for Summary Judgment* was filed with the United States District Court for the District of Maryland, and served, electronically, on all counsel of record, via the Court's CM/ECF e-filing system.

*/s/ Thomas H. Barnard*
Thomas H. Barnard, Fed. Bar No. 27488

37