# EXHIBIT 7



# Transcript of Sergeant James Conley

**Date:** January 21, 2022
**Case:** Simmons, et al. -v- Baltimore City Police Department, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

**1**

```
           IN THE UNITED STATES DISTRICT COURT

2              OR THE DISTRICT O  MARYLAND

3                  (Northern Division)

4                        x

5  ROWENA SIMMONS, et   :

6  al.,                 :

7         Plaintiffs,  :   Civil Action No.

8     v.               :2  cv 00969 RDB

9  BALTIMORE CITY POLICE :

0  DEPARTMENT, et al.,  :

             Defendants.  :

2                        x

3

4              CON IDENTIAL

5    Deposition of SERGEANT JAMES CONLEY

6           Conducted Virtually

7           riday, January 2 , 2022

8                0:04 a.m.

9

20 Job No.:  426464

2  Pages:    78

22 Reported By:  Sandra A. Slater, CSR
```

**2**

```
     Deposition of SERGEANT JAMES CONLEY, conducted

2  virtually.

3

4

5

6

7

8

9     Pursuant to notice, before Sandra A. Slater,

0  Notary Public in and for the State of Maryland.

2

3

4

5

6

7

8

9

20

2

22
```

**3**

```
           A P P E A R A N C E S

2  ON BEHAL  O  PLAINTI S:

3      NIKOLETTA S. MENDRINOS, ESQUIRE

4      MURPHY,  ALCON AND MURPHY

5      One South Street

6      Suite 3000

7      Baltimore, Maryland 2 202

8      (4 0) 539 6500

9

0  ON BEHAL  O  DE ENDANTS O  ICER ZACHARY A.

   RANKS AND O  ICER JOHNTA GRAY:

2      THOMAS H. BARNARD, ESQUIRE

3      ASHLEIGH SINGLETON, ESQUIRE

4      BAKER, DONELSON, BEARMAN, CALDWELL &

5      BERKOWITZ, PC

6       00 Light Street

7       9th  loor

8      Baltimore, Maryland 2 202

9      (4 0) 862  85

20

2

22
```

**4**

```
     A P P E A R A N C E S   C O N T I N U E D

2  ON BEHAL  O  DE ENDANT O  ICER  ELIX TORRES:

3      CHRISTOPHER C. JE RIES, ESQUIRE

4      KRAMON & GRAHAM, PA

5      One South Street

6      Suite 2600

7      Baltimore, Maryland 2 202

8      (4 0) 752 6030

9

0  ON BEHAL  O  DE ENDANT BALTIMORE POLICE

   DEPARTMENT:

2      KARA K. LYNCH, ESQUIRE

3      BALTIMORE CITY LAW DEPARTMENT

4      O  ICE O  LEGAL A AIRS

5       00 North Holliday Street

6      Room  0

7      Baltimore, Maryland 2 202

8      (4 0) 396 2496

9

20 ALSO PRESENT:

2      GREER MCKEE, PLANET DEPOS TECHNICIAN

22
```

**Page 5**

```
              C O N T E N T S
2   EXAMINATION O  SERGEANT JAMES CONLEY        PAGE
3       By Ms. Mendrinos                          6
4
5
6
7              E X H I B I T S
8         (Attached to the Transcript.)
9   CONLEY DEPOSITION EXHIBITS                   PAGE
0   Exhibit    oxtrot footage                     72
    Exhibit 2  Conley footage                     72
2   Exhibit 3  64 and 65                          72
3   Exhibit 4  Policy  503                        74
4
5
6
7
8
9
20
2
22
```

**Page 6**

P R O C E E D I N G S

1 Wherefore,

2       SERGEANT JAMES CONLEY,

3 being first duly sworn or affirmed to testify to

4 the truth, the whole truth, and nothing but the

5 truth, was examined and testified as follows:

6     EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

7 BY MS. MENDRINOS:

8     Q  Good morning, Sergeant Conley.  Sorry for

9 the confusion.  My name is Nikoletta Mendrinos and

10 I represent the decedent, Darius Gore, his mother,

11 and Mr. Gary Tyson.  And I'm going to be asking

12 you some questions on behalf of them today.

13 Before we get started, have you ever had your

14 deposition taken before?

15 **A  No.**

16    Q  I'm having trouble hearing you.  Is there

17 a way to sit closer to the microphone and turn it

18 up?

19 **A  I have not, no.**

20    Q  Okay.  All right.  So normally we do this

21 in person, but because of the circumstances we are

**Page 7**

1 doing this remotely today.  It s very important

2 that you let me finish my question before you

3 offer an answer because the court reporter is

4 capturing everything that we re saying here today.

5 And with remote depositions, it s very difficult

6 to capture everything.

7       Please remember to offer verbal responses

8 to my questions.  Head shakes and head nods are

9 impossible to capture, especially remotely,

10 virtually.  So if you don t mind offering verbal

11 answers to my questions at all times, that would

12 be appreciated.

13       I m going to try and let you finish your

14 answer before I ask the next question.  And at

15 times there may be an attorney who is objecting,

16 so if you want to make sure that you offer a pause

17 before you offer an answer, that would be really

18 helpful because sometimes the attorney tries to

19 object and we start talking over each other and

20 it s impossible to capture everything.

21       You can ask me to clarify a question if

22 you don t understand it at any time.  Please let

**Page 8**

1 me know so I can rephrase it, if that's the case.

2 If you need to take a break at any time, please

3 let me know and we can take a break whenever you

4 need to.  It just can't be in the middle of a

5 question.  Okay?

6       I'm going to ask you a couple questions,

7 but I want to make sure that you understand what

8 it is that we're doing here today.  Do you

9 understand that you're testifying here under oath,

10 the penalties of perjury?

11 **A  Yes.**

12    Q  Okay.  And do you understand that this

13 transcript may be offered and showed to a jury at

14 any point in time in the future?

15 **A  Yes.**

16    Q  Okay.  Are you under the influence of any

17 substances that would impair your ability to tell

18 the truth here today?

19 **A  No.**

20    Q  Are you under the influence of any

21 substances that would impair your ability to

22 understand my questions?

9

1    A  No.

2    Q  Okay.  I see that you're -- I don't

3  normally ask these questions, but because this is

4  done remotely I'm going to where you are

5  physically.  It looks like you're in a room -- are

6  you at --

7    A  I'm in my office.

8    Q  Your home office or your work office?

9    A  My work office.

10    Q  Okay.  And where is that located?

11    A  10 Cherry Hill Road.  It's in Baltimore.

12    Q  Is this office -- does this office have a

13  door on it?

14    A  Yes.

15    Q  Is the door closed?

16    A  Yes.

17    Q  Is there anyone in the room with you?

18    A  No.

19    Q  Okay.  Are you on a laptop or on an

20  iPhone?

21    A  It's a laptop through the department.

22  It's kind of like a tablet, though, if that makes

1  to be standing at your door wondering who you're

2  talking to, but you're going to have to let them

3  know that it's just us.  Do you need a moment to

4  get the audio squared away?

5    A  I was having problems with this earlier.

6  I tried connecting the headphones and the

7  headphones weren't working either.

8    Q  Okay.  All right.  We'll do our best.  All

9  right.  So you've never been deposed before.  Have

10  you ever offered testimony in court?

11    A  Yes.

12    Q  Okay.  How many times approximately have

13  you testified in court?

14    A  Five to ten.

15    Q  I'm sorry?

16    A  Between five and ten.

17    Q  Okay.  And were you always a witness

18  officer or were there any instances where you were

19  a named plaintiff or defendant?

20    A  The witnessing officer.

21    Q  Okay.  All right.  Have you ever been

22  identified by any governmental agency as unfit to

0

1  sense.

2    Q  Okay.  I m going to be showing you some

3  videos and we re going to be going through some

4  footage.  So if at any point you can t see what it

5  is that I m showing you, we can switch over to a

6  larger screen.  Let us know and we ll take care of

7  that.  And if at any point in time anyone starts

8  texting you or instant messaging you or e-mailing

9  you anything about your testimony here today,

10  please let me know so we can address that

11  accordingly.

12      And the same thing for any documents.  If

13  people start e-mailing you or sending you or

14  texting you documents that are related to your

15  testimony here today, please let me know so we can

16  also address that accordingly.  Okay?

17    A  Okay.

18    Q  And then I m going to remind you, I m

19  having a little bit of trouble hearing you.  So

20  what you may want to do is you may want to sit a

21  little bit closer to the microphone and offer

22  nice, big loud responses.  I know people are going

2

1  testify?

2    A  No.

3    Q  No?  Okay.  And have you ever been

4  convicted of perjury?

5    A  No.

6    Q  Have you ever been charged with perjury?

7    A  No.

8    Q  Okay.

9      (Discussion off the record; technical

10  difficulties.)

11    Q  All right.  Sir, which district are you

12  based out of currently?

13    A  Southern District.

14    Q  Okay.  How long have you been based out of

15  the Southern District?

16    A  Since January of 2019.

17    Q  Okay.  And what about, what is your role

18  within the Southern District?

19    A  Apparently, I'm a detective sergeant

20  within the district detective unit.

21    Q  How long have you been a detective

22  sergeant?

**3**

1    A   August of this year.

2    Q   Congratulations.

3    A   Yeah.  I don't know if that's a good thing

4  or not.  We'll see.

5    Q   And before August of 2021, how long --

6  what did you do before that between --

7    A   Patrol sergeant.

8    Q   Okay.  Patrol sergeant?

9    A   Yes.

10   Q   Okay.  And what were you -- before January

11 2019, where were you based out of and what was

12 your rank?

13   A   I was an officer in the Eastern District.

14   Q   Patrol officer?

15   A   Yes.

16   Q   Yes?  Okay.  How long were you a patrol

17 officer out of the Eastern District?

18   A   Since I graduated the academy.

19   Q   When did you graduate the academy?

20   A   2015.

21   Q   What month?

22   A   I believe it was April.

**4**

1    Q   Okay.  So you were -- so when were you

2  hired, do you remember?

3    A   7/7 of '14.

4    Q   So you were hired in July of 2014 and you

5  spent, what, about 12 months -- no, not 12 months.

6  Eight months?

7    A   With the academy and field training, yes.

8    Q   Okay.  Have you had any specialized

9  training to become a detective sergeant?

10   A   No.

11   Q   Okay.  I'm going to direct your attention

12 to the time of the incident that we're here

13 today -- actually, first of all, let me press

14 pause a little bit.  What is your understanding of

15 why you are here today?

16   A   Give my testimony in reference to the

17 incident that occurred from — I guess I don't

18 remember the date, but from the vehicle pursuant.

19   Q   Do you remember the incident?

20   A   Yes.

21   Q   Okay.  Do you know whether or not you are

22 represented by counsel here today?

**5**

1    A   I don't believe that I am in their suit.

2  I'm under I guess Mr. Barnard as far as counsel

3  goes.

4    Q   Okay.  And you are here to offer your

5  testimony.  Do you think you are here as a witness

6  or do you think you are a named party?  Or tell me

7  a little bit about what your understanding of your

8  role.

9    A   Right now, I believe, I'm just a witness.

10   Q   Okay.  What do you mean "right now"?

11   A   I believe that it could change.  Nothing

12 has gone to court yet and nothing has been

13 settled.

14   Q   Okay.  Have you met with anyone other than

15 your attorney to discuss your testimony here

16 today?

17   A   No.

18   Q   No?

19   A   No.

20   Q   Okay.  Have you reviewed any documents in

21 preparation for your testimony here today?

22   A   I reviewed policy.  I reviewed body

**6**

1  camera.

2    Q   What policy did you review?

3    A   The pursuit policy.  I don't know the

4  policy number.

5    Q   Okay.  And the body-worn camera footage?

6    A   And the Foxtrot video.

7    Q   What body-worn camera footage did you

8  review?

9    A   Specifically mine.  I don't recall

10 watching anybody else's, but I watched my

11 recently.

12   Q   What do you mean by "recently"?  When was

13 that?

14   A   Yesterday.

15   Q   Yesterday?  About what time?

16   A   2:00.

17   Q   Okay.  Was this the first time you had

18 reviewed it or had you seen it before?

19   A   I've seen it before.

20   Q   How many times had you seen it before?

21   A   A handful of times.  I'm not sure how many

22 times.

**7**

1    Q  Okay.  When did you review that body-worn
2  camera footage?
3    **A  Mr. Barnard's office.**
4    Q  Okay.  What about before that, had you
5  reviewed it before?
6    **A  I don't think I did because it's being**
7  **investigated, and it's kind of flagged if you look**
8  **at body cameras.**
9    Q  What do you mean by "flagged"?
10   **A  So, like, any time someone logs into a --**
11 **and reviews body camera, it shows that I've looked**
12 **at it or I'm reviewing it or anything like that.**
13 **It shows a record.**
14   Q  Right.  Did you review it after the
15 incident, closer in time to the incident?
16   **A  I would say I reviewed it that night**
17 **probably, yes.**
18   Q  Okay.  Why?
19   **A  Because we have to document it.  We have**
20 **to put it onto a -- we have to, like, note what**
21 **happened and stuff like that.**
22   Q  At the time of your --

**8**

1    **A  I have to tag the video.**
2    Q  Okay.  When you reviewed it close in time
3  to the incident, I think you said that night, did
4  you notice anything that you seen that you thought
5  to be unusual?  And not necessarily about what you
6  saw, but, like, if it matched what it is that you
7  recall?
8    **A  No.  I mean, I didn't see anything**
9  **unusual, no.**
10   Q  Okay.  All right.  And then since you
11 reviewed it close to the incident and when you
12 reviewed it yesterday, did you notice any
13 alterations, any changes?
14   **A  No.**
15   Q  Okay.  All right.  So have you reviewed
16 the Foxtrot footage before -- well, let me ask you
17 this.  When did you review the Foxtrot footage
18 last?
19   **A  With Mr. Barnard.**
20   Q  Okay.  Was this yesterday or the previous
21 meeting?
22   **A  The previous meeting.**

**9**

1    Q  Okay.  Had you reviewed it before your
2  meeting with Mr. Barnard?
3    **A  Yes, I have seen the video before.**
4    Q  When did you see the video?
5    **A  That night or a day after the incident.**
6    Q  Why did you look at that?
7    **A  I just wanted to see actually what Foxtrot**
8  **saw and what they saw went down.**
9    Q  Okay.  So you reviewed the Foxtrot footage
10 either the night of the incident or the day after,
11 and then with Mr. Barnard at some point in time.
12 In between those two times, did you review the
13 Foxtrot footage?
14   **A  No.**
15   Q  Okay.  When you reviewed the Foxtrot
16 footage either that night or the day after the
17 incident, did you review it alone or did you
18 review it with others?
19   **A  With Mr. Barnard.**
20   Q  No.  I mean, when -- before the time with
21 Mr. Barnard, when you reviewed it on the night of
22 the incident or close in time.

**20**

1    **A  There might have been some people in the**
2  **office, but I just had it up.**
3    Q  Okay.  Where did you have it up?
4    **A  On the computer at the district.**
5    Q  In your office?
6    **A  Yeah.  Not this office specifically, but**
7  **before.  Being a patrol sergeant, there's a**
8  **cubicle.**
9    Q  Okay.  And you said there were some
10 officers there as well reviewing it with you?
11   **A  It's an open cubicle, there's not a door**
12 **lock.  I don't -- I'm not sure who was in the**
13 **office.**
14   Q  Do you remember whether Lieutenant Tucker
15 reviewed it with you?
16   **A  I don't recall.**
17   Q  I'm sorry?
18   **A  I don't recall.**
19   Q  Okay.  You don't recall one way or the
20 other or you don't remember her being there?
21   **A  I don't remember her being there.**
22   Q  Okay.  Do you remember any of the other

2

1 officers that were standing there or perhaps
2 looking at the video with you in your cubicle?
3    A  I do not.
4    Q  Okay.  Did you guys have any conversations
5 as you were reviewing the video?
6    A  I think we just looked over, like, the
7 tactics and what was going on.
8    Q  Okay.  And tell me a little bit about
9 that.  What did you guys discuss about the
10 tactics?
11    A  Like, at one point, you know, she was
12 going so slow, we are wait waiting for her to stop
13 and bail out and we were just trying to figure out
14 if we could have done anything differently or, you
15 know.
16    Q  And what did you guys conclude?
17    A  I think that we did the best job that we
18 could do.
19    Q  Why do you think that?
20    A  I didn't see any problems with our
21 tactics.  I think we were safe.
22    Q  All right.  We will get to the specifics

22

1 in a minute.  All right.  So you reviewed the
2 policy.  Before your meeting with Mr. Barnard when
3 you reviewed the policy, did you review the policy
4 at any point in time before that?
5    A  I probably reviewed it when I was
6 interviewed by SERT.
7    Q  When were you interviewed by SERT?
8    A  I don't have a specific date.  I can look
9 in my phone and see if I have it calendared.
10    Q  That would be really helpful, if you don't
11 mind.
12    A  I'm sorry.  I'm looking for it.
13    Q  No worries, take your time.





**25**

1

2

3

4

5

6

7  (A recess was taken.)

8  MR. BARNARD: So yeah, this is Tom

9 Barnard, Detective Conley. So I would like to --

10 I m not going to instruct the witness not to

11 answer the questions about the IA or the SERT

12 interview. Subject to -- as long as all counsel

13 are in agreement that while we do not have the

14 protective order in place yet, I did circulate a

15 draft that later we will be able designate these

16 portions and portions discussed in IA or SERT as

17 confidential. So plaintiffs  counsel may use

18 them, but they will not be subject to any broader

19 dissemination.

20  MS. MENDRINOS: And I m fine with marking

21 the deposition as confidential, depending on what

22 the protective order says. I haven t seen it yet,

**26**

1 to be honest with you.

2  MR. BARNARD: Yeah. It s the standard

3 block one from the court, so it s nothing unique.

4 But yeah, we ll come to a protective order. We

5 just want to designate any discussions or

6 documents related to SERT or IA as confidential,

7 but I don t want to create a situation where you

8 have to come back later, so I think it s fine.

9  MS. MENDRINOS: Okay. All right.

10  MR. BARNARD: Is all counsel in agreement

11 on that?

12  MS. MENDRINOS: So I have no problem with

13 coming to an agreement about what the

14 protective -- like, I have no problem with the

15 protective order, but I certainly want to look at

16 the language and make sure that it s not than what

17 it needs to be.

18  MR. BARNARD: Of course. Of course.

19  MS. MENDRINOS: So we can we can talk

20 about that and then we can figure out what needs

21 to be done specifically.

22  MR. BARNARD: Yep.

**27**

1  MS. MENDRINOS: But I agree with you that

2 we need to keep moving.

3  MR. BARNARD: Okay.

4  MS. MENDRINOS: (Indiscernible) efficient.

5  MR. BARNARD: And I'm confident that we

6 can reach a -- protective orders are not

7 controversial. They are pretty standard, so I'm

8 not worried about that.

9  MS. MENDRINOS: Okay. All right. Let's

10 keep going.

11  Q  All right. So I think -- are we ready?

12 Sergeant Conley, I apologize for that.

13

14

15

16

17

18

19

20

21

22

**28**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

29



7 Q Okay. All right. So we are going to talk
8 a little bit about the incident that occurred on
9 March 21st of 2020. But before we do that, I want
10 to get a couple of background things from you and
11 I wanted to chat with you a little bit about your
12 training.
13 So you ve been with the Baltimore City
14 Police Department since July of 2014 and you were
15 sworn in in April of 2015. And I wanted to talk
16 to you a little bit about the training that you
17 received during that time because I know that
18 there s a training period for Baltimore City
19 police officers. And I want to focus your
20 attention specifically to vehicular pursuits.
21 What training, if anything, if at all, did you
22 receive in vehicular pursuits?

30

1 A During the academy there was -- it's
2 called EVOC --
3 Q Yep.
4 A -- training. I think it was in
5 Sykesville, about a week long.
6 Q Um-hum.
7 A With regards to pursuits and vehicle
8 operations.
9 Q How much of that training was focused on
10 pursuits specifically?
11 A I don't know how many hours there was. It
12 was, like, a two -- I think it was a week-long
13 training out in Sykesville that went over
14 different maneuvers, as far as like driving,
15 lights and sirens, stuff like that.
16 Q So I guess the week-long training included
17 vehicular operations, it wasn't geared or focused
18 on pursuits; is that correct?
19 A Right.
20 Q Okay. But do you remember how much of
21 that training, if at all, was geared towards
22 pursuits, pursuits specifically?

3

1 A I don't know how many hours or how many
2 days or...
3 Q Can you estimate at all?
4 A If I had to estimate, I would say, if I'm
5 estimating, maybe two days.
6 Q Okay. And what did that training consist
7 of?
8 A It was alike an almost, like, a Nascar,
9 like, track that shows, like, the elements of
10 pursuit and, like, how to drive certain ways and
11 cut the curve and stuff like that.
12 Q Okay. Was there a graduation requirement
13 for that vehicular pursuit? Did you have to take
14 a test to pass?
15 A I believe so, yes.
16 Q Okay. And obviously you passed it, right?
17 A Yes.
18 Q Okay. Then you got promoted to
19 sergeant -- as a patrol sergeant out of the
20 Southern. What additional training, if at all,
21 did you receive in pursuits as a sergeant?
22 A I did not.

32

1 Q You did not. Okay. What additional
2 training did you receive in pursuits after you
3 graduated from the academy? I mean, let me -- do
4 you need me to rephrase the question?
5 A Please.
6 Q So you graduated in 2015 and then you were
7 patrol officer in the Eastern District, and then
8 you were promoted congratulations to the Southern.
9 My question is, in that five -- four to five-year
10 period, did you receive any additional training in
11 pursuits?
12 A There's policy. But as far as -- there is
13 no other hands on training, no.
14 Q Okay. What do you mean by "there's
15 policy"? What did you mean by that?
16 A The pursuit policy that we discussed
17 earlier.
18 Q Okay. And tell me a little bit about what
19 did that training consist of?
20 A Logging on to, it's called PowerDMS, and
21 reviewing the policy and signing for the policy.
22 Q Okay. Is there -- does anybody check that

33

1 you have actually reviewed it and understand it?

2 **A Some policies have tests. I'm not sure if**
3 **this one did or not.**

4 Q Okay. Do you remember doing that for this
5 policy? Meaning going on and logging on and
6 downloading it and then signing that you reviewed
7 it?

8 **A (Indiscernible.)**

9 Q You do? When do you remember doing that,
10 if at all?

11 **A I don't remember when I did it.**

12 Q Okay. But you remember doing it once; is
13 that correct?

14 **A I remember the policy being -- coming out,**
15 **yes.**

16 Q Okay. So in your -- I'm going to focus
17 your attention to -- from the time that you were
18 sworn in as a police officer to the time of the
19 incident. How many pursuits had you participated
20 in?

21 **A (Indiscernible.)**

22 Q I'm sorry?

34

1 **A I have not.**

2 Q How many pursuits had you supervised
3 before?

4 **A I have not.**

5 Q Okay. Which, I guess, leads me to my next
6 questions. And I already know the answer, but I'm
7 going to ask it to make sure. You had never
8 terminated a pursuit before; is that correct?

9 **A Correct.**

10 Q All right. There's been some
11 conversations I've had with other officers who
12 distinguished between pursuits and following. Do
13 you make that same distinction?

14 **A Yes.**

15 Q Okay. What is the distinction, in your
16 mind? What's the difference between following and
17 pursuing?

18 **A Not activating your emergency lights and**
19 **sirens. Basically just being in the -- in, like,**
20 **a distance, I guess we would call it.**

21 Q Is there another word for following with
22 the Baltimore City Police Department? Do you

35

1 think that it's called trailing?

2 **A If I looked at the policy. I mean, I**
3 **would say that could be accurate. I would need to**
4 **look at the policy for it to make the statement.**

5 Q Before the pursuit, this pursuit that
6 we're here to talk about today, had you followed
7 suspects before?

8 **A Yes.**

9 Q Okay. How many times, approximately, if
10 you can estimate?

11 **A I don't know how many times.**

12 Q Okay. Had you ever followed someone who
13 refused to stop?

14 **A That's why we would be following them.**

15 MR. BARNARD: I'm going to object to form.

16 Q What do you mean by that?

17 **A Are you speaking to me?**

18 Q Yes.

19 MR. BARNARD: You can answer.

20 **A If we are following -- if we activate our**
21 **lights and sirens and they don't stop, we cut them**
22 **off. We can still follow at a safe distance.**

36

1 Q Let me make sure I'm understanding this.
2 So you turn on your lights and sirens to initiate
3 a traffic stop, right?

4 **A Sure.**

5 Q And the person doesn't stop.

6 **A Right.**

7 Q And you follow at that point in time; is
8 that correct?

9 **A Yes.**

10 Q Are your lights and sirens still on?

11 **A No.**

12 Q You turn them off?

13 **A Right.**

14 Q Why do you turn them off?

15 **A Because we are no longer pursuing the**
16 **vehicle, but if I can see where they are going.**
17 **Like, if they stop.**

18 Q So has there ever been an instance where
19 you followed somebody and they haven't stopped?

20 MR. BARNARD: Object to form.

21 Q So they keep on going, right? I'm trying
22 to understand the distinction between the pursuit

37

1 and following and you say you turn your lights and
2 sirens off, but you continue to follow them until
3 when?  When they leave the district?  When they
4 get out of your jurisdiction?  I'm not sure what
5 that --
6    **A  Until it's -- until the incident stops.**
7    Q  Well, what makes the incident stop?
8 Meaning that --
9    **A  They might go at a high rate of speed and**
10 **then we are no longer following behind.  We --**
11 **Foxtrot might have the air.  I mean, there's**
12 **different elements to the incident where we are,**
13 **like, okay, this is -- we are no longer behind the**
14 **vehicle, we are not following anymore.**
15    Q  Okay.  All right.  Do you fill out any
16 reports when you are following a vehicle?
17    **A  No.**
18    Q  No.  Okay.  All right.  So I'm going to
19 focus your attention to the time of the incident.
20 You were a sergeant at the time?
21    **A  Yes.**
22    Q  How many individuals did you supervise?

38

1    **A  That night or daily?**
2    Q  Daily.
3    **A  Maybe between four and sixteen.**
4    Q  What was your usual shift?
5    **A  The time or how many people?**
6    Q  Your usual shift, did you work mornings or
7 nights or did you alternate?
8    **A  We alternated.**
9    Q  Okay.  Who's "we"?
10    **A  The district alternates the patrol.**
11    Q  How many other sergeants were in the
12 district?
13    **A  I know it was me and another sergeant.  I**
14 **don't know how many other sergeants were working**
15 **that night.**
16    Q  Okay.  Who was the other sergeant that
17 comes to your mind?
18    **A  Sergeant Adams, he was another.  I was**
19 **9C10 and I think he was 9C40.**
20    Q  What about Sergeant Camarote, was he based
21 out of your district?
22    **A  Yes.**

39

1    Q  What was his normal shift?
2    **A  He was -- he is on the other shift.**
3    Q  Okay.  Do you know whether he was working
4 that night?
5    **A  He was working that night, yes.**
6    Q  What do you mean by "other shift"?
7    **A  There's a 9:00 to -- there is an 8:00 to**
8 **3:00 or -- and then there's a 5:00 to 1:00 and**
9 **then there's -- or 5:00 to 11:00 and then 11:00 to**
10 **7:00.**
11    Q  What was your shift?
12    **A  The second shift, the 3:00 to 11:00.**
13    Q  Okay.  And what was his?
14    **A  He had the dayshift.**
15    Q  Okay.  But he was working that night?
16    **A  Yes.**
17    Q  Why was he working that night, if you
18 know?
19    **A  He was working overtime.**
20    Q  Okay.  Okay.  So you supervise four to
21 sixteen people.  Do you remember their names?
22    **A  Some of them.**

40

1    Q  Can you give me some of their names?
2    **A  Officer Torres.**
3    Q  Okay.
4    **A  Officer Gray.**
5    Q  Okay.
6    **A  Officer Franks.**
7    Q  Okay.  Who else, if you can remember?
8    **A  I remembered supervising the officers in**
9 **Sector 1, Sector 2.  I don't know who was working**
10 **that night specifically.**
11    Q  I am just asking generally who you
12 supervised.  Do you remember?  How about Officer
13 Schreven, was he a direct report?
14    **A  I don't believe so.**
15    Q  Do you know who Mark Grabowski (phonetic)
16 is?
17    **A  No.**
18    Q  Do you know who Michael Wood is?
19    **A  No.**
20    Q  Did you supervise Joshua Corcoran?
21    **A  He's assigned to the district, but I don't**
22 **think he was under my supervision that night.**

**4**

1    Q  Who was supervising him that night?

2    A  So what usually happens is we split it up.

3  So if there are 16 people, I might be supervising

4  Sector 1 and Sector 2.  And then the other

5  sergeant -- I don't remember if it was just me and

6  Sergeant Adams or if there was another supervisor

7  working.  They supervise Sector 3 and Sector 4.

8    Q  And you don't know whether Joshua Corcoran

9  was in Sector 1 or Sector 2 or Sector 3 or Sector

10 4 that night?

11    A  Correct.  And I don't know -- I don't

12 think he was -- he wasn't on our shift either, I

13 don't believe.  He was working overtime.

14    Q  Okay.  What about Yenual Familia

15 (phonetic)?

16    A  He is a Sector 3 officer.  I'm not sure.

17    Q  What about Dylan LaPorta?

18    A  LaPorta is under me.

19    Q  What about Sharif Kellogg?

20    A  Sector 3 officer.

21    Q  So you weren't -- he wasn't a direct

22 report to you, but possibly to Sergeant Adams?

**42**

1    A  Correct.

2    Q  What about Shane Stinchcomb?

3    A  Another Sector 3 officer.

4    Q  What about Officer Christina Braun?

5    A  I don't know Officer Christina Braun.

6    Q  I'm sorry?

7    A  Brown?  I don't know an Officer Brown.

8    Q  B-R-A-U-N.

9    A  Braun.

10    Q  Um-hum.

11    A  She's supervised under me.

12    Q  And Officer Mathis I think is based out of

13 Northwestern; is that right?

14    A  Mathis.

15    Q  Right?  Correct?

16    A  Yeah, I don't know Mathis.

17    Q  And the same thing for Gavilano, does that

18 name sound familiar?

19    A  It does not.

20    Q  What about Sergio Valenzuela?

21    A  It does not.

22    Q  Okay.  And Officer Patrick?

**43**

1    A  I don't know Officer Patrick.

2    Q  You don't know Officer Patrick?  Okay.

3  And then what about Officer Upton?

4    A  I don't know.

5    Q  Your microphone is coming out a little

6  bit.  Sorry.

7    A  That's okay.  I apologize.  It's what I

8  got to work with.

9    Q  Can we go off the record real quick?

10    (Discussion off the record; technical

11 difficulties.)

12    Q  We were talking about officers, and then I

13 paused because we had some audio issues.  So do

14 you remember how many officers were working that

15 night?

16    A  The constant is 16.  And I'm not sure of

17 the --

18    (Discussion off the record; technical

19 difficulties.)

20    Q  So we were talking about the number of

21 officers who were working that night, and I think

22 you said there were 16 officers working that

**44**

1  night; is that correct?

2    A  Sixteen patrol officers.  I'm not sure how

3  many crime suppression units that we had.

4    Q  All right.  Let's talk a little bit about

5  what you remember from that day.  Can you walk me

6  through that day.  And just whatever it is that

7  you remember from the beginning of your day up

8  until the time of the announcement of the stolen

9  car at the gas station at 2600 Patapsco?

10    A  Honestly, that's all I remember.  I don't

11 remember -- there is nothing that sticks out to me

12 prior to that incident.

13    Q  Do you know whether you were working your

14 regular shift or was this an overtime shift?

15    A  This was my regular shift.

16    Q  Do you remember whether or not you had

17 worked the day before or the few days before or

18 were you coming back from a day off?

19    A  I don't recall.

20    Q  Do you remember what your shift was that

21 week?  Because this happened on a Saturday.  Do

22 you remember what your normal shift was that week?

45

1 Did you normally work the weekends?

2 **A We are usually four on, three off. I**
3 **don't know where it lined up in that time.**

4 Q Okay. Do you have a calendar on your
5 phone of the time frame?

6 **A Yeah. It might not go back to 2000.**
7 **2000, right?**

8 Q No, 2020.

9 **A I'm sorry, that's what I meant.**

10 Q Do you mind taking a look and tell me how
11 far back it goes?

12 **A Sure. What was the date?**

13 Q March 21st of 2020.

14 **A March 21st, a Saturday.**

15 Q Correct.

16 **A My schedule looks like it says I worked --**
17 **I was on eight days. I worked that Friday and**
18 **then that Saturday.**

19 Q So you had Wednesday, Thursday off?

20 **A I had off Thursday, Friday, Saturday. And**
21 **I worked Friday, Saturday. I worked -- I guess I**
22 **worked overtime, but it was my shift.**

46

1 Q So you had Thursday off?

2 **A Yes.**

3 Q And you worked your days off Friday,
4 Saturday?

5 **A Yes.**

6 Q Did you -- how many hours did you think
7 you worked on Friday?

8 **A I probably worked -- it looks like -- it**
9 **says I worked a double, probably 15, 16.**

10 Q What about Saturday?

11 **A Saturday that was my first shift of a**
12 **double.**

13 Q What do you mean your first shift as a
14 double?

15 **A To it says I had Adam shift that night, so**
16 **I guess I was supposed to work that 3:00 to 11:00**
17 **shift and then work 11:00 to 7:00 shift.**

18 Q Oh, so you were going to work through the
19 night?

20 **A Yes.**

21 Q Okay. What about -- let's say the Sunday,
22 Monday, Tuesday, Wednesday before?

47

1 **A Sunday the 15th, I was on a vacation day.**

2 Q Okay. What about Monday?

3 **A Monday, I assume it's just one shift.**

4 Q (Indiscernible.)

5 **A 3:00 to 11:00, yes.**

6 Q What about Tuesday?

7 **A Tuesday single shift, 3:00 to 11:00.**

8 Q What about Wednesday?

9 **A Wednesday, I worked overtime in the**
10 **morning, 10:00 to 3:00, and then I worked my**
11 **regular shift.**

12 Q So 10:00 to 11:00?

13 **A 10 A to 11 P, yes.**

14 Q And then off Thursday, you worked a double
15 on Friday, and then you were going to pull another
16 double on Saturday, right?

17 **A That's what it looks like, yes.**

18 Q What was your schedule on Sunday?

19 **A Sunday was my regular shift and then the**
20 **midnight shift again.**

21 Q All right. What do you do to stay up
22 during all those long hours?

48

1 **A I've been doing it for -- I have a special**
2 **needs daughter so I have been doing it for awhile.**
3 **I'm just kind of used to it.**

4 Q Okay. Do you drink a ton of coffee or Red
5 Bull or what is it?

6 **A I drink coffee.**

7 Q Okay. I'm sorry to hear about your
8 daughter.

9 **A She's okay.**

10 Q Okay. So from the double -- so the Friday
11 before the incident, you had worked that double.
12 Do you remember getting much sleep that night when
13 you got home or do you have to tend to your
14 daughter?

15 **A I sleep in my vehicle. We live in**
16 **Pennsylvania, so I had the van. I sleep in the**
17 **van.**

18 Q What van? I don't --

19 **A My personal vehicle in the district.**

20 Q So you have a van in the district and you
21 park it and you sleep in the van?

22 **A Yes. Because I will get more hours of**

49

1 sleep in the van than I would if I went home.
2    Q   Okay.  How far away is home?
3    **A   It's an hour.**
4    Q   It's an hour away.  All right.  So let's
5 focus a little bit on the incident itself.  So you
6 had worked a double the day before, you slept in
7 your van and then you got up, I'm sure at some
8 point in time.  Are there, like, showers or what
9 not in the precinct there?
10   **A   There are.**
11   Q   You take a shower, you get ready and you
12 hop on your shift for the 3 p.m.  And then tell me
13 a little bit about what you remember when you
14 started at 3 p.m.?
15   **A   I mean, we usually start with roll call**
16 **that discusses the assignments, and then officers**
17 **are dismissed and we start answering calls for**
18 **service.**
19   Q   Okay.  What do you remember about after
20 the roll call and then the dismissal?
21   **A   Specifically nothing.  I mean, it's 2020.**
22 **I don't — there's nothing that sticks out to me**

50

1 besides that incident.
2    Q   Okay.  Tell me the first thing that you
3 remember from that night.
4    **A   Our desk officer, which is Dave — their**
5 **call sign is 99.  They got on the radio and said**
6 **there was a stolen vehicle at the gas station on**
7 **Patapsco.**
8    Q   Okay.  What do you remember next?
9    **A   Our units start heading that way.  And**
10 **then we asked if Foxtrot is available, which is**
11 **the helicopter.**
12   Q   Okay.  What do you remember next?
13   **A   That officers tried to block or box in the**
14 **suspect, at which time she flees, striking Officer**
15 **Gray.**
16   Q   What do you remember next?
17   **A   The suspect pulling out of the gas station**
18 **onto Patapsco and then I'm behind her vehicle.**
19   Q   What do you remember next?
20   **A   Keying up, saying — telling the**
21 **dispatcher, but specifically Foxtrot, that I'm**
22 **behind the vehicle and that he has the eyeball**

5

1 basically, he has the communication and he has --
2 you know, he can kind of tell us what's going on.
3    Q   What do you remember next?
4    **A   We followed the vehicle for a little bit,**
5 **and there was an accident.**
6    Q   What do you remember next?
7    **A   The vehicle struck — the suspect vehicle**
8 **hit like a concrete area.  I'm not sure what you**
9 **want to call it, a concrete wall.**
10   Q   Um-hum.
11   **A   And we were trying to get the suspect out**
12 **the vehicle.  At the same time, we see that**
13 **there's people injured.  We immediately request**
14 **for ambulance and medics.  And the situation was**
15 **kind of fluid from there.**
16   Q   What do you remember next?
17   **A   Going off of the body cam?  Or going off**
18 **of — like, I remember the officers working,**
19 **medics show up.  The officers are working on one**
20 **vehicle.  The — there is another victim in, like,**
21 **a silver small sedan, and she was okay.  And then**
22 **I just remember everybody going to the hospital**

52

1 and the AIU detectives arriving on scene.
2    Q   What do you remember next?
3    **A   I mean, just handling the incident.  We**
4 **are just standing by to make sure everything is**
5 **done correctly.**
6    Q   Okay.  Do you remember anything else?
7    **A   I think that's basically what happened.**
8    Q   Do you remember what you did after?  I
9 mean, I guess at some point in time, you left the
10 scene, right?
11   **A   Right.**
12   Q   Do you remember what you did after you
13 left the scene?
14   **A   I remember going back to the district.  I**
15 **don't remember if I had a call before that.  I**
16 **just remember going back to the district.**
17   Q   Did you work the rest of the evening?
18   **A   Honestly, I don't remember.  Going off my**
19 **phone, I would say I did, but I don't remember.**
20   Q   Okay.  Do you remember going home at some
21 point in time or did you spend the rest of the --
22 you don't remember one way or the other?

53

1    **A  So here is the thing.  I do work overtime,**
2    **right.  I do have a special needs daughter that I**
3    **have to take care of.  And my wife doesn't work.**
4    **So I don't remember every day, incident as far as**
5    **if I have worked or -- does that make sense?**
6        Q  Yeah.  I guess how often do you go home?
7    **A  I work here for two or three days and then**
8    **I'll go home.**
9        Q  Okay.  But you don't remember whether or
10   not you went home that Sunday or whether you
11   stayed and worked?
12   **A  I don't.**
13       Q  Okay.  Do you remember filling out any
14   paperwork related to the incident that took you
15   some time?
16   **A  No.**
17       Q  Okay.  So -- all right.  Let me make sure
18   that I captured everything.  Correct me where I'm
19   wrong.  Let's see how good I can write.  So you
20   remember a desk officer 99 making an announcement
21   that there was a stolen vehicle at a gas station
22   on Patapsco.  You remember that there was a call

54

1    to make sure that Foxtrot was available, which it
2    was.  And then you recall that some officers tried
3    to box the car in.  The suspect fled the scene,
4    striking Gray.  And then she pulled out on
5    Patapsco, and you were right behind the vehicle.
6    You keyed up and you said Foxtrot -- I'm sorry,
7    you told Foxtrot that you're behind the vehicle
8    and Foxtrot had the eyeball, which to you meant
9    that it was to be communicating and to be
10   providing updates.
11       You followed the vehicle for a little bit
12   and then she struck a concrete wall.  And there
13   was a suspect that was taken out of the vehicle.
14   And then you remember ambulance and medics.  And
15   the medics were working on getting at least one of
16   the individuals out of the car.  And then you
17   remember AIU detectives arriving on the scene.
18   And then you were standing by to make sure that
19   everything was done correctly.
20       And then you think you went back to the
21   district after you left the scene, but you can't
22   really remember anything else about the evening or

55

1    the following day.  Did I sum that up correctly?
2    **A  (Indiscernible.)**
3        MR. BARNARD:  Object to form.
4        Q  Sorry, I missed your answer.
5    **A  Me?**
6        Q  Yes, please.
7    **A  Yes.**
8        Q  Okay.  All right.  So let's talk a little
9    bit about what your -- we are going to parse this
10   out a little bit.  What was your understanding of
11   your role in the pursuit?
12   **A  I was the primary officer behind the**
13   **pursuit.**
14       Q  And why do you think that you were the
15   primary officer in the pursuit?
16   **A  Because I initiated the pursuit.**
17       Q  And what are your responsibilities as the
18   primary officer initiating a pursuit?
19   **A  There's -- to ensure the safety of others**
20   **and, you know, making sure that we keep in contact**
21   **with the suspect vehicle.**
22       Q  I think you said one of your recollections

56

1    was that the suspect -- well, the officers tried
2    to box her in and then she fled striking Gray.
3    Are you in a position where you actually saw that
4    or did you hear that over the radio?
5    **A  I heard it over the radio.  I was coming**
6    **in the gas station as she was coming out of the**
7    **gas station.**
8        Q  So you didn't actually see her leaving or
9    trying to get out of the box?
10   **A  I just — all I heard was Gray keyed up**
11   **and said that she hit me.**
12       Q  Okay.  Do you remember any conversations
13   about that, whether or not she might the vehicle?
14   Do you remember any clarification about whether or
15   not she hit the vehicle or whether she actually
16   hit the officer?
17   **A  I didn't know what she hit.  I just knew**
18   **that she hit him is what I heard.**
19       Q  Okay.  And in your mind, that was the
20   reason for the pursuit?
21   **A  Yes.**
22       Q  Okay.  Were you actually heading over to

57

1 the location when -- before the woman tried to
2 leave the box in?
3     **A   Yes.**
4     Q   Okay.  And why were you heading over
5 there?
6     **A   Because the incident would have led to an**
7 **arrest.  And as a supervisor, I wanted to make**
8 **sure everything was done correctly.  And it was a**
9 **tactical incident.  I wanted to make sure that**
10 **everybody was safe.**
11    Q   Okay.  As a primary unit and as a
12 sergeant, did you consider yourself to be a
13 supervisor during the pursuit?
14    **A   Yes.**
15    Q   Okay.  Why?
16    **A   Because I am a supervisor.  I'm a**
17 **sergeant.**
18    Q   Okay.  And I guess the follow-up question
19 to that is, at the time, did you understand that
20 one of your responsibilities was to make sure that
21 you and all of the other officers were comporting
22 with the pursuit policy?

58

1     **A   Yes.**
2     Q   Okay.  And let's talk a little bit about
3 the pursuit policy.  What is your understanding of
4 the pursuit policy?  Do you agree with me --
5 excuse me, let me rephrase it.  Do you agree with
6 me that the pursuit policy is a directive by --
7 issued by the Baltimore City Police Department?
8     **A   Yeah, I think it's the guide that we use.**
9     Q   Okay.  It's a guide, it's not a directive.
10 Tell me why you make the distinction.
11    **A   So the policy if -- from my recollection,**
12 **the policy states that it's a guidance on vehicle**
13 **pursuit operations or vehicle -- emergency vehicle**
14 **operations.**
15    Q   Okay.  So do you understand -- do you
16 believe, as you sit here today, that the policy
17 has certain requirements that must be followed
18 during a pursuit or is it more of a guide, an
19 optional thing for officers to follow?
20    **A   I wouldn't call it optional.  I just think**
21 **it gives guidance.  Not every incident is going to**
22 **be black and white.**

59

1     Q   Okay.  But I guess there are certain
2 things that the policy talks about.  And like, for
3 example, there are factors that have to be
4 considered in a pursuit.  Do you consider that to
5 be a guide or is it a directive that officers must
6 comport with?
7     **A   There are certain things that are outlined**
8 **in the policy that we need to follow for it to be**
9 **pursuit.**
10    Q   Okay.  Do you know whether or not there is
11 a recommendation for de-escalation by officers
12 before they participate in a pursuit or initiate a
13 pursuit?
14    **A   Yes.**
15    Q   Okay.  What is your understanding of
16 de-escalation techniques that can be used before
17 pursuit is initiated?
18    **A   So during that incident, we try to box in**
19 **the vehicle.  I think that would be a**
20 **de-escalation tactic.**
21    Q   Okay.
22    **A   Officer Franks knocked on the vehicle,**

60

1 **which is also a de-escalation tactic.  We are in**
2 **marked vehicles, right.  So they knew that we were**
3 **the police officers.  I think that's also a**
4 **de-escalation tactic.**
5     Q   Okay.  What about after that, when she
6 fled the scene, is that -- go ahead.
7     **A   Let me -- we activated our lights and**
8 **sirens.**
9     Q   What about anything else that you would
10 consider to be a de-escalation technique that
11 could have been used?
12    **A   I mean, I don't -- I think if we hit**
13 **multiple de-escalation techniques that were used.**
14    Q   Okay.  Do you know whether or not there is
15 a de-escalation policy issued by the Baltimore
16 City Police Department?
17    **A   There is a de-escalation policy.**
18    Q   When was the last time you reviewed that?
19    **A   When it was probably -- when it was**
20 **issued.**
21    Q   When was that?
22    **A   I don't know.**

6

1    Q  Okay.  Do you remember in the training
2  that you had in the academy whether or not
3  de-escalation techniques were used as part of the
4  vehicular pursuit policy?
5    **A Can you say that again.**
6    Q  Yeah, I will rephrase it.  I apologize.
7  So I think you said there was approximately, in
8  your recollection, about two days worth of policy
9  pursuit training.  Within that policy --
10   **A Right.**
11   Q  Go ahead.
12   **A No, I agree.**
13   Q  Okay.  And then what I'm asking you is, do
14  you remember specifically within that policy --
15  within those two days, did anyone talk about
16  de-escalation techniques specifically as they
17  related to vehicular pursuits?  Do you understand
18  my question?
19   **A I understand your question.  I don't**
20 **recall if there was specifically a time where they**
21 **said, hey, this is a technique for de-escalation.**
22   Q  Okay.  So you don't think that that was

62

1  ever provided to you as part of the training?
2    **A I don't recall.**
3    Q  One way or the other, or you don't recall
4  it?
5    **A I don't recall one way or the other.**
6    Q  Okay.  All right.  So tell me a little bit
7  about what your understanding is of Foxtrot's role
8  in the pursuit.  Because I think you said that you
9  keyed up and you said Foxtrot has the eyeball.
10 What was your understanding of Foxtrot's role in
11 the pursuit at that point?
12   **A So my understanding was that Foxtrot can**
13 **see more than -- see the surroundings better than**
14 **we can see, right.  I can only see what's in front**
15 **of me.  He can kind of see further out and have a**
16 **better view of the whole -- incident as a whole.**
17   Q  Okay.  Do you know whether or not there
18 are factors that should be considered before
19 initiating a pursuit?
20   **A Yes.**
21   Q  Okay.  What are those factors?
22   **A The severity of the incident, the weather.**

63

1    **I believe it speaks of, like, the density of how**
2  **many people are around.  And if we know the area**
3  **that we are going.  The familiarity, I believe, is**
4  **how it's stated.**
5    Q  Do you know whether or not these fact --
6  well, let me ask you this, do you remember any
7  other factors that are to be considered when
8  initiating or continuing a pursuit?
9    **A No.**
10   Q  Okay.  And do you know whether or not
11 these factors are -- are they -- are you supposed
12 to consider them throughout the entirety of the
13 pursuit or just at the beginning?
14   **A No, it's fluid.**
15   Q  Okay.  And in your mind, who was
16 responsible for calling these out -- or not
17 calling them out, but considering them throughout
18 the pursuit?
19   **A I would say I'm the primary officer.  I**
20 **think I was responsible to make sure that the**
21 **pursuit was as safe as it could be.**
22   Q  Okay.  So do you know whether or not you

64

1  are responsible for alerting anyone else as to
2  these factors throughout the entirety of the
3  pursuit?
4      MR. BARNARD:  Object to form.
5    Q  Do you need me to rephrase?
6    **A Yes.**
7    Q  Okay.  Do you -- let me ask you this, do
8  you know whether or not you had the authority to
9  terminate the pursuit based on your assessment of
10 the risk?
11   **A Yes, I could terminate a pursuit.**
12   Q  Do you know whether or not there was a
13 supervisor that you reported to that had the
14 authority to terminate the pursuit?
15   **A Yes.**
16   Q  And who was that person?
17   **A Lieutenant Tucker.**
18   Q  Okay.  And do you know whether or not you
19 were required to advise Lieutenant Tucker of these
20 factors and perhaps the fluidity of the factors as
21 they changed during the pursuit?
22   MR. BARNARD:  Object to form.  You can go

**65**

1  ahead.

2  **A Can you state the question again.**

3  Q Sure. Let me rephrase. Do you know

4  whether or not you're supposed to alert anyone on

5  the radio about the speed that the pursuit is

6  traveling?

7  **A I would assume that if Foxtrot wasn't**

8  **overhead, that these, like, communications would**

9  **be more important.**

10  Q Okay.

11  **A My understanding, as a tactical operation,**

12  **that Foxtrot could see more than we could see and**

13  **his communication allowing everybody to know where**

14  **to go was more important than anything that I saw**

15  **was going on.**

16  Q Why do you think that?

17  **A Because when we have radio traffic,**

18  **everything can get confused or someone -- like,**

19  **not everybody needs to be talking on the radio at**

20  **the same time. If I saw something that I thought**

21  **was a safety concern, then I could terminate.**

22  Q What would you consider to be a safety

**66**

1  concern, such that it would to rise to terminating

2  the pursuit?

3  **A If I didn't feel comfortable or if I felt**

4  **my performance couldn't keep up with the pursuit.**

5  Q What do you mean by "performance"?

6  **A If -- as if, like, the car was out of**

7  **control or if I was spinning around corners or**

8  **something along those lines. Does that make**

9  **sense?**

10  Q Sure. So in your mind, the speed isn't a

11  factor that you would call out --

12  MR. BARNARD: Object to form.

13  Q -- during the pursuit?

14  MR. JEFFRIES: Join.

15  THE WITNESS: Can I speak or...

16  MR. BARNARD: Yeah, yeah. You can always

17  answer unless I tell you not to.

18  **A Okay. I think speed is a factor, but it's**

19  **not the only factor. I think the fluidity of the**

20  **incident is important, right.**

21  Q Okay. So I guess my question is, it's a

22  factor, but it's a fluid situation, and I get

**67**

1  that. But I guess my question is, do you believe

2  that calling out the speed of the pursuit is a

3  factor that you should be considering during the

4  duration of the pursuit?

5  MR. BARNARD: Object to form.

6  MR. JEFFRIES: Join.

7  **A Yeah. I think the speed is a factor that**

8  **should be called out during the pursuit. But**

9  **Foxtrot is overhead. And there was times we were**

10  **going so slow and using turn signals.**

11  Q Okay. What about were there times where

12  you were going fast?

13  **A There was times when our speed changed,**

14  **yes.**

15  Q I'm not asking you about your speed

16  changing. You were accelerating and you were

17  decelerating. And you said you were going so slow

18  and you were using your turn signals. I'm asking

19  about the opposite, which is you guys were going

20  fast.

21  **A I wouldn't consider it fast. I never felt**

22  **uncomfortable behind wheel. I never felt that we**

**68**

1  were endangering anybody.

2  Q Why do you say that?

3  **A That's just how I felt during the time.**

4  Q What about -- I think you said the weather

5  is a factor. Do you know whether or not that

6  should be called out during the pursuit?

7  MR. BARNARD: Object to form.

8  **A It was nighttime, it wasn't snowing, it**

9  **wasn't raining. I didn't get on the air and was**

10  **like it's 70 degrees with a wind chill. I didn't**

11  **get in specifics as far as that.**

12  Q Okay. I think you said earlier traffic

13  density was a factor to be considered.

14  **A Sure.**

15  Q Is that something that you would have --

16  you think you should have called out on the radio

17  to alert people or was that something that Foxtrot

18  was responsible for?

19  MR. BARNARD: Object to form.

20  **A I -- the way I understood it or the best**

21  **tactical decision we had was that Foxtrot could**

22  **see ahead of what was going on.**

**69**

1    Q  And I understand that.  But I guess my
2  question is, what about traffic density?  You
3  named it as one of the factors in pursuing, but
4  I'm trying to figure out, if it's one of the
5  factors that needs to be considered, who is
6  responsible -- in your mind, who is responsible
7  for alerting the rest of the crew and Lieutenant
8  Tucker about the traffic density as the pursuit is
9  ongoing?
10     MR. BARNARD:  Object to form.
11    **A  All right.  So I think that it's a factor**
12  **that's being concerned as far as terminating the**
13  **incident.  As far as calling it out, I didn't**
14  **think it was necessary at the time.**
15    Q  Why not?
16    **A  It was more important -- because I think**
17  **it was more important for Foxtrot to be overhead**
18  **to tell us where we're going and where she's going**
19  **and what was going on around us.**
20    Q  What about pedestrian traffic, is that
21  something -- you said that that was a factor to be
22  considered.  Is that something that you would have

**70**

1  called out during this pursuit or no?
2    **A  I mean, yeah.  If we are going into a**
3  **crowd of people, I think that would be important,**
4  **but I didn't --**
5    Q  Sorry, go ahead.  I apologize.
6    **A  I didn't see that as a problem.**
7    Q  Why not?
8    **A  I didn't see any pedestrians that were in**
9  **the middle of the traffic when we were going**
10  **through them.**
11    Q  What about traffic violations, is that
12  another factor that should be considered?
13    **A  It can be considered, yes.**
14    Q  Okay.  Who's responsible for calling any
15  traffic violations out?
16     MR. BARNARD:  Object to form.
17    **A  The primary officer is supposed to call**
18  **out the violation.**
19    Q  Okay.  And why are traffic violations one
20  of the factors to be considered?
21    **A  It could be a safety concern.**
22    Q  And why is it a safety concern?

**7**

1    **A  Because if they violated traffic, they**
2  **could somebody could get hurt.**
3    Q  Right.  So it's indicative -- and let me
4  see if I can -- is it your understanding that a
5  person who is fleeing and is committing traffic
6  violations will continue to commit traffic
7  violations and it causes a concern for the safety
8  of other individuals; is that correct?
9     MR. BARNARD:  Object to form.
10     MR. JEFFRIES:  Objection.
11    **A  Can you rephrase that?**
12    Q  Sure.
13    **A  I mean, with the objections it's like.**
14    Q  Sure.  Yeah.  So if the person who is
15  fleeing the police is committing multiple traffic
16  violations, running red lights, running stop
17  signs, not obeying traffic signals, making U-turns
18  that are illegal, going the wrong direction, et
19  cetera, et cetera, that is cause for concern,
20  because if that person is committing these traffic
21  violations, it's obvious that they are not going
22  to stop at some point in time and start complying

**72**

1  with the law; is that right?
2    **A  (Indiscernible.)**
3     MR. BARNARD:  Object to form.
4     MR. JEFFRIES:  Objection.
5    Q  Go ahead.  I'm sorry.  I missed your
6  answer.
7    **A  It could be concerning, yes.**
8    Q  And that's why I'm trying to understand
9  why.
10    **A  Because somebody could get injured.**
11    Q  Right.  Do you know what the -- in what
12  circumstances a vehicular pursuit is authorized?
13    **A  If a felony is committed and we can't**
14  **determine the identity of the person.**
15    Q  Do you know instances where vehicular
16  pursuits are prohibited?
17    **A  I would have to refresh to the policy.**
18    Q  Okay.  So sitting here today, you can't
19  remember if there are any instances where
20  vehicular pursuits --
21    **A  I'm sure there's incidents.**
22    Q  Yeah.  I'm just asking if you remember

73

1  them, as you sit here today?

2  **A  No.**

3  Q  Okay.  Do you know whether or not there is

4  a requirement that if you are involved in a

5  pursuit as an officer whether or not your lights

6  and sirens must be on?

7  MR. BARNARD:  Object to form.

8  MR. JEFFRIES:  Join.

9  **A  Yes.  The lights and sirens have to be**

10 **activated when you are pursuing a vehicle.**

11 Q  Okay.  Is there a time where you can turn

12 it on and turn it off or must they be on the

13 entire time?

14 **A  From my understanding of the policy, they**

15 **should be on the entire time or we can use**

16 **different, like, sounds, right?  Like one officer**

17 **may use one and then the other use a different**

18 **sound.**

19 Q  Okay.  Do you know whether or not there is

20 a policy on whether or not an officer can either

21 catch up to another officer and cut him off?  Do

22 you know if that's prohibited or allowed under the

74

1  rules, under the policy, excuse me?

2  MR. BARNARD:  Object to form.

3  MR. JEFFRIES:  Join.

4  **A  Can you rephrase it?**

5  Q  Sure.  Do you know whether or not there is

6  a requirement that police officers can't cut other

7  officers off in the policy?

8  **A  Right.  So the primary officer is the**

9  **primary lead unless he states otherwise.**

10 Q  Okay.  Can another officer cut him off

11 without saying --

12 **A  I don't think another officer should cut**

13 **another person off, I don't think.**

14 Q  Do you know whether or not the policy

15 allows it or prohibits it?

16 **A  I don't think the policy allows it.**

17 Q  Okay.  What about the number of officers

18 in pursuit, do you know if there is a restriction

19 on the number of officers?

20 **A  I believe it's three.**

21 Q  Okay.  Do you know who's responsible for

22 making sure that there are only three officers?

75

1  **A  I'm not sure.  I'm not sure who is**

2  **responsible.**

3  Q  So you are doing what we do all the time.

4  We are starting to sort of get in the

5  conversational mode and you are starting to cut me

6  off a little bit.

7  **A  I apologize.**

8  Q  It happens all the time.  Don't worry

9  about it.  So I'm going to ask the question again.

10 Do you know who is responsible for ensuring that

11 there are only three officers involved in the

12 pursuit?

13 **A  I'm not sure who's responsible.**

14 Q  Okay.  Do you know whether or not there's

15 a prohibition of pursuing a vehicle driving the

16 wrong direction on a roadway?

17 **A  Yes.**

18 Q  Okay.  Tell me about that.  What is your

19 understanding of that?

20 **A  I believe the policy states that if we are**

21 **going the wrong way, if we are traveling the**

22 **direction in the wrong way that we are supposed to**

76

1  terminate the pursuit.

2  Q  Okay.  Do you remember if there were any

3  other officers involved in the pursuit?

4  **A  Yes.**

5  Q  Okay.  Who were they?

6  **A  Myself, Officer Camarote -- Sergeant**

7  **Camarote and Officer Schreven.**

8  Q  Let me see if I can spell it.

9  S-C-H-R-E-V-E-N.  Did I get that right?

10 Do you know if any other officers were

11 involved in the pursuit?

12 MR. BARNARD:  Object to form.

13 MR. JEFFRIES:  Join.

14 **A  I don't know how many officers were in the**

15 **pursuit.  My focus was on the vehicle that we were**

16 **behind.**

17 Q  Okay.  Do you know whether or not there's

18 a prohibition of officers leaving their assigned

19 area and trailing the pursuit?

20 MR. BARNARD:  Object to form.

21 **A  I don't think there's a -- I don't think**

22 **you are prohibited from leaving your area if the**

**77**

1 pursuit is -- if you are in the pursuit or the
2 pursuits around you.
3    Q  Do you know whether or not Officer Gray
4 was required to remain in his assigned area?
5       MR. BARNARD:  Object to form.
6    A  After the accident?
7    Q  Go ahead.
8    A  After the accident?
9    Q  So good question.  Thank you for the
10 clarification.  From the time of the gas -- the
11 time that the woman fled the scene at the gas
12 station, do you know whether or not Officer Gray
13 was required to stay in his assigned area?
14       MR. BARNARD:  Object to form.
15    A  My understanding is that if a departmental
16 vehicle is in an accident, that nothing moves
17 until AIU responds.
18    Q  What do you mean "nothing moves"?
19    A  We are not supposed to move our vehicle or
20 the other vehicle that was involved so that AIU
21 can investigate.
22    Q  So Officer Gray was struck at the gas

**78**

1 station.  So according to your understanding, he
2 should have remained there until AIU responded to
3 that location?
4    A  Yes.
5    Q  Okay.  I'm going to focus a little bit on
6 the sort of broader aspects of the policy 1503.
7 Do you agree with the statement that sometimes it
8 is better to allow a suspect to temporarily escape
9 apprehension than to jeopardize anyone's safety in
10 the pursuit?
11    A  I agree there could be times.
12    Q  Do you agree with the statement that
13 members of the Baltimore City Police Department
14 are prohibited from using retaliatory force?
15    A  I would agree.
16    Q  Okay.  You talked a little bit about the
17 familiarity of the officers -- I'm sorry, the
18 officers' familiarity with the area.  And my
19 understanding is that this pursuit started in the
20 Southern District and ended up in the Northwestern
21 District.  The fact that it traversed the city
22 into a separate district cause you concern?

**79**

1    A  It was a factor.  It's not the only
2 factor; everything goes into play.
3    Q  And explain -- I'm not an officer.
4 Explain to me why familiarity with the area is a
5 factor to be considered.
6    A  I mean, there's the density of the people
7 or who could be around or where we are going or if
8 we are going off of the highway.  Or there's just
9 kind of like -- the more familiar you are with the
10 area, the more comfortable you would feel behind.
11    Q  Okay.  And the fact that it ended up in
12 the Northwestern District didn't cause you
13 concern?
14    A  I wasn't concerned.
15       MR. BARNARD:  Objection.
16    Q  Okay.
17       MR. JEFFRIES:  Counsel, when you get to a
18 good spot, can we take a comfort break?
19       MS. MENDRINOS:  Let's do that.  Let's
20 reconvene at 11:45.
21       (A recess was taken.)
22    Q  We were talking a little bit about

**80**

1 factors.  And I wanted to ask you a question that
2 came up in Lieutenant Tucker's deposition
3 yesterday about a person who is driving under the
4 influence.  If the person who is fleeing -- you
5 suspect the person who's fleeing is driving under
6 the influence, is that another factor to be
7 considered during the pursuit?
8       MR. BARNARD:  Object to form.
9    Q  Go ahead.
10    A  It can be a factor.
11    Q  Why?
12    A  Their safety and the safety of everyone
13 else around.
14    Q  And I'm trying to understand.  Does
15 pursuing a person who is suspected to be under the
16 influence of substances increase the danger factor
17 or decrease the danger factor of the pursuit?
18       MR. BARNARD:  Object to form.
19       MR. JEFFRIES:  Join.
20    A  I think it would determine what substance
21 we are talking about.
22    Q  All right.  Let's parse it out.  Under the

8

1  substance -- under the influence of alcohol.
2  **A   Does it determine -- yeah, it's a factor,**
3  **yes.**
4      Q   Okay.  But does it increase the risk of
5  the pursuit or decrease the risk of the pursuit
6  when you are pursuing someone who is suspected to
7  be under the influence of alcohol?
8      MR. BARNARD:  Objection.  Calls for
9  speculation.
10     **A   It would increase it.**
11     Q   Why?
12     **A   Because their reaction time might not be**
13  **up to par.**
14     Q   Okay.  What about if you're pursuing
15  somebody who is suspected to be under the
16  influence of some sort of illegal substance;
17  narcotics, marijuana, heroin, cocaine, etcetera?
18  Does that increase the risk factor of the pursuit
19  or decrease it?
20     **A   It increases it, but I also think it's**
21  **important.  Like, what if they need medical**
22  **attention afterwards, right?**

82

1      Q   Okay.  So it increases the risk factor of
2  the pursuit, but you believe that sometimes you
3  need to continue to pursue to provide assistance
4  at some point in time?  I'm a little -- can you
5  clarify that for me?
6      **A   If we're speaking that a person is under**
7  **the influence and we don't pursue, which is fine.**
8  **But they crash, right, should we still not be in**
9  **the area to make sure they are okay.**
10     Q   I guess that's where you come in, right?
11  Is that your answer, that you would not pursue
12  because it increases the risk factor, but you
13  would prefer to be in the area in the event that
14  there's an incident, you could be nearby to
15  provide assistance?
16     MR. BARNARD:  Object to form.
17  Characterization.
18     MR. JEFFRIES:  Join.
19     **A   I think it's important that we care about**
20  **everybody's safety that's going on, whether it's a**
21  **suspect's safety or a witness safety or a victim**
22  **safety.  I think the safety of everyone is what**

83

1  **we're concerned with.**
2      Q   Okay.  Did you have reason to suspect that
3  the person -- this person in this incident was
4  driving under the influence of prohibited
5  substances?
6      **A   Not when we are pursuing.  After she got**
7  **into the accident, she seemed like she was out of**
8  **sorts.  That's where I believe I asked if she's on**
9  **something.**
10     Q   Okay.  What do you mean by "out of sorts"?
11  What did you observe specifically that led you to
12  believe that she was under the influence of
13  something?
14     **A   The officer said that she was trying to,**
15  **like, start the car or drive again.  And she**
16  **wasn't able to have a conversation, like me and**
17  **you are.**
18     Q   I'm going to pull up -- I'm going to ask
19  you some questions about the body -- let's see if
20  we can get this.  All right.  I'm going to show
21  you the Foxtrot footage.  And I think you said
22  that you reviewed this close in time to the

84

1  incident and then again with Mr. Barnard.  And did
2  you review the Foxtrot footage in its entirety
3  both times?
4      **A   Yes.**
5      Q   Okay.  Did you notice anything in the
6  Foxtrot footage that you hadn't remembered seeing
7  while you were involved in the pursuit?
8      MR. BARNARD:  Object to form.
9      **A   The accident.**
10     Q   Did you actually observe the accident?
11  And when you say "the accident," you are talking
12  about the accident on Liberty Heights and
13  Callaway, right?
14     **A   Yes.**
15     Q   Okay.  And you didn't actually see that
16  when you were behind the suspect?
17     **A   Correct.**
18     Q   I have a question for you before we
19  continue.  I think when Officer Schreven cut you
20  off, was he directly behind the suspect or were
21  you still the person behind the suspect, directly
22  behind her?

85

1    MR. BARNARD:  Object to form.

**2    A Officer Schreven was.**

3    Q  Okay.  And what is your understanding of
4 whether or not Officer Schreven either continues
5 to -- is it your understanding that Officer
6 Schreven is the primary pursuit officer at that
7 point or is he the secondary or the third officer?

8    MR. BARNARD:  Objection to form.

9    MR. JEFFRIES:  Object to form.

**10    A I'm still the primary officer.  I**
**11 initiated it.  I'm still in charge.**

12    Q  Okay.  All right.  All right.  So let's
13 start with the Foxtrot footage.  Let's see here.

14    (Video playing.)

**15    A I can't see the video.**

16    Q  You can't see the video?

**17    A I see your -- like, your desktop.  I don't**
**18 see a video playing.**

19    MR. BARNARD:  Neither do I.

20    THE TECHNICIAN:  Ms. Mendrinos, this is
21 the tech.  I believe you just clicked on the file
22 page instead of the video.  If you go back to your

86

1 share screen and click on the video, it should
2 show us the footage.

3    MS. MENDRINOS:  Let's go off the record
4 real quick.

5    Q  Sorry about that.  All right.  Let's start
6 the Foxtrot footage.  Can you see -- can everybody
7 see that and hear it?

8    (Video playing.)

9    Q  So we are at 1 minute and 12 seconds.  Do
10 you see the vehicle with the lettering on top
11 that's upper left-hand corner of the screen?

**12    A Yes.**

13    Q  Do you see the letters on top of it?  Can
14 you make them out?

**15    A It looks like it says 300.**

16    Q  Do you know which car that belong -- who
17 that belongings to?  Or who was driving it that
18 evening?

**19    A Officer Torres.**

20    Q  Okay.

21    (Video playing.)

22    Q  Do you see the vehicle rolling into the

87

1 right of the stolen vehicle?  Do you see the
2 lettering up here?

**3    A It's kind of grainy.**

4    Q  Okay.  If at any time you can make it out,
5 let me know.

**6    A It looks like it says "11" right now.**

7    Q  I'm sorry.  It says what?  What did you
8 say?  I'm sorry.

**9    A It looked like it say "118."**

10    Q  Do you know who was driving 118 that
11 evening?

**12    A I know, from watching the video, that**
**13 Officer Franks gets out the vehicle.**

14    (Video playing.)

15    Q  Okay.  Did you know, at the time, who was
16 driving this vehicle right here, the one up at the
17 top of the screen?

**18    A That's Officer Gray's vehicle.**

19    Q  Okay.  For the record, we are at 1 minute
20 and 51 seconds.  As the suspect is exiting the
21 parking lot, do you remember exactly where you
22 were?

88

**1    A The address or where I was in position?**

2    Q  Where were you physically?  Yeah.  Where
3 you were in relation to the woman exiting the gas
4 station?

**5    A I was coming in around, like, in the front**
**6 of the pump.**

7    Q  Were you actually in the gas station or
8 were you on the street?

**9    A No.  I was on the lot.**

10    Q  The lot.  Okay.

11    (Video playing.)

12    Q  And is this you right here at the very top
13 of the screen in the SUV pulling out?

**14    A Yes.**

15    Q  Okay.

16    (Video playing.)

17    Q  I'm going to pause at 2 minutes and 35
18 seconds.  So my understanding, and correct me if
19 I'm wrong, this vehicle right here that just went
20 through the gas station is the fleeing vehicle.
21 You're the vehicle that is taking the right-hand
22 turn behind her.  But then there's another -- it

**89**

1   looks like a SUV that's following her through the
2   gas station.  Do you see that?
3       A  Yes.
4       Q  Is that another Baltimore City police
5   officer vehicle?
6       A  Yes.
7       Q  Do you know who's driving that car?
8       A  I'm not sure if it's a SUV.  I'm not sure
9   who has the vehicle behind me at this time.
10      Q  Okay.  At the time, did you know that
11  there was somebody behind you?  Meaning an officer
12  with the Baltimore City Police Department who was
13  now what would be considered to be a secondary
14  vehicle?
15      A  Yes.
16      Q  Okay.  Did you know who it was?
17      A  No.
18      Q  Did you know whether or not that person
19  was part of the Southern District?
20      A  I would assume that they were part of the
21  Southern District, only because the incident is
22  still in the Southern District.

**9**

1       A  Yes.
2       Q  Okay.  Do you recall that person doing so?
3       A  No.
4       Q  Okay.
5          (Video playing.)
6       Q  Question for you.  And we are, for the
7   record, we are at 3 minutes.  And we just heard
8   Foxtrot announce that -- asking that Southwestern
9   would be alerted.  Are you going -- is the pursuit
10  going into the Southwestern District at this
11  point?
12      A  There is a part of the districts where, on
13  Washington Boulevard, is part Southwest and part
14  Southern.
15      Q  Did the fact that it was going into the
16  Southwestern District cause you concern?
17      A  No.
18      Q  Do you know whether or not any of the
19  officers from the Southern District
20  participated in the pursuit?
21      A  I don't know.  I knew that we were patched
22  together.

**90**

1       Q  Okay.  Do you know whether or not that
2   officer is supposed to alert and provide
3   information that he or she is joining in the
4   pursuit?
5       A  Foxtrot was calling everything out and the
6   incident was still fluid.  And at that time, the
7   priority was where the person was going.
8       Q  I understand that.  I appreciate it.  But
9   that wasn't my question.  Do you know whether or
10  not the secondary vehicle was supposed to alert
11  other officers on the radio that he or she is
12  joining in the pursuit?
13         MR. BARNARD:  Object to form.
14      A  I could review policy.
15      Q  As you sit here today, do you know whether
16  or not that secondary vehicle is required to alert
17  on the radio that he or she is joining in the
18  pursuit?
19         MR. BARNARD:  Objection to form.
20      A  I believe that --
21      Q  I believe yes, is that what your answer
22  was?

**92**

1       Q  I'm sorry.  I missed -- I know that we
2   were what together?
3       A  We are patched together, the radio.
4       Q  Okay.  But you don't know, one way or the
5   other, whether any officers from the Southwestern
6   District were involved in the pursuit?
7       A  Correct.
8       Q  Okay.
9          (Video playing.)
10      Q  I just want to ask you a couple of
11  questions.  And for the record, we are at 4
12  minutes and 20 seconds in.  Have you heard Foxtrot
13  call out the speeds of the pursuit thus far?
14      A  No.
15      Q  Were you calling out the speeds of the
16  pursuit?
17      A  No.
18      Q  Okay.  Was anyone else calling out the
19  speeds of the pursuit?
20      A  No.
21      Q  Okay.  Do you remember whether or not she
22  had committed any traffic violations by this

93

1  point?

2  **A  From looking at the video, yes.**

3  Q  Were you calling out any traffic

4  violations that the eluder had committed?

5  **A  No.**

6  Q  What about Foxtrot, was -- did you hear

7  Foxtrot calling out any traffic violations that

8  the eluder had committed?

9  **A  No.**

10  (Video playing.)

11  Q  For the record, we are at 4 minutes and 34

12  seconds.  Have we gone through any residential --

13  or had the pursuit gone through any residential

14  areas by this point?

15  **A  I wouldn't consider it -- I mean, I**

16  **wouldn't consider this residential.  Like, I mean,**

17  **there's -- I wouldn't consider this residential.**

18  Q  This particular area?  Or you hadn't gone

19  through any residential areas up until this point?

20  **A  We haven't gone through any residential**

21  **area.**

22  MR. BARNARD:  Object to form.  Go ahead.

94

1  (Video playing.)

2  Q  5 minutes and 36 seconds.  Up until this

3  point, I am going to ask the same series of

4  questions.  Did you hear Foxtrot calling out any

5  speeds that the pursuit was going?

6  **A  No.**

7  Q  Were you calling out the speeds of the

8  pursuit?

9  **A  No.**

10  Q  Was anyone else providing an up-to-date

11  speeds of the pursuit?

12  **A  No.**

13  Q  Okay.  And neither you nor Foxtrot, nor

14  anyone else, was providing any updates as to the

15  number of traffic violations that the eluder had

16  committed up until this point; is that correct?

17  **A  Correct.**

18  Q  Okay.  And we are at 5 minutes and 36

19  seconds.  And it looks like the person, the

20  eluder, almost hit another vehicle.  Did you see

21  that?

22  MR. BARNARD:  Object to form.

95

1  MR. JEFFRIES:  Join.

2  **A  When I passed the vehicle, the vehicle**

3  **stopped.  I didn't notice it.  I believe I was**

4  **kind of a distance away.**

5  Q  So you didn't see, from behind the person

6  who was fleeing, you didn't see this vehicle

7  coming out into the road that the eluder was

8  traveling on?

9  **A  Correct.**

10  Q  Okay.

11  (Video playing.)

12  Q  Let's stop it at 5 minutes and 46 seconds.

13  Do you remember whether or not -- or did you know

14  whether any other officers had joined in the

15  pursuit other than you and I think you said

16  Officer Schreven?

17  **A  I knew there was officers around.  I**

18  **didn't know who was involved.**

19  Q  Okay.  I'm sorry.  Excuse me.  You said

20  there was another officer behind you, but you

21  didn't know who it was.  So you don't know whether

22  or not Officer Camarote or Officer Schreven or any

96

1  other officers were behind you; is that correct?

2  **A  Correct.**

3  Q  Okay.

4  (Video playing.)

5  Q  And I guess -- let me pause it again at 5

6  minutes and 58 seconds.  I think you said earlier

7  that some of the factors to be considered are

8  pedestrian traffic and traffic density.  Were you

9  calling out any changes in traffic density?

10  **A  No.**

11  Q  Was Foxtrot calling out any changes in

12  traffic density?

13  **A  No.**

14  Q  Okay.  And you didn't hear Foxtrot call

15  out the vehicle that had almost entered into the

16  path of travel by the eluder at that time; is that

17  correct?

18  **A  Correct.**

19  Q  And you weren't calling out any pedestrian

20  traffic that you could observe; is that correct?

21  **A  Correct.**

22  Q  And the same thing for Foxtrot, Foxtrot

**97**

1  hasn't called out any pedestrian traffic that may
2  have been in the area; is that correct?
3  **A  Correct.**
4  Q  All right.  Let's continue.
5      (Video playing.)
6  Q  I'm going to pause at 6 minutes and 5
7  seconds.  It looks like there are two vehicles
8  pursuing, and one of them, I think this is pretty
9  close to you.  At that point in time, did you know
10 who was operating that vehicle?
11 **A  No.**
12 Q  And did you know whether or not there were
13 any officers that had joined in the pursuit at
14 that time?
15 **A  As I previously stated, I didn't know who**
16 **was involved.  I heard that there was people**
17 **saying they have camera on the area and stuff.  I**
18 **don't know.  My concern was what was in front of**
19 **me.**
20 Q  Okay.
21     (Video playing.)
22 Q  So we are at 6 minutes and 28 seconds in.

**98**

1  Is the pursuit going through what would be
2  considered to be a residential area at this
3  juncture?
4      MR. BARNARD:  Object to form.
5  **A  Yes, I would consider this more**
6  **residential.**
7  Q  Did you call that change in the landscape
8  out?
9  **A  No.**
10 Q  Did you hear Foxtrot call out that the
11 change in the pursuit was moving into a
12 residential area?
13 **A  No.**
14     (Video playing.)
15 Q  I'm going to ask you questions at 6
16 minutes and 47 seconds.  And I'll go back 10
17 seconds.  Do you see any pedestrians in the
18 screen?
19 **A  I do, yes.**
20 Q  Okay.  I'm going to skip back 10 seconds
21 and then we will go back so you can tell me where
22 you see them.

**99**

1      (Video playing.)
2  Q  I'm going to press pause.  My eyes aren't
3  used to looking at this, but I see three
4  pedestrians at least.  I see one to the right of
5  the fleeing vehicle and then I see two to the left
6  of the fleeing vehicle.  Are my eyes correct?  Am
7  I seeing that correctly?
8  **A  Yes.**
9  Q  Okay.  Did you see these pedestrians as
10 you were following the suspect?
11 **A  No, I did not.**
12 Q  All right.  Did you hear Foxtrot call out
13 that there were three pedestrians in the path of
14 travel of the suspect?
15 **A  No.**
16 Q  Would that be a factor that should have
17 been considered and called out as the pursuit was
18 ongoing?
19     MR. BARNARD:  Objection to form and
20 characterization.
21     MS. LYNCH:  The same objection.
22 **A  One of the factors, yes, is the pedestrian**

**00**

1  traffic.
2  Q  Right.
3      (Video playing.)
4  Q  I have questions about this turn that she
5  took.  I'm going to go back.  For the record,
6  we're at 1 minute and 55 seconds.
7      (Video playing.)
8  Q  Did she almost lose control of the vehicle
9  at that turn?
10     MR. BARNARD:  Object to form.
11     MR. JEFFRIES:  Join.
12 Q  Do you need me to go back?
13 **A  So it's grainy until you stop it.**
14 Q  Okay.  I'll go back.
15     (Video playing.)
16 Q  Do you need me to go back?
17 **A  No.**
18 Q  I will go back.
19     (Video playing.)
20 Q  Would you agree with me that she almost
21 lost control of the vehicle on that left-hand
22 turn?

1    MR. BARNARD: Object to form.
2    MR. JEFFRIES: Join.
3    **A I don't think she lost control of the**
4 **vehicle.**
5    Q I didn't say she loss control, she almost
6 lost control.
7    MR. BARNARD: Object to form.
8    **A I mean, it's an interpretation.**
9    Q What do you mean by that?
10    **A I — you may think that she lost control.**
11 **I didn't see — like —**
12    Q I didn't say that she lost control. I
13 said it looks like she almost lost control of the
14 vehicle. Am I looking at that correctly? Do you
15 agree with me or do you disagree with me?
16    **A I don't think she lost — I don't think**
17 **that she lost control. What we are trying to**
18 **define is "almost"? What's almost?**
19    Q Okay. Let's go back and take another
20 look.
21    (Video playing.)
22    Q So I will rephrase my question a little

1 bit differently. Do you agree with me or disagree
2 with me that she almost lost control of the
3 vehicle at that left-hand turn at 7 minutes in the
4 Foxtrot footage?
5    MR. BARNARD: Object to form.
6    MR. JEFFRIES: Join.
7    **A I think that we're still in the same —**
8 **we're trying to decide if — what's almost? I**
9 **don't — like — did her tires move? Sure. But I**
10 **don't know if she lost control. Or like what's**
11 **almost lose control?**
12    Q So you disagree with the statement?
13    **A I disagree that she lost control of the**
14 **vehicle, yes.**
15    Q Do you disagree with the statement that
16 she almost lost control of the vehicle?
17    **A I would say she did not almost lose**
18 **control of the vehicle.**
19    Q Okay. If she was about to lose control of
20 the vehicle, is that a factor that should have
21 been considered?
22    MR. BARNARD: Object to form.

1    A Yeah.
2    Q Okay. And either one of the pursuing
3 officers on the ground or Foxtrot should have
4 called it out; is that correct?
5    MR. BARNARD: Object to form.
6    **A Correct.**
7    MS. LYNCH: Objection.
8    (Video playing.)
9    Q So at 7 minutes and 26 seconds are we
10 still in a residential area?
11    **A I would say yes.**
12    Q Okay.
13    (Video playing.)
14    Q I'm at 7 minutes and 33 seconds. And I
15 have questions about this intersection. It looks
16 like the eluder either didn't stop at a stop sign
17 or ran a red light. I can't really tell from
18 this. But it looks like she had a near miss with
19 another car that was traveling in the — on the
20 cross street. Did you see this intersection with
21 this vehicle when you were behind her?
22    MR. BARNARD: Object to form.

1    MR. JEFFRIES: Join.
2    **A I don't recall.**
3    Q Is this something that you would expect
4 Foxtrot to call out?
5    **A I mean, it's — I think it's something —**
6    MR. BARNARD: Object to form. Sorry.
7    **A — to consider. I don't think it was a —**
8 **like, did that person stop and just went through?**
9 **I don't know if it was a stop sign — like I said,**
10 **I don't know if it's a stop sign or a red light.**
11    Q But it would be information that would be
12 important to consider as the pursuit is ongoing;
13 is that correct?
14    MS. LYNCH: Object to form.
15    MR. BARNARD: Object to form.
16    MR. JEFFRIES: Join.
17    **A Yes. It's a factor, yes.**
18    Q Okay.
19    (Video playing.)
20    Q So we are at 9 minutes and 41 seconds.
21 And it looks like there is another third vehicle
22 that is pursuing or involved in the pursuit. The

**05**

1 same question, do you know who was driving that
2 vehicle?
3    **A No.**
4    Q Do you know whether or not that person
5 identified that he or she was joining in the
6 pursuit?
7    **A No.**
8    Q Is it true that the person who is joining
9 in the pursuit must announce that he or she is
10 joining in the pursuit?
11    MR. BARNARD: Object to form. Go ahead.
12    **A Yes.**
13    Q Okay. When you were directly behind --
14 excuse me. Are you still directly behind the
15 suspect at this point?
16    **A Yes.**
17    Q Okay. And the same question, did you know
18 that these two individuals were behind you?
19    **A No.**
20    (Video playing.)
21    Q I have questions about this at 10 minutes
22 and 20 seconds. You said, "I got it guys, I got

**06**

1 it." Am I correct in hearing you say that?
2    **A Yes.**
3    Q Okay. Who were you talking to?
4    **A The vehicle where your mouse is at.**
5    Q This one right here on the bottom of the
6 screen?
7    **A Yes.**
8    Q Okay. Who was in that vehicle?
9    **A I don't know who was in the vehicle. I**
10 **just know it was a patrol vehicle.**
11    Q And you were telling them that you got
12 the -- you got the pursuit, you were the primary
13 vehicle and that they, what, should not join or
14 that they should hang back? Or did you give a
15 specific instruction? Or tell me a little bit
16 about that why you said, "I got it guys, I got
17 it."
18    MR. BARNARD: Form.
19    MR. JEFFRIES: Join.
20    **A I'm just clarifying that I still was**
21 **comfortable behind the vehicle.**
22    Q Do you know whether or not these

**07**

1 individuals were permitted to join in the pursuit?
2    **A I do not know.**
3    Q Do you know whether or not this vehicle
4 joined in the pursuit later?
5    **A I don't know who was in that vehicle.**
6    (Video playing.)
7    Q I have questions about this. What is the
8 maneuver, I guess, that the suspect did. I think
9 weaving in and out of cars we would call it.
10    **A Changing lanes?**
11    Q Well, sure. We can do that.
12    (Video playing.)
13    Q Would you consider that to be a traffic
14 violation?
15    **A If she didn't put her signal on, we could**
16 **say that, sure.**
17    Q Do you know whether -- would you consider
18 that to be putting others in danger?
19    **A That specific change of lanes or weaving**
20 **out of traffic? Like, that right there, is that**
21 **what we are talking about?**
22    Q Yes.

**08**

1    **A I personally don't see that being, like, a**
2 **safety concern. I felt like everything was still**
3 **under control.**
4    Q Okay. Let's go back 10 seconds. I want
5 to make sure I see it right.
6    (Video playing.)
7    Q So after reviewing that, is your answer
8 still the same, you didn't consider that to be a
9 safety factor?
10    MR. BARNARD: Object to form.
11    **A I did not.**
12    (Video playing.)
13    Q So we are at 11 minutes and 16 seconds in.
14 And now Foxtrot is requesting that Northwestern be
15 alerted. So it sounds like the pursuit has now
16 moved into the Northwestern District; is that
17 correct?
18    **A I think he said Western on the --**
19    Q Oh, I think he said Western and then he
20 changed it. Let's go back.
21    (Video playing.)
22    **A Okay.**

**09**

1    Q  Did the fact that it was moving into the

2 Northwestern District cause you concern?

3    **A  No. I still feel like we are at speeds**

4 **and -- and we -- the totality of the circumstances**

5 **were still in our favor.**

6    Q  Okay. What do you mean "we were at

7 speeds"? What do you mean by that?

8    **A  I don't think we were reckless and**

9 **speeding. There was times where, like I said, she**

10 **was using her turn signal. And you will see her**

11 **coming up, she stops at the intersection. Like, I**

12 **mean, we are traveling at a slow rate of speed**

13 **most times.**

14    Q  Most times. What about other times?

15    **A  There's times where it's higher than**

16 **others.**

17    Q  Okay. As you recall here today, do you

18 remember what speeds the highest speeds were?

19    **A  I don't recall. I didn't look at my**

20 **odometer -- like the speedometer.**

21    Q  If you didn't look at your speedometer,

22 how do you know that you were traveling at speeds?

**0**

1    **A  You can tell when you are going faster and**

2 **when you are not going fast. I mean, it's --**

3    Q  So it was basically how you felt at the

4 time and you estimated that you weren't going fast

5 based on what you felt?

6    MR. BARNARD: Objection to the

7 characterization and the form.

8    MR. JEFFRIES: Join.

9    **A  Yes. I felt that there was times we were**

10 **going so slow -- yes, we were going slow at**

11 **sometimes, yes.**

12    Q  Okay. And then other times you were going

13 faster; is that correct?

14    **A  That's correct.**

15    Q  Okay. But you didn't actually look at

16 your speedometer to determine how fast you were

17 actually going; is that correct?

18    **A  That's correct.**

19    Q  Okay.

20    (Video playing.)

21    Q  I have questions about here. And we will

22 go back in a couple of seconds. I see the suspect

1 and then I see three cars and then I see two more

2 behind it. And I will go back so you can tell me

3 whether I'm looking at this incorrectly.

4    (Video playing.)

5    Q  Am I seeing two additional officers

6 involved in the pursuit?

7    MR. BARNARD: Object to the

8 characterization and form. Go ahead.

9    **A  It's -- the video is grainy. There it is.**

10 So --

11    Q  So let's go back.

12    (Video playing.)

13    Q  Were you able to see two additional police

14 officers? Or is it still too grainy for you to

15 make that determination?

16    **A  It's grainy.**

17    Q  Okay.

18    **A  So the video is grainy. And then when it**

19 **stops, when you pause it, it clears it up.**

20    Q  Would you prefer that I go back or do you

21 want -- or do you just want to move on?

22    **A  That's up to you.**

**2**

1    Q  Okay. I will go back one last time and

2 see if we can make a determination about whether

3 two additional officers have joined in the

4 pursuit.

5    (Video playing.)

6    Q  Were you able to make the determination as

7 to whether or not two additional officers have

8 joined in the pursuit?

9    **A  There is four vehicles behind the suspect**

10 **vehicle. I can't determine if they are police. I**

11 **would -- are we assuming -- I can't -- there is no**

12 **lights and sirens. There is nothing like that I**

13 **can make a distinction on.**

14    Q  Okay.

15    (Video playing.)

16    Q  North Avenue, is this area considered

17 residential?

18    **A  There's houses. I mean, it's the city. I**

19 **feel like everything is residential just**

20 **determines on -- I mean some are single lane, some**

21 **are double lane. I think North Avenue is four**

22 **lanes. There's still -- but I mean, there's**

**3**

1 houses on North Avenue.

2    Q   Okay.

3       (Video playing.)

4    Q   I have questions about this intersection

5 over here at 1326, for the record.  Do you recall

6 seeing this vehicle right here entering the

7 intersection?

8    A   I don't recall during the moments.  I see

9 the vehicle now.

10   Q   Okay.  Is this something that you would

11 expect Foxtrot would be calling out, that there is

12 a vehicle in the intersection that she just

13 entered?

14   A   Foxtrot, yeah.

15   Q   Right.

16      (Video playing.)

17   Q   This is where I have a question.  And for

18 the record, we are at 14 minutes and 13 seconds.

19 Do you remember this collection of cars here at

20 this median intersection?

21   A   Yes.

22   Q   Okay.  Are these police officers?

**4**

1    A   Yes.

2    Q   All four of them?

3    A   I believe so, yes.

4    Q   Do you know who was driving these four

5 police vehicles?

6    A   I do not know.

7    Q   Do you know -- so you don't know which

8 district they are out of; is that correct?

9    A   That's correct.

10   Q   Okay.  Do you know whether or not they

11 joined in the pursuit?

12      MR. BARNARD:  To form.

13   A   I don't know.

14   Q   You don't know?  Okay.  Did you give out

15 any instruction that they not join in the pursuit?

16   A   No.

17   Q   Why not?

18   A   I was focused on the vehicle that I was

19 behind, right.  I don't know if they were pursuing

20 or were waiting for a bail out or what they were

21 going to do.

22   Q   All right.  Let's continue.

**5**

1       (Video playing.)

2    Q   It looks like at 14 minutes and 21 seconds

3 there is another police officer that speeds up and

4 almost overtakes you.  Do you know who was driving

5 that vehicle?

6    A   Is that me?  I thought I was the one in

7 front of that.

8    Q   So we can go back and I'll ask you some

9 questions to sort of orient ourselves.  At this

10 point in time, do you remember whether or not you

11 were directly behind the suspect or had you fallen

12 behind?

13   A   I was behind it.

14   Q   Directly behind it?

15   A   Yes.

16   Q   Okay.  All right.  So that means that you

17 would be this car right here.

18      (Video playing.)

19   Q   Which means that the car to the left of

20 you is another police vehicle taking over; is that

21 correct?

22   A   There is.

**6**

1       MR. BARNARD:  Objection to form.

2    Q   Do you know whether or not that is

3 permitted under the policy?

4       MR. BARNARD:  Object to form.

5       MR. JEFFRIES:  Join.

6    A   No.  The policy says we are not supposed

7 to overtake vehicles.

8       (Video playing.)

9    Q   So my understanding is that this vehicle

10 cut you off; is that right?

11      MR. BARNARD:  Object to the

12 characterization.

13      MR. JEFFRIES:  Join.

14   A   So if we go back to the intersection where

15 that occurred.

16   Q   Sure, sure.

17      (Video playing.)

18   Q   Do you remember that intersection?

19   A   I remember the intersection.  There was —

20 but looking at it, I was kind of stuck behind

21 another vehicle and that other vehicle had a

22 better advantage.

**7**

1   Q  Okay.  And got ahead of you?
2   **A  Yes.**
3   Q  Right.  Do you remember whether or not you
4   were directly behind the suspect now or had you
5   fallen behind the second vehicle?
6   **A  I'm the second police officer.**
7   Q  Okay.
8      (Video playing.)
9   Q  And so your understanding that you're the
10  primary pursuit vehicle because you are the person
11  who initiated the pursuit; is that correct?
12  **A  That's correct.**
13     MR. BARNARD:  Objection to
14  characterization and form.
15     MR. JEFFRIES:  Join.
16  Q  Did you just say that's correct, sir?
17  **A  That's correct.**
18  Q  Okay.
19     (Video playing.)
20  Q  I'm going to go back.  Sorry.  I'm going
21  to go back.  We are at 15 minutes and 4 seconds.
22     (Video playing.)

**8**

1   Q  At 15 minutes and 10 seconds, do you
2   remember this intersection where the person who
3   was fleeing drove down the wrong side of the road?
4   **A  Yes.  I remember, then we immediately go**
5   **back to the right side of the road.**
6   Q  When do you mean "immediately"?
7   **A  I think there was an area where it opens**
8   **up again and we go back to the correct side of the**
9   **road.**
10  Q  Do you know whether or not the policy
11  prohibits or permits following a person who is
12  driving down the wrong side of the road?
13  **A  The policy prohibits driving down the**
14  **wrong side of the road.**
15  Q  Okay.  But you followed it down the wrong
16  side of the road, right?
17     MR. BARNARD:  Object to form.
18     MR. JEFFRIES:  Join.
19  **A  For about 4 seconds.**
20  Q  Okay.  So the answer is yes.  And do you
21  know whether or not an officer followed you
22  following the suspect down the wrong side of the

**9**

1   road?
2   **A  I don't know.  I didn't look in my**
3   **rearview mirror.  I only looked at everything in**
4   **front of me.**
5   Q  Okay.  But I guess earlier you said that,
6   as the primary officer, it was your responsibility
7   to make sure that you and everyone else was
8   comporting with the requirements of the policy; is
9   that correct?
10  **A  That's correct.**
11  Q  Okay.  But you didn't look behind you to
12  make sure that there was nobody following you down
13  the wrong side of the road; is that correct?
14     MR. BARNARD:  Object to form.
15  **A  That's correct.**
16  Q  Okay.
17     (Video playing.)
18  Q  I just have a couple questions.  Do you
19  know what the speed limit is on Liberty Heights
20  Avenue?
21  **A  I do not.**
22  Q  And you didn't actually look at your

**20**

1   speedometer to know how fast you were going down
2   Liberty Heights Avenue; is that correct?
3   **A  That's correct.**
4   Q  Okay.  And I have questions about the
5   distance of the pursuit.  Did the fact that the
6   pursuit began in the southern part of the city on
7   2600 West Patapsco and ended all the way up on the
8   northwestern side of the city, did that cause
9   concern?
10     MR. BARNARD:  Object to form and
11  characterization.
12  **A  Can you rephrase that?  Concerning what?**
13  Q  Was it one of the factors that, in your
14  opinion, or did you believe that that distance
15  traveled from the southern part of the city to the
16  northwestern side of the city, was that one of the
17  factors that should be considered when assessing
18  the risk versus the benefit of the pursuit?  Do
19  you need me to rephrase?
20  **A  I get what you are saying.  I mean, it's a**
21  **factor.**
22  Q  Do you believe, in your training and

**2**

1 experience as a police officer, that the distance
2 traveled is a factor to be considered when
3 assessing the risk versus the benefit of the
4 pursuit?
5     **A I think more the familiarity of the area,**
6 **not the distance traveled. I mean, we could have**
7 **went in circles for four days and --**
8     Q Okay. So I guess the same question as far
9 as the length of the pursuit, meaning the time,
10 the time or the length of the pursuit. Was that
11 something that is to be considered as a factor in
12 assessing the risk of the pursuit versus the
13 benefit of catching the person?
14     **A It's a factor.**
15     Q Okay. How long do you think the pursuit
16 lasted?
17     **A During the time, I can look at the video**
18 **and tell you it's 16 minutes. I didn't -- at that**
19 **time I wasn't -- I didn't, like, calculate the**
20 **time. I knew that we were traveling for, you**
21 **know, sometime. But I didn't have an idea of like**
22 **whether that would be, you know.**

**22**

1     Q All right. So we reviewed the entirety of
2 the pursuit. And I want to make sure that I'm
3 understanding. You didn't hear Foxtrot call out
4 any speeds traveled; is that correct?
5     **A That's correct.**
6     Q And you didn't call out any speeds
7 traveled; is that correct?
8     **A That's correct.**
9     Q The same thing for any other officer who
10 may have been involved in the pursuit, you didn't
11 hear any speeds called out; is that correct?
12     **A That's correct.**
13     Q Okay. And do you recall whether or not
14 this person, the suspect, was running red lights?
15     **A I don't know if it was red lights. There**
16 **was some times where they went through the light,**
17 **yes.**
18     Q So she wasn't stopping at a red light; is
19 that correct?
20     **A Correct.**
21     Q Did you hear any officer, including
22 yourself, call out the fact that she was running

**23**

1 red lights and not stopping?
2     **A No.**
3     Q Okay. Was she running stop signs?
4     **A Yes.**
5     Q Okay. Did you hear yourself or any other
6 officer call out that she was running stop signs?
7     **A No.**
8     Q Okay. In certain areas, did you see an
9 increase in traffic density?
10     **A Yes.**
11     Q Okay. Did you call out -- or did any
12 other officer call out these increases in traffic
13 density?
14     **A No.**
15     Q Okay. At some point in time, did you see
16 at least three pedestrians at an intersection?
17     **A Yes.**
18     Q Okay. Did you hear yourself or any other
19 officer, including Foxtrot, call out that there
20 were pedestrians at an intersection?
21     **A No.**
22     Q Okay. I'm trying to understand the reason

**24**

1 for the pursuit. You said that the reason you
2 initiated the pursuit was because assault on a
3 police officer; is that correct?
4     **A Yes.**
5     Q Okay. What facts did you think gave rise
6 to the fact that this was assault on a police
7 officer?
8     **A Officer Gray said that he just hit me.**
9     Q And in your mind, that is a reason for a
10 pursuit?
11     MR. BARNARD: Object.
12     Q Go ahead. I'm listening.
13     **A The suspect hit an officer with a vehicle,**
14 **yes.**
15     Q Okay. And do you know whether or not that
16 is a felony or a misdemeanor or what is that?
17     **A I believe it's a felony.**
18     Q Okay. And why do you think that?
19     **A It's an aggravated assault, and**
20 **specifically on a police officer.**
21     Q Okay. Did you remember any clarification
22 later from Officer Gray that he hit -- she hit his

25

1 vehicle?

2    **A Hearing the tape.**

3    MR. BARNARD: Object to form.

4    Q I'm sorry. Go ahead.

5    **A While reviewing the Foxtrot video, I heard**

6 **him say that she hit my vehicle.**

7    Q Do you remember hearing that as you were

8 pursuing the person?

9    **A I don't recall.**

10    Q Okay. Did that clarification change, in

11 your mind, the reason for the pursuit?

12    **A No. I mean, I didn't know where Officer**

13 **Gray was in relation to the vehicle. He was**

14 **inside the vehicle and she still struck him in the**

15 **vehicle, still could cause serious harm or damage.**

16    Q What about if he was outside the vehicle?

17    **A If he was struck, yes.**

18    Q So wait. If she struck the vehicle and he

19 wasn't inside of it, would that change the

20 analysis? Would that change the factors or the

21 reason for the pursuit? Do you understand my

22 question or do you need me to repeat it?

26

1    **A Can you repeat it.**

2    Q Sure. If she hit the police vehicle and

3 nobody was in the car, is that still an assault on

4 a police officer?

5    **A I mean, is Officer Gray near the car?**

6 **Like, could he have gotten injured? Or, like, are**

7 **we talking the vehicle is parked, right? Like, if**

8 **Officer Gray is near the vehicle and could have**

9 **been injured from the vehicle, I still believe**

10 **that's — he was trying to get assaulted. Does**

11 **that make sense?**

12    Q Maybe. Let me see if I can clarify your

13 answer. So you're saying that -- whether or not

14 the officer is in the vehicle isn't -- doesn't

15 change if the officer is near the vehicle. And

16 when you strike the vehicle, it causes injury to

17 that officer; is that correct?

18    MR. BARNARD: Object to the

19 characterization.

20    MR. JEFFRIES: Join.

21    Q Did I state that correctly?

22    **A I would say that's correct.**

27

1    Q Okay. What about if the officer then

2 clarified that he is fine and he is not injured,

3 does that make is make a difference whether or not

4 it's assault on an officer or no?

5    **A So I think assault is an assault.**

6    Q Okay. And in your mind, assault on a

7 police officer is different than assault on a

8 regular person?

9    **A I believe there's charging. I'm not a**

10 **lawyer. But I believe that there's charging —**

11 **there's a different charge for assault on police.**

12    Q Okay. Regardless of whether or not the

13 officer is fine or whether he is significantly

14 injured; is that correct?

15    **A I mean, that's my understanding.**

16    Q Okay. All right. Do you remember making

17 any statements close in time to the incident that

18 there were at least 12 officers following?

19    **A Yes. From reviewing my body camera, yeah.**

20    Q Do you remember making that statement at

21 the time?

22    **A No.**

28

1    Q Okay. So you don't remember how you came

2 to believe that there were 12 officers following

3 the car?

4    **A When we turned around, made that U-turn,**

5 **like the vehicles that were behind it, I think**

6 **that was my understanding of it.**

7    Q Did you make any -- did you provide any

8 instruction to limit the pursuit of the number of

9 vehicles pursuing to three?

10    **A No.**

11    Q Why not?

12    **A I don't -- why did I not limit it to**

13 **three?**

14    Q Correct.

15    **A From like — we — I don't know if they**

16 **were pursuing or not, right. Like, my main**

17 **priority was everything that was, like, in front**

18 **of me, if that makes sense. I don't know how many**

19 **people were behind me, right. Only when I saw**

20 **that turn, I'm like, okay, these are all flashing**

21 **lights. But my main concern was still where we**

22 **were going.**

**29**

1    Q  So there were flashing lights and you saw
2  them, right?
3    **A  Right.**
4    Q  Were there sirens on?
5    **A  I believe so, yeah.**
6    Q  Okay.  And were they keeping up with the
7  rest of the people and the suspect who was
8  fleeing?
9      MR. BARNARD:  Object to form, speculation.
10   **A  They were at the intersection for that,**
11 **like, turnaround.**
12   Q  Okay.  And so by definition, they're in
13 pursuit or at least involved in the pursuit; is
14 that correct?
15     MR. BARNARD:  Object to form.
16     MR. JEFFRIES:  Join.
17   **A  That's fair to say.**
18   Q  Okay.  But -- and I think I asked you
19 earlier how many officers are allowed to be
20 involved in a pursuit, and I think you said three.
21 But you didn't -- as the primary officer and the
22 sergeant, you didn't make any -- provide any

**30**

1  command that only three officers continue in the
2  pursuit; is that correct?
3      MR. BARNARD:  Object to form and
4  characterization of testimony.
5    **A  That's correct.**
6    Q  Okay.  Do you remember making statements
7  that she wasn't going that fast, she wasn't going
8  80?
9    **A  Yes.**
10   Q  Okay.  Do you remember who you made those
11 statements to?
12   **A  No.**
13   Q  Okay.  I think you said earlier that you
14 didn't look at your speedometer during the
15 pursuit; is that correct?
16   **A  Correct.**
17   Q  So you couldn't say, one way or the other,
18 how fast you were actually going; is that true?
19     MR. BARNARD:  Object to the form.
20     MR. JEFFRIES:  Join.
21   **A  Can I speak?**
22   Q  Sure.

**3**

1    **A  Yeah, I can't -- I couldn't determine how**
2  **fast I was going.**
3    Q  Okay.  So it's possible that, at some
4  point in time, you may have been going 80 miles an
5  hour and wouldn't have known it; is that correct?
6      MR. BARNARD:  Objection.  Calls for
7  speculation.
8    **A  That's possible.**
9    Q  Okay.
10     MR. BARNARD:  When you get to a break, can
11 we take a comfort break?
12     MS. MENDRINOS:  We can do that now, that's
13 fine.
14     (A recess was taken.)
15   Q  Sergeant Conley, thank you so much for
16 your patience.  I'm just going to show you a
17 couple -- where did I put it?  Here we go.  All
18 right.  Sergeant Conley, can you see that, my
19 screen?
20   **A  Yes.**
21   Q  Can you see down here where it says
22 "Conley," and I will proffer you it's the

**32**

1  body-worn footage because that ID number behind it
2  pretty long.  But I will proffer to you this is
3  produced to me as the body-worn camera footage
4  from your unit that you were wearing the night of
5  the incident.  And I m going to go through and ask
6  you a couple of questions that I have from the
7  body-worn camera footage.
8      And I think you said earlier that it
9  doesn t -- from what you reviewed, it s pretty
10 accurate as to what actually you remember
11 happening that night; is that correct?
12   **A  That's correct.**
13   Q  I m going to fast forward a couple
14 minutes.
15     (Video playing.)
16   Q  So we are a couple of minutes into the
17 pursuit, and we are going to be coming up on an
18 intersection here that I want to ask you a
19 question about.  Do you see the red light here on
20 the screen at 4 minutes and 25 seconds?
21   **A  Yes.**
22   Q  Do you remember whether or not she stopped

**33**

1  at that red light?

2  **A She didn't stop at the red light. It**
3  **looked like it just changed, to be honest with**
4  **you.**

5  Q But did she stop at that red light?

6  **A No.**

7  Q All right.

8  (Video playing.)

9  Q Do you see the red light here at 6 minutes
10  and 8 seconds?

11  **A Yes.**

12  Q Did she stop at that red light?

13  **A No.**

14  (Video playing.)

15  Q Do you see the red light here at 8
16  minutes?

17  **A Yes.**

18  Q Did she stop at that red light?

19  **A No.**

20  Q Okay.

21  (Video playing.)

22  Q Do you see the red light here at 8 minutes

**34**

1  and 21 seconds?

2  **A Yes.**

3  Q Did she stop at that red light?

4  **A No.**

5  (Video playing.)

6  Q Did you see the red light at 8 minutes and
7  34 seconds? I will go back just a little bit for
8  you.

9  (Video playing.)

10  Q Right there. Do you see those red lights?

11  **A Yes.**

12  Q Did she stop at that red light?

13  **A No.**

14  Q Okay.

15  (Video playing.)

16  Q Did you see the stop sign here at the top
17  of the screen at 9 minutes and 45 seconds?

18  **A I didn't. Can you go back?**

19  Q Sure.

20  (Video playing.)

21  Q Did you see that?

22  **A Yes.**

**35**

1  Q Did she stop at that stop sign?

2  **A No.**

3  Q Was this the first time that she hadn't
4  stopped at a stop sign?

5  **A It was the first time you are showing me**
6  **the stop sign. I don't --**

7  Q But there are multiple signs that she
8  didn't stop at, right?

9  **A From the video, from the Foxtrot video,**
10  **yes.**

11  Q Yes.

12  (Video playing.)

13  Q Do you see the red light at 11 minutes and
14  53 seconds?

15  **A Yes.**

16  Q Did she stop at that red light?

17  **A She did not, but it looks like we are**
18  **turning right.**

19  Q Okay. But she didn't stop, right?

20  MR. BARNARD: Objection. Speculation.

21  **A From looking at the body camera, it**
22  **doesn't look like that's our red light.**

**36**

1  Q Okay. I'm asking you, did she stop to
2  make that right-hand turn? Are you saying that
3  there's a green light for you guys traveling to
4  make that right-hand turn; is that what you are
5  saying?

6  **A That's the way I'm looking at the video**
7  **because the light turned, so I would assume that**
8  **that's for the oncoming traffic.**

9  Q Okay, got it.

10  (Video playing.)

11  Q Did you see that red light? Let me go
12  back a couple seconds.

13  (Video playing.)

14  **A It looks like it's turning.**

15  Q Did she stop at that yellow light?

16  **A She did not yield at the yellow light, no.**

17  Q All right.

18  (Video playing.)

19  Q Did you see the red light at 13 minutes?

20  **A Yes.**

21  Q Did she run that red light?

22  **A Yes.**

37

1  Q  Okay.
2     (Video playing.)
3  Q  Is that another red light at 13 minutes
4  and 21 seconds?
5  A  Yes.
6  Q  Did she stop at that red light?
7  A  No.
8     (Video playing.)
9  Q  I'm going to fast forward -- hold on.  Did
10 you hear the dispatch ask the question about
11 whether 21 was okay?
12 A  Yes.
13 Q  At 13 minutes and 35 seconds-ish.  Did you
14 hear the response?
15 A  Now or then?
16 Q  Then.
17 A  I don't recall.
18    (Video playing.)
19 Q  Do you remember then hearing Officer Gray
20 respond that he was fine and that he was actually
21 right behind the supervisor?
22 A  I remember hearing Gray key up, not that

38

1  he was behind the supervisor.
2  Q  What do you remember hearing him key up
3  and saying?
4  A  I just remember hearing — he's got a
5  deep-tone voice, and he is distinct.  I just
6  remember him keying up.
7  Q  But you don't remember -- but at that
8  time, you don't remember what he said?
9  A  Correct.
10 Q  Okay.
11    (Video playing.)
12 Q  I think you said you didn't actually
13 observe the crash as you were driving your car; is
14 that correct?
15 A  That's correct.
16 Q  Okay.  I'm going to fast forward it to a
17 certain section because I have questions about
18 that.
19    (Video playing.)
20 Q  Did you hear that section where you said
21 "she's crazy"?
22 A  Just now, no.  Is she crazy?  Can you

39

1  replay it?
2  Q  Yeah.  Let me replay it.  Did you hear
3  that?
4  A  Sure.
5  Q  Do you remember making that statement?
6  A  No.  I think it was just everything that
7  was going on, you know.
8  Q  Did you say she's crazy or pardon my
9  French, shit's crazy?
10 A  It seems like I said she's crazy, because
11 like she's out of — like, she's out of sorts and
12 doesn't know what's going on.
13 Q  But you are referring to the woman who was
14 driving the vehicle that was fleeing, right?
15 A  Correct.
16 Q  Okay.  And you are telling Lieutenant
17 Tucker that the driver is crazy?
18 A  Right.
19 Q  Right, okay.  And the reason you are
20 saying that is because she was out of sorts.  I
21 think you observed some things that she had done
22 that led you to believe that she was suffering

40

1  from either significant mental health issues or
2  she was under the substance -- or the influence of
3  substances?
4  A  That's fair to say.
5  Q  Okay.
6     (Video playing.)
7  Q  Do you see Officer Gray there at the
8  scene?
9  A  Yes.
10 Q  Do you know whether or not he was
11 permitted to be there?
12    MR. BARNARD:  Object to form.
13 A  We discussed earlier that if he was
14 involved in the accident that it was usually the
15 policy that he stays where the accident occurred.
16 Q  Do you know why he came to the scene?
17 A  I don't.
18 Q  Did you authorize him to come to the
19 scene?
20 A  I did not.
21 Q  Did you have a conversation with him after
22 the fact that he was supposed to stay at the scene

4

1  of the incident and allow AIU to come?

2      **A  I did not.**

3      Q  Do you know if anyone else had a

4  conversation with Officer Gray about why he left

5  his assigned area from where the incident had

6  occurred at 2600 West Patapsco?

7      MR. BARNARD: Object to form.

8      MR. JEFFRIES: Join.

9      **A  I don't know.**

10     Q  Did you follow-up with either Lieutenant

11 Tucker or any of the other sergeants to determine

12 why Officer Gray had left 2600 West Patapsco?

13     **A  I did not.  AIU was in charge of that**

14 **investigation.**

15     Q  What do you mean?

16     **A  The vehicle — if a police officer's**

17 **vehicle is struck or you get into an accident, AIU**

18 **handles the incidents.**

19     Q  Okay.  But I guess you are his direct

20 supervisor; is that correct?

21     **A  That's correct.**

22     Q  And you are required to make sure that he

42

1  is complying with the policies of the Baltimore

2  City Police Department; is that correct?

3      MR. BARNARD: Object to form.

4      **A  That's correct.**

5      Q  Okay.  So if he left an area or violated a

6  policy, it would be your responsibility to make

7  sure that you had a conversation with him as to

8  why, and if it was outside of the rules of the

9  policy to hold him accountable; is that correct?

10     MR. BARNARD: Object to form.

11     **A  That's correct.**

12     Q  Okay.  But you didn't follow-up with him

13 and you didn't follow-up with anyone else to

14 determine what the next best steps would be

15 because he had violated the policy; is that

16 correct?

17     **A  There were so many things going on that I**

18 **didn't — that wasn't my main concern.  The safety**

19 **of everybody else was my main concern.**

20     Q  Well, I get that, that, you know, perhaps

21 now would not be the best time to do that, but

22 perhaps the following day or two days later or a

43

1  week later and going up to him and asking him why

2  were you there?  You weren't supposed to be there.

3  Is that fair?

4      **A  That's fair.**

5      Q  But you didn't do that, right?

6      **A  Correct.**

7      (Video playing.)

8      Q  Okay.  Did you hear you say that you were

9  in the jump seat, that you were number one?

10     **A  Yes.**

11     Q  Okay.  Why did you make that statement to

12 Lieutenant Tucker?

13     **A  Because I was behind the vehicle and I was**

14 **waiting for that person to bail out, as far as the**

15 **jump seat, that's what I was referring to.**

16     Q  Okay.  Why were you -- you said that the

17 bailout, let me ask you some follow-up questions

18 about the bailout.  Did you -- the jump seat

19 person is the officer who is expected to chase the

20 suspect if he or she gets out of the car and runs

21 away?

22     MR. BARNARD: Object to form.

44

1      MR. JEFFRIES: Form.

2      **A  I would hope that everyone is trying to**

3  **arrest the suspect if he's running.  It's not a**

4  **technical term.  It was a term that I used as far**

5  **as jump seat.  There's no policy that says that**

6  **I'm in the jump seat.  It was just a phrase that I**

7  **used.**

8      Q  Okay.  We will move on.  You said earlier

9  that the reason why you initiated the pursuit was

10 because you believed that she had assaulted a

11 police officer; is that correct?

12     **A  That's correct.**

13     Q  And you said that the reason why you

14 believed it was assault on a police officer was

15 because you believed that she had hit him while he

16 was in the vehicle; is that correct?

17     MR. BARNARD: Objection.

18 Mischaracterizes.

19     **A  That's correct.**

20     Q  Okay.  And you are positive that at the

21 time you began the pursuit, Officer Gray was in

22 the vehicle; is that correct?  That she had

45

1 struck?

2     MR. BARNARD: Object to form.

3     MR. JEFFRIES: Join.

4   **A I didn't know where Officer Gray was. I**

5 **heard Officer Gray say she hit me.**

6   Q Okay. Did you have any conversations with

7 Lieutenant Tucker about whether the pursuit was

8 proper?

9     MR. BARNARD: Object to form.

10   **A I mean, watching the body camera, we had a**

11 **discussion about what was going on.**

12   Q What about after the incident, do you

13 remember having any conversations with her after

14 the fact about whether or not the pursuit was

15 proper and complied with the policy?

16   **A Yeah. I think we had a discussion that,**

17 **like, what was going on and that, you know, we**

18 **weren't, like -- we were going slow or something**

19 **along those lines.**

20   Q You were or were not going slow? I'm

21 sorry, I missed it.

22   **A That we were going slow. That the pursuit**

46

1 **was extremely slow.**

2   Q Okay. Are you talking about the

3 conversations that you -- the conversations that

4 you are referring to, are those the ones that are

5 captured on the body-worn camera footage or did

6 you have any conversations after the fact?

7   **A The ones on the body camera.**

8   Q And my question is, after the body-worn

9 camera footage sort of ends and the next day or

10 the following day or the week after or two weeks

11 after or even months after, did you have any

12 follow-up conversations with Lieutenant Tucker

13 about the pursuit?

14   **A We brought it up. I believe we talked**

15 **about it. It's a traumatic incident for everybody**

16 **involved and just --**

17   Q Do you remember -- I'm sorry, go ahead.

18   **A We probably chatted about it.**

19   Q Okay. When did you chat about it?

20   **A I don't have specifics of when we chatted**

21 **about it.**

22   Q Okay. Was it a formal conversation?

47

1   Q Meaning that you were filling out reports or the

2 conversation was documented? Or was it just kind

3 of conversations happening as the conversations

4 were happening?

5   **A Just conversations that were happening.**

6   Q Okay. Did you have any conversations with

7 any other officers about the pursuit?

8   **A Yeah. I spoke with Officer Franks.**

9   Q Okay. What about after?

10   **A The same thing. I mean, like I said, this**

11 **is kind of traumatic for everybody. I think we**

12 **all kind of discussed, like, hey, what happened**

13 **and just kind of, you know, took each other's**

14 **point of view of what was going on.**

15   Q Okay. When you say traumatic, what do

16 you -- why was it traumatic for you?

17   **A Because I wouldn't -- I don't want anyone**

18 **to get hurt, that's not my job as a police officer**

19 **is for anyone to get hurt. Right? It's**

20 **unfortunate. I mean, it's hard to look at now.**

21   Q Okay.

22   (Video playing.)

48

1   Q Did you hear the part that Lieutenant

2 Tucker is telling you something that's not

3 captured on body-worn camera footage?

4   **A I don't know what she was trying to say**

5 **there.**

6   Q You don't remember -- do you remember

7 having a conversation with her?

8   **A Here during this video?**

9   Q Yeah. So, I mean, as you sit here today,

10 do you remember what it is that she was saying?

11   **A I do not.**

12   Q Okay.

13   (Video playing.)

14   Q Is this Captain Callaghan here on the

15 screen?

16   **A Yes.**

17   Q Did you have any conversations with him

18 after the pursuit?

19   **A No. Just there.**

20   (Video playing.)

21   Q So the conversations that you had with

22 Captain Callaghan is whatever is captured here on

49

1 the body-worn camera footage?

2 **A That's correct. He is a captain, I really**

3 **don't have a need to talk to him.**

4 Q Okay.

5 (Video playing.)

6 Q Let me fast forward a little bit.

7 (Video playing.)

8 Q Did you hear that part where you asked

9 Officer Franks whether he thought you were wrong

10 for chasing her?

11 **A Yeah, I heard it.**

12 Q Do you remember asking Officer Franks that

13 question?

14 **A From reviewing my body camera, yes.**

15 Q Do you remember why you asked him that

16 question?

17 **A When stuff like this happens, it's**

18 **upsetting, right. Like, I mean, you kind of want**

19 **reassurance of, like, you are doing your job, you**

20 **are doing the right thing. Does that make sense?**

21 Q Okay. It makes sense. I guess I'm

22 wondering why you asked Officer Franks that

50

1 question, not Lieutenant Tucker or Sergeant

2 Camarote or anyone else.

3 **A Officer Franks was -- I'm, like, close**

4 **with Officer Franks. Like, I feel comfortable**

5 **with Officer Franks. He has worked for me and we**

6 **have a -- like, a relationship outside of work, if**

7 **that makes sense.**

8 Q Okay.

9 (Video playing.)

10 Q So you asked Officer Gray whether or not

11 he was in the vehicle when she hit him. Did you

12 see that -- excuse me, did you hear that?

13 **A I just heard it, yes.**

14 Q Why did you ask him that question?

15 **A I guess I was curious of where he was at.**

16 Q Okay.

17 (Video playing.)

18 Q Did you hear the part where you told

19 Lieutenant Tucker that it was so much fun?

20 **A I heard it.**

21 Q Okay. Why did you say that?

22 **A Because my job is to get the bad guy,**

5

1 **right? But, like, we were doing our job and it**

2 **was -- we were all working together as a team.**

3 **And until the accident occurred, I felt like**

4 **everything was done the way it was supposed to be**

5 **done. Does that make sense?**

6 Q It does make sense. I guess my question

7 is -- and this is perhaps going back to the

8 policy, right. You agreed with me earlier that

9 the policy, you are responsible for making sure

10 that all the officers, including yourself, comply

11 with the policy. Do you recall that?

12 **A Yes.**

13 Q Okay. And your obligation under the

14 policy is to make sure that everyone is safe; is

15 that correct?

16 **A Correct.**

17 Q And my understanding is that the reason

18 for the policy, and you can correct me if I'm

19 wrong -- well, let me ask you this. What is your

20 understanding of why the policy is in place for

21 vehicular pursuits?

22 **A To protect life and property.**

52

1 Q Okay. Which is why it's very important

2 that all officers comply with the requirements of

3 the policy; is that correct?

4 **A Correct.**

5 Q To make sure that everyone is safe; is

6 that correct?

7 **A Correct.**

8 Q Okay. So incidents like these don't

9 happen; is that right?

10 MR. BARNARD: Object to form. Calls for

11 speculation.

12 MR. JEFFRIES: Join.

13 **A I mean, everything up until that event, I**

14 **felt under control with. I felt safe with. I**

15 **felt we were -- I had a comfort level of where I**

16 **felt like we were still under control.**

17 Q I understand that, sir. But my question

18 to you is this, the reason for the compliance for

19 the policy is to make sure that everyone is safe.

20 You and I agreed to that a few seconds ago. Do

21 you recall that?

22 **A Yes.**

### 53

1   Q  And it's to protect innocent civilians and
2  bystanders from incidents like these from
3  happening; is that correct?
4   **A  Correct.**
5   Q  Okay.  I just have a few more questions on
6  this.
7      (Video playing.)
8   Q  For the record, we are at 50 minutes and
9  30 seconds.  And then coming up there is something
10 that I want to ask you about.  Did you hear what
11 you told Lieutenant Tucker there at 50 minutes and
12 40 seconds?
13  **A  No.**
14  Q  Let me play it again and let me see if I
15 can get you to hear it.
16     (Video playing.)
17  Q  Did you hear that?
18  **A  No.**
19  Q  Let me do it one last time and see if we
20 can get you to hear it.
21     (Video playing.)
22  Q  Did you hear that, sir?

### 54

1   **A  "I can't wait to hear this video."**
2   Q  Did you say that to Lieutenant Tucker?
3   **A  The video shows, yes.**
4   Q  Do you remember making that statement?
5   **A  Not at the time of the incident.  It's two**
6  **years ago.  I don't remember everything that was**
7  **said during the time.**
8   Q  But you said, "I can't wait to see this
9  video"; is that correct?
10  **A  Correct.**
11  Q  Okay.  Do you remember why you couldn't
12 wait to see the video?
13  **A  I mean, it was -- it was a police pursuit.**
14 **I wanted to see what Foxtrot captured.**
15  Q  Okay.
16     (Video playing.)
17  Q  I'm going to ask you a couple of questions
18 about the statements you made there.  I think the
19 first one you said was, "that was so fun," and I
20 think you said, "I got to see the video."  Did you
21 hear that?
22  **A  Yes.**

### 55

1   Q  Okay.  And I think the same -- I guess
2  let's parse it out.  The statement that you made
3  that it was so fun, I think you said earlier the
4  reason you made that statement to Lieutenant
5  Tucker was because the job is to catch the bad
6  guys?
7   **A  Yes.**
8   Q  And this was, I guess, part of catching
9  the bad guy?
10     MR. BARNARD:  Object to characterization.
11 Incomplete rule of completeness.
12  Q  All right.  Well, let me ask you this.
13 Why did you make that statement?
14  **A  The statement that it was fun?**
15  Q  Yes.
16  **A  We were doing police work.  We were trying**
17 **to get the bad guy and trying to get someone off**
18 **the street.**
19  Q  But why is it fun?
20  **A  I mean, I -- this is my job.  This is what**
21 **being a police officer is fun for me, right, and**
22 **being able to do police work is enjoying.**

### 56

1   Q  Okay.  So I guess this pursuit was part of
2  the fun part of being the police officer and
3  catching the bad guy?
4      MR. BARNARD:  Objection.  Form.
5   **A  I think catching the -- yeah, catching the**
6  **bad guy is fun.  Yes, I enjoy getting the bad guy**
7  **off the street.**
8   Q  Okay.  I think you said, "I got to see the
9  video."  Do you remember making that statement?
10 Do you want me to replay it for you?
11  **A  I heard it.**
12  Q  Okay.  Why did you make that statement to
13 Officer Kellogg?
14  **A  The same thing.  I mean, it was a lengthy**
15 **pursuit.  I wanted to see what Foxtrot saw.**
16  Q  Okay.  All right.  Question about any
17 conversations you had with Officer Schreven about
18 him cutting you off.  Did you follow up with him,
19 I guess, in a formal manner about that?
20  **A  No, I did not.**
21  Q  Okay.  Any particular reason why not?
22  **A  I don't have a reason.**

57

1  Q  Okay.  All right.  And then just a few
2  more questions on this.
3      (Video playing.)
4  Q  I just have a question about the statement
5  that you made about all the traffic violations
6  that they did.
7  **A  Right.**
8  Q  Were you telling Officer Torres to
9  identify all the traffic violations that the
10  suspect committed?
11  **A  Correct.**
12  Q  Okay.  Do you know whether or not Officer
13  Torres followed up with that and actually indeed
14  wrote down all the traffic violations that she
15  committed?
16  **A  I'm not sure.**
17  Q  Okay.  Do you know if Officer Torres
18  followed up with either you or anyone else
19  regarding all the traffic violations that she
20  committed?
21      MR. BARNARD:  Objection to form.
22  **A  No.**

58

1  Q  Okay.  I just have a couple more
2  questions.  Do you recall whether or not -- well,
3  let me ask you this.  Did you have any
4  conversations with Foxtrot after the pursuit?
5  **A  So I think Fox asked someone to go to see**
6  **to get a number or to upload something, I believe.**
7  **But I never had any kind of conversations as far**
8  **as what was going on.**
9  Q  Okay.  Do you recall writing an incident
10  report detailing the facts providing probable
11  cause for the pursuit?
12  **A  No.**
13  Q  Do you know whether or not that's required
14  by you as the primary unit?
15  **A  Officer Torres was the one who came up**
16  **with the charging document.**
17  Q  Okay.  But you were the primary unit
18  during the pursuit, right?
19  **A  Correct.**
20  Q  Do you know whether or not, as the primary
21  unit, you are required to provide an incident
22  report detailing the facts that give rise to

59

1  initiating and continuing the pursuit?
2  **A  I think it's a policy.  I don't know the**
3  **actual statement of what's in the policy.**
4  Q  Okay.  Do you know whether or not you
5  documented the facts that caused you to believe
6  the safety risks of the pursuit outweighed the
7  risks posed by the eluding driver?
8  **A  No.  It wasn't documented.**
9  Q  Do you know whether or not, as the primary
10  unit, that's a requirement?
11  **A  Once again, I can go back.  I'm sure there**
12  **is somewhere in the policy that says it, yes.**
13  Q  Okay.  I guess is there any point in time
14  after the pursuit ended and you had a moment to
15  sort of decompress, did you ever go back to the
16  policy and determine what the requirements were
17  and whether or not you were comporting with the
18  requirements of the policy?
19  **A  No.**
20  Q  Did Lieutenant Tucker ask you to do that?
21  **A  No.**
22  Q  Did Captain Callaghan ask you to do that?

60

1  **A  No.**
2  Q  Did any of the other sergeants or
3  lieutenants or captains or majors suggest that you
4  go back to the policy and figure out what the
5  requirements are and see if you comport with the
6  policy?
7  **A  No.**
8  Q  Okay.  So let me make sure I'm
9  understanding this.  And I want to get the
10  timeline right.  The pursuit is initiated, it ends
11  in a crash, serious crash, causing serious
12  critical injuries to a bystander.  And then after
13  that point in time up until the interview that you
14  had with SERT in September of 2021, you didn't
15  have any conversations with anyone else, formal
16  conversations with anyone else, with the Baltimore
17  City Police Department regarding this pursuit; is
18  that correct?
19      MR. BARNARD:  Objection.
20  **A  That's correct.**
21  Q  Okay.  At the time that you were pursuing,
22  did you have any reason to believe that the GPS

**6**

1 device that was on the Ford had stopped operating?
2    MR. BARNARD: Objection.
3    **A No, I did not get any updates on the GPS.**
4    Q Okay. So at the time of the incident, you
5 believed that the GPS was still functioning on the
6 Ford, right?
7    **A Yes.**
8    Q Okay.
9    MR. BARNARD: I need, like, a 30-second
10 break because somebody is ringing my doorbell.
11 Can I have a break?
12    MS. MENDRINOS: Yeah.
13    (A recess was taken.)
14    Q Sergeant Conley, this came up yesterday,
15 so I want to ask you, what is your understanding
16 of reckless driving?
17    **A I would say it's endangering, you know,**
18 **other drivers around you.**
19    Q After reviewing the body-worn camera
20 footage and the Foxtrot footage here today, do you
21 believe that the suspect was driving recklessly?
22    MR. BARNARD: Objection to the form.

**62**

1    **A There was times where she was in and out**
2 **of traffic, but I don't see that it was reckless.**
3    Q Okay. So as you sit here today, using
4 your definition, you don't think that she was
5 endangering other drivers around her; is that
6 correct?
7    **A From watching the body camera footage --**
8 **I'm sorry, from watching the Foxtrot video, there**
9 **was times, like, there's times where she was and**
10 **there's times where she was not.**
11    Q Endangering other drivers around her; is
12 that correct?
13    **A Correct.**
14    Q So at times she was endangering other
15 drivers around her; is that correct?
16    **A To an extent, yes.**
17    Q So at times, she was driving recklessly;
18 is that correct?
19    **A That's correct.**
20    Q Okay. But you didn't announce that and
21 nobody else did; is that correct?
22    **A That's correct.**

**63**

1    Q Okay. Do you remember contacting other
2 sergeants or majors in other districts to
3 determine whether or not any of their officers had
4 participated or had been involved in the pursuit
5 in any way?
6    **A No.**
7    Q Okay. And you didn't contact any other
8 sergeants or lieutenants or captains from any
9 other district despite the fact that you didn't
10 actually really know who participated or were
11 involved in the pursuit; is that correct?
12    MR. BARNARD: Object to the form.
13    Q Do you need me to rephrase?
14    **A No. I didn't contact another district to**
15 **see who was working.**
16    Q It wasn't who was working. It was who, if
17 anyone, had been involved in the pursuit.
18    **A No.**
19    Q Okay.
20    **A The investigation was being done by AIU**
21 **and there was a blue team entry made.**
22    Q Well, I guess going back to what it is

**64**

1 that you told me at the beginning of the
2 deposition where you said that, as the primary
3 pursuing officer and as a sergeant, you were
4 responsible for making sure that all officers
5 complied with the pursuit policy; is that correct?
6    **A Correct.**
7    Q Right. So my question to you is, did you
8 contact -- did you personally contact any of the
9 other supervising officers at any other district
10 to determine whether or not any of their officers
11 had participated in the pursuit?
12    MR. BARNARD: Objection to form.
13    **A No.**
14    Q No, okay. I just want to make sure the
15 Court Reporter got your answer. Is that no?
16    **A No.**
17    Q Okay. Would you have wanted to know if
18 other officers from other districts had
19 participated in the pursuit?
20    MR. BARNARD: Objection to form.
21    **A From looking at the policy, yes. I mean,**
22 **that was not my concern when we were behind the**

**65**

1 vehicle.

2     Q  I understand that.  I'm asking about any

3 time after.  So the pursuit ends, you make sure

4 that everyone is okay and you clear out.  I'm

5 asking about in the days after the pursuit when

6 you've had a minute to sort of gather your

7 thoughts.  Is that something that you wanted --

8 would have wanted to know, whether or not any

9 other officers from any other districts had

10 participated in the pursuit?

11     MR. BARNARD:  Objection to form.

12     A  I mean, looking back now, I understand.

13 But at that time, no, I was not.  That was not

14 where I was -- my thinking was at.

15     Q  Well, where was your thinking at?

16     A  That it was being — it was going to be

17 investigated by AIU.

18     Q  Okay.  Do you consider a pursuit to be a

19 use of force?

20     A  No.

21     Q  Why not?

22     A  I don't think it's a use of force because

**66**

1 I mean there's —

2     Q  Go ahead.  I'm sorry.  Go ahead.  I'm

3 sorry I interrupted you.  I apologize.

4     A  The use of force is, like, arresting,

5 like, you know, arresting control techniques.

6     Q  Well, we were pursuing her in order to

7 arrest her; is that correct?

8     A  Correct.

9     Q  So pursuing someone who's fleeing with the

10 intent to arrest them is an arrest technique; is

11 that correct?

12     MR. BARNARD:  Objection.  It

13 mischaracterizes.  Form.

14     MS. MENDRINOS:  Perhaps he can clarify.

15     A  Not every arresting — not every arrest

16 leads to a use of force.  Me chasing somebody on

17 foot is not a use of force.  If someone goes to

18 the ground and we have to put their arm behind

19 their back, then that's use of force.

20     Q  So, in your mind, putting your hands on

21 someone is the definition of a use of force?

22     A  No.  It's the amount of force that you

**67**

1 have to use.  It's the suspect's resistance, level

2 of resistance.

3     Q  I'm not sure I'm understanding you.  Can

4 you clarify that for me?  Is pulling a weapon a

5 use of force?

6     A  If you point your firearm at a suspect or

7 a person, yes, that's level one use form.

8     Q  Is pointing a TASER at a suspect a use of

9 force?

10     A  Yes.

11     Q  Okay.  So I'm trying to understand what

12 the distinction is, in your mind, regarding the

13 use of force.  What's considered, in your mind, to

14 be use of force and what's not?

15     MR. BARNARD:  Objection.

16     A  Pointing a gun, pointing a TASER at an

17 individual or a suspect.

18     Q  Um-hum.

19     A  And I don't think a vehicle pursuit is a

20 use of force.

21     Q  But why not?

22     A  I could ask you the same.  But why?  What

**68**

1 makes it a force?

2     Q  So I guess my question is, the vehicle is

3 a marked police vehicle and there are lights and

4 there are sirens on with -- and the intent is to

5 get the suspect to stop the vehicle and get out.

6 So I'm not quite sure why that's not considered a

7 use of force.

8     A  Because if I'm standing in uniform talking

9 to a suspect, that's not — I'm not — there is no

10 force there.  Like, I don't see how we're — I

11 just don't see where there's force at.

12     Q  Okay.  All right.  I'm going to go through

13 this real quick, guys.  I think I'm done, but let

14 me just confirm.  Did you review the reports

15 written by Torres or Upton or Patrick or any of

16 the other officers to confirm their accuracy?

17     A  I don't know Patrick or Upton.

18     Q  Okay.

19     A  And then I'd have to look back to see if I

20 signed for his reports.

21     Q  Hold on, let me check something real

22 quick.  I'm just going to show you something real

**69**

1 quick. All right. Do you see that, sir?
2    **A No. There it is.**
3    Q Hold on. Let's try this again. Did you
4 see a document or did you see the video?
5    **A I see the document.**
6    Q Okay. Okay, here we go. And for the
7 record, I'm looking at officer defendants 00064
8 and it's two pages. I'm going to zoom in so you
9 can see it a little bit better. Do you see on the
10 bottom here where it says, "Sergeant J.R. Conley"?
11    **A It should just be a period, not J.R., just**
12 **a period.**
13    Q Okay, I apologize. Sergeant J. Conley?
14    **A Yes.**
15    Q Is this your signature?
16    **A Yes.**
17    Q So you reviewed this and signed it?
18    **A That's what it looks like, yes.**
19    Q All right. And the same thing for the
20 second page, which is officer defendant 00065. Is
21 this your signature on line 23, sir?
22    **A Yes.**

**70**

1    Q So you reviewed it and signed it?
2    **A Yes.**
3    Q Do you recall, other than this document,
4 do you recall reviewing any other reports and
5 signing off on them?
6    **A At the end of the night, we get a whole**
7 **bunch of reports. I don't know how many reports**
8 **there were that night.**
9    Q And do you remember reviewing any -- well,
10 let me ask you this. Do you remember reviewing
11 any reports related specifically to this incident,
12 not reports in general, reports related to this
13 incident?
14    **A I don't remember. I – this is two years**
15 **ago. I don't remember how many other reports I –**
16    Q Okay. Do you know whether or not the
17 suspect was charged with reckless driving or
18 reckless endangerment?
19    **A I don't know.**
20    Q Okay. Do you see the screen, sir?
21    **A Yes.**
22    Q Okay. I want to offer to you that this is

**7**

1 the body-worn camera footage of Lieutenant Tucker.
2 I just have a couple questions of things that she
3 said to you, or at least I think she said to you.
4 All right. I'm going to turn the volume as much
5 as I possibly can up, and if you could do the same
6 on your end.
7    (Video playing.)
8    Q Did you lean in? Did you see yourself
9 leaning in to hear what Lieutenant Tucker was
10 telling you?
11    **A Yeah, I saw myself leaning in.**
12    Q Okay. I'm going to go back and make sure
13 that we can what she's saying. Did you hear
14 Lieutenant Tucker mumble to you?
15    **A "You got to do what you got to do."**
16    Q Right. What was your understanding of
17 what she meant by that?
18    **A You got to do police work, you got to get**
19 **the bad guy, right.**
20    Q Okay.
21    MS. MENDRINOS: All right. Let's take 5
22 minutes and let me just go through my notes and

**72**

1 make sure I didn t miss anything.
2    (A recess was taken.)
3    (Conley Deposition Exhibit 1 was marked
4 for identification and is attached to the
5 transcript.)
6    Q I just want to mark a couple of exhibits
7 before we re done for the day. Exhibit Number 1
8 is the going to be the Foxtrot footage that we
9 talked about first.
10    (Conley Deposition Exhibit 2 was marked
11 for identification and is attached to the
12 transcript.)
13    Q Exhibit Number 2 is going to be Sergeant
14 Conley s body-worn camera footage from the
15 evening.
16    (Conley Deposition Exhibit 3 was marked
17 for identification and is attached to the
18 transcript.)
19    Q And then Exhibit 3 is going to be 64 and
20 65.
21    And then I also want to ask you a
22 question, Sergeant Conley, about a document. It s

**73**

1 about the pursuit -- the vehicular pursuit policy
2 that you and I have been discussing for a couple
3 hours now.
4 **A Yes.**
5 Q So I wanted to confirm, I think you said
6 earlier that you had reviewed the policy and --
7 with Mr. Barnard, and I think at some point in
8 time prior. And I wanted to confirm that this is
9 actually the policy that you and I are talking
10 about. In other words, we're talking about the
11 same thing.
12 So this is policy 1503, Emergency
13 Vehicular -- Vehicle Operation and Pursuit Policy
14 dated 24 November of 2019. And I'm going to
15 scroll through the 12 pages, and I will go slowly
16 so you can confirm that this is indeed the policy
17 that you reviewed. Okay?
18 **A Okay.**
19 Q I'm ready when you are. Just tell me when
20 you want me to go to the next page. Okay?
21 **A Okay. Okay. Okay. Okay. Okay. Okay.**
22 **Okay. Okay. Okay. Okay. Okay. Okay.**

**74**

1 Q So this is the policy that you were
2 referring to that you said that you reviewed with
3 Mr. Barnard at some point in time?
4 **A Right.**
5
6
7
8
9
10 Q And this was the policy that was
11 applicable at the time of the incident; is that
12 correct?
13 **A Correct.**
14 Q Okay. This is going to be Exhibit
15 Number 4.
16 (Conley Deposition Exhibit 4 was marked
17 for identification and is attached to the
18 transcript.)
19 Q All right. Officer Conley, did you
20 understand all of my questions here today?
21 MR. BARNARD: Objection.
22 **A Yes, for the most part.**

**75**

1 Q Sitting here today, are there any answers
2 that you would wish to change?
3 **A No.**
4 Q All right.
5 MS. MENDRINOS: I don't have any further
6 questions, but I will reserve for redirect
7 depending on what's asked.
8 MR. BARNARD: I need a quick break, if I
9 could.
10 MS. MENDRINOS: Okay.
11 (A recess was taken.)
12 MR. BARNARD: Sergeant Conley, I have no
13 questions for you. I do want to advise you that
14 you have -- that you can have an opportunity to
15 review your transcript and review the responses
16 and we'll work with you on that. Madam court
17 reporter, we're going to want a copy of the
18 transcript, a mini and full. That's all I have.
19 MR. JEFFRIES: Obviously, for the record,
20 I don't have any questions.
21 MS. MENDRINOS: Do we want to confirm that
22 Baltimore City Police Department doesn't have any

**76**

1 questions? But I think we already know the
2 answer.
3 MS. LYNCH: No questions. No questions.
4 MS. MENDRINOS: Thank you for your time,
5 Sergeant Conley, I appreciate it.
6 (Off the record at 2:38 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

77

1            * * *
2        ACKNOWLEDGMENT OF DEPONENT
3     I, SERGEANT JAMES CONLEY, do hereby acknowledge
4  that I have read and examined the foregoing
5  testimony, and the same is a true, correct and
6  complete transcription of the testimony given by
7  me and any corrections appear on the attached
8  Errata sheet signed by me.
9
10
11     (DATE)          (SIGNATURE)
12
13
14
15
16
17
18
19
20
21
22

78

CERTIFICATE OF SHORTHAND REPORTER E NOTARY PUBLIC
2     I, Sandra A Slater, the officer before whom
3  the foregoing deposition was taken, do hereby
4  certify that the foregoing transcript is a true
5  and correct record of the testimony given; that
6  said testimony was taken by me stenographically
7  and thereafter reduced to typewriting under my
8  direction; that reading and signing was requested;
9  and that I am neither counsel for, related to, nor
0  employed by any of the parties to this case and
   have no interest, financial or otherwise, in its
2  outcome
3     IN WITNESS WHEREOF, I have hereunto set my hand
4  and affixed my notarial seal this 2nd day of
5  February, 2022
6  My Commission Expires:
7  May 25, 2025
8
9  _Sandra A Slater_
20 E NOTARY PUBLIC IN AND FOR
2  THE STATE OF MARYLAND
22