**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| ROWENA SIMMONS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 21-cv-00969-LKG |
| | ) | |
| v. | ) | Dated:  December 6, 2023 |
| | ) | |
| BALTIMORE CITY POLICE | ) | |
| DEPARTMENT, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**<u>MEMORANDUM OPINION</u>**

## I.    INTRODUCTION

This civil rights action involves Section 1983 and Maryland state law claims arising from a vehicular pursuit conducted by several Officers of the Baltimore City Police Department (the "BPD") through the streets of Baltimore City, during which the suspect being chased ultimately struck another vehicle, killing the driver of the vehicle and seriously injuring a passenger in that vehicle.  Defendants, the BPD and Major Jason Callahan have moved to dismiss the claims brought against them in the amended complaint, pursuant to Fed. R. Civ. P. 8(a) and 12(b)(6).  ECF Nos. 66, 66-1.  In addition, the individual Defendant Officers, Zachary A. Franks, Johnta Gray, Lakishia L. Tucker, James L. Conley, Felix Torres, John W. Schreven, John Bilheimer, Mark T. Gurbelski, Michael H. Wood, Joshua P. Corcoran, Sharif K. Kellogg, Yenuel F. Familia, Dylan R. LaPorta and Sergeant Marc J. Camarote (collectively, the "Defendant Officers") have also moved to dismiss the claims brought against them in the amended complaint, or in the alternative, for summary judgment, pursuant to Fed. R. Civ. P. 12(b)(6) and 56.  ECF Nos. 6, 67-1.

These motions are fully briefed.  ECF Nos. 66, 67, 69, 70, 74, 75.  No hearing is necessary to resolve the motions.  *See* L.R. 105.6.  For the reasons that follow, the Court: (1) **GRANTS -in-PART** Defendants BPD and Major Jason Callaghan's motion to dismiss; (2)

**GRANTS -in-PART** the Defendant Officers' motion to dismiss; and (3) **DISMISSES** the amended complaint.

## II.    FACTUAL AND PROCEDURAL BACKGROUND[1]

### A.    Factual Background

In this civil rights action, Plaintiffs, Rowena Simmons, individually and on behalf of the Estate of Darius Gore, and Gary Tyson, bring Section 1983 and Maryland state law claims against the BPD, Major Jason Callahan and 14 Officers of the BPD, Zachary A. Franks, Johnta Gray, Lakishia L. Tucker, James L. Conley, Marc J. Camarote, Felix Torres, John W. Schreven, John Bilheimer, Mark T. Gurbelski, Michael H. Wood, Joshua P. Corcoran, Sharif K. Kellogg, Yenuel F. Familia and Dylan R. LaPorta, arising from a vehicular pursuit conducted by several BPD Officers, during which the suspect being chased, Delisa Ann Dello-Stritto, struck another vehicle, killing Mr. Gore and seriously injuring Mr. Tyson.  *See generally*, ECF No. 57. Plaintiffs assert the following seven claims in the amended complaint: (1) Section 1983—Due Process Violation against the Defendant Officers (Count I); (2) Section 1983—Failure to Train and Supervise (*Monell*) against the BPD (Count II); (3) Maryland Declaration of Rights—Article 24 against the Defendant Officers (Count III); (4) Gross Negligence against the Defendant Officers (Count IV); (5) Wrongful Death against the Defendant Officers (Count V); (6) Survival Action against the Defendant Officers (Count VI); and (7) Indemnification against the BPD (Count VII).  *Id.*  As relief, Plaintiffs seek to recover monetary damages from the Defendants. *Id.* at Prayer for Relief.

<u>The Parties</u>

Plaintiff Rowena Simmons is a resident of Baltimore, Maryland and the mother of Darius Gore, who was killed after being struck by a vehicle fleeing a police pursuit.  ECF No. 57 at ¶¶ 5, 6.  Ms. Simmons brings this action on behalf of herself and the Estate of Mr. Gore.  *Id.*

---

[1] The facts recited in this memorandum opinion and order are taken from the amended complaint (ECF No. 57); the BPD and Major Jason Callaghan's motion to dismiss (ECF No. 66); the Defendant Officers' motion to dismiss or, alternatively, for summary judgment (ECF No. 67); and the memoranda in support thereof (ECF Nos. 66-1, 67-1).

Plaintiff Gary Tyson was in the car with Mr. Gore when Mr. Gore's car was struck and he suffered injuries from the collision.  *Id.* at ¶ 7.

The Baltimore City Police Department is a government agency of the State of Maryland. *Id.* at ¶ 10.

Major Jason Callaghan is a BPD officer.  *Id.* at ¶ 11.  Plaintiffs allege that Major Callaghan "was the Captain on duty at the time of the incident, and as such was a supervisor of the pursuit."  *Id.*

Lieutenant Lakishia L. Tucker is a BPD officer.  *Id.* at ¶ 12.  Plaintiffs allege that Lieutenant Tucker "was the Lieutenant on duty at the time of the incident, and as such was a supervisor of the pursuit." *Id.*  Plaintiffs also allege that Lieutenant Tucker did not request for information, such as speed or traffic violations committed, to be provided to the BPD Officers conducting the vehicle pursuit.  *Id.* at ¶¶ 73-74.  Plaintiffs further allege that Lieutenant Tucker: (1) did not follow up with the officers who participated in the pursuit for a "debriefing" and (2) that she did not "make any formal inquiries as to whether the Policy [1503] had been violated" in the weeks following the accident.  *Id.* at ¶¶ 97, 101.

Sergeant James L. Conley is a BPD officer.  *Id.* at ¶ 13.  Plaintiffs allege that Sergeant Conley was "the operator of a police cruiser that pursued the operator of a vehicle that ran a red light and ultimately stuck Decedent Gore's vehicle" and that he was "the Sergeant on duty at the time of the incident, and as such was a supervisor of the pursuit."  *Id.*  Plaintiffs also allege that, "[p]ursuant to the Policy [1503], [Sergeant Conley] was the Primary Unit in pursuit as he initiated the pursuit and was the vehicle closest to Dello-Stritto[.]"  *Id.* at ¶ 62.  In addition, Plaintiffs allege that Sergeant Conley: (1) did not follow up with the officers who participated in the pursuit for a "debriefing" and (2) that he did not "make any formal inquiries as to whether the Policy [1503] had been violated," in the weeks following the accident.  *Id.* at ¶¶ 97, 101.

Officer John W. Schreven is a BPD officer.  *Id.* at ¶ 14.  Plaintiffs allege that Officer Schreven "was also the operator of a police cruiser that pursued the operator of a vehicle that ran a red light and ultimately struck Decedent Gore's vehicle."  *Id.*  Plaintiffs also allege that, during the pursuit of Ms. Dello-Stritto, Officer Schreven overtook Sergeant Conley and became the Primary Unit.  *Id.* at ¶ 75.

Officers Zachary A. Franks, Felix Torres and Johnta Gray are BDP officers. *Id.* at ¶¶ 17-19. Plaintiffs allege that Officers Franks, Torres and Gray operated the "police cruiser[s] that chased the operator of a vehicle that ran a red light and ultimately struck Decedent Gore's vehicle." *Id.* Plaintiffs also allege that Officers Franks, Torres and Gray were the three officers who, using their vehicles, "attempted to box in the stolen vehicle to prevent it from moving," but Ms. Dello-Stritto "backed up, struck [Officer] Gray's vehicle, and fled." *Id.* at ¶ 60. Plaintiffs further allege that Officer Gray left the scene of the "collision" between his police car and the suspect's vehicle and "participated" in the pursuit of the suspect's vehicle without authorization from a supervisor. *Id.* at ¶ 76.

Officers Joshua P. Corcoran, Marc J. Camarote, Yenuel F. Familia and Dylan R. Laporta and Mark T. Gurbelski are BPD officers. *Id.* at ¶¶ 15, 20, 22, 24, 25. Plaintiffs allege that Officers Corcoran, Camarote, Familia, Laporta and Gurbelski were also the operators of "police cruiser[s] that pursued the operator of a vehicle that ran a red light and ultimately struck Decedent Gore's vehicle." *Id.*

Officer Michael H. Wood is a BPD officer. *Id.* at ¶ 21. Plaintiffs allege that Officer Wood "was a passenger in a police cruiser that pursued the operator of a vehicle that ran a red light and ultimately struck Decedent Gore's vehicle." *Id.* Plaintiffs also allege that Officer Wood, along with Officer Grubeski, "did not inform their supervisor, did not alert that they were joining on the radio, and did not provide any of the required updates under the Policy." *Id.* at ¶ 78.

Officer Sharif K. Kellogg is a BPD officer. *Id.* at ¶ 23. Plaintiffs allege that Officer Kellogg "was also the operator of a police cruiser that pursued the operator of a vehicle that ran a red light and ultimately struck Decedent Gore's vehicle." *Id.* Plaintiffs also allege that Officer Kellogg continued to pursue even when he could see three to four officers ahead of him and three to four officers behind him and that his radio was not working during the pursuit. *Id.*

Officer John Bilheimer is a BPD officer. *Id.* at ¶ 16. Plaintiffs allege that Officer Bilheimer was "the operator of a camera that record[ed] the pursuit from a police helicopter" and the aerial observer in the police helicopter active during the pursuit of Ms. Dello-Stritto. *Id.* Plaintiffs also allege that Officer Bilheimer did not "advise as to the increased traffic congestion, road hazards, visible pedestrians, [or] traffic violations;" (2) did not advise as to "any other pertinent information that would assist in evaluating termination of the pursuit;" (3)

did not "advise as to the excessive speed of the pursuit," or that Ms. Dello-Stritto "had blown through multiple stop signs and traffic lights … driven down the wrong side of the roadway and had passed at least one vehicle on the left over a double yellow line; and (4) did not "recommend that the pursuit be terminated."  *Id.*  at ¶ 70.

<u>The March 21, 2020, Pursuit</u>

On March 21, 2020, at approximately, 7:45 p.m., BPD officers were notified that a GPS device located on a stolen 2014 Ford Fusion indicated that the vehicle was located in the 2600 block of W. Patapsco Avenue in Baltimore City.  *Id.* at ¶¶ 56-57.  The following material facts about the BPD officers' response to this notification are undisputed:

The stolen vehicle, which was occupied by Delissa Ann Dello-Stritto, was located at a gas station.  ECF No. 67-4, Foxtrot Video at 00:16.  When the initial responding BPD officers, Officers Gray and Franks, arrived at the gas station, the stolen vehicle was occupied and not moving and the officers tried to box it in.  ECF No. 57 at ¶ 59; *see* ECF No. 67-1 at 2.  To accomplish this, the officers pulled their marked police vehicles behind and to the sides of the stolen vehicle to prevent it from escaping.  ECF No. 67-4, Foxtrot Video at 01:46; ECF No. 67-6, Torres Dep. at 54:20-55:21; *see also* ECF No. 67-7, Franks Dep. at 25:3-14, 55:19- 56:6.

Officers Franks and Torres then exited their police vehicles and commanded Ms. Dello-Stritto to turn off her vehicle.  ECF No. 67-7, Franks Dep. at 54:18-56:6); *see also* ECF No. 67-6, Torres Dep. at 59:16-20.  But Ms. Dello-Stritto ignored the officers' commands and she backed up, pulled forward and struck Officer Gray's occupied police vehicle, and then fled the parking lot.  ECF No. 67-4, Foxtrot Video at 01:46; ECF No. 67-7, Franks Dep. at 54:8-55:16, 59:11-22, 62:15-63:13.

When Officer Gray's police vehicle was struck by Ms. Dello-Stritto, Officer Gray was sitting inside the vehicle and Officers Franks and Torres were standing outside their police vehicles, which were located near the fleeing stolen vehicle while it attempted to escape.  ECF No. 67-4, Foxtrot Video at 01:46; ECF No. 67-7, Franks Dep. at 59:18-22; ECF No. 67-8, Gray Dep. at 30:18-31:11.  At that time, Officer Franks was standing by the right passenger side of the stolen vehicle and Officer Torres was standing towards the back of the stolen vehicle on the driver's side.  ECF No. 67-4, Foxtrot Video at 01:46; ECF No. 67-7, Franks Dep. at 54:18-22.  After Ms. Dello-Stritto struck Officer Gray's police vehicle, Officer Gray

radioed "she just hit me," and subsequently confirmed that it was his police vehicle that had been struck.  ECF No. 67-8, Gray Dep. at 30:18-31:11; *see also* ECF No. 69 at 8.

Other BPD Officers heard what was transpiring over the radio.  *See* ECF No. 57 at ¶ 62.  One such officer was Sergeant James L. Conley, the Sergeant on duty.  ECF No. 67-9, Conley Dep. at 55:22-57:17.  And so, Sergeant Conley arrived at the gas station right as Ms. Dello-Stritto was fleeing.  *Id.* at 87:19-88:9.  Sergeant Conley testified during his deposition that he believed that a felony assault on a police officer had just been committed and he made the decision to pursue the fleeing suspect, Ms. Dello-Stritto.  *Id.* at 55:8-21, 123:22-124:20; *see also* ECF No. 67-10, Tucker Dep. at 70:6-71:20.

It is undisputed that the BPD Officers at the scene used multiple de-escalation techniques before the pursuit was initiated including: (1) announcing their police presence (they were in uniforms and marked police vehicles with emergency lights activated); (2) attempting to box-in the parked stolen vehicle to prevent it from fleeing; and (3) attempting to make contact with the suspect and asking several times for the suspect to "shut the vehicle down," "put the vehicle in park," and "step out of the vehicle."  *See* ECF No. 67-4, Foxtrot Video at 00:00-01:55; ECF No. 67-7, Franks Dep. at 54:8-55:16; ECF No. 67-8, Gray Dep. at 68:16-21, 72:9-73:10; ECF No. 67-9, Conley Dep. at 59:10-60:8); ECF No. 67-10, Tucker Dep. at 55:16- 156:10; *see also* ECF No. 57 at ¶ 60.  During his deposition, Sergeant Conley also testified that the officers at the scene activated their emergency lights and sirens when Ms. Dello-Stritto fled.  *See* ECF No. 67-9, Conley Dep. at 59:10-60:8.

The Foxtrot Video Footage

During the entirety of the vehicle pursuit, a Foxtrot police helicopter was flying overhead and providing information to the BPD Officers on the ground.  *See* ECF No. 67-4, Foxtrot Video at 01:55-15:56; *see also* ECF No. 57 at ¶ 70.  The Defendant Officers were also communicating over the radio during the vehicle pursuit and their communications are captured on the Foxtrot video.  *See* ECF No. 67-4, Foxtrot Video at 01:55-15:56.

The Foxtrot video footage of this incident shows that three police vehicles immediately follow Ms. Dello-Stritto's vehicle when she fled the scene.  *See* ECF No. 67-4, Foxtrot Video at 01:55; *see also* ECF No. 67-10, Tucker Dep. at 56:6-17.  This video also records various BPD Officers discussing what was happening in "real-time" as the pursuit began, including that: (1)

Officer Bilheimer radioed that the stolen vehicle was trying to escape the car stop and said, "it's moving like it's trying to get out;" (2) Officer Gray radioed "she just hit 21, she just hit me;" (3) Lieutenant Tucker subsequently asked, "she hit your vehicle" to which Gray responded "10-4;" (4) Officer Bilheimer provided descriptions of the stolen vehicle, constant updates on its location, and asked dispatch to notify the other districts of its location; (5) Lieutenant Tucker radioed that the fleeing suspect hit Officer Gray's police vehicle; (6) Sergeant Conley radioed that he was behind the suspect after she fled the parking lot and that Foxtrot had the "eyeball;" and (7) Lieutenant Tucker asked Foxtrot "to keep us updated."  *See* ECF No. 67-4, Foxtrot Video at 01:55-15:56; *see also* ECF No. 67-7, Franks Dep. at 10:9-14; ECF No. 67-8, Gray Dep. at 30:18-31:11; ECF No. 67-9, Conley Dep. at 50:12-51:2; ECF No. 67-10, Tucker Dep. at 74:12-75:7; ECF No. 67-11, Bilheimer Dep. at 61:8-163:8; ECF No. 67-12, Schreven Dep at 47:12-49:8.

The Foxtrot video also captures radio communications by BPD supervisors Conley and Tucker during the pursuit and shows that: (1) Sergeant Conley radioed "everyone watch your cross streets, Fox has got it, everyone just watch your cross streets, alright, . . . we're good;" (2) Lieutenant Tucker radioed "just follow safely, do not cut off the intersections please;" and (3) Lieutenant Tucker radioed "remember watch your side streets everybody, let Fox keep spotting until she stops." ECF No. 67-4, Foxtrot Video at 01:55-15:56; *see also* ECF No. 67-7, Franks Dep. at 09:2-4; ECF No. 67-10, Tucker Dep. at 74:12-75:7); ECF No. 67-12, Schreven Dep at 47:12-49:8.  Following the conclusion of the vehicle pursuit, Lieutenant Tucker and Sergeant Conley are also heard on the Foxtrot video discussing the pursuit and how Officer Conley felt it was under control and that "they [were] not going at a high speed" and "everything was calm."  *See* ECF No. 67-10, Tucker Dep. at 94:1-95:6.

It is undisputed that, under BPD Policy 1503, Sergeant Conley was the Primary Unit and responsible for the conduct of the pursuit.  *See* ECF No. 67-3 at 5; *see also* ECF No. 57 at ¶ 62.  The two other officers in the police cruiser located immediately behind Sergeant Conley were Officer Schreven and Sergeant Camarote.  ECF No. 67-9, Conley Dep. at 76:2-7.

It is also undisputed that the vehicle pursuit transpired over 11 miles through the City of Baltimore, lasted approximately 14 minutes, and came to an end when the fleeing suspect ran a red light at the intersection of Liberty Heights and Callaway Avenue and struck a vehicle being driven by Darius Gore, in which Gary Tyson was also a passenger.  ECF No. 67-1 at 3; *see* ECF No. 57 at ¶¶ 64-65.  In addition, it is undisputed that none of the BPD Officers

recommended that the vehicle pursuit be terminated.  ECF No. 57 at ¶ 80.

Sadly, Mr. Gore died as a result of his vehicle being struck and Mr. Tyson was injured. ECF No. 57 at ¶¶ 87-91.  Mr. Tyson's injuries from the crash included a broken tibia, two broken ribs, bruising on his lung, and pooling blood between his chest wall and lungs on his right side. *Id.* at 89.  He was taken to the hospital for his injuries and required extensive treatment and subsequent physical therapy.  *Id.*

<u>Relevant BPD Policies</u>

On November 24, 2019, the BPD adopted Policy 1503 ("Policy 1503"), entitled "Emergency Vehicle Operation and Pursuit Policy."  *See* ECF No. 67-3.  This policy governs vehicular pursuits.  *See generally*, *id.*  "The purpose of this policy is to provide guidance on conducting safe emergency vehicle operations and pursuits."  *Id.* at 2.

Policy 1503 dictates that officers "shall use sound judgement and discretion" when pursuing vehicles, thereby allowing officers to use their own discretion when deciding to pursue. *Id.*; *see also* ECF No. 57 at ¶ 32.  And so, under Policy 1503, BPD officers are permitted to use their discretion to pursue a fleeing vehicle when:

> (1) The vehicle contains a felony suspect and failure to immediately apprehend poses an immediate threat of death or serious bodily injury to the [officer] or others; and
>
> (2) Before the pursuit is initiated, there exists probable cause to believe that the fleeing suspect committed a felony which resulted, or could have resulted, in death or serious bodily injury.

*See* ECF No. 57 at ¶ 33; ECF No. 67-3 at 4.  The factors to be considered when deciding to initiate or continue a pursuit include, but are not limited to: (1) type of area in which the pursuit is traversing, such as a school zone or residential area; (2) weather and road conditions; density of vehicular and pedestrian traffic; (3) speed of the pursuit; (4) officers' familiarity with the area of the pursuit; (5) availability of other resources, such as air support assistance; and (6) likelihood of apprehension at a later time. ECF No. 57 at ¶ 34; *see also* ECF No. 67-3 at 4.

Policy 1503 also directs BPD officers to use de-escalation techniques to reduce the threat and gain compliance to lawful commands.  ECF No. 67-3 at 1.  And so, under Policy 1503, there are certain limited factors that prohibit an officer from initiating a pursuit, including

where the person fleeing is only suspected of a crime against property and when the risk of the pursuit outweighs the need to stop the eluding driver. *See id.* at 4.

Policy 1503 does not, however, limit the speeds that the pursuit may reach, and there is no requirement that officers stop at intersections. *See id.* Rather Policy 1503 requires that "officers . . . not endanger life or property," and this policy also requires that officers slow down as necessary for safety when proceeding through a red light or stop sign. *See id.* at 3.

Policy 1503 defines the "Primary Unit," as first police vehicle immediately behind the eluding vehicle, is responsible for providing updates about the location, speed, and direction of travel of the eluding vehicle, the reason for the pursuit, the weather, traffic, and road conditions, and other information. *See id.* at 5. Policy 1503 also requires that, when a vehicle pursuit begins, air support assistance should be requested. *Id.* Once the air support crew establishes visual contact with the eluding vehicle, the air support crew should video record the pursuit and assume control of radio communication during the pursuit. *Id.* at 8; *see also* ECF No. 57 at ¶ 40. In this regard, the air support crew should "report on the progress of the pursuit, road hazards and conditions, and other pertinent information to assist in evaluating whether the pursuit should continue." ECF No. 67-3 at 8. The air support crew can also recommend terminating the pursuit. *Id.*

Policy 1503 also contains "Vehicle Pursuit Considerations," which provide that officers should not pursue a vehicle driving the wrong direction on a roadway and should not attempt to pass other pursuing vehicles unless requested to do so by the Primary Unit (and there is a clear understanding between all pursuing vehicles that an officer will be passing the other vehicles). *See id.* at 5. The policy also requires that pursuits be supervised by a supervisor, and that a supervisor has the authority to terminate a pursuit upon command. *Id.* at 4, 8. In addition, Policy 1503 requires that the Primary Unit who initiated the vehicle pursuit be responsible for completing an incident report after the pursuit has ended, detailing the facts that provided probable cause for the pursuit, and documenting the facts that caused the officer to believe that the safety risks of the pursuit were outweighed by the risks posed by the fleeing suspect. *See id.* Lastly, Policy 1503 provides certain "Directives" to BPD Officers regarding vehicle pursuits. *Id.* at 3.

<u>The Plaintiffs' Allegations</u>

In the amended complaint, Plaintiffs allege that, as a direct and proximate result of the Defendants' actions or omissions, Mr. Gore was killed and Mr. Tyson sustained significant injuries during the March 21, 2020 Incident.  ECF No. 57 at ¶ 104.

Specifically, in Count I of the amended complaint, Plaintiffs allege substantive due process violations against the Defendant Officers under of 42 U.S.C. § 1983, and they contend that the Defendant Officers' use of force was intentional, excessive, unconstitutional, unlawful, objectively unreasonable and absent of any lawful justification or excuse.  *See id.* at ¶¶ 106-18. Plaintiffs also allege in Count II of the amended complaint that the BPD is liable under Section 1983, due to the BPD's unconstitutional custom, pattern, and/or practice of failing to train and supervise its officers regarding police vehicle pursuits.  *Id.* at ¶¶ 119-37.

In Count III of the amended complaint, the Plaintiffs allege that the Defendant Officers violated the Maryland Declaration of Rights Article 24, which prohibits the deprivation of life, liberty, and property during the March 21, 2020 Incident.  *Id.* at ¶¶ 138-50.  In addition, Count IV of the amended complaint alleges gross negligence under Maryland law against the Defendant Officers.  *Id.* at ¶¶ 151-59.

In Count V of the amended complaint, Plaintiff Simmons alleges a wrongful death claim under Maryland law against the Defendant Officers.  *Id.* at ¶¶ 160-66.  Count VI of the amended complaint is a survival action brought solely by the Estate of Darius Gore against the Defendant Officers.  *Id.* at ¶¶ 167-72.  Lastly, in Count VII of the amended complaint, Plaintiffs assert a claim for indemnification against the BPD for the actions of the Defendant Officers.  *Id.* at ¶¶ 173-76.

Plaintiffs contend that the vehicular pursuit at issue in this case shocked the conscience, because the pursuit traveled through areas where civilians were located, passing three schools and one hospital.  ECF No. 69 at 11-12; ECF No. 70 at 5.  In addition, Plaintiffs contend that this pursuit also shocked the conscience, because visibility was lower at the time of the vehicular pursuit.  ECF No. 57 at ¶ 69.

Lastly, Plaintiffs allege that the BPD has been sued multiple times for injuries and deaths arising from police pursuits that ended up killing innocent bystanders, thereby putting the BPD on actual notice of a pattern and practice of officers' use of excessive force in the context of

vehicular pursuits, substantive due process rights violations, and/or other constitutional violations and/or violating the BPD's pursuit policies. *Id.* at ¶¶ 49-50. And so, Plaintiffs contend that Mr. Gore and Mr. Tyson had conscious pain and suffering, and that Mr. Gore's mother has suffered and will continue to suffer from mental anguish, emotional pain and suffering, loss of society, loss of comfort, loss of protection, loss of filial care, loss of attention, and loss of services, as a result of the Defendants' conduct. *Id.* at ¶ 105.

### B. Procedural Background

Plaintiffs commenced this action on April 19, 2021. ECF No. 1. After the Court granted-in-part Defendants' motion to dismiss, Plaintiffs filed an amended complaint on February 7, 2022. ECF No. 57.

On April 15, 2022, the BPD and Major Jason Callaghan filed a motion to dismiss the claims against them and a memorandum in support thereof. ECF Nos. 66 and 66-1. On April 15, 2022, the Defendant Officers also filed a motion to dismiss the claims against them, or, in the alternative, for summary judgment, and a memorandum in support thereof. ECF Nos. 67 and 67-1.

On May 6, 2022, Plaintiffs filed a response in opposition to these motions. ECF Nos. 69 and 70. On May 25, 2022, the BPD and Major Jason Callaghan and the Defendant Officers filed their respective reply briefs. ECF Nos. 74 and 75.

These motions having been fully briefed, the Court resolves the pending motions.

### III. LEGAL STANDARDS

### A. Fed. R. Civ. P. 8(a) And 12(b)(6)

Under Fed. R. Civ. P. 8(a), a complaint must set forth "a short and plain statement of the claim showing that the pleader is entitled to relief. To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible when "the plaintiff pleads factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

When evaluating the sufficiency of a plaintiff's claims under Fed. R. Civ. P. 12(b)(6), the Court accepts the factual allegations in the complaint as true and construes them in the light most favorable to the plaintiff. *Nemet Chevrolet, Inc. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005) (citations omitted). But, the complaint must contain more than "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement . . . ." *Nemet Chevrolet*, 591 F.3d at 255. And so, the Court should grant a motion to dismiss for failure to state a claim if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *GE Inv. Priv. Placement Partners II, L.P. v. Parker*, 247 F.3d 543, 548 (4th Cir. 2001) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 249-50 (1989)).

### B.    Fed. R. Civ. P.  56

A motion for summary judgment filed pursuant to Fed. R. Civ. P. 56 will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). And so, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co., Inc. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co., Ltd.*, 601 F.2d 139, 141 (4th Cir. 1979).

When ruling on a motion for summary judgment, the Court must construe the facts alleged in the light most favorable to the party opposing the motion. *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co*., 773 F.2d 592, 595 (4th Cir. 1985). In this regard, the moving party bears the burden of showing that there is no genuine issue as to any material fact and that the party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Catawba Indian Tribe of S.C. v. State of S.C.*, 978 F.2d 1334, 1339 (4th Cir. 1992), *cert. denied*, 507 U.S. 972 (1993). But, a party who bears the burden of proof on a particular claim must also factually support each element of his or her claim. *See Celotex Corp.*, 477 U.S. at 322-23. Given this, "a complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Id.* at 323. And so, on those issues on which the

nonmoving party will have the burden of proof, it is the nonmoving party's responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial. *See Liberty Lobby*, 477 U.S. at 256.

In this regard, the United States Court of Appeals for the Fourth Circuit has held that, "[a] mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment." *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 536 (4th Cir. 1997). And so, there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted).

### C.    Section 1983 And *Monell* Claims

Title 42, United States Code, Section 1983 provides a mechanism for individuals who have had their constitutional rights violated to seek a remedy against individual state actors. *See* 42 U.S.C. § 1983 (providing that if any person acting "under color of any statute, ordinance, regulation, custom, or usage, of any State" deprives a United States citizen of any constitutional right, that person may be liable in a suit for money damages). Section 1983 permits a plaintiff to bring a claim directly against a municipality if the municipality causes a deprivation of a constitutional right through an official policy or custom. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). But, "a municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). Given this, a local government, "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell*, 436 U.S. at 694. And so, the Supreme Court has held that a municipality may be liable under § 1983 "when a municipality's policy or custom has caused the violation of an individual's federal rights." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 296 (2002) (J. Stevens, dissenting).

Relevant to this dispute, this Court has held that, when a plaintiff alleges unconstitutional action by the executive branch of government, only official conduct that "shocks the conscience" will give rise to a substantive due process violation. *Johnson v. Baltimore Police Dep't*, 452 F. Supp. 3d 283, 300–04 (D. Md. 2020) (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998)).

13

A *Monell* plaintiff need only meet the basic "short and plain statement" requirement of Fed. R. Civ. P. 8(a) in the complaint. *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168-69 (1993). But, the United States Court of Appeals for the Fourth Circuit has held that a *Monell* plaintiff must adequately plead "the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan ex rel. Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994). The Fourth Circuit has also held that "a municipal policy or custom giving rise to § 1983 liability will not be inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees." *Milligan v. City of Newport News*, 743 F.2d 227, 230 (4th Cir. 1984). And so, the municipality's conduct must demonstrate "deliberate indifference to the rights of potentially affected citizens," for conduct to be properly thought of as a "policy." *Jones v. Wellham*, 104 F.3d 620, 626 (4th Cir. 1997).

In this regard, the Fourth Circuit has held that a plaintiff can demonstrate the existence of a policy or custom for which a municipality may be liable in four ways: "(1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifest[s] deliberate indifference to the rights of citizens; or (4) through a practice that is so 'persistent and widespread' as to constitute a custom or usage with the force of law." *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (citation omitted) (brackets in original). This Court has also held that "[a] plaintiff must allege numerous particular instances of unconstitutional conduct in order to establish a custom or practice, because 'a municipality is not liable for mere isolated incidents of unconstitutional conduct by subordinate employees.'" *Weeden v. Prince George's Cty.*, No. 17-2013, 2018 WL 2694441, at *4 (D. Md. June 4, 2018) (quoting *Smith v. Ray*, 409 F. App'x 641, 651 (4th Cir. 2011); *see also Talley v. Anne Arundel Cty.*, No. 21-347, 2021 WL 4244759, at *14 (D. Md. Sept. 17, 2021) ("Alleging such a [persistent and widespread] practice requires a plaintiff to plead prior instances of similar conduct.").

"Under a *Monell* condonation theory of liability, a municipality is liable if its policymakers fail "'to put a stop to or correct a widespread pattern of unconstitutional conduct.'" *Cottman v. Balt. Police Dep't*, No. 21-837, 2022 WL 137735, at *6 (D. Md. Jan. 13, 2022) (quoting *Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379, 402 (4th Cir. 2014)). To

state a claim for liability under this theory, a plaintiff must point to: "'[A] persistent and widespread practice[] of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'  Both knowledge and indifference can be inferred from the 'extent' of employees' misconduct. Sporadic or isolated violations of rights will not give rise to Monell liability; only 'widespread or flagrant' violations will." *Owens*, 767 F.3d at 402-03 (internal citations omitted) (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1390 (4th Cir. 1987)).

### D.     Gross Negligence

Lastly, Maryland law defines gross negligence as "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another," and is said to imply "a thoughtless disregard of the consequences without the exertion of any effort to avoid them." *Barbe v. Pope*, 935 A.2d 699, 717 (Md. 2007) (internal citation omitted).  "Stated conversely, a wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist."  And so,gross negligence describes "a level of neglect more egregious than simple negligence." *Holloway-Johnson v. Beall*, 103 A.3d 720, 735 (Md. Ct. Spec. App. 2014).

## IV.     ANALYSIS

The BPD and Major Callaghan have moved to dismiss the claims brought against them in this action, pursuant to Fed. R. Civ. P. 8(a) and 12(b)(6), upon the grounds that: (1) Plaintiffs fail to state a claim for supervisory liability against Major Callaghan; (2) Plaintiffs' claims against Major Callaghan fail as a matter of law, because he was not personally involved in the commission of the alleged torts; (3) Major Callaghan has public official immunity; (4) Plaintiffs fail to state plausible *Monell* claims against the BPD; and (5) Plaintiffs' indemnification claim is not ripe for judicial review.  *See generally*, ECF No. 66-1.

In addition, the Defendant Officers have moved to dismiss the claims brought against them in this action, or, alternatively, for summary judgment on these claims, pursuant to Fed. R. Civ. P. 12(b)(6) and 56, upon the grounds that: (1) Plaintiffs fail to state claims for substantive due process violations under Section 1983 and Article 24 of the Maryland Declaration of

Rights; (2) the undisputed material facts show that the Defendant Officers did not violate Plaintiffs' constitutional rights; (3) the Defendant Officers are entitled to qualified immunity; (4) Plaintiffs fail to state a gross negligence claim, because the amended complaint lacks sufficient facts to support causation; and (5) Plaintiffs cannot prevail on their wrongful death and survival claims, because the undisputed material facts show that the Defendant Officers are not responsible for the death of Mr. Gore. *See generally*, ECF No. 67-1.

Plaintiffs counter that the Court should deny the Defendants' respective dispositive motions, upon the grounds that: (1) Major Callaghan is liable under the theory of supervisory liability, because he was personally involved in the March 21, 2020, Incident and had notice that his subordinates were engaging in conduct that posed an unreasonable risk; (2) Major Callaghan is not entitled to public official immunity, because he acted with gross negligence and Plaintiffs assert a claim under Article 24 of the Maryland Declaration of Rights; (3) the BPD is liable for failure to train and supervise its officers, and for condoning their unconstitutional conduct, because the BPD failed to adequately train its officers on its vehicle pursuit policy and the BPD failed to take any action to address the March 21, 2020, Incident until after this case was filed. *See generally*, ECF No. 70.

In addition, Plaintiffs argue that the Defendant Officers are not entitled to summary judgment on their claims, because: (1) the evidence shows that the Defendant Officers' conduct shocked the conscience and violated Plaintiffs' clearly-established rights; (2) proximate cause is a question for the jury; (3) the undisputed material facts show that the Defendant Officers' conduct was grossly negligent; and (4) the undisputed material facts show that the Defendant Officers engaged in a wrongful act by acting with reckless disregard. *See generally*, ECF No. 69.

For the reasons that follow, a careful reading of the amended complaint shows that Plaintiffs fail to state a plausible claim for supervisory liability against Major Callaghan, and that their other claims against Major Callaghan fail as a matter of law, because the factual allegations in the amended complaint make clear that Major Callaghan was not personally involved in the commission of the torts alleged in this matter. Plaintiffs also fail to state plausible *Monell* claims against the BPD, based upon either failure to train and a condonation theory, because there are no facts to show that the BPD had notice of, or was deliberately indifferent to, the alleged the constitutional violations.

16

In addition, a careful review of the amended complaint shows that Plaintiffs fail to state substantive due process claims under Section 1983 and Article 24 of the Maryland Declaration of Rights against the Defendant Officers, because there are no factual allegations in the amended complaint to show that the conduct of any of the Defendant Officers caused Plaintiffs' harm.  The undisputed material facts in this case also show that the Defendant Officers did not violate Plaintiffs' constitutional rights, because the evidence shows that the Defendant Officers' decision to conduct the vehicle pursuit was legally justified and there is no evidence to show that the Defendant Officers intentionally misused their vehicles to cause harm to the Plaintiffs.

In addition, Plaintiffs fail to state a gross negligence claim against the Defendant Officers, because the amended complaint lacks sufficient facts to show causation.  Plaintiffs also cannot prevail on their wrongful death and survival claims against the Defendant Officers, because the undisputed material facts do not establish a wrongful act on the part of the Defendant Officers in connection with the March 20, 2021, Incident.  Lastly, Plaintiffs' indemnification claim is not ripe for review, because there is no judgment against the Defendant Officers in this case.

And so, for each of these reasons, the Court: (1) **GRANTS-in-PART** the BPD and Major Callaghan's motion to dismiss; (2) **GRANTS-in-PART** the Defendant Officers' motion to dismiss, or, alternatively, for summary judgment; and (3) **DISMISSES** the amended complaint.

### A.    Plaintiffs Fail To State A Plausible Claim For Supervisory Liability Against Major Callaghan

As an initial matter, a careful reading of the amended complaint shows that Plaintiffs fail to state a plausible claim for supervisory liability against Major Callaghan.  To prove a supervisory liability claim against Major Callaghan in a Section 1983 action, Plaintiffs must show three things:

> (1) That the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to . . . the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

The Fourth Circuit has held that "[e]stablishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." *Id.* at 799 (quoting *Slakan v. Porter*, 737 F.2d 368, 373-74 (4th Cir. 1984)). The Fourth Circuit has also held that "a plaintiff [o]rdinarily . . . cannot satisfy his burden of proof by pointing to a single incident or isolated incidents . . . for a supervisor cannot be expected . . . to guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate the misconduct." *Randall v. Prince George's Cnty., Md.*, 302 F.3d 188, 206 (4th Cir. 2002) (alteration in original). But, where a supervisor demonstrates "continued inaction in the face of documented widespread abuses," it may be sufficient to show deliberate indifference. *Shaw*, 13 F.3d at 799. In addition, "'proof of causation may be direct. . . where the policy commands the injury of which the plaintiff complains. . . or may be supplied by the tort principle that holds a person liable for the natural consequences of his actions.'" *Wilkins v. Montgomery*, 751 F.3d 214, 226-27 (4th Cir. 2014) (quoting *Shaw*, 13 F.3d at 799).

The Defendants persuasively argue that Plaintiffs have not alleged facts in the amended complaint to satisfy the elements of a supervisory liability claim against Major Callaghan. First, Plaintiffs fail to allege facts to support the first element of this claim—that Major Callaghan had actual or constructive knowledge that his subordinates were engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to the Plaintiffs. A careful reading of the amended complaint shows that Plaintiffs do not allege any facts to show that the BPD officers that Major Callaghan supervised had a history of engaging in unlawful or unreasonable vehicle pursuits. *See generally*, ECF No. 57. There are also no factual allegations in the amended complaint to show that Major Callaghan had any knowledge of any past incidents of unlawful or unreasonable vehicle pursuits involving any of the BPD officers that he supervised. *Id.* Given this, Plaintiffs' general allegation that "[su]pervisors and ranking officers, including an officer with the rank of Major within the [BPD], had actual or constructive knowledge that subordinate officers" engaged in unconstitutional conduct, lacks factual support. ECF No. 57 at ¶ 131.

The Court also agrees with the Defendants that Plaintiffs' reliance upon the settlement of

past lawsuits against the BPD involving injuries arising from vehicle pursuits and a 2017 Department of Justice Study regarding police pursuits, to establish that Major Callaghan had notice that his subordinate officers engaged in unconstitutional vehicle pursuits, is misplaced. Again, there are no factual allegations in the amended complaint to show that Major Callaghan had prior notice of either these lawsuits, or the subject study. *See* ECF No. 57. Given this, the factual allegations in the amended complaint, taken as true, simply do not show that *Major Callaghan* had actual or constructive knowledge that his subordinates were engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to Plaintiffs.

Plaintiffs similarly fail to allege facts to support the second element of their supervisory liability claim against Major Callaghan—that Major Callaghan's response to any knowledge he may have had of unconstitutional conduct on the part of his subordinate was so inadequate as to show deliberate indifference to, or tacit authorization of, the alleged offensive practices. Again, there are no factual allegations in the amended complaint to show that Major Callaghan's response to known unconstitutional conduct involving vehicle pursuits was improper, or that he was deliberately indifferent to known misconduct with regards to such pursuits by his subordinate officers. *See* ECF No. 57. And so, absent such facts, Plaintiffs also cannot show that Major Callaghan was deliberately indifferent to their constitutional rights.

Lastly, the amended complaint is also devoid of factual allegations to show that that there is an affirmative causal link between Major Callaghan's alleged inaction to the offensive conduct and the particular constitutional injury suffered by Plaintiffs here—the injury of Mr. Tyson and the tragic death of Mr. Gore. Plaintiffs do not allege any facts to show that Major Callaghan's response to the March 21, 2020, Incident caused their harm. *See generally*, *id.* Rather, the factual allegations in the amended complaint make clear that Major Callaghan had no opportunity to respond differently to the March 21, 2020, Incident, because it is undisputed that he did not become involved in this incident until *after* the vehicle pursuit and subsequent crash occurred. ECF No. 57 at ¶¶ 11 and 100 (alleging that Major Callaghan was the Captain on duty at the time of the incident and was present at the scene after vehicle pursuit occurred.); *see also* ECF No. 70 at 10.

Given this, the amended complaint lacks the kind of factual allegations needed to plausibly state a supervisory liability claim against Major Callaghan. And so, the Court must

DISMISS this claim.  Fed. R. Civ. P. 12(b)(6).

### B.      Plaintiffs' Claims Against Major Callaghan Also Fail Because He Was Not Personally Involved In The Vehicle Pursuit

Defendants also persuasively argue that Plaintiffs fail to state viable Section 1983 and state law claims against Major Callaghan, because the factual allegations in the amended complaint make clear that he was not personally involved in the vehicle pursuit that occurred on March 21, 2020.  Under 42 U.S.C. § 1983, individuals are not vicariously liable and cannot be sued under a theory of *respondeat superior*.  *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Shaw*, 13 F.3d at 798.  And so, liability only lies where there is personal involvement in the underlying tort.  *See, e.g.*, *Vinnedge v. Gibbs*, 550 F.2d 926, 928-29 (4th Cir. 1977).

In this case, the amended complaint contains no factual allegations to show that Major Callaghan was personally involved in the events that led to Plaintiffs' injuries.  As discussed above, Plaintiffs allege that Major Callaghan was the Captain on duty at the time of the vehicle pursuit and that he responded to the scene of the accident, but did not inquire about whether the BPD officers involved in the vehicle pursuit complied with the BPD's vehicle pursuit policy. *See* ECF No. 57 at ¶¶ 11 and 100.  But, as also discussed above, Plaintiffs conceded that Major Callaghan first arrived at the scene after this incident occurred.  ECF No. 70 at 10.  And so, taken as true, the allegations in the amended complaint simply do not show that Major Callaghan was personally involved in the March 21, 2020, Incident.  For this reason, the Court must also DISMISS the Section 1983 and state law claims asserted against Major Callaghan.  Fed. R. Civ. P. 12(b)(6).

### C.      Plaintiffs Fail To State A Plausible *Monell* Claim

Turning to Plaintiffs' *Monell* claims against the BPD, a careful reading of the amended complaint also makes clear that Plaintiffs have not properly pled their *Monell* claim against the BPD based upon either failure to train or supervise, or a condonation theory.

#### 1.    Plaintiffs Fail To State A *Monell* Claim Based Upon Failure To Train

As an initial matter, Plaintiffs fail to state a plausible failure to train claim.  To state a failure to train claim, Plaintiffs must allege facts to establish: (1) the nature of the training, (2) that the training was a deliberate or conscious choice by the municipality, and (3) that the

officer's conduct resulted from said training." *McDowell v. Grimes*, No. GLR-17-3200, 2018
WL 3756727 at *4 (D. Md. 2018) (citations omitted).  In this regard, this Court has held that the
nature of the training element "requires more than bald assertions that police officers were not
properly trained." *Jones v. Chapman*, No. ELH-14-2627, 2015 WL 4509871, at *20 (D. Md. Jul.
24, 2015).  This Court has also held that it is not sufficient to state "in broad, conclusory terms
and in a variety of different ways" that the police department "failed to train and supervise its
officers." *Peters v. City of Mount Rainier*, No. GJH-14-0955, 2014 WL 4855032 at *5 (D. Md.
Sept. 29, 2014).  Nor is it sufficient to allege a "general laxness or ineffectiveness" to state a
cognizable failure to train claim.  *Shields v. Prince George's Cty.*, No. GJH-15-1736, 2016 WL
4581327, at *9 n.11 (D. Md. Sept. 1, 2016) (quoting *Spell*, 824 F.2d at 1390).  And so, Plaintiffs
must allege a "specific deficiency" with the training on the BPD's vehicle pursuit policy to
plausibly state their claim.  *Id.*

      Plaintiffs have failed to do so here for several reasons.  First, the amended complaint
makes clear that Plaintiffs allege only a perceived general laxness in the training of officers with
regards to the BPD's vehicle pursuit policy.  Notably, in the amended complaint, Plaintiffs allege
that:

- [the BPD] does not adequately train its officers under the pursuit policies.
  The training on pursuits falls under the general umbrella of what is
  identified as Emergency Vehicle Operator Course ("EVOC") training,
  which also comprises of general information about police vehicles and
  their operation. However, the training BCPD officers receive consists of
  spending approximately one day reviewing the emergency vehicle pursuit
  policy and then practicing on a closed course. This training occurs during
  the training at the BCPD Academy, after officers are hired but before they
  are sworn in as officers.

- Once the officers have successfully completed the training program and
  are sworn in, they receive no further formal training or refresher courses
  on vehicular pursuits.

- When an updated version of vehicular pursuits issued, officers are
  required to review the policy and sign a form that they have reviewed it.
  There may be a short test after the review, but there is no direct contact
  with a supervisor to ensure comprehension of the requirements and
  changes.

- Further, there are no requirements for higher ranking officers, who are the
  officers who supervise pursuits and ensure that lower ranking officers

comport with the Policy, to complete any additional training upon
receiving their promotion. Thus, officers rise through the ranks and
supervise other officers during vehicular pursuits, having never received
any additional training on supervisory requirements or even refresher
courses on the fundamentals of the Policy. Some officers have been
employed by Defendant BCPD for decades and have never received any
additional training on the Policy, even though they are supervisors with the
BCPD.

ECF No. 57 at ¶¶ 44-47.  And so, Plaintiffs contend in this action that "a single day learning and
testing on a Policy of 15 pages and then practicing on a closed course is not sufficient."  ECF
No. 70 at 17.

Taken as true, Plaintiffs' allegations fail to identify a specific deficiency with respect to
the BPD's vehicle pursuit policy to support their failure to train claim.  Plaintiffs' factual
allegations instead simply show a laxness on the part of BPD with regards to the training on its
vehicle pursuit policy.  As this Court has recognized, such allegations are not sufficient for
Plaintiffs to state a plausible failure to train claim.  *Shields*, 2016 WL 4581327, at *9 n. 11
(quoting *Spell*, 824 F.2d at 1390) (It is not sufficient to allege a "general laxness or
ineffectiveness" to state a failure to train claim.).

The factual allegations in the amended complaint are also not sufficient to show that the
alleged deficiencies in the BPD's vehicle pursuit training amount to deliberate indifference to the
rights of persons with whom the police come into contact.  *Harris*, 489 U.S. at 388.  To show
deliberate indifference, Plaintiffs allege that the BPD was on actual notice of its failure to train
with regards to the vehicle pursuit policy, because of the existence of four prior lawsuits
involving injuries arising from vehicle pursuits that were filed against the BPD and ultimately
settled.  ECF No. 57 at ¶¶ 48-50.  But, as this Court previously observed, these four cases are not
sufficient to establish notice of the alleged misconduct regarding the vehicle pursuit policy at
issue in this case.  ECF No. 40 at 23-24.

Notably, it is undisputed that the four cases relied upon by the Plaintiffs pre-date the
vehicle pursuit policy that is at issue in this case.  *See* ECF No. 57 at ¶¶ 48-50.  The amended
complaint also does not contain any factual allegations to show that there was a pattern of
constitutional violations like the violations alleged in this case involving vehicle pursuits
conducted by untrained, or improperly trained BPD officers.  *See Connick v. Thompson*, 563

U.S. 51, 61-62 (2011).[2]

Because the amended complaint lacks facts to show that the BPD's vehicle pursuit policy is deficient in a specific way, or that the BPD was deliberately indifferent to the rights of persons with whom the police come into contact with regards to this policy, Plaintiffs fail to state a plausible failure to train claim. And so, the Court must DISMISS Count II of the amended complaint to the extent that it assets a *Monell* claim based upon a failure to train or supervise.

### 2. Plaintiffs Fail To State A *Monell C*laim Based Upon Condonation

Plaintiffs' *Monell* claim based upon a condonation theory is also problematic. A municipality may be liable under a condonation theory only if policymakers fail "to put a stop to or correct a widespread pattern of unconstitutional conduct." *Owens*, 767 F.3d at 402 (quoting *Spell*, 767 F.3d at 1389). And so, to survive a motion to dismiss, Plaintiffs must support their condonation claim with facts which, if true, would entitle them to relief. *Id.* (quoting *Iqbal*, 556 U.S. at 678).

In this regard, the Supreme Court has held that, when a plaintiff seeks to establish a policy or custom based on such "persistent or widespread practices," the Court must "rigorously test the chain of causation." *See Connick*, 563 U.S. at 75; *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 415, (1997). And so, the Fourth Circuit has set forth the following analysis for considering a *Monell* claim based upon a condonation theory:

> We have recognized that, in appropriate circumstances, § 1983 liability may attach to a municipality for the misconduct of its police force. If a police force develops an unconstitutional custom or usage, *i.e.*, a widespread practice of a particular unconstitutional method, such custom or usage may be the basis for municipal liability, but only if its continued existence can be laid to the fault of municipal policy-makers, and a sufficient casual connection between the municipal custom and usage and the specific violation can then be established. In order for liability to attach, (1) the municipality must have actual or constructive knowledge of the custom and usage by its responsible policy makers, and (2) there must be a failure by those policy makers, as a matter of specific intent or deliberate indifference,

---

[2] While not dispositive of this issue, there is also no dispute in this case that the BPD has been subject to the provisions of a Consent Decree since 2017, and that the BPD's vehicle pursuit policy has been reviewed and enacted as a result of a collaborative process between the United States Department of Justice, the Monitoring Team, and the BPD. *See United States v. Baltimore Police Dep't*, 282 F. Supp. 3d 897, 898 (D. Md. 2017).

to correct or terminate the improper custom or usage.

*Randall*, 302 F.3d at 210 (internal citations and quotations omitted).

In this case, Plaintiffs have not alleged any facts to show either notice of, or deliberate indifference to, the alleged unconstitutional conduct related to the BPD's vehicle pursuit policy, or the custom or practice related to vehicle pursuits, to support their condonation claim. *Id.* As discussed above, Plaintiffs point to four cases that the BPD previously settled, which involve serious injuries to citizens in connection with vehicle pursuits, to show that the BPD had notice of, or was deliberately indifferent to, unconstitutional conduct involving police vehicle pursuits. But, as also discussed above, these cases predate the adoption of the vehicle pursuit policy that is at issue in this case. ECF No. 57 at ¶¶ 48-50.

While Plaintiffs generally allege that the BPD was aware of the persistent and pervasive pattern and practice of its officers in disregarding the BPD's vehicle pursuit policy, there are no factual allegations in the amended complaint to show that the BPD knew about and disregarded constitutional violations that are similar to the violations alleged in this case. *See generally*, ECF No. 57. Given this, Plaintiffs have not alleged facts to show that the BPD's decisions with regards to the training on, and implementation of, its vehicle pursuit policy reflect deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow such decisions. And so, the Court must also DISMISS Plaintiffs' *Monell* claim based upon a condonation theory.

**D.    Plaintiffs Fail To State Plausible Substantive
        Due Process Violation Claims Against The Defendant Officers**

A careful reading of the amended complaint also makes clear that Plaintiffs fail to state plausible substantive due process violation claims under Section 1983 and Article 24 against the Defendant Officers, because they do not allege any facts to show a causal connection between the Defendant Officers' alleged conduct and their harm.

To state a claim under Section 1983, Plaintiffs must allege that: (1) a right conferred by the Constitution or the laws of the United States was violated and (2) the alleged violation was committed by a person acting under the color of state law. *See* 42 U.S.C. § 1983; *West v. Atkins*, 487 U.S. 42, 48 (1988). Relevant to this dispute, Section 1983 imposes personal liability on

anyone who causes a constitutional deprivation while acting under color of state law. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("On the merits, to establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right.") (emphasis in original). To establish causation of a constitutional deprivation, Plaintiffs must show an "affirmative causal link" between the Defendants' constitutional violation and the harm suffered by the Plaintiffs. *See Shaw*, 13 F.3d at 799 (citing *Slakan*, 737 F.2d at 376). And so, "the causal link in § 1983 cases is analogous to proximate cause," meaning that a defendant is liable for the "natural [and foreseeable] consequences of his actions." *Id.* (citing *Slakan*, 737 F.2d at 376).

As the Defendant Officers persuasively argue in their dispositive motion, Plaintiffs have not sufficiently alleged a substantive due process violation claim under Section 1983, because Plaintiffs do not allege facts to show a causal connection between any of the officers' alleged misconduct and Plaintiffs' harm. In the amended complaint, Plaintiffs allege that the harms resulting from the Defendant Officers' alleged unconstitutional conduct are the injuries suffered by Mr. Tyson, the death of Mr. Gore, and the subsequent impact of these harms on the Plaintiffs. *See generally*, ECF No. 57. There is no dispute that this tragic incident occurred when the vehicle that Ms. Dello-Stritto was operating hit Mr. Gore's vehicle. But, Plaintiffs maintain that Mr. Gore's death and Mr. Tyson's injuries were the direct result of the Defendant Officers' misconduct, the BPD's vehicle pursuit policy, and the BPD's failure to train and supervise its officers with regards to vehicle pursuits. *See id.*

To support their claim, Plaintiffs allege the following facts to show that the Defendant Officers caused their harm:

- "Dello-Stritto, as she had done multiple times before, did not stop at a busy traffic signal that intersected with Liberty Heights and went around vehicles that were stopped at the traffic signal." *Id.* at ¶ 86.

- "At the intersection of Liberty Heights and Callaway Avenue, the Ford Fusion ran a red light and t-boned Decedent Gore's car on the passenger side, causing it to spin several times and then hit another car that was in the intersection." *Id.* at ¶ 87.

- "The BCPD and its officers created the threat to the citizens when they engaged in the pursuit and continued to pursue, with conscience shocking deliberate indifference and reckless disregard for the rights of innocent citizens." *Id.* at ¶ 88.

25

- "The conduct of Defendants was without legal justification and was improperly motived by ill will and actual malice. Defendants, with ample time to deliberate, recklessly and intentionally engaged in a high-speed, high-risk pursuit with the intent to harm, thus causing a vehicle to hit Decedent Gore's vehicle, killing him and severely injuring Plaintiff Tyson." *Id.* at ¶¶ 111, 146 (same).

- "They knew they were placing the lives of innocent drivers and/or bystanders in danger when they engaged a driver in a highspeed, high-risk pursuit with an emergency vehicle, causing the operator of the Ford Fusion to drive dangerously and recklessly, ultimately leading to Decedent Gore's death and Plaintiff Tyson's injuries." *Id.* at ¶¶ 113, 148 (same).

Plaintiffs also allege that Sergeant Conley and Officers Schreven, Camarote, Torres, Gray, Franks, Gurbelski, Cocoran, Kellog, Familia and Laporta each operated police cruisers that pursued Ms. Dello-Stritto, who ran a red light and ultimately struck Decedent Gore's vehicle. *Id.* at ¶¶ 13-15, 17-20, 22-25. In addition, Plaintiffs further allege that Officer Wood was a passenger in a police cruiser that pursued the operator of a vehicle that ran a red light and ultimately struck Mr. Gore's vehicle and that Officer Bilheimer was the operator of a camera that recorded the pursuit from a police helicopter. *Id.* at ¶¶ 16, 21.

Taken as true, these allegations do not show that the Defendant Officers caused either the injuries to Mr. Tyson or the death of Mr. Gore. While Plaintiffs generally criticize the Defendant Officers for engaging in a high-speed vehicle pursuit of the stolen vehicle that Ms. Dello-Stritto was operating, there are no factual allegations in the amended complaint to show how each individual officer caused her vehicle to hit Mr. Gore's vehicle, or caused Plaintiffs' harm. *See generally*, ECF No. 57. In fact, the amended complaint lacks any facts to connect the Defendant Officers' actions to the harm to the Plaintiffs, *i.e.*, the death of Mr. Gore and the injury of Mr. Tyson. *Id.*

For example, there are no facts in the amended complaint to show that the natural and foreseeable consequences of the Defendant Officers' alleged conduct was the accident that resulted in the injuries to Mr. Tyson and the death of Mr. Gore. *See Shaw*, 13 F.3d at 799 (citing *Slakan*, 737 F.2d at 376). Rather, as the amended complaint makes clear, it was Ms. Dello-Stritto's vehicle that hit Mr. Gore's vehicle, resulting in his death and the injury of Mr. Tyson. *See* ECF No. 57 at ¶¶ 111, 113, 146, 148.

While Plaintiffs argue that the Defendant Officers should not have engaged in this vehicle pursuit, and correctly observe that Ms. Dello-Stritto ran several red-lights during the pursuit, they do not point to any evidence to show that the action of the Defendant Officers caused Ms. Dello-Stritto's vehicle to strike Mr. Gore's vehicle, or that the accident was a reasonably foreseeable consequence of their actions. *See id.*; ECF No. 69 at 31-33. And so, without more, the Court agrees with the Defendant Officers that the factual allegations in the amended complaint are not sufficient to show an "affirmative causal link" between the Defendant Officers' alleged constitutional violation and the harm suffered by Plaintiffs. *Shaw*, 13 F.3d at 799 (citing *Slakan*, 737 F.2d at 376).

The Court is also not persuaded by Plaintiffs' argument that summary judgment on their Section 1983 claims is not warranted, because causation is a question for the jury. ECF No. 69 at 31-32. To establish their substantive due process violation claims under Section 1983, Plaintiffs must show a causal connection between the Defendant Officers' alleged misconduct and their harm. *Shaw*, 13 F.3d at 799 (citing *Slakan*, 737 F.2d at 376). To be clear, Plaintiffs need not *prove* their case at the summary judgment stage. But, they must at least allege facts and point to evidence to support their claim that the conduct of each of the Defendant Officers caused their harm. Plaintiffs simply fail to do so here. And so, the Court GRANTS the Defendant Officers' motion to dismiss, or in the alternative, for summary judgment, on Plaintiffs' substantive due process violation claims and DISMISSES Counts I and III of the amended complaint.

### E.   The Undisputed Material Facts Also Show That The Defendant Officers Did Not Violated Plaintiffs' Constitutional Rights

Even if the Court were to accept that Plaintiffs state plausible substantive due process violation claims against the Defendant Officers, the undisputed material facts in this case, nonetheless, make clear that Plaintiffs cannot prevail on these claims. The unrebutted evidence before the Court shows that the conduct of the Defendant Officers does not "shock the conscience," so as to give rise to a substantive due process violation. And so, the Defendant Officers are also entitled to summary judgment on these claims.

This Court has held that, when a plaintiff alleges unconstitutional action by the executive branch of government, only official conduct that "shocks the conscience" will give rise to a

substantive due process violation.  *Johnson*, 452 F. Supp. 3d at 300–04 (citing *Lewis*, 523 U.S. at 846-47).  As this Court has also observed, the Supreme Court made clear in *Cnty. of Sacramento v. Lewis* that "'high-speed chases with no intent to harm suspects physically or to worsen their legal plight,' ordinarily, do not 'shock the conscience.'"  *Id.* at 301 (citing *Lewis*, 523 U.S. at 854).  Rather, the "shocks the conscience" standard is met where conduct is "intended to injure" and is "unjustifiable by any government interest."  *Lewis*, 523 U.S. at 848; *see also Johnson*, 452 F. Supp. 3d at 301 (citing *Lewis*, 523 U.S. at 854 n. 13) (explaining that "there may be a different result if 'a citizen suffers or is seriously threatened with physical injury due to a police officer's intentional misuse of his vehicle.'").  And so, absent evidence that the Defendant Officers intentionally misused their vehicles during the vehicle pursuit, or otherwise engaged in conduct showing an intent to harm unrelated to the arrest of the suspect, their conduct during the vehicle pursuit would not shock the conscience and give rise to a substantive due process violation.

The undisputed material facts in this case show that the vehicle pursuit did not "shock the conscience," so as to give rise to a substantive due process violation for several reasons.  First, the unrebutted evidence shows that the Defendant Officers' decision to initiate this vehicle pursuit was legally justified and was not made with an intent to harm unrelated to the legitimate object of arrest.  *Lewis*, 523 U.S. at 854.  As the deposition testimony of the Defendant Officers shows, and the Foxtrot Video footage of the March 20, 2021, Incident confirms, before deciding to initiate the vehicle pursuit, the Defendant Officers observed Ms. Dello-Stritto ignore their commands, avoid a vehicle box-in by backing up, pulling forward and striking Officer Gray's police vehicle, and then flee the gas station parking lot before deciding to conduct the vehicle pursuit.  ECF No. 67-4, Foxtrot Video at 01:46; ECF No. 67-7, Franks Dep. at 54:8-55:16, 59:11-22, 62:15-63:13; ECF No. 67-12, Schreven Dep. at 47:12- 49:8; ECF No. 67-9, Conley Dep. at 123:22-124:20.  ECF No. 67-1 at 25-26.[3]  Plaintiffs do not dispute any of these facts.

---

[3] Plaintiffs argue that the Defendant Officers' conduct in engaging in the pursuit violated Policy 1503, because the Defendant Officers did not deliberate first and they pursued Ms. Dello-Stritto for damage to property or a misdemeanor.  ECF No. 69 at 26.  But, the undisputed material facts in this case show that the Defendant Officers pursued Ms. Dello-Stritto, because they believed she had committed felony assault on a police officer.  In this regard, Sergeant Conley testified during his deposition that he made the decision to pursue Ms. Dello-Stritto as she fled, because he believed that a felony assault on a police officer had just been committed.  ECF No. 67-9, Conley Dep. at 55:8-21, 123:22-124:20; *see also* ECF No. 67-10, Tucker Dep. at 70:6-71:20.

*See generally*, ECF No. 69.

It is also undisputed that, when Officer Gray's police vehicle was struck by Ms. Dello-Stritto, Officer Gray was sitting inside the vehicle. ECF No. 67-4, Foxtrot Video at 01:46; ECF No. 67-7, Franks Dep. at 54:18-22, 59:18-22; ECF No. 67-8, Gray Dep. at 30:18-31:11. In this regard, the evidence shows that, after Ms. Dello-Stritto struck Officer Gray's police vehicle, Officer Gray radioed "she just hit me," and Officer Gray confirmed that it was his police vehicle that had been struck. *See* ECF No. 57 at ¶ 62; ECF No. 67-8, Gray Dep. at 30:18-31:11; *see also* ECF No. 69 at 8.

The Foxtrot video of the March 20, 2021, Incident also shows that, before the vehicle pursuit began: (1) Officer Bilheimer radioed that the stolen vehicle was trying to escape the car stop and said, "it's moving like it's trying to get out;" (2) Officer Gray radioed "she just hit 21, she just hit me;" and (3) Lieutenant Tucker subsequently asked, "she hit your vehicle" to which Gray responded "10-4." *See* ECF No. 67-4, Foxtrot Video at 01:55-15:56; *see also* ECF No. 67-7, Franks Dep. at 10:9-14; ECF No. 67-8, Gray Dep. at 30:18-31:11; ECF No. 67-9, Conley Dep. at 50:12-51:2; ECF No. 67-10, Tucker Dep. at 74:12-75:7; ECF No. 67-11, Bilheimer Dep. at 61:8-163:8; ECF No. 67-12, Schreven Dep at 47:12-49:8; ECF No. 69 at 8. Given this, the evidence, which is undisputed, shows that the Defendant Officers believed Ms. Dello-Stritto had committed a felony assault against a police officer when they decided to initiate the vehicle pursuit. And so, the undisputed material facts show that the Defendant Officers' decision to conduct the vehicle pursuit was legally justified.

The undisputed material facts also show that the Defendant Officers' conduct during the vehicle pursuit did not "shock the conscience." *Lewis*, 523 U.S. at 846-47. It is undisputed that a BPD Foxtrot helicopter monitored the vehicle pursuit and the location of Ms. Dello-Stritto's vehicle throughout the duration of the vehicle pursuit and that the Defendant Officers' were aware that this information and guidance would be provided to them when they commenced the vehicle pursuit. *See* ECF No. 67-4, Foxtrot Video at 01:55-15:56; *see also* ECF No. 57 at ¶ 70. It is also undisputed that the Foxtrot helicopter provided the Defendant Officers with contemporaneous information about the location of Ms. Dello-Stritto's vehicle and traffic conditions observed in the vicinity of the vehicle. *See* ECF No. 67-4, Foxtrot Video at 01:55-15:56.

29

The Defendant Officers were also communicating with each other about the status of the vehicle pursuit over the radio. *See id.*  For example, the Foxtrot video shows that: (1) Officer Bilheimer provided descriptions of the stolen vehicle, constant updates on its location, and asked dispatch to notify the other districts of its location during the entirety of the vehicle pursuit and (2) Sergeant Conley radioed that he was behind the suspect after she fled the parking lot and that Foxtrot had the "eyeball."  *See* ECF No. 67-4, Foxtrot Video at 01:55-15:56; *see also* ECF No. 67-7, Franks Dep. at 10:9-14; ECF No. 67-8, Gray Dep. at 30:18-31:11; ECF No. 67-9, Conley Dep. at 50:12-51:2; ECF No. 67-10, Tucker Dep. at 74:12-75:7; ECF No. 67-11, Bilheimer Dep. at 61:8-163:8; ECF No. 67-12, Schreven Dep at 47:12-49:8; ECF No. 69 at 8.  These communications show that the Defendant Officers took steps to promptly and safely track and apprehend Ms. Dello-Stritto.

The evidence also makes clear that the Defendant Officers took steps to ensure they were aware of traffic conditions and to mitigate any dangers posed by the vehicle pursuit.  In this regard, the unrebutted evidence also shows that Officers Conley and Tucker instructed the other Defendant Officers to exercise caution during the vehicle pursuit.  The Foxtrot video shows that: (1) Sergeant Conley radioed "everyone watch your cross streets, Fox has got it, everyone just watch your cross streets, alright,. . . we're good;" (2) Lieutenant Tucker radioed "just follow safely, do not cut off the intersections please;" and (3) Lieutenant Tucker radioed "remember watch your side streets everybody, let Fox keep spotting until she stops."  ECF No. 67-4, Foxtrot Video at 01:55-15:56; *see also* ECF No. 67-7, Franks Dep. at 09:2-4;  ECF No. 67-10, Tucker Dep. at 74:12-75:7); ECF No. 67-12, Schreven Dep. at 47:12-49:8.  At the conclusion of the vehicle pursuit,  Officers Tucker and Conley are also heard on the Foxtrot video discussing the pursuit and how Officer Conley felt it was under control and that "they [were] not going at a high speed" and "everything was calm."  *See* ECF No. 67-10, Tucker Dep. at 94:1-95:6.

Again, Plaintiffs do not dispute this evidence.  *See generally*, ECF No. 69.  Indeed, while Plaintiffs correctly observe that the vehicle pursuit traveled through areas where civilians were located, passing three schools and one hospital and lasted approximately 14 minutes, these facts, without more, do not show that the Defendant Officers intentionally misused their vehicles, or engaged in conduct showing an intent to harm.

The evidence that Plaintiffs rely upon to show that the Defendant Officers violated their constitutional rights after the vehicle pursuit concluded also fails to establish conduct that would "shock the conscience." Plaintiffs allege, among other things, that Lieutenant Tucker: (1) did not follow up with the officers who participated in the pursuit for a "debriefing" and (2) that she did not "make any formal inquiries as to whether the Policy [1503] had been violated," in the weeks following the accident. *Id.* at ¶¶ 97, 101. Plaintiffs similarly allege that Sergeant Conley: (1) did not follow up with the officers who participated in the pursuit for a "debriefing" and (2) that he did not "make any formal inquiries as to whether the Policy [1503] had been violated," in the weeks following the accident. *Id.* But, even if true, Plaintiffs do not explain how this conduct caused the injuries that resulted from the March 20, 2021, Incident. Nor do Plaintiffs explain how this alleged conduct shows an intent to harm the Plaintiffs.

Indeed, at bottom, the factual record before the Court simply does not support Plaintiffs' claim that the Defendant Officers "intended to injure" Plaintiffs and that the officers' actions were "unjustifiable by any government interest," so as to give rise to a substantive due process violation. *Lewis*, 523 U.S. at 848.[4] And so, the Court will GRANT the Defendant Officers' motion for summary judgment on Counts I and III of the amended complaint. Fed. R. Civ. P. 56.

### F.        Plaintiffs Fail To State A Gross Negligence Claim

A careful reading of the amended complaint also makes clear that Plaintiffs fail to state a viable gross negligence claim in this matter. To prevail on their gross negligence claim, Plaintiffs must prove, among other things, that the Defendant Officers' gross "negligence was both a cause in fact of the injury and a legally cognizable cause." *Pasternak & Fidis, P.C. v. Recall Total Information Management, Inc.*, 95 F. Supp. 3d 886, 895 (D. Md. 2015) (citing *Swedish Civil Aviation Admin. v. Project Mgmt. Enters.*, 190 F. Supp. 2d 785, 803 (D. Md. 2002)) (internal citations and quotations omitted). To determine whether such causation-in-fact exists, Maryland courts apply the substantial factor test in situations, like here, "where more than one independent negligent act may be responsible for a plaintiff's injury." *Id.* (internal citations and quotations omitted). And so, "[u]nder the substantial factor test, an action is viewed as the

---

[4] Because Plaintiffs cannot establish that the Defendant Officers violated their constitutional rights, the Court does not consider whether the Defendant Officers are entitled to qualified immunity.

cause of an injury only if the action was a substantial factor in bringing about plaintiff's injury." *Id.* (internal citations and quotations omitted).

In this case, there are no facts in the amended complaint to show that any of the Defendant Officers conducted themselves with reckless disregard of the consequences to affect the life or property of Plaintiffs during the vehicle pursuit. ECF No. 57 at ¶¶ 151-59. As discussed above, the evidence shows that the Defendant Officers' decision to initiate the vehicle pursuit was legally justified. ECF No. 67-4, Foxtrot Video at 01:46; ECF No. 67-7, Franks Dep. at 54:8-55:16, 59:11-22, 62:15-63:13; ECF No. 67-12, Schreven Dep. at 47:12- 49:8; ECF No. 67-9, Conley Dep. at 123:22-124:20. ECF No. 67-1 at 25-26.

The undisputed material facts also show that the vehicle pursuit was not reckless, because a BPD helicopter and BPD supervisors were providing information about the location of Ms. Dello-Stritto's vehicle and the need to ensure safety to the BPD officers engaged in the vehicle pursuit. ECF No. 67-4, Foxtrot Video at 01:55-15:56. ECF No. 67-4, Foxtrot Video at 01:55-15:56; *see also* ECF No. 67-7, Franks Dep. at 09:2-4; ECF No. 67-10, Tucker Dep. at 74:12-75:7); ECF No. 67-12, Schreven Dep at 47:12-49:8.

Given this, the evidence before the Court does not establish that the Defendant Officers acted with reckless disregard of the consequences as affecting the life or property of Plaintiffs with regards to the vehicle pursuit. And so, the Court must also DISMISS Plaintiffs' gross negligence claim in Count IV of the amended complaint.

### G.    Plaintiffs Cannot Prevail On Their Wrongful Death And Survival Claims

Plaintiffs also have not alleged sufficient facts to prevail on their wrongful death and survival claims, because they do not allege facts to show a wrongful act on the part of the Defendants. For a beneficiary to maintain a wrongful death action under Maryland law, there must have been a "[w]rongful act," which is defined as "an act, neglect, or default including a felonious act which would have entitled the party injured to maintain an action and recover damages if death had not ensued." Md. Code, Cts. & Jud. Proc. § 3-901(e).

In Counts V and VI of the amended complaint, Plaintiff Simmons asserts claims for wrongful death and survival action against the Defendants. ECF No. 57 at ¶¶ 163-69. In Count X, the Estate of Darius Gore asserts a survival action against the Defendant Officers. *Id.* at ¶¶

170-75.  But, as discussed above, the undisputed material facts show that the Defendant Officers did not engage in any wrongful acts, because the unrebutted evidence shows that the Defendant Officers did not cause Mr. Tyson's injuries or Mr. Gore's death, and that their conduct in pursuing Ms. Dello-Stritto did not shock the conscience.  Given this, the undisputed material facts fail to show any "an act, neglect, or default including a felonious act which would have entitled [Plaintiffs] to maintain an action and recover damages if death had not ensued."  Md. Code, Cts. & Jud. Proc. § 3-901(e).  And so, the Court DISMISSES Counts V, VI and X of the amended complaint.

### H.     Plaintiffs' Indemnification Claim Is Not Ripe

As a final matter, there can be no genuine dispute in this case that Plaintiffs' indemnification claim against the BPD, set forth in Count VII of the amended complaint, is not ripe for judicial review.  Plaintiffs may pursue their indemnification claim against BPD if (1) they successfully prove that the Defendant Officers committed the underlying torts alleged in this matter and they obtain a judgment, and (2) this Court finds that the Defendant Officers acted within the scope of their employment.  *Grim v. Baltimore Police Dep't.*, 2019 WL 5865561, at * 27 (D. Md. Nov. 8. 2019); *see also Johnson v. Baltimore Police Dep't*, 2020 WL 1169739, at *38 (D. Md. Mar. 10, 2020).  In this regard, Maryland's Local Government Tort Claims Act (the "LGTCA") provides that the BPD is liable for any judgments against its employees for damages resulting from tortious acts or omissions committed by the employees within the scope of employment with the local government.  *Grim*, 2019 WL 5865561, at *27.  And so, a judgment against the Defendant Officers is a precondition to Plaintiffs recovering against the BPD under the LGTCA.  *Johnson*, 2020 WL 1169739, at *38.

In this case, it is undisputed that, presently, there is no judgment against the Defendant Officers and there has been no finding of liability with regards to these officers.  *See* ECF No. 40; *see generally*, docket.  For this reason, Plaintiffs' indemnification claim against the BPD is not ripe for judicial review.  Because the Court has determined that it must dismiss the Section 1983 and state law claims asserted against the Defendant Officers in this matter, the Court must also DISMISS Plaintiffs' indemnification claim against the BPD.

### V.     CONCLUSION

In sum, a careful reading of the amended complaint shows that Plaintiffs fail to state a

plausible claim for supervisory liability against Major Callaghan, and that their other claims against Major Callaghan fail as a matter of law. Plaintiffs also fail to state plausible *Monell* claims against the BPD.

In addition, a careful review of the amended complaint shows that Plaintiffs fail to state substantive due process violation claims against the Defendant Officers and that the Defendant Officers did not violate Plaintiffs' constitutional rights. Plaintiffs also fail to state a gross negligence claim against the Defendant Officers and they cannot prevail on their wrongful death and survival claims against the Defendant Officers. Lastly, Plaintiffs indemnification claim is not ripe for judicial review.

While there can be no question that the injuries sustained by the Plaintiffs are the result of a very tragic accident that occurred on March 21, 2020, the unrebutted evidence before the Court fails to show that Plaintiffs' harm was caused by the Defendant Officers, or the training related to the BPD's vehicle pursuit policy. Given this, Plaintiffs cannot prevail on their claims in this matter as a matter of law.

And so, for the forgoing reasons, the Court:

1. **GRANTS-in-PART** the BPD and Major Callaghan's motion to dismiss;
2. **GRANTS-in-PART** the Defendant Officers' motion to dismiss, or, alternatively, for summary judgment; and
3. **DISMISSES** the amended complaint.

A separate Order shall issue.

s/Lydia Kay Griggsby
LYDIA KAY GRIGGSBY
United States District Judge